JOHN T. JASNOCH (CA 281605)
HAL CUNNINGHAM (CA 243048)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Tel.: (619) 233-4565
jjasnoch@scott-scott.com
hcunningham@scott-scott.com

*Counsel for Plaintiff James Douvia and the Proposed Class*

[Additional counsel on signature page.]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JAMES DOUVIA, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>         v.<br><br>ON24, INC., SHARAT SHARAN, STEVEN VATTUONE, IRWIN FEDERMAN, DENISE PERSSON, HOLGER STAUDE, DOMINIQUE TREMPONT, BARRY ZWARENSTEIN, GOLDMAN SACHS & CO. LLC, J.P. MORGAN SECURITIES LLC, KEYBANC CAPITAL MARKETS INC., ROBERT W. BAIRD & CO. INCORPORATED, CANACCORD GENUITY LLC, NEEDHAM & COMPANY, LLC, PIPER SANDLER & CO., and WILLIAM BLAIR & COMPANY, L.L.C.,<br><br>                    Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff James Douvia ("Plaintiff") makes the following allegations, individually and on behalf of all others similarly situated, by and through Plaintiff's counsel, upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included, among other things, review and analysis of: (i) regulatory filings made by ON24, Inc. ("ON24" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by and disseminated by the Company; and (iii) analyst reports, media reports, and other publicly disclosed reports and information about the Company.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE AND SUMMARY OF THE ACTION

1.      Plaintiff brings this federal class action under §§11, 12, and 15 of the Securities Act of 1933 ("Securities Act") against (i) ON24, Inc. ("ON24" or the "Company"), (ii) certain of the Company's senior executives and directors who signed the Registration Statement, effective February 2, 2021, issued in connection with the Company's initial public offering (the "IPO" or the "Offering"), and the underwriters of the Offering.  Plaintiff alleges that the Registration Statement and Prospectus (filed with the SEC on January 8, 2021 and February 4, 2021, respectively), including all amendments thereto, contained materially incorrect or misleading statements and/or omitted material information that was required by law to be disclosed. Defendants are each strictly liable for such misstatements and omissions therefrom (subject only to their ability to establish a "due diligence" affirmative defense) and as so liable in their capacities as signers of the Registration Statement and/or as an issuer, statutory seller, and/or offeror of the shares sold pursuant to the Offering.

2.      ON24 purports to be a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinar experiences, virtual event experiences, and multimedia content experiences.  From January 1, 2020 through September 30, 2020, ON24's platform powered more than 159,000 interactive, live digital experiences, engaged an average of four million prospective customers and business professionals

CLASS ACTION COMPLAINT

monthly, representing an increase of 174% year-over-year, and facilitated a monthly average of 12 million prospective customer interactions in the same time period, representing an annual run rate of 2.45 billion engagement minutes for an increase of 167% year-over-year.  As of September 30, 2020, ON24 had over 1,900 customers in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies, and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue.

3.      On or about February 3, 2021, ON24 conducted its IPO, offering 8,560,930 shares of its common stock to the public at a price of $50 per share (the "Offering Price") for anticipated proceeds of approximately $428,046,500.

4.      According to the Offering Documents, ON24's cloud-based platform, developed to enable "***enterprise-grade***" scalability, affords customers, namely large enterprise customers ("$100K Customers"), representing a "substantial portion of [ON24's] business," the ability to make privacy and compliance choices that align to their needs as well as integrations with a broad ecosystem to third-party applications.  As of December 31, 2019, ON24 had 1,401 customers, of which, 144 were $100k Customers.  As of September 30, 2020, ON24 had 1,918 customers, of which, 271 were $100k Customers.  This increase resulted in ON24 "experience[ing] significant revenue growth during 2020," and was driven by "increase[ed] demand for [ON24's] platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures." ON24's effort to acquire new customers and "retain and expand" the use of ON24's solutions "across [its] existing customer" base, were both also credited for driving the Company's growth.

5.      Unbeknownst to investors, however, the Offering Documents representations were materially inaccurate, misleading, and/or incomplete because they failed to disclose, *inter alia*, that the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts.

6.      As these true facts emerged after the Offering, the Company's shares fell sharply. By the commencement of this action, ON24's shares traded as low as $18.66 per share, a decline of nearly 63% from the Offering Price.

7.      By this action, Plaintiff, on behalf of himself and other members of the Class (defined below) who also acquired ON24's shares pursuant and traceable to the Offering, now seeks to obtain a recovery for the damages suffered as a result of Defendants' violations of the Securities Act, as alleged herein.

8.      The claims asserted herein are purely strict liability and negligence claims.  Plaintiff expressly eschews any allegation sounding in fraud.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§11, 12(a)(2), and 15 of the Securities Act, 15 U.S.C. §§77k, 77*l*(a)(2), and 77o, respectively.

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and §22 of the Securities Act, 15 U.S.C. §77v.

11.      Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because the acts and transactions giving rise to the violations of law complained of occurred, in part, in this District, including the dissemination of false and misleading statements into this District, certain Defendants reside and/or transact business in this District, and the Company maintains its corporate headquarters in this District.

12.      In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

13.      **Divisional Assignment**: This action should be assigned to the San Francisco Division of this Court, as the Company is headquartered in San Francisco County, California, under Local Rule 3-2(d).

## PARTIES

### A.     Plaintiff

14.     Plaintiff, as set forth in his accompanying certification, purchased shares of the Company's common stock that were issued pursuant and traceable to the Registration Statement and Offering, and was damaged thereby.

### B.     Defendants

#### 1.     The Company

15.     Defendant ON24 is a San Francisco, California-based company that provides a cloud-based hybrid engagement platform to enterprise and other customers.  Incorporated under the laws of the state of Delaware, ON24 maintains its principle executive offices at 50 Beale Street, 8th Floor, San Francisco, CA 94105.  ON24's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "ONTF."

#### 2.     The Individual Defendants

16.     Defendant Sharat Sharan ("Sharan") is, and was at all relevant times, President and Chief Executive Officer ("CEO"), and a director on the Board of Directors ("Board"), of ON24. Defendant Sharan co-founded ON24 in 1998.  Defendant Sharan reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

17.     Defendant Steven Vattuone ("Vattuone") is, and was at all relevant times, Chief Financial Officer ("CFO") of ON24.  Defendant Vattuone reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

18.     Defendant Irwin Federman ("Federman") is, and was at all relevant times, a director on the Board.  Defendant Federman reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

19.     Defendant Denise Persson ("Persson") is, and was at all relevant times, a director on the Board.  Defendant Persson reviewed, approved, and participated in making statements in the Offering Documents, which she signed.

20. Defendant Holger Staude ("Staude") is, and was at all relevant times, a director on the Board. Defendant Staude reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

21. Defendant Dominique Trempont ("Trempont") is, and was at all relevant times, a director on the Board. Defendant Trempont reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

22. Defendant Barry Zwarenstein ("Zwarenstein") is, and was at all relevant times, a director on the Board. Defendant Zwarenstein reviewed, approved, and participated in making statements in the Offering Documents, which he signed.

23. Defendants Sharan, Vattuone, Federman, Persson, Staude, Trempont, and Zwarenstein are collectively referred to herein as the "Individual Defendants."

### 3. The Underwriter Defendants

24. The Underwriter Defendants were also instrumental in soliciting investors and in making the ON24 shares that were offered and sold in or traceable to the IPO available to Plaintiff and the other members of the Class. The table below lists each of the Underwriter Defendants, together with the number of allotted shares that each sold in the IPO:

| Name | Number of Shares |
|------|------------------|
| Goldman Sachs & Co. LLC | 3,145,029 |
| J.P. Morgan Securities LLC | 2,714,204 |
| KeyBanc Capital Markets Inc. | 775,487 |
| Robert W. Baird & Co. Incorporated | 385,242 |
| Canaccord Genuity LLC | 385,242 |
| Needham & Company, LLC | 385,242 |
| Piper Sandler & Co. | 385,242 |
| William Blair & Company, L.L.C. | 385,242 |

25. Defendant Goldman Sachs & Co. LLC ("Goldman Sachs") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents. Goldman Sachs acted as a representative of all the underwriters. Goldman Sachs also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel,

among other expenses.  Goldman Sachs' participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Goldman Sachs conducts business in this District.

26.  Defendant J.P. Morgan Securities LLC ("J.P. Morgan") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  J.P. Morgan acted as a representative of all the underwriters.  J.P. Morgan also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  J.P. Morgan's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant J.P. Morgan conducts business in this District.

27.  Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  KeyBanc acted as a representative of all the underwriters.  KeyBanc also participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  KeyBanc's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant KeyBanc conducts business in this District.

28.  Defendant Robert W. Baird & Co. Incorporated ("Baird") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Baird participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Baird's participation in and its solicitation of offers in

connection with the IPO was motivated by its financial interests.  Defendant Baird conducts business in this District.

29.   Defendant Canaccord Genuity LLC ("Canaccord") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Canaccord participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Canaccord's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Canaccord conducts business in this District.

30.   Defendant Needham & Company, LLC ("Needham") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Needham participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Needham's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Needham conducts business in this District.

31.   Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents.  Piper Sandler participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses.  Piper Sandler's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests.  Defendant Piper Sandler conducts business in this District.

32.   Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter of the Company's IPO, serving as a financial advisor for and assisting in the preparation and

dissemination of the Company's material inaccurate, misleading, and incomplete Offering Documents. William Blair participated in conducting and promoting the roadshow for the IPO and paying for the expenses of the Individual Defendants who participated in the roadshow, including lodging and travel, among other expenses. William Blair's participation in and its solicitation of offers in connection with the IPO was motivated by its financial interests. Defendant William Blair conducts business in this District.

33. Defendants listed in ¶¶25-32 are collectively referred to herein as the "Underwriter Defendants."

34. Pursuant to the Securities Act, each Underwriter Defendant is liable for the materially inaccurate, misleading, and incomplete statements in the Offering Documents. In addition, although not an element of Plaintiff's claims and an issue on which each Underwriter Defendant bears the burden of proof to the extent it seeks to assert it as an affirmative defense, no Underwriter Defendant conducted an adequate due diligence investigation in connection with the matters alleged herein and will accordingly be unable to establish a statutory "due diligence" affirmative defense under the Securities Act. Each Underwriter Defendant committed acts and omissions that were a substantial factor leading to the harm complained of herein.

35. Each Underwriter Defendant named herein is an investment banking firm whose activities include, *inter alia*, the underwriting of public offerings of securities. As the underwriters of the IPO, the Underwriter Defendants earned lucrative underwriting fees.

36. As underwriters, the Underwriter Defendants met with potential investors in the IPO and presented highly favorable, but materially incorrect and/or materially misleading, information about the Company, its business, products, plans, and financial prospects, and/or omitted to disclose material information required to be disclosed under the federal securities laws and applicable regulations promulgated thereunder.

37. Representatives of the Underwriter Defendants also assisted ON24 and the Individual Defendants in planning the IPO. They further purported to conduct an adequate and reasonable investigation into the business, operations, products, and plans of the Company, an undertaking known as a "due diligence" investigation. During the course of their "due diligence,"

the Underwriter Defendants had continual access to confidential corporate information concerning the Company's business, financial condition, products, plans, and prospects.

38.     In addition to having access to internal corporate documents, the Underwriter Defendants and/or their agents, including their counsel, had access to ON24's management, directors, and lawyers to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which ON24's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about ON24 would be made in the Offering Materials; and (v) what responses would be made to the SEC in connection with its review of the Offering Materials.  As a result of those constant contacts and communications between the Underwriter Defendants' representatives and ON24's management, directors, and lawyers, at a minimum, the Underwriter Defendants should have known of ON24's undisclosed then-existing problems and plans and the Offering Document's materially inaccurate, misleading, and incomplete statements and omissions, as detailed herein.

39.     The Underwriter Defendants also demanded and obtained an agreement from ON24 under which ON24 agreed to indemnify and hold the Underwriter Defendants harmless from any liability under the Securities Act.

40.     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with the IPO, so that they, and the Individual Defendants, could offer to sell, and sell, ON24 shares to Plaintiff and other members of the Class pursuant (or traceable) to the Offering Documents.

## SUBSTANTIVE ALLEGATIONS

### A.     ON24's Initial Public Offering and False and/or Misleading Offering Documents

41.     On October 27, 2020, ON24 filed with the SEC a confidential draft registration statement on Form S-1, which would be used for the IPO following a series of amendments in response to SEC comments.  On January 25, 2021, ON24 filed its final amendment to the Registration Statement, which registered over nine million ON24 shares for public sale.  The SEC declared the Registration Statement effected on February 2, 2021.  On February 3, 2021, a year

1   after COVID emerged, Defendants priced the IPO at $50 per share and filed the final Prospectus

2   for the IPO, which forms part of the Registration Statement.

3        42.    The Offering Documents were negligently prepared and, as a result, contained

4   untrue statements of material facts or omitted to state other facts necessary to make the statements

5   made not misleading, and was not prepared in accordance with the rules and regulations governing

6   its preparation.

7        43.    According to the Offering Documents, in response to a shift in business-to-business

8   ("B2B") sales and marketing approaches (away from "cold-calling," "snail mail," industry

9   networking events and in-office visits to digital-based approaches), a shift that was accelerated by

10   the COVID-19 pandemic, ON24's "***leading cloud-based digital experience platform***," developed

11   to enable "***enterprise-grade***" scalability, supposedly afforded customers, namely large enterprise

12   customers ("$100K Customers"), representing a "substantial portion of [ON24's] business," the

13   ability to make privacy and compliance choices that align to their needs as well as integrations

14   with a broad ecosystem to third-party applications, as they look to convert engagement into

15   revenue through interactive webinar experiences, virtual event experiences, and multimedia

16   content.  From January 1, 2020 through September 30, 2020, during the height of COVID-19,

17   ON24 facilitated more than 159,000 interactive, live digital experiences, engaged an average of

18   four million prospective customers and business professionals monthly, representing ***an increase***

19   ***of 174%*** year-over-year, and enabled a monthly average of 12 million prospective customers to

20   interact with one another, representing an annual run rate of 2.45 billion engagement minutes,

21   representing ***an increase of 167%*** year-over-year.  [Emphasis added.]

22        44.    With its "***highly engaged and loyal customer base***," consisting of 1,900 customers

23   across more than 40 countries (as of September 30, 2020), including three of the five largest global

24   technology companies, four of the five largest U.S. banks, three of the five largest global healthcare

25   companies and three of the five largest global industrial and manufacturing companies, in each

26   case measured by 2019 revenue, ON24's revenue "***increased by 59%***" for the nine months ended

27   September 30, 2020 (as compared to the nine months ended September 30, 2019, "***due to the***

28   ***impact of COVID-19***."  ON24's dollar-based net retention rate, or NRR, also increased, measuring

147% (as of September 30, 2020), compared to 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.  The Offering Documents said ON24 expected its ARR to likely swell to between "$153.0 million and $153.4 million as of December 31, 2020 as compared to ARR of $76.9 million as of December 31 2019," primarily reflecting ON24's "***success in acquiring new customers and expanding subscriptions with existing customers***[,]" which were "***accelerated in 2020 partly in response to the COVID-19 pandemic***."  [Emphasis added.]

45.     COVID-19, and the resulting shift to off-site digital experiences, was thus a boon for ON24 — a fact the Offering Documents repeatedly acknowledged, stating for example, "we believe our opportunity to help businesses convert digital engagement into revenue ***will continue to grow*** as industries modernize their sales and marketing processes, ***which has been accelerated by the COVID-19 pandemic***."  The Offering Documents continued:

> The imperative to optimize digital sales and marketing investments to drive revenue conversion has become more important as businesses accelerate digital transformation initiatives in response to the COVID-19 pandemic.
>
> *       *       *
>
> The ability to engage with large numbers of prospective customers and customers cost-effectively is crucial.  ***As businesses broadly embrace digital transformation initiatives, they are standardizing on cloud-based platforms to transform their sales and marketing strategies***.  Increased focus on next-generation digital marketing solutions offers our customers an opportunity to drive personalized and interactive prospective customer engagement at scale by aggregating a significant amount of insights on prospective customers.  This enables businesses to optimize sales and marketing campaigns and drive revenue growth.  ***The impacts of the COVID-19 pandemic have accelerated the digital transformation plans of many businesses, especially with respect to sales and marketing.  According to McKinsey, 96% of B2B sales teams have fully or partially shifted their go-to-market model during the COVID-19 pandemic, and 65% of B2B decision makers believe the new model is just as effective as, or more effective than, their prior model.  Once adopted, we believe that most businesses will permanently utilize a digital-first sales and marketing strategy following the COVID-19 pandemic***, including by developing hybrid approaches to customer engagement through a combination of complementary in-person and digital experiences.

[Emphasis added.]

46.     The Offering Documents, however, were false and misleading and omitted to state that, ***at the time of the Offering***, the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts.

47.     Defendants were required to disclose this material information in the Offering Documents for at least three independent reasons.  First, SEC Regulation S-K, 17 C.F.R. §229.303 (Item 303), required disclosure of any known events or uncertainties that at the time of the Offering had caused, or were reasonably likely to cause, ON24's disclosed financial information not to be indicative of future operating results.  At the time of the Offering, ON24 knew of, or in the exercise of reasonable care should have known, that the surge in COVID-19 customers ON24 observed in the lead up to the IPO consisted of a significant number that did not fit ON24's conventional customer profile, with its platform far better suited to enterprises, and priced as such, and that, as a result, they were significantly less likely to renew their contracts.  These undisclosed negative events and trends were likely to (and in fact, did) materially and adversely affect ON24's financial state and rendered the disclosed results and trends in the Offering Documents misleading and not indicative of the Company's future operating results.

48.     Second, SEC Regulation S-K, 17 C.F.R. §229.105 (Item 105), required, in the "Risk Factor" section of the Offering Documents, a discussion of the most significant factors that make the offering risky or speculative, and that each risk factor adequately describe the risk. ON24's discussion of risk factors did not adequately describe the risk posed by the increase in number of customers that did not fit ON24's traditional customer profile and, as a result, were significantly less likely to renew their contracts, and the foreseeable negative impact such was already having (or would have) on ON24's business, nor the other already occurring negative results and trends, nor the likely and consequent materially adverse effects on the Company's future results, share price and prospects.

49.     Third, Defendants' failure to disclose the aforementioned material information rendered false and misleading the Offering Documents' many references to known risks that, "if" occurring "might" or "could" affect the Company, including the following:

> Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures.  As the impact of COVID-19 lessens, there **may** be reduced demand for our platform, and our revenue growth rate **may** decline.  **If** these new customers elect not to continue their subscription as the impact of COVID-19 lessens, our business, financial condition and results of operations **would be** harmed.
>
> *      *      *

> Our quarterly results of operations and financial condition *may* fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business.  For example, our revenue and revenue growth rate *may* decline in future periods compared to 2020 as the impact of COVID-19 lessens.  Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term.  *If* fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates *may* decrease.
>
> \*       \*       \*
>
> While some of our customers may consider our platform to be a cost-saving purchase by, among other things, decreasing the need for large, in-person events, others *may* view a subscription to our platform as a discretionary purchase, and such customers *may* reduce their discretionary spending on our platform during an economic downturn.  Particularly in light of COVID-19, some of our customers *may* experience reduced revenue and revised budgets, which *may* adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, and the value or duration of subscriptions, all of which *could* adversely affect our operating results.

[Emphasis added.].  In fact, these supposed contingent risks were already materializing at the time of the IPO.

**B.     Events and Disclosures Following the Offering**

50.     On August 10, 2021, after the markets closed and in connection with announcing the Company's second quarter 2021 financial results, On24 offered guidance for the remainder of the year.  Specifically, ON24 guided to revenue of no more than $48.5 million in Q3 and $204.5 million for fiscal year 2021, missing analyst consensus by $2.7 million and $4.5 million, respectively.

51.     During the Company's analyst call held that same day, Defendant Sharat admitted that ON24 "***experienced higher-than-expected churn and down-sell from customers [it] signed up in the second quarter of last year during the peak of COVID***."  He then added, "***this higher churn was primarily in the first-time renewal cohort***, customers who signed [] [one]-year contracts last year and who were up for renewal."  [Emphasis added.]

52.     Both analysts and the market responded immediately.  For example, on August 11, 2021, analysts at Defendant J.P. Morgan published a report in which they cut their rating to neutral (from Buy), assigned a new price target of $32 (down from $85) and noted that "***Management's previous guidance had not factored in enough churn from smaller accounts that had driven up***

professional services revenue," recognizing further that the churn and down-sell pressure observed was "primarily [due to] the first-time renewal cohort that represented ~60% of the entire renewal base," which consisted of "[l]ess sticky SMB customers, account[ing] for roughly 50% of [the] churn, as many of these businesses rushed to adopt digital solutions at the onset of the pandemic but now are either adopting smaller-scale solutions or returning to in-person events." [Emphasis added.]

53.     Analysts at Defendant Piper Sandler, which rated ON24 as "overweight" in its August 11, 2021 report, likewise noted how the Company's second quarter results were "clearly more negative than [it] had anticipated," expressing concern over the fact that ON24's ARR had "stalled," due to "renewal downsizing and churn," stating in relevant part:

> ON24 reported total revenue of $52.1M, representing a $1M beat on growth of 43% y/y (or 47% y/y ex-legacy).  However, total ARR increased just $1M sequentially to $164.1M with strong new customer additions partially offsetting *the largest quarter of existing customer renewals that selected to downsize the number and volume of virtual events and webinars.  SMB churn also contributed to the smallest number of net new customer additions* of just 16 q/q in three years.

[Emphasis added.].  Piper Sandler also noted how the "combination of renewal downsizing and higher SMB churn was accentuated by a material reduction in the 2H outlook for professional services."

54.     Analysts at Defendant Canaccord Genuity also downgraded ON24 to hold on August 11, 2021 as a result of "*the COVID tourist depart[ures]*" ON24 observed during the quarter.  In its report, which was titled, "COVID renewals take a bite out of growth; ONTF in the penalty box, downgrade to HOLD," Defendant Canaccord Genuity, admitted that "*the magnitude of non-renewals caught [it] by surprise*," and noted that:

> Q2 was a transition quarter as vaccinations became widespread and *a significant number of transitory customers who had joined ON24's platform out of necessity during the pandemic chose not to renew.  Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID, and in particular from SMB buyers within that cohort who had rushed to find alternatives to in-person business for one-time events – 50% of logo churn came from those SMBs.  To be clear, these are not normally ON24's target customer, with its platform being far better suited to enterprises, and priced as such*. Enterprise customers saw much different churn dynamics than the SMB cohort, with gross logo retention consistent with pre-COVID levels, though there was significant downsell from that group.  By the numbers, ARR grew to $164M, increasing only $1M sequentially (down from $10M last quarter and $28M a year

1    ago), though management expects sequential ARR growth to improve in both Q3
2    and Q4.                                *       *       *

3    **Churn and downsell granularity.**  ON24 added 183 new logos during the quarter,
     which was offset by 167 customer departures, equating to 8% logo churn in a single
4    quarter.  For the sake of comparison, ON24 added 266 net new customers in the
     year ago quarter – ***we believe this indicates that around half of renewals in that***
5    ***COVID cohort chose not to renew, if not more.  This was ON24's largest renewal***
     ***cohort ever, with the share of first-time renewals accounting for over 60% of the***
6    ***batch*** – the remaining 40% of the cohort saw retention dynamics equivalent to pre-
     pandemic levels.

8    [Emphasis added.]

9        55.    On this news, ON24's stock declined nearly 31%, falling from $32.31 per share on

10   August 10, 2021 to close at $22.31 per share on August 11, 2021.

11       56.    By the commencement of this action, ON24's stock traded as low as $18.66 per

12   share, a nearly 63% decline from the $50 per share IPO price.



**CLASS ACTION ALLEGATIONS**

23       57.    Plaintiff repeats and realleges each and every allegation contained above as if fully

24   set forth herein.

25       58.    Plaintiff brings this action as a class action, pursuant to Rules 23(a) and 23(b)(3) of

26   the Federal Rules of Civil Procedure, on behalf of a class consisting of all persons and entities that

27   purchased, or otherwise acquired, ON24 common stock issued in connection with the Company's

28   IPO.

59.     Excluded from the Class are: (i) Defendants; (ii) present or former executive officers of ON24, members of the ON24's Board, and members of their immediate families (as defined in 17 C.F.R. §229.404, Instructions (1)(a)(iii) and (1)(b)(ii)); (iii) any of the foregoing persons' legal representatives, heirs, successors, or assigns; and (iv) any entities in which Defendants have or had a controlling interest, or any affiliate of ON24.

60.     The members of the Class are so numerous that joinder of all members is impracticable.   The Company's common stock was actively traded on the NYSE, a national securities exchange.   While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the Class.   During the relevant time, millions of ON24 shares were publicly traded on the NYSE.   Record owners and other members of the Class may be identified from records maintained by ON24 or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

61.     Plaintiff's claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of the federal securities laws.   Further, Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel competent and experienced in class and securities litigation.

62.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Among the questions of law and fact common to the members of the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether statements made by Defendants to the investing public misrepresented material facts about the business, operations, and prospects of ON24;

(c)     whether statements made by Defendants to the investing public omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

(d)     the extent of damage sustained by Class members and the appropriate measure of damages.

63.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**CLAIM ONE**
**For Violations of §11 of the Securities Act**
**(Against All Defendants)**

64.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

65.     This claim is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.  This is a non-fraud cause of action.  Plaintiff does not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

66.     The Offering Documents were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

67.     The Company is the registrant of the securities purchased by Plaintiff and the Class. As such, the Company is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate.  By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, ON24 is liable under §11 of the Securities Act to Plaintiff and the Class.

68.     The Individual Defendants each signed the Offering Documents and caused its issuance.  As such, each is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate, unless they are able to carry their burden of establishing an affirmative "due diligence" defense.  The

1   Individual Defendants each had a duty to make a reasonable and diligent investigation of the

2   truthfulness and accuracy of the statements contained in the Offering Documents and ensure that

3   they were true and accurate, there were no omissions of material facts that would make the

4   Offering Documents misleading, and the documents contained all facts required to be stated

5   therein.  In the exercise of reasonable care, the Individual Defendants should have known of the

6   material misstatements and omissions contained in the Offering Documents and also should have

7   known of the omissions of material fact necessary to make the statements made therein not

8   misleading.  Accordingly, the Individual Defendants are liable to Plaintiff and the Class.

9        69.    The Underwriter Defendants each served as underwriters in connection with the

10   IPO.  As such, each is strictly liable for the materially inaccurate statements contained in the

11   Offering Documents and the failure of the Offering Documents to be complete and accurate, unless

12   they are able to carry their burden of establishing an affirmative "due diligence" defense.  The

13   Underwriter Defendants each had a duty to make a reasonable and diligent investigation of the

14   truthfulness and accuracy of the statements contained in the Offering Documents.  They had a duty

15   to ensure that such statements were true and accurate, there were no omissions of material facts

16   that would make the Offering Documents misleading, and the documents contained all facts

17   required to be stated therein.  In the exercise of reasonable care, the Underwriter Defendants should

18   have known of the material misstatements and omissions contained in the Offering Documents

19   and also should have known of the omissions of material facts necessary to make the statements

20   made therein not misleading.  Accordingly, each of the Underwriter Defendants is liable to

21   Plaintiff and the Class.

22        70.    Defendants acted negligently in preparing the Offering Documents.  None of the

23   Defendants named in this Claim made a reasonable investigation or possess reasonable grounds

24   for the belief that the statements contained in the Offering Documents were true and without

25   omission of any material facts and were not misleading.  In alleging the foregoing, Plaintiff

26   specifically disclaims any allegation of fraud.

27        71.    By reasons of the conduct herein alleged, each Defendant named in this claim

28   violated §11 of the Securities Act.

72.     None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement.   Rather, each such statement concerned existing facts.  Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

73.     Plaintiff acquired the Company's securities pursuant or traceable to the Offering Documents and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff sustained damages, and the price of the Company's shares declined substantially due to material misstatements in the Offering Documents.

74.     This Claim is brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the Offering.

75.     By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under §11, as measured by the provisions of §11(e), from the Defendants and each of them, jointly and severally.

**CLAIM TWO**
**For Violations of §12(a) of the Securities Act**
**(Against All Defendants)**

76.     Plaintiff repeats and realleges each and every allegation contained above, as if fully set forth herein.

77.     By means of the defective Prospectus, Defendants promoted, solicited, and sold ON24 shares to Plaintiff and other members of the Class.

78.     The Prospectus for the IPO contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above.  Defendants owed Plaintiff, and the other members of the Class who purchased ON24 shares pursuant to the Prospectus, the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus, to ensure that such statements were true and that there was no omission to state a material fact required to be stated, in order to make the statements contained therein not misleading.  Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus, as set forth above.

79.     Plaintiff did not know, nor in the exercise of reasonable diligence could Plaintiff have known, of the untruths and omissions contained in the Prospectus at the time Plaintiff acquired ON24 shares.

80.     By reason of the conduct alleged herein, Defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Plaintiff and the other members of the Class who purchased ON24 securities, pursuant to the Prospectus, sustained substantial damages in connection with their purchases of the shares.  Accordingly, Plaintiff and the other members of the Class who hold ON24 securities issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their ON24 shares to Defendants sued herein.  Class members who have sold their ON24 securities seek damages to the extent permitted by law.

**CLAIM THREE**
**For Violations of §15 of the Securities Act**
**(Against the Individual Defendants)**

81.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

82.     This claim is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against each of the Individual Defendants.

83.     The Individual Defendants were controlling persons of the Company within the meaning of §15 of the Securities Act.  By reason of their ownership interest in, senior management positions at, and/or directorships held at the Company, as alleged above, these Defendants invested in, individually and collectively, and had the power to influence, and exercised same over, the Company to cause it to engage in the conduct complained of herein.  Similarly, each of the other Individual Defendants not only controlled those subject to liability as primary violators of §11 of the Securities Act, as alleged above, they directly participated in controlling ON24 by having signed, or authorized the signing of, the Registration Statement and authorizing the issuance of ON24 securities to Plaintiff and members of the Class.

84.     As control persons of ON24, each of the Individual Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as ON24 for its violations of §11 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on Plaintiff's own behalf and on behalf of the Class, prays for relief and judgement as follows:

A.     Declaring that this action is a proper class action, pursuant to Fed. R. Civ. P. 23, certifying Plaintiff as a representative of the Class, and designating Plaintiff's counsel as Class Counsel;

B.     Awarding Plaintiff and the other members of the Class compensatory damages;

C.     Awarding Plaintiff the other members of the Class rescission on their §12(a)(2) claims;

D.     Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as reasonable attorneys' fees, expert witness fees, and other costs and disbursements; and

E.     Awarding Plaintiff and the other members of the Class such other and further relief as the Court may dem just and proper.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff hereby demands a trial by jury of all issues that may be so tried.

DATED:  November 3, 2021                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

                                         *s/John T. Jasnoch*
                                         JOHN T. JASNOCH (CA 281605)
                                         HAL CUNNIGHAM (CA 243048)
                                         600 W. Broadway, Suite 3300
                                         San Diego, CA 92101
                                         Tel.: (619) 233-4565
                                         jjasnoch@scott-scott.com
                                         hcunningham@scott-scott.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

THOMAS L. LAUGHLIN, IV
(*pro hac vice* filed herewith)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Tel.: (212) 233-6444
tlaughlin@scott-scott.com

*Counsel for Plaintiff James Douvia and the
Proposed Class*

CLASS ACTION COMPLAINT

**CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS**

1.      I, James Douvia, make this declaration pursuant to §27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or §21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against ON24, Inc.  ("ON24" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire ON24 securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or acquired ON24 securities during the class period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet (Schedule "A") lists all of my transactions in ON24 securities during the Class Period, as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury, under the laws of the United States, that the foregoing is true and correct this day of ___11/2/2021___.

DocuSigned by:

30FC3C8F0AC64F2...

James Douvia

DocuSign Envelope ID: 87D50531-8131-4F12-92A3-85FC24995BCB

Schedule A

Buy – 02/03/21 – 12 shares – $76.68/share
Buy – 02/03/21 – 250 shares – $77.00/share