Jonathan Gardner (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
dschwartz@labaton.com
afatale@labaton.com
mduenas@labaton.com

*Lead Counsel for Lead Plaintiff Leadersel Innotech ESG*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re ON24, Inc. Securities Litigation | Case No. 4:21-cv-08578-YGR<br><br>ECF CASE<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>Dept: Courtroom 1, 4th Floor<br>Judge: Honorable Yvonne Gonzalez Rogers |

## TABLE OF CONTENTS

Page


I. NATURE OF THE ACTION AND BACKGROUND .......... 1

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 6

A. Lead Plaintiff .......... 6

B. Defendants .......... 7

1. Corporate Defendant .......... 7

2. The Individual Defendants .......... 7

3. The Underwriter Defendants .......... 8

IV. SUBSTANTIVE ALLEGATIONS .......... 11

A. ON24 and its Business .......... 11

B. ON24's Pre-IPO Growth .......... 12

C. ON24 Conducts the IPO .......... 14

D. Defendants' Materially False and Misleading Offering Documents .......... 15

1. Former ON24 Employees Substantiate the Allegations that the Offering Documents Were Materially False and Misleading .......... 15

(a) Former Employee 1 .......... 16

(b) Former Employee 2 .......... 18

(c) Former Employee 3 .......... 20

(d) Former Employee 4 .......... 20

(e) Former Employee 5 .......... 23

2. The Offering Documents Contained Materially False and Misleading Statements About ON24's Customers and Financial Condition .......... 27

3. The Offering Documents Contained Material Omissions About ON24's Customers and Financial Condition .......... 29

4. The Offering Documents Failed to Disclose Significant Risks Concerning ON24's Customers That Made the IPO More Speculative and Risky .......... 34

E. Events Following the IPO .......... 39
V. CLASS ACTION ALLEGATIONS .......... 51
VI. CAUSES OF ACTION .......... 52
COUNT I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT .......... 52
COUNT II FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT .......... 54
VII. PRAYER FOR RELIEF .......... 55
VIII. JURY TRIAL DEMANDED .......... 56

Court-appointed Lead Plaintiff, Leadersel Innotech ESG ("Lead Plaintiff"), individually and on behalf of a class of similarly situated persons and entities, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge. Lead Plaintiff's information and belief is based upon, among other things, the investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included a review and analysis of: (i) regulatory filings made by ON24, Inc. ("ON24" or the "Company") with the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company website and marketing materials; (iv) price and volume data for ON24 common stock; (v) research reports from securities and financial analysts; (vi) news and media reports concerning the Company and other facts related to this action; (vii) interviews with former ON24 employees; and (viii) other publicly available materials and data. Lead Counsel's investigation into the factual matters alleged herein continues and many of the relevant facts are known only by the Defendants (as defined herein) or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION AND BACKGROUND

1. The claims asserted herein are strict liability claims for violations of Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") relating to ON24's initial public offering (the "IPO" or "Offering"), commenced on or about February 3, 2021, of over 8,560,930 shares of common stock at a price of $50.00 per share. This federal securities class action is brought on behalf of a Class (as defined herein) of all persons or entities who purchased or otherwise acquired ON24 common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in connection with the IPO, and who were damaged thereby.

2. Congress passed the Securities Act in the hopes of restoring investor confidence after corporate scandals and the stock market crash of 1929. The Securities Act requires that those who sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The Securities Act creates liability for false, misleading, and incomplete statements

made in connection with public securities offerings in order to protect investors and maintain confidence in our public markets.

3. ON24 touts itself as offering a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. ON24's customers include business-to-business ("B2B") companies that seek sales and marketing strategies to generate revenue through personalized and interactive digital customer engagement. ON24 is led by co-founder, President, and Chief Executive Officer ("CEO") Defendant Sharat Sharan ("Sharan").

4. ON24 offers four "Experience" products: (1) ON24 Elite, a live, interactive webinar; (2) ON24 Virtual Environment, a live, large scale virtual event experience; (3) ON24 Engagement Hub, an always-on, multimedia content experience; and (4) ON24 Target, a curated, multimedia content experience.

5. ON24's Experience products are "backed" by two enhanced functionality solutions: (1) ON24 Intelligence, an analytics tool that captures first-person data to power the artificial intelligence ("AI")/machine learning ("ML") engine within ON24's platform; and (2) ON24 Connect, an ecosystem of third-party application integrations.

6. ON24 derives revenue and cash flow from sales of subscriptions to its products. As a subscription-based Company, ON24 must attract new customers and maintain and expand relationships with existing customers, including by "upselling" additional solutions. In order to grow, ON24 must continually secure new customers and renew or upsell existing customers. In the Offering Documents, ON24 touted its "highly engaged and loyal customer base," including 1,900 customers in more than 40 countries as of September 30, 2020.

7. With the shift to a more digital world in 2020 due in part to the COVID-19 pandemic, ON24 had purportedly hit a watershed moment and, as a result, was experiencing explosive growth.

8. On or about February 3, 2021, ON24 conducted the IPO and raised more than ***$428 million*** in gross proceeds for the shares ON24 offered to the public, while the banks that

underwrote the Offering collected over ***$29 million*** in fees. In other words, the IPO was a great success for Defendants; however, the IPO was disastrous for investors.

9. Unbeknownst to investors, ON24 signed up new customers for 1-year contracts during the second quarter ended June 30, 2020 ("Q2 2020"), third quarter ended September 30, 2020, and fourth quarter ended December 31, 2020 ("Q4 2020")—the three quarters preceding the IPO—that planned to either not renew or downsell, a larger-than-typical percentage of which were small- and medium-sized business ("SMB") customers, nonideal customers focused on one-time events, and one-time use cases that planned to either not renew or downsell.

10. Within months of the IPO, ON24 disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company that pre-dated the IPO, including high churn, nonrenewals, and downselling amongst customers signed up during the second, third, and fourth quarters of 2020. For the second quarter ended June 30, 2021 ("Q2 2021"), for example, higher churn was primarily in the first-time renewal cohort, which accounted for over 60% of the total renewal cohort, while SMB customers accounted for 50% of ON24's total "logo churn," *i.e.*, the number of logos or customers lost during that period.

11. Former ON24 employees substantiate the allegations concerning ON24 customers that planned to either not renew or downsell.[1] According to Former Employee 3 ("FE-3"), ON24 was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things. FE-3 explained that ON24 had instituted special, lower commission rates that were applied to accounts where the customer was interested in a one-time purchase and was not expected to renew. According to FE-3, these lower commission rates for one-time purchasers confirmed that ON24 knew which customers fell into that category. FE-3 advised that ON24 tracked information through Salesforce including customer purchases, renewals, customers that were active, and customers that were dormant. When asked whether ON24 would have known that the small business customers who purchased single event or one-year subscriptions would not have renewed their services, FE-3 replied that they would have.

[1] For ease of comprehension and readability, the Consolidated Complaint uses the pronoun "he" and possessive "his" in connection with the former ON24 employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

12. Former Employee 1 ("FE-1") recalled that during the COVID-19 pandemic, ON24 signed anybody and everybody up regardless of if they were considered to be a good customer for the Company. In reference to ON24's business during COVID-19, FE-1 recalled that the Company knew a lot of the COVID business was not going to stick including their enterprise business. FE-1 explained that there were always monthly calls with Defendant Sharan and other C-level employees to discuss clients, including churn risk and potential for expansion. He went on to recount that the C-suite employees at ON24 were very involved and that there was a monthly call (held both before the IPO and after) called the "sales and client success meeting."

13. According to FE-1, those monthly meetings lasted around five hours and everyone from employees of the small business cohort to the executives, including Defendant Sharan, participated. According to FE-1, there were open discussions during meetings and within ON24 that the small business cohort did not have good retention rates and that this information could be seen in Salesforce metrics. In reference to a customer's expectation for renewal, FE-1 recalled that employees were required to track their clients' expectation for renewal in Salesforce in a field labeled "churn" as "low, medium, or high." According to FE-1, "churn reports" were produced and were discussed at the monthly meetings that were led by Defendant Sharan where he would go through every customer to discuss their status on the churn reports. FE-1 added this included all the customers designated as having a high risk of churn and the reports would often be color coded green, yellow, orange, and red to signify likelihood of renewal.

14. According to Former Employee 2 ("FE-2"), Defendant Sharan not only misled investors, but also employees about the sustainability of ON24's performance. FE-2 explained that ON24 failed to adequately qualify potential customers, including ensuring they had an appropriate use case, from the beginning of the pandemic and throughout 2021. FE-2 explained that churn being indicated as occurring due to the customer citing ON24 as a COVID-19 related expense was brought up throughout 2020 and that everyone was running into these issues. According to FE-2, there were instances that he would notice 40-50% churn amongst his customers. FE-2 explained that churn was occurring in several ways: clients were only using ON24 as a COVID-19 solution and electing not to renew at all; customers were not renewing

one-time purchases (such as an event manager); or customers were electing to down sell and remove features from their contract. FE-2 stated that this represented a huge downturn.

15. FE-2 recalled customers informing him as much as six months in advance, during both 2020 and 2021, that they were not going to renew their contracts. FE-2 explained that the concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to indicate if a customer had indicated they were engaging ON24 only due to the pandemic as a COVID-19 related expense.

16. Former Employee 5 ("FE-5") recalled that, after a lot of early success, things really dropped off and demand declined during November/December 2020. FE-5 explained that market saturation and uncertainty regarding COVID-19 played crucial roles. FE-5 added that new competition was springing up and offering customers the ability to hold one-off events at more reasonable prices, and that ON24 began losing potential clients during initial calls. FE-5 agreed that the Company became less particular about its prospective clients as time went on, whereas previously ON24 had only wanted a particular client profile.

17. Then-existing material facts confirmed by the FEs—and other then-existing material facts that were undisclosed until after the IPO—about ON24's one-time, event-only, and SMB customers that planned to either not renew or downsell were omitted from the Offering Documents and rendered the Offering Documents' statements materially false and misleading in context.

18. On August 10, 2021, for example, Defendant Sharan claimed that ON24 "experienced higher-than-expected ***churn and downsell from customers we signed up in the second quarter of last year*** during the peak of COVID. This ***higher churn was primarily in the first-time renewal cohort***, customers who signed up 1-year contracts last year and who were up for renewal." Defendant Sharan added that "the ***lower churn was primarily in the SMB***."

19. Also on August 10, 2021, ON24's Chief Financial Officer ("CFO") Defendant Steven Vattuone ("Vattuone") admitted:

> [T]he ***share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort. We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal***

> ***customer profile buyers focused on onetime events*** who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

20. As a result of these undisclosed adverse facts that existed at the time of the IPO, ON24 common stock plummeted, falling from the IPO price of $50.00 per share to close at $18.86 per share on November 3, 2021, the date this Action was filed.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under and pursuant to Section 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

22. This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

23. Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

24. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III. PARTIES

### A. Lead Plaintiff

25. As set forth in the Certification filed in this Action on January 3, 2022 (Dkt. No. 36), Lead Plaintiff Leadersel Innotech ESG purchased ON24 common stock in the IPO pursuant and/or traceable to the Offering Documents. Lead Plaintiff purchased ON24 common stock at a time when only shares offered in the IPO were in the market. Lead Plaintiff suffered damages as a result of the violations of the federal securities laws alleged herein. On February 3, 2022, the Court appointed Leadersel Innotech ESG as Lead Plaintiff in this Action (Dkt. No. 67).

**B. Defendants**

**1. Corporate Defendant**

26. Defendant ON24 is a Delaware corporation headquartered at 50 Beale Street, 8th Floor, San Francisco, California 94105. ON24 claims it provides a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. ON24's stock is listed under the ticker symbol "ONTF" on the New York Stock Exchange ("NYSE").

**2. The Individual Defendants**

27. At the time of the IPO, Defendant Sharat Sharan, a co-founder of the Company, was ON24's President and CEO and served as a member of ON24's board of directors (the "Board"). Defendant Sharan sold 147,453 shares of ON24 common stock in the IPO for $7.4 million.

28. At the time of the IPO, Defendant Steven Vattuone was ON24's CFO.

29. At time of the IPO, Defendant Irwin Federman ("Federman") was a director on the Board and a member of the Audit Committee.

30. At time of the IPO, Defendant Denise Persson ("Persson") was a director on the Board.

31. At time of the IPO, Defendant Holger Staude ("Staude") was a director on the Board and a member of the Compensation Committee. At the time of the IPO, Defendant Staude was also an employee of Underwriter Defendant Goldman Sachs & Co. LLC.

32. At time of the IPO, Defendant Dominique Trempont ("Trempont") was a director on the Board and a member of the Audit Committee and the Compensation Committee.

33. At time of the IPO, Defendant Barry Zwarenstein ("Zwarenstein") was a director on the Board and a member of the Audit Committee and the Compensation Committee.

34. Defendants Sharan, Vattuone, Federman, Persson, Staude, Trempont, and Zwarenstein are collectively referred to herein as the "Individual Defendants."

35. Each of the Individual Defendants signed the Registration Statement.

36. Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO and solicited the purchase of ON24 common stock in the IPO to serve their financial interests and those of ON24.

37. The Individual Defendants conducted the roadshow along with the Underwriter Defendants to solicit the purchase of ON24 common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

**3. The Underwriter Defendants**

38. Defendant Goldman Sachs & Co. LLC ("GS&Co.") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant GS&Co. was allocated 3,145,029 shares in the IPO to sell to the investing public.

39. Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant JPMorgan was allocated 2,714,204 shares in the IPO to sell to the investing public.

40. Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant KeyBanc was allocated 775,487 shares in the IPO to sell to the investing public.

41. Defendant Robert W. Baird & Co. Incorporated ("Baird") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Baird was allocated 385,242 shares in the IPO to sell to the investing public.

42. Defendant Canaccord Genuity LLC ("Canaccord") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the

materially inaccurate, misleading, and incomplete Offering Documents. Defendant Canaccord was allocated 385,242 shares in the IPO to sell to the investing public.

43. Defendant Needham & Company, LLC ("Needham") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Needham was allocated 385,242 shares in the IPO to sell to the investing public.

44. Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Piper Sandler was allocated 385,242 shares in the IPO to sell to the investing public.

45. Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant William Blair was allocated 385,242 shares in the IPO to sell to the investing public.

46. Defendants GS&Co., JPMorgan, KeyBanc, Baird, Canaccord, Needham, Piper Sandler, and William Blair are collectively referred to herein as the "Underwriter Defendants." Defendants ON24, the Individual Defendants, and the Underwriter Defendants are collectively referred to herein as the "Defendants."

47. The Underwriter Defendants are investment banking houses that specialize, among other things, in underwriting public offerings of securities. The Underwriter Defendants' participation in and their solicitation of purchases of ON24 common stock in the IPO was motivated by their financial interests. Collectively, the Underwriter Defendants received over $29 million in fees and commissions in connection with their sale of ON24 common stock in the IPO.

48. The Underwriter Defendants determined that in return for their share of the IPO's proceeds, they were willing to merchandise ON24 common stock in the IPO. The Underwriter Defendants worked with the Individual Defendants to prepare and arrange a roadshow prior to

the IPO during which they, and the Individual Defendants, met with investors and presented highly favorable information about the Company, its operations, and its financial prospects.

49. The Underwriter Defendants also demanded and obtained an agreement for ON24 that ON24 would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that ON24 had purchased millions of dollars of directors' and officers' liability insurance.

50. The Underwriter Defendants assisted ON24 and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of ON24, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning ON24's operations and financial prospects.

51. In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

52. The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common

stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and the Class.

## IV. SUBSTANTIVE ALLEGATIONS

### A. ON24 and its Business

53. ON24's self-professed "mission" is to "transform the way businesses drive revenue and customer engagement through data-rich digital experiences." Founded in 1998 and led by co-founder and CEO Sharat Sharan, ON24 serves B2B company customers by providing a cloud-based digital experience platform for interactive webinars, virtual events, and multimedia content experiences, either live or on-demand. The platform prioritizes two-way engagement between businesses and their customers by turning end-user data into buying signals and behavioral insights that enable businesses to convert customer engagement into revenue.

54. ON24 offers four "Experience" products: (1) ON24 Elite, a live, interactive webinar that engages prospective customers in real-time and on-demand; (2) ON24 Virtual Environment, a live, large scale virtual event experience that engages prospective customers in real-time and on-demand; (3) ON24 Engagement Hub, an always-on, multimedia content experience that engages specific prospective customer segments; and (4) ON24 Target, a curated, multimedia content experience that engages specific prospective customer segments to drive a desired action.

55. ON24's Experience products are "backed" by two enhanced functionality solutions: (1) ON24 Intelligence, an analytics tool that captures first-person data to power the artificial intelligence/machine learning, or AI/ML, engine within ON24's platform; and (2) ON24 Connect, an ecosystem of third-party application integrations.

56. ON24 derives revenue and cash flow from sales of subscriptions to its products. As a subscription-based Company, ON24 depends on its ability to attract new customers and maintain and expand relationships with existing customers, including by expanding customer usage by "upselling" additional solutions. In order to grow its business, ON24 must continually secure new customers and renew or upsell existing customers.

57. The terms of ON24 subscription agreements are primarily annual and the Company bills clients for the full term in advance on an annual or monthly basis.

58. Although ON24 used to facilitate one-off digital conferences, the Company de-emphasized this legacy revenue over the past decade and now focuses on "stickier," recurring platform revenue.

**B. ON24's Pre-IPO Growth**

59. ON24 proudly touted to investors that due to the changes in how businesses were operating more digitally in response to the COVID-19 pandemic, the Company had experienced explosive growth in the new, more digital world.

60. For example, for the nine months ended September 30, 2020, the Company's revenue increased by 59% as compared to the nine months ended September 30, 2019:

| | Year Ended December 31, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | | | (unaudited) | |
| | (in thousands, except share and per share data) | | | |
| **Consolidated Statements of Operations Data:** | | | | |
| Revenue: | | | | |
| Subscription and other platform | $ 66,079 | $ 72,589 | $ 53,368 | $ 81,379 |
| Professional services | 16,529 | 16,544 | 11,825 | 22,276 |
| Total revenue | 82,608 | 89,133 | 65,193 | 103,655 |
| Cost of revenue: | | | | |
| Subscription and other platform(1) | 14,232 | 16,730 | 12,571 | 14,405 |
| Professional services(1) | 10,689 | 10,411 | 7,666 | 8,883 |
| Total cost of revenue | 24,921 | 27,141 | 20,237 | 23,288 |
| Gross profit | 57,687 | 61,992 | 44,956 | 80,367 |
| Operating expenses: | | | | |
| Sales and marketing(1) | 46,980 | 47,773 | 35,460 | 40,495 |
| Research and development(1) | 14,343 | 15,730 | 11,660 | 13,272 |
| General and administrative(1) | 13,299 | 14,590 | 10,928 | 14,370 |
| Other gains from operations | (850) | — | — | — |
| Total operating expenses | 73,772 | 78,093 | 58,048 | 68,137 |
| Income (loss) from operations | (16,085) | (16,101) | (13,092) | 12,230 |
| Interest expense, net | 1,052 | 1,029 | 799 | 633 |
| Other expense, net | 256 | 42 | 134 | 226 |
| Income (loss) before provision for income taxes | (17,393) | (17,172) | (14,025) | 11,371 |
| Provision for income taxes | 198 | 355 | 44 | 123 |
| Net income (loss) | $ (17,591) | $ (17,527) | $ (14,069) | $ 11,248 |
| Change in Class B-1 preferred stock redemption value | — | (10,047) | (7,547) | — |

61. Importantly, ON24 highlighted how "key business metrics" such as the number of customers grew because of purported "[i]ncreasing awareness" of ON24's platform and offerings. In particular, the Company's customer base grew from 760 customers as of December 31, 2015 to over 1,900 customers as of September 30, 2020:




62. According to ON24, at the time of IPO, the Company was "focused on continuing to grow the number of customers that use [its] platform[,]" and "[d]espite [its] strong growth to date," ON24's "market [was] still relatively underpenetrated" and there was "significant opportunity to attract many more customers across industries, market segments and regions."

63. Annual recurring revenue ("ARR")—which is driven by ON24's ability to acquire new subscription customers and to maintain and expand its relationship with existing subscription customers—similarly exploded prior to the IPO growing from $61.2 million as of December 31, 2018, to $138.9 as of September 30, 2020:

| | December 31, | | September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | (dollars in thousands) | | | |
| Customers | 1,241 | 1,401 | 1,342 | 1,918 |
| ARR | $61,249 | $76,852 | $69,997 | $138,872 |
| NRR | 107% | 108% | 106% | 147% |
| $100k Customers | 116 | 144 | 129 | 271 |

64. As noted in these figures, the Company also reported massive growth in its net retention rate ("NRR")—which reflects ON24's ability to retain and organically grow revenue from existing customers.

65. Moreover, ON24 told investors that at the time of the IPO it believed it could "achieve significant organic growth by expanding penetration of [its] existing customer base."

66. Finally, ON24 told investors that this growth was "partly in response to the COVID-19 pandemic." This partial candor aside, Defendants omitted to disclose and misrepresented, as further alleged below, that material adverse events, trends, and risks had already developed at the time of the IPO that were putting ON24's growth story to an end.

**C. ON24 Conducts the IPO**

67. On or about February 3, 2021, ON24 conducted its IPO, in which it sold 8,560,930 shares of common stock to the public. The IPO, which was priced at $50 per share, generated over $428 million in gross proceeds for ON24 and the selling stockholders, while the Underwriter Defendants collected over $29 million in fees.

68. The Underwriter Defendants also had an overallotment option to purchase up to an additional 1,284,139 shares of common stock from ON24 at the $50 per share IPO price, which, if exercised in full, would raise over $64 million in additional gross proceeds for ON24 and generate over $4.4 million in additional fees for the Underwriter Defendants.

69. The IPO was conducted pursuant to, and the sale of ON24 stock was solicited by, several documents that were filed by ON24 and the Underwriter Defendants with the SEC and disseminated to the investing public, including (i) an January 8, 2021 registration statement on Form S-1, which following amendment on January 25, 2021, was declared effective by the SEC on February 2, 2021 (the "Registration Statement"), and (ii) a February 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

70. The Prospectus states that investors "should rely only on the information contained in this prospectus and any free writing prospectus that we may provide to you in connection with this offering."

71. The Prospectus also states: "You should not assume that the information contained in this prospectus is accurate as of any date other than its date. Our business, financial condition, results of operations and prospects may have changed since that date."

### D. Defendants' Materially False and Misleading Offering Documents

#### 1. Former ON24 Employees Substantiate the Allegations that the Offering Documents Were Materially False and Misleading

72. Five former ON24 employees (FEs) cited herein substantiate the allegations.[2]

73. For example, the Offering Documents misleadingly touted ON24's customer base of over 1,900 highly engaged and loyal customers as of September 30, 2020. The Offering Documents also misleadingly claimed that ON24's competitive strengths include a growing base of customers across verticals, and that ON24 intended to leverage its land and expand model to further penetrate customers across these verticals.

74. The Offering Documents further misleadingly claimed that ON24's annual recurring revenue or ARR reflects its success in acquiring new customers and expanding subscriptions within existing customers.

75. Several other statements in the Offering Documents were rendered false and misleading by the omission of undisclosed adverse facts and trends detailed by the former ON24 employees.

76. In addition, the Offering Documents purported to warn of certain risks—*e.g.*, ON24's growth and ability to retain, expand the usage of, or upsell existing customers, as well as ON24's customers' ability or willingness to purchase or renew subscriptions and COVID-19's effects on customer demand—that, unbeknownst to investors, had already materialized.

77. As discussed by the former ON24 employees below, ON24 signed up new customers for 1-year contracts during Q2 2020, Q3 2020, and Q4 2020 that planned to either not renew or downsell. Of those 1-year customers, a larger-than-typical percentage were SMB customers and nonideal customer profile buyers focused on one-time events, and many were one-time use cases that did not integrate ON24's platform in their sales and marketing ecosystem. These customers planned to either not renew or downsell.

[2] Lead Plaintiff believes that the details of the FEs' identities contained herein are sufficient to satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Lead Plaintiff can provide additional information to the Court through an *in camera* submission.

**(a) Former Employee 1**

78. Former Employee 1 or FE-1 was an ON24 account executive from January 2019 through September 2021. FE-1's responsibilities included handling enterprise sales and accounts.

79. In reference to ON24's business during COVID, FE-1 recalled that the Company knew a lot of the COVID business was not going to stick including their enterprise business.

80. FE-1 recalled that ON24 used at least three different systems to track sales, clients, and other information including Salesforce, Forrester, and Gartner. He added that Totango was used to track outreach, contacts to clients, and every interaction with clients. FE-1 advised that Totango showed how long it had been since ON24 last heard from a client.

81. FE-1 went on to clarify that he was not sure if Gartner was still in use and that Salesforce, Forrester, and Totango were more prevalently used during his tenure. FE-1 explained that these systems were used to track all meetings with and notes about clients and that all entries made by a customer success manager ("CSM") would be time stamped in the system.

82. FE-1 recounted how he regularly sent updates to C-level employees via email, including Defendant Sharan, and that the same was required for the small business cohort.

83. FE-1 explained that there were always monthly calls with Defendant Sharan and other C-level employees to discuss clients, including churn risk and potential for expansion. According to FE-1, all updates went through the directors and above.

84. FE-1 recounted that weekly meetings were held with his supervisor to discuss accounts and that the same thing was required of the small business cohorts. He went on to recount that the C-suite employees at ON24 were very involved and that there was a monthly call (held both before the IPO and after) called the "sales and client success meeting." According to FE-1, those monthly meetings lasted around five hours and everyone from employees of the small business cohort to the executives, including Defendant Sharan, participated.

85. At these meetings, employees discussed every customer, what was going well and what was not, which clients were likely going to renew, and which were not. According to FE-1, these meetings typically took place during the first or second week of every month. FE-1 recalled that ON24 skipped the meetings in February and March of 2021 but that he was still required to

give account details to C-level employees via email. He went on to recall that the monthly meetings started back up in April 2021.

86. According to FE-1, there were open discussions during meetings and within the Company that the small business cohort did not have good retention rates and that this information could be seen in Salesforce metrics. He added that employees knew when clients would be signing up and going away.

87. FE-1 explained that every time an employee met with a client upcoming renewals were discussed, and employees were required to put a note in Salesforce regarding that conversation and update their superior as well.

88. FE-1 recalled that during the COVID-19 pandemic, ON24 signed anybody and everybody up regardless of if they were considered to be a good customer for the Company. FE-1 explained that a "good customer" was measured by the Company as (1) having multiple products within their business and (2) fully integrated or having internal customer relationship management ("CRM") or large integration programs like Oracle to handle the data.

89. FE-1 explained that during the COVID-19 pandemic whoever wanted a contract got one, whereas before the Company wanted customers that would sign on for three of ON24's four or five product offerings.

90. FE-1 explained that during this period a lot of eventual clients were scrambling to put on conferences or events. According to FE-1, ON24 was historically interested in customers who would use ON24's platform for meetings with investors, marketing meetings, or large internal meetings, whereas the new COVID-19 related customers were looking to buy maybe five to ten events.

91. According to FE-1, ON24 had never serviced these customers before and that previously they were looking for a greater degree of integration with ON24's products. When asked if the Company had shifted towards event only clients during the pandemic, FE-1 described the shift towards event only customers as 100% accurate.

92. In reference to a customer's expectation for renewal, FE-1 recalled that employees were required to track their clients' expectation for renewal in Salesforce in a field

labeled "churn" as "low, medium, or high." He added that the client success team regularly tracked this field in Salesforce.

93. FE-1 explained that the Customer Success team would be present on all client calls and were responsible for updating Totango, which served as their Salesforce equivalent. FE-1 added that all managers through C-level employees had access to these systems.

94. According to FE-1, "churn reports" were produced and were discussed at the monthly meetings that were led by Defendant Sharan where he would go through every customer to discuss their status on the churn reports. FE-1 added this included all the customers designated as having a high risk of churn and the reports would often be color coded green, yellow, orange, and red to signify likelihood of renewal. According to FE-1, executives received this report regularly.

**(b) Former Employee 2**

95. Former Employee 2 or FE-2 worked in sales at ON24 before and after the IPO.

96. According to FE-2, the churn of customers who signed on during the pandemic was a concern from an account management perspective, but Defendant Sharan was only concerned with revenue. FE-2 stated that ON24 was signing on everyone and did not care about their potential use cases.

97. FE-2 explained that ON24 was intended to be used as a marketing tool, not an internal use product, which is what many customers were intending to use it for. FE-2 stated that ON24 signed on customers that only intended to use the product for a single event as well. FE-2 recalls these concerns being escalated to management, but not addressed.

98. According to FE-2, Defendant Sharan not only misled investors, but also employees about the sustainability of ON24's performance. FE-2 recalled that ON24's success was characterized as a success in itself and not something dependent on the circumstances of the pandemic. FE-2 explained that this materialized in the form of increased quotas in winter 2020 in the lead up of the IPO. According to FE-2, the increase in quotas were instituted despite a dramatic decline in demand once lockdown restrictions had begun to relax.

99. According to FE-2, customer success managers or CSMs would attempt to track the reason behind why customers signed on to determine if they were COVID-19 related customers. FE-2 explained that when CSMs would go to account executives for clarification, they would be told that the account executives were being told to just sell and did not have time to qualify customers. FE-2 explained that ON24 failed to adequately qualify potential customers, including ensuring they had an appropriate use case, from the beginning of the pandemic and throughout 2021.

100. FE-2 explained that churn being indicated as occurring due to the customer citing ON24 as a COVID-19 related expense was brought up throughout 2020 and that everyone was running into these issues. According to FE-2, there were instances that he would notice 40-50% churn amongst his customers.

101. FE-2 explained that churn was occurring in several ways: clients were only using ON24 as a COVID-19 solution and electing not to renew at all; customers were not renewing one-time purchases (such as an event manager); or customers were electing to down sell and remove features from their contract. FE-2 stated that this represented a huge downturn.

102. FE-2 recalled customers informing him as much as six months in advance, during both 2020 and 2021, that they were not going to renew their contracts. According to FE-2, staff were given strict instructions not to check churn, referring to a specific field in Totango, for these customers and instead indicate that they had informed ON24 that they would not renew in the notes section. FE-2 explained that the notes section could not be aggregated in a report to show the true numbers of customers that were going to churn and that the notes field was not tracked.

103. FE-2 explained that the concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to indicate if a customer had indicated they were engaging ON24 only due to the pandemic as a COVID-19 related expense. FE-2 recalled staff being told to retroactively go back through accounts to indicate if this was the case, in order to better assess which customers would likely churn.

**(c) Former Employee 3**

104. Former Employee 3 or FE-3 was an ON24 account executive from March 2019 through April 2021. FE-3 was responsible for selling ON24 products to small business and mid-market companies.

105. In reference to ON24 tracking customer information, FE-3 advised that ON24 tracked information through Salesforce including customer purchases, renewals, customers that were active, and customers that were dormant. When asked whether ON24 would have known that the small business customers who purchased single event or one-year subscriptions would not have renewed their services with ON24, FE-3 replied that they would have.

106. FE-3 also added that the Company was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things. FE-3 explained that the Company had instituted special, lower commission rates that were applied to accounts where the customer was interested in a one-time purchase and was not expected to renew. According to FE-3, these lower commission rates for one-time purchasers confirmed that the Company knew which customers fell into that category.

107. According to FE-3, there was a lot of new business in the first few months of the pandemic, which then leveled out shortly before and after the Company's IPO.

108. When asked whether ON24's annual recurring revenue or ARR computation has a churn element or consideration for existing customers, FE-3 replied that it does not.

**(d) Former Employee 4**

109. Former Employee 4 or FE-4 worked at ON24 from July 2020 through July 2021 as a sales development representative ("SDR") for the enterprise team and, after the IPO, for the higher education business segment team.

110. According to FE-4, during his first several months at ON24, business was doing extremely well on the back of the first wave of COVID-19. FE-4 explained that customers were coming directly to ON24, which was unheard of in sales, and the quotas established by the Company were obtainable during these initial months.

111. FE-4 recalled customers needing quick solutions during this period and willing to try new services, like ON24.

112. FE-4 stated that during this period account executives were selective in taking meetings with prospective clients and were only interested in meeting with companies identified as being good potential customers. He explained that when detailing "opportunities," it was necessary to provide very detailed notes to the account executives describing the customer's interest. FE-4 added that notes taken when assessing opportunities were important in the beginning of his tenure, but progressively became less crucial over time as account executives became less selective about who they took meetings with.

113. FE-4 explained that it got to the point where account executives would tell him, "Look we just need meetings" to attempt to meet quotas in the face of increased pressure and declining demand.

114. According to FE-4, enterprise level clients were described as having over $500 million in revenue and over 1,000 employees. FE-4 recalled that over time ON24 was taking meetings with prospective clients that were simply not an enterprise level opportunity, like the City of Portsmouth or small Christian universities. FE-4 explained that ON24 did have major clients like Deloitte, but he added that outside of these large and established clients, others were not interested in renewing their subscriptions.

115. According to FE-4, there were customers who only wanted to utilize ON24 for a single event: "quick fix" customers who would still require a one-year subscription. FE-4 explained that during the summer and early fall 2020, account executives were not interested in speaking with these potential customers.

116. According to FE-4, things began to change in November 2020 when additional pressure was being placed on account executives and all the employees overall. FE-4 explained that it was around this time that account executives became willing to take meetings with prospective clients that were interested in using ON24 for "event only" purposes, which did not signify an ideal customer.

117. FE-4 explained that qualified and unqualified often came down to the way the potential customer planned to use ON24's product and their size. According to FE-4, qualified customers met certain benchmarks, including revenue and number of employees. FE-4 stated that qualified customers were not single event customers; they were going to maybe use the product for a few flagship events at the least.

118. FE-4 explained that unqualified customers were too small in regard to revenue and employee figures or were interested only in using the products for single events. According to FE-4, he was responsible for determining which prospective clients would advance to a meeting with an account executive.

119. FE-4 explained that as time went on and demand decreased that he was more likely to pass on unqualified potential customers to an account executive. FE-4 added that there were times where smaller inbound clients would present themselves, and early on his tenure these would be deemed unqualified, but account executives took meetings with these clients as time went on.

120. FE-4 described how customers would signal to him that they were interested in trying ON24 for one event and reluctantly signing on for the one-year subscription in order to do this. FE-4 explained that some customers had previously established multi-year deals with Zoom at the time and did not want a long-term commitment to ON24 as well. FE-4 explained that ON24 did have an integration with Zoom, which was a selling point for clients especially if they only wanted a one-year subscription. FE-4 described how ON24's Zoom integration made it worth it for these clients, a lot of whom already had Zoom.

121. FE-4 recalled a lot of notes and memos going around in November/December or early winter 2020 hinting that the Company would be going public soon and with that came the additional pressure on staff. FE-4 explained that this pressure continued after the IPO. FE-4 explained that from his perspective there was increased pressure for him to set meetings, while account executives were pressured to sign clients, noting that overall the whole sales team was feeling the pressure. According to FE-4, the Company expected more from the sales team despite the declining demand, failing to adjust to the changes from the beginning of the pandemic.

**(e) Former Employee 5**

122. Former Employee 5 or FE-5 was an ON24 sales development representative or SDR from August 2020 through July 2021. FE-5's responsibilities included handling new business opportunities for mid-market clients, which involved engaging potential customers and setting up meetings with account executives.

123. According to FE-5, demand was very high during the Spring, Summer, and Fall of 2020, so account executives were more selective with what potential customers they took meetings with. FE-5 recalled that during that timeframe, he was exceeding his quotas and even exceeding the more difficult quotas that were implemented thereafter.

124. FE-5 explained that in the beginning there were other companies coming in at a similar price point to ON24, so that did not become an issue until later on. According to FE-5, customers were not using the platform as a replacement for their internal systems, such as Microsoft Teams, and that ON24 was primarily used for marketing purposes through webinars or large company all-hands type of events.

125. FE-5 recalled that, after a lot of early success, things really dropped off and demand declined during November/December 2020. FE-5 explained that market saturation and uncertainty regarding COVID-19 played crucial roles. FE-5 added that new competition was springing up and offering customers the ability to hold one-off events at more reasonable prices, and that ON24 began losing potential clients during initial calls.

126. FE-5 clarified that the drop-off occurred towards the end of 2020 and customer interest continued at the turn of the year. FE-5 explained that ON24 became interested in pursuing a hybrid model to cater to potential clients interested in one-time events, and there were discussions around the possibility of a less strict subscription model. FE-5 agreed that the Company became less particular about its prospective clients as time went on, whereas previously ON24 had only wanted a particular client profile.

127. According to FE-5, prior to his employment with the Company, SDRs were focused on large enterprise clients exclusively, and when he joined in August 2020, he was placed on a new team that focused on small and mid-market clients. FE-5 explained that he was

instructed to target tech companies in the software as a service ("SaaS") space because these customers were likely to have the necessary resources available to them to afford ON24.

128. FE-5 explained that over time the focus on tech companies lessened and any prospective client with a suitable "use case" was considered even if it appeared they would have less money available for ON24's products. FE-5 recalled that the instruction was to get clients in the door, regardless of if they satisfied ON24's previously particular prospective customer profile.

129. FE-5 recalled a shift from inbound to outbound customers, and as 2020 turned to 2021, customers were more interested in "one-off" events. According to FE-5, these prospective clients would express that they did not have the capital that made sense for a subscription like ON24 or they simply did not have a use for a platform such as ON24 any longer. FE-5 added that meetings with clients deemed "event only" were taken on more and more as time went on.

130. According to FE-5, Webex, Zoom, and later Hopin, served as ON24's primary competition. FE-5 explained that price became the number one objection by customers as time went on. FE-5 added that customers would speak positively about the platform, but ultimately decline to advance the process due to the one-year commitment and the considerable price compared to competitors.

131. FE-5 clarified that when he initially joined ON24, BrightTALK was essentially ON24's only competitor. FE-5 explained that BrightTALK had a similar platform at a similar price point and at this time Zoom did not yet offer measurements for engagement metrics.

132. According to FE-5, the competition shift occurred with the shift towards an increased desire for one-off events. FE-5 explained that once this occurred, Zoom and Hopin became greater competitors. FE-5 explained that Hopin's price was based on number of registrants, which was much more attractive for smaller customers, like those that he dealt with. FE-5 recalled that as a member of Commercial Acquisition I, his focus was on prospective customers that had between 25 and 200 employees.

133. FE-5 recalled Hopin becoming a real issue for ON24 later in 2020, which continued in 2021, as Hopin had become the Company's biggest competition. According to FE-

5, Hopin was a cheaper alternative and customers were drawn to its transparent pricing model. FE-5 explained that Hopin was available for one-off events and did not have the same contract requirements as ON24.

134. FE-5 clarified that that Hopin's prominence rose in 2021, the same time that things began opening up regarding COVID-19 restrictions, and customers had a greater interest in hosting cheap one-time events.

135. FE-5 added that it was his understanding that ON24 was exploring altering their product suite to cater to one-off events at a more reasonable price point in late 2020, but he is not sure what the status of that possibility ended up being.

136. According to FE-5, there was a big shift towards hybrid style events, which SDRs began pitching to customers. FE-5 explained that companies were optimistic about hosting in-person events in 2021 and as a result expressed uncertainty regarding their willingness to commit to a one-year subscription. FE-5 continued to say that the hybrid model, which would allow for in-person events to be accessible to those who could not attend, was a selling point SDRs used to try to convince prospective clients of ON24's value.

137. FE-5 recalled a shift around the time of the IPO in February 2021 and noted that the shift to new quotas for sales staff were announced in either March or April. According to FE-5, when demand began to drop off the sales staff pushed a lot harder, including more dials and contact increased in late 2020. FE-5 explained that the new quotas were announced without warning and included an increase of 40-45%.

138. FE-5 explained that the shift was pretty much centered around the IPO and that it was made clear that ON24 going public and its numbers being public as a result contributed to messaging for sales staff to push. According to FE-5, the pressure to increase output did not appear to be coming from sales managers, but instead from the top.

139. According to FE-5, quotas and key performance indicators ("KPIs") increased for SDRs and account executives, and it was his understanding that Defendant Sharan had a hand in determining these new benchmarks. Through conversations with account executives, FE-5 recalled that it was not just the SDR team whose quotas went up, but also account executives.

140. According to FE-5, Defendant Sharan was tuned in to what was going on with the sales team and was closely monitoring their performance. FE-5 explained that Defendant Sharan played a role in the establishment of the new quotas, noting that it was Defendant Sharan and other executives pushing the sales directors who then pushed the account executives to increase numbers. FE-5 added that he was told that Defendant Sharan oversaw everything.

141. FE-5 explained that in speaking with account executives, it was his understanding that Defendant Sharan was a micro-manager and was hands on with the account executives. For example, FE-5 explained that when contracts were going through, it would have to go through Defendant Sharan and not just the account executives. FE-5 explained that it appeared that the executive team as a whole was closely involved with monitoring the performance of the sales team. FE-5 added that you could see that every decision, from every team, came from Defendant Sharan and that Defendant Sharan wanted control of every aspect of every department.

142. According to FE-5, customers became reluctant over signing one-year deals as time went on, especially in his segment. FE-5 noted that early on customers were somewhat experimenting to see if a platform like ON24 could add value to their business. FE-5 explained that, over time, clients realized ON24 did not add enough to their bottom line to justify the cost of the subscription. FE-5 stated that customers either removed this aspect from their businesses all together or elected to go with a cheaper alternative.

143. FE-5 recalled conversations with account executives where it became apparent that Defendant Sharan was aware when inbound opportunities slowed down. FE-5 stated that in response, the SDRs had to go to an outbound approach, which was seen by all the account executives from the meetings booked by the SDR team. According to FE-5, when account executives saw what was happening regarding demand, they went to the SDRs, who informed them that opportunities were no longer coming in like they were previously. FE-5 explained that this information made its way up the chain of command.

### 2. The Offering Documents Contained Materially False and Misleading Statements About ON24's Customers and Financial Condition

144. The Offering Documents misleadingly touted ON24's customer base of over 1,900 highly engaged and loyal customers as of September 30, 2020. The Offering Documents stated, in pertinent part, as follows:

> ***As of September 30, 2020, we had over 1,900 customers*** in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue. No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020. ***We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time***, and achieve an NRR of 147% as of September 30, 2020. Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.

145. The Offering Documents misleadingly claimed that ON24's competitive strengths include a growing base of customers across verticals, including 1,900 customers as of September 30, 2020, and that ON24 intended to leverage its land and expand model to further penetrate customers across these verticals. The Offering Documents stated, in pertinent part, as follows:

> ***Growing base of customers across verticals. We have a large and diverse set of customers across a broad set of industries. We have grown our customer base from approximately 760 customers as of December 31, 2015 to over 1,900 customers in more than 40 countries as of September 30, 2020***, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial manufacturing companies, in each case measured by 2019 revenue. ***We intend to leverage our land and expand model to further penetrate customers across these verticals***.

146. The Offering Documents misleadingly claimed that ON24's annual recurring revenue or ARR reflects its success in acquiring new customers and expanding subscriptions within existing customers. The Offering Documents stated, in pertinent part, as follows:

> Key Factors Affecting Our Performance
>
> * * *
>
> Annual Recurring Revenue
>
> We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription

> customers and to maintain and expand our relationship with existing subscription customers. ARR is calculated as the sum of the annualized value of our subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR amounts exclude professional services, overages from subscription customers and Legacy revenue. Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020. ***Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic***.

147. The statements referenced above in ¶¶144-146 were each materially false and misleading statements of material fact when made because they failed to disclose and misrepresented the following significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO:

(a) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell;

(b) Of these new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell;

(c) Prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID-19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue;

(d) During both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts;

(e) Before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn;

(f) Customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract;

(g) Prior to the IPO the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango;

(h) Customer demand declined during November and December 2020; and

(i) Given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021.

### 3. The Offering Documents Contained Material Omissions About ON24's Customers and Financial Condition

148. The Offering Documents were also materially false and misleading in context because they omitted the following material adverse facts, material adverse trends, material uncertainties, or significant risks that existed at the time of the IPO, including:

(a) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell;

(b) Of these new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell;

(c) Prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID-

19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue;

(d) During both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts;

(e) Before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn;

(f) Customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract;

(g) Prior to the IPO the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango;

(h) Customer demand declined during November and December 2020; and

(i) Given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021.

149. The Offering Documents misleadingly touted ON24's growth strategy, including expanding within existing customers by selling more subscriptions to existing customers and upselling new solutions. The Offering Documents stated, in pertinent part, as follows:

> Our Growth Strategy
>
> We intend to drive the growth of our business and the adoption of our solutions by executing the following strategies:
>
> - Expand within existing customers. We believe we can achieve significant organic growth by expanding penetration of our existing customer base. ***Our land and expand model drives expansion of new subscriptions within our existing customer base by selling subscriptions to additional parts of existing***

> ***customers' organizations, expanding into new regional divisions and upselling new solutions***. In addition, we are developing new applications for our platform, including partner training and employee recruiting and forms of indirect marketing, such as education, enrollment and benefits programs.

150. The Offering Documents misleadingly touted how the COVID-19 pandemic accelerated ON24's opportunity to help businesses generate revenue as industries modernize. The Offering Documents stated, in pertinent part, as follows:

> Businesses today primarily use automated solutions, such as digital advertising and email, for marketing. While these automated solutions reach large numbers of prospective customers, they have generally failed to deepen customer engagement because they were designed with the simple purpose of pushing marketing messages in one direction—from the business to the prospective customer. For businesses to succeed, we believe their sales and marketing strategies must evolve from the era of automation to the era of engagement. Our platform provides an innovative way both to scale digital marketing and deepen prospective customer engagement. We believe ***our opportunity to help businesses convert digital engagement into revenue will continue to grow as industries modernize their sales and marketing processes, which has been accelerated by the COVID-19 pandemic***.

151. The Offering Documents misleadingly emphasized and touted how ON24 had seen an increase in the proportion of multi-year subscriptions as the number of larger customers increase. The Offering Documents stated, in pertinent part, as follows:

> The terms of our subscription agreements are primarily annual and, to a lesser extent, multi-year. We bill for the full term in advance or on an annual or monthly basis, depending on the terms of the agreement. We recognize subscription revenue ratably over the term of the subscription period beginning with the date customers are granted access to our platform. Our contracts typically require payments in annual installments. ***We have seen an increase in the proportion of multi-year subscriptions as the number of larger customers has increased***. Customers with multi-year subscription agreements accounted for 21% and 27% of ARR as of December 31, 2018 and September 30, 2020, respectively. See "—Key Business Metrics—Annual Recurring Revenue" for further information regarding how we calculate ARR.

152. The Offering Documents misleadingly claimed that ON24 continued to focus on customers with 2,000 or more employees and expand usage within those accounts. The Offering Documents stated, in pertinent part, as follows:

> ***We intend to continue to focus on the acquisition of new customers with 2,000 or more employees, or Enterprise***

> ***customers, and to expand the usage of our platform within these larger accounts***. We follow a named account coverage approach with aligned account teams, including sales, account management and customer success. After establishing a customer relationship with a business unit of an Enterprise, we seek to expand to new business units, divisions, departments and geographic regions, as well as increase subscriptions to additional products, which we refer to as "attachments," and expand product use cases.

153. The Offering Documents misleadingly claimed that ON24 could achieve significant growth by retaining, upselling, and increasing sales among existing customers. The Offering Documents stated, in pertinent part, as follows:

> We believe ***we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell***. Our multi-dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment. As we continue to drive more actionable revenue generating marketing insights, we believe that ***we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization***. Our ability to pursue this opportunity will require us to scale our sales and marketing organization and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period.

154. The statements referenced above in ¶¶149-153 were each materially false and misleading in context because they omitted the following significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO:

(a) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell;

(b) Of these new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell;

(c) Prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID-

19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue;

(d) During both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts;

(e) Before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn;

(f) Customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract;

(g) Prior to the IPO the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango;

(h) Customer demand declined during November and December 2020; and

(i) Given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021.

155. Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(a)(3)(ii), required the Defendants to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on the sales or revenues or income from continuing operations." Similarly, Item 105 of SEC Regulation S-K, 17 C.F.R. § 229.105, requires, in the "Risk Factors" section of registration statements and prospectuses, "a discussion of the most significant factors that make the offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." The failure of the Offering Documents to disclose the omitted material facts set forth above in ¶¶144-154—including the

fact that ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020, the three quarters preceding the IPO, that planned to either not renew or downsell—violated Item 303, because these undisclosed facts were known and would (and did) have an unfavorable impact on the Company's sales, revenues, and income from continuing operations. This also violated Item 105, because these specific risks were not adequately disclosed, or disclosed at all, even though they were some of the most significant factors that made an investment in ON24's stock speculative or risky. Indeed, as alleged below in ¶¶156-162, the purported Risk Factors that were provided in the Offering Documents were themselves materially false and misleading when made.

### 4. The Offering Documents Failed to Disclose Significant Risks Concerning ON24's Customers That Made the IPO More Speculative and Risky

156. The Offering Documents contained materially misleading risk factors that failed to warn of significant, then-materialized risks posed by ON24's one-time and event only customers that planned to either not renew or downsell, including weak revenues, operating losses, and losses per share. In other words, the Offering Documents contained materially misleading risk factors that purported to warn of various risks related to, *e.g.*, ON24's growth, ability to retain and upsell existing customers, and the impact of COVID-19 that "may" adversely affect the Company, while failing to disclose that these very "risks" had materialized prior to and at the time of the Offering.

157. The Offering Documents inaccurately described as potential certain risks associated with ON24's ability to sustain revenue growth and expand sales to existing customers, fluctuation in ON24's performance, potential decline in demand for ON24's solutions, ON24's ability to expand its sales and marketing capabilities and manage its growth, and the impact of the COVID-19 pandemic. The Offering Documents stated, in pertinent part, as follows:

> Investing in our common stock involves risks, which are discussed more fully under "Risk Factors." You should carefully consider all the information in this prospectus, including under "Risk Factors," before making an investment decision. ***These risks include, but are not limited to, risks relating to***:

- ***Our ability to sustain our recent revenue growth rate in the future, attract new customers and expand sales to existing customers***;
- ***Fluctuation in our performance, our history of net losses and expected increases in our expenses***;
- ***Competition and technological development in our markets and any decline in demand for our solutions or generally in our markets***;
- ***Our ability to expand our sales and marketing capabilities and otherwise manage our growth***;
- ***The impact of the COVID-19 pandemic***.

158. The Offering Documents inaccurately described as potential certain risks associated with ON24's ability to sustain recent revenue growth, the impact of increasing demand following the onset of the COVID-19 pandemic, and whether new customers will elect not to continue their subscriptions. The Offering Documents stated, in pertinent part, as follows:

> ***We may not be able to sustain our recent revenue growth rate in the future***.
>
> For the year ended December 31, 2019, our revenue increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. ***Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscription as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed***.

159. The Offering Documents inaccurately described as potential certain risks associated with fluctuations in ON24's quarterly results and the performance of the business, potential declines in ON24's revenue growth rate and fewer new enrollments or renewals as the impact of COVID-19 lessens, and ON24's ability to retain and expand customer usage, and to attract new customers. The Offering Documents stated, in pertinent part, as follows:

> ***Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business***.

> Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. ***For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens***. Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. ***If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease***. Fluctuation in quarterly results may negatively impact the value of our securities. ***Factors that may cause fluctuations in our quarterly results of operations include:***
>
> - ***our ability to retain and expand customer usage***;
> - ***our ability to attract new customers***.

160. The Offering Documents inaccurately described as potential certain risks associated with: ON24's ability to attract new customers or retain, expand the usage of, or upsell products to existing customers; whether customers will renew, increase their usage of, or purchase subscriptions for additional solutions; whether subscription renewals will decline or fluctuate; and whether ON24 will expand the usage of solutions amongst existing customers. The Offering Documents stated, in pertinent part, as follows:

> ***Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects***.
>
> We derive, and expect to continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products. As such, our business depends upon our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling additional solutions. Our business is largely subscription-based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire. ***As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all. Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options***. In order to grow our business, we must continually add new

> customers and replace customers who choose not to continue to use our platform. Any decrease in user satisfaction with our solutions or support may result in negative online customer reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow.
>
> ***In addition to striving to attract new customers to our platform, we seek to expand the usage of our solutions by our existing customers by increasing the number of departments, divisions and teams that use our solutions within each of our customers. If we fail to expand the usage of our solutions by existing customers or if customers fail to purchase other solutions from us, our business, financial condition and results of operations would be harmed***.

161. The Offering Documents inaccurately described as potential certain risks associated with: COVID-19's impact on ON24's results of operations; the economic impact of COVID-19 on customer and prospective customer spending; customers' ability or willingness to purchase or renew subscriptions; whether ON24's results of operations reflect the effect of COVID-19; and COVID-19's effects on customer demand. The Offering Documents stated, in pertinent part, as follows:

> ***Our results of operations may be adversely impacted by the COVID-19 pandemic***.
>
> ***[T]he economic impacts of COVID-19 have affected and may continue to affect customer and prospective customer spending on technology such as ours, particularly for businesses involving in-person interactions, such as hospitality, manufacturing and professional services businesses. These customers may experience reduced revenue and revised budgets, which may adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, customer retention, and the value or duration of subscriptions, all of which could adversely affect our operating results***.
>
> * * *
>
> ***Due to our subscription-based business model, the effect of the COVID-19 pandemic may not be fully reflected in our results of operations until future periods***. In addition, uncertainty regarding the impact of COVID-19 on our future operating results and financial condition may result in our taking cost-cutting measures, reducing the level of our capital investments and delaying or canceling the implementation of strategic initiatives, any of which may negatively impact our business and reputation. ***The global macroeconomic effects of the COVID-19 pandemic and related impacts on our customers' business operations and their demand for our solutions may persist for an indefinite period, even after the COVID-19 pandemic has subsided***.

162. The statements referenced above in ¶¶157-161 were each inaccurate statements of material fact when made because while noting only the potential negative impacts on ON24's business, financial condition, and results of operations, the Offering Documents failed to disclose the following significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO:

(a) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned to either not renew or downsell;

(b) Of these new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020, a larger-than-typical percentage were SMB customers and nonideal customers focused on using ON24's platform for one-time events that did not integrate ON24's platform into their sales and marketing ecosystems because they planned to either not renew or downsell;

(c) Prior to the IPO, ON24 relaxed the qualification criteria to sign up new customers and shifted to signing up one-time, event-only customers that saw ON24 as a COVID-19 related expense, regardless of whether the customer had an appropriate use case or would be "sticky" customers generating recurring revenue;

(d) During both 2020 and 2021, customers informed ON24 employees as much as six months in advance that they were not going to renew their contracts;

(e) Before the COVID-19 pandemic, ON24 was already aware that there was high churn amongst SMB customers, and the pandemic amplified this high churn;

(f) Customer churn manifested prior to the IPO in several ways: customers only using ON24 as a COVID-19 solution and electing not to renew; customers such as event managers not renewing one-time purchases; and customers electing to downsell and remove features from their contract;

(g) Prior to the IPO the facts that ON24's small business customers were not renewing, were choosing to downsell, and did not have good retention rates were discussed at monthly "sales and client success" meetings, and customer churn was reflected in churn reports and email updates and recorded with Salesforce, Forrester, Gartner, and Totango;

(h) Customer demand declined during November and December 2020; and

(i) Given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO, as well as inevitable weaker revenues, operating losses, and losses per share in 2021.

**E. Events Following the IPO**

163. After the market closed on August 10, 2021, just six months after the IPO, ON24 announced its financial results for Q2 2021. In its Q2 2021 earnings release, ON24 provided its financial outlook for the third quarter ended September 30, 2021 ("Q3 2021"). Specifically, ON24 reported that it expects total revenue of $47.5 to $48.5 million—***$3.2 million less*** at the midpoint versus analysts' consensus of $51.2 million total revenue. ON24 also reported that it expects a non-GAAP operating loss of $(4.0) to $(3.0) million and a non-GAAP net loss per share of $(0.09) to $(0.07)—***$0.9 million and $0.03 per share worse*** at the midpoints versus analysts' consensus of $(2.60) million operating loss and $(0.05) net loss per share, respectively.

164. In the same Q2 2021 earnings release, ON24 also provided its financial outlook for the full year ended December 31, 2021 ("FY 2021"). Specifically, ON24 reported that it expects total revenue of $201.2 to $204.2 million—***$6.3 million less*** at the midpoints versus ON24's prior guidance of $207.5 to $210.5 million total revenue, and ***$6.4 million less*** at the midpoint versus analysts' consensus of $209.1 million total revenue. ON24 also reported that it expects a non-GAAP operating loss of $(4.3) to $(1.3) million and a non-GAAP loss per share of $(0.13) to $(0.06)—***$2.3 million and $0.05 per share worse*** at the midpoints versus ON24's prior guidance of $(2.0) to $(1.0) million operating loss and $(0.08) to $(0.02) loss per share, and ***$2.6 million and $0.10 per share worse*** at the midpoints versus analysts' consensus of $(0.2) million operating loss and $0.0 loss per share.

165. During the related Q2 2021 earnings call held on August 10, 2021, Defendant Sharan claimed that ON24 "experienced higher-than-expected ***churn and downsell from customers we signed up in the second quarter of last year*** during the peak of COVID. This

***higher churn was primarily in the first-time renewal cohort***, customers who signed up 1-year contracts last year and who were up for renewal." Defendant Sharan added that "the total Q3 and Q4 renewal cohorts are meaningfully smaller than Q2. Most importantly, when we look at Q2, the ***lower churn was primarily in the SMB***."

166. During the same Q2 2021 earnings call, Defendant Vattuone explained:

> [T]he ***share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort. We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events*** who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

Defendant Vattuone added that, "in the second quarter of 2020, a larger-than-typical percentage of customers added were SMB customers, and these customers accounted for approximately 50% of our logo churn."

167. In response to a question about churn from an analyst at Defendant Baird, Defendant Vattuone answered, "Now the primary factor for this was our first year renewals, which Sharat mentioned, being over 60% of the renewal mix in Q2. And we did see higher churn and downsell than we were initially expecting."

168. The same analyst at Defendant Baird followed up with another question about churn, to which Defendant Sharan responded, "One of the things we learned, now that we know the data points and why these people churn, if they don't integrate our platform in this onetime use case, that's not the customer I want."

169. In response to another question about churn from an analyst at Defendant KeyBanc, Defendant Sharan answered,

> First of all, I explained our ideal customer buyer profile, and I think it's important to keep in mind that we focus on solving the sales, marketing and partner engagement platform, right? People who -- customers who integrate our products in their sales and marketing ecosystem. Now we have the churn that we saw was downsell, that we would win back. And we also talked about the SMB customers being -- and the onetime buyers were the large part of the churn. So let me talk about the SMB and onetime buyers. As these folks saw in Q2 that life may return to some form of normalcy, they're focused on going back to physical events and then also probably thought about going back to cheaper point solutions, cheaper virtual event platforms, okay? In some cases,

> what I would call ankle buyers, okay? And there's also probably a small portion of people who -- our sales and marketing customers but don't care about data and integration. They may have looked at cheaper video conference tools.

170. Market analysts quickly noted both the weakened third quarter 2021 and full year 2021 outlook and the unexpected churn issues. On August 11, 2021, for example, analysts at Defendant JPMorgan downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $85 per share to $32 per share in a report titled "2Q21: Downgrading to Neutral as Post-Pandemic Churn/Down-Sell Is Bigger than Anticipated." The report explains that the "***major issue is the increase in churn and enterprise down-sell that will likely cause platform revenue to decelerate into the first quarter of 2022***." The report stresses:

> ***Management's previous guidance had not factored in enough in churn from smaller accounts*** that had driven up professional services revenue, and that causes a double hit to both platform and professional service revenue line items. Separately, a shift back to hybrid and in-person events is seeing some portion of enterprise accounts reducing spend on items like number of licenses and workspaces, and that further impacts platform revenue.

171. The August 11, 2021, JPMorgan report further explains:

> On24 experienced ***higher than expected churn and down-sell in the June quarter, primarily in the first-time renewal cohort that represented ~60% of the entire renewal base. Less sticky SMB customers accounted for roughly 50% of this churn***, as many of these businesses rushed to adopt digital solutions at the onset of the pandemic but now are either adopting smaller-scale solutions or returning to in-person events.

The report also notes: "FY21 revenue guidance is coming down by ~$6M at the midpoint as a result of these dynamics, in addition to the fact that professional services revenue should decline to 13-14% of total revenue for the full-year, down from its COVID high of ~22% in FY20."

172. On August 11, 2021, analysts at Defendant Canaccord downgraded ON24's common stock from "buy" to "hold" and lowered their price target from $45 per share to $30 per share in a report titled "COVID renewals take a bite out of growth; ***ONTF in the penalty box***, downgrade to HOLD." The report explains:

> Q2 was a transition quarter as vaccinations became widespread and a significant number of transitory customers who had joined ON24's platform out of necessity during the pandemic chose not to renew. ***Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID,***

> ***and in particular from SMB buyers*** within that cohort who had rushed to find alternatives to in-person business for one-time events – 50% of logo churn came from those SMBs. ***To be clear, these are not normally ON24's target customer***, with its platform being far better suited to enterprises, and priced as such.

173. The August 11, 2021, Canaccord report further explains:

> ON24 added 183 new logos during the quarter, which was offset by 167 customer departures, equating to 8% logo churn in a single quarter. For the sake of comparison, ON24 added 266 net new customers in the year ago quarter – ***we believe this indicates that around half of renewals in that COVID cohort chose not to renew, if not more. This was ON24's largest renewal cohort ever, with the share of first-time renewals accounting for over 60% of the batch*** – the remaining 40% of the cohort saw retention dynamics equivalent to pre-pandemic levels.

The report also notes: "Management lowered its guidance for the year, citing two factors: (1) most obviously, churn and downsell in Q2 was more than anticipated, and those trends are flowing through to future periods; and (2) management expects professional services revenue to decline in conjunction with lower implementation- and one-time event-related fees."

174. On August 11, 2021, analysts at Defendant Piper Sandler also lowered their price target from $70 per share to $40 per share in a report titled "Largest Renewal Quarter Bites Hard as Customers Downsize; Lowering PT to $40." The report explains that "[m]ixed Q2 results and revised 2H guidance of 5% y/y (vs. 12% prior estimate) ***was clearly more negative than we had anticipated***. Q2 was the largest renewal quarter, and ***it bit hard as enterprise customers downsized contract values*** and was ***further exacerbated by higher SMB churn***."

175. The August 11, 2021, Piper Sandler report further explains:

> ***ARR stalled at $164.1M, pressured by renewal downsizing and churn****....* ARR increased just $1M sequentially to $164.1M with strong new customer additions partially offsetting the ***largest quarter of existing customer renewals that selected to downsize the number and volume of virtual events and webinars. SMB churn also contributed to the smallest number of net new customer additions of just 16 q/q in three years***.

The report also notes: "2H guidance lowered by $7M on declining professional services. The ***combination of renewal downsizing and higher SMB churn was accentuated by a material reduction in the 2H outlook for professional services***."

176. The August 11, 2021, Piper Sandler report also stresses: "Reducing PT to $40 on revised outlook and execution risk. Despite ***material estimate cuts, a considerable amount of near-term execution risk, and a potential turnaround that might not materialize until mid-2022***, we see limited downside risk below our bear-case of $25 (4x CY23E EV/S)."

177. On August 11, 2021, analysts at Defendant William Blair analyzed ON24's weak results and financial outlook in a report titled "Rocky Second Quarter Impacted By Churn and Downsell in COVID Cohort; Revenue Guidance Lowered for the Year." The report explains:

> At the beginning of the pandemic, many customers looked to ON24 as a quick fix to help them reach their customers in a virtual environment. While this led to explosive growth for the company during 2020, many of them purchased ON24 for a limited use-case (e.g., hosting a small number of webinars) and did not take advantage of the data capture and analytics capabilities that are a core part of ON24's platform. In addition, ***many of these customers were outside the customer profile the company typically targets. Of those customers who churned, about 50% were SMB, whereas ON24 is primarily enterprise focused***.

178. After the market closed on November 9, 2021, just nine months after the IPO, ON24 announced its financial results for the third quarter ended September 30, 2021, or Q3 2021. In its Q3 2021 earnings release, ON24 provided its financial outlook for the fourth quarter ended December 31, 2021 ("Q4 2021"). Specifically, ON24 reported that it expects total revenue of $51.0 to $52.0 million"—***$0.8 million less*** at the midpoint versus analysts' consensus of $52.3 million total revenue.

179. During the related Q3 2021 earnings call held on November 9, 2021, Defendant Sharan claimed that the "third quarter of 2021 marked our lapping the second COVID-influenced quarter. Overall, the dollar value of churn declined quarter-over-quarter, and churn rate was in line with our expectations." Defendant Sharan added: "As we anticipated in Q2, the percentage of first-time renewals in the renewal cohort decreased meaningfully quarter-over-quarter, although ***we continue to face headwinds from those renewals***."

180. During the same Q3 2021 earnings call, Defendant Vattuone explained:

> In Q3, we lapped another COVID-influenced quarter and first-time renewals from customers who purchased in the year ago period represented slightly more than half of the total renewal cohort, a meaningful decline compared to Q2. ***We faced headwinds with respect to those first-time renewals, particularly with***

> ***organizations that were not our ideal customer profile and had onetime needs***. We also saw some rationalization with midterm additions from the year ago period. Overall, the dollar value of churn declined compared to Q2, and the churn rate was in line with our forecast.

Defendant Vattuone added:

> Total customer count declined slightly quarter-over-quarter to 2,054, with ***SMB churn representing the largest contributor to the decrease***. Given the learnings from the past couple of quarters, ***we are laser-focused on acquiring enterprise and mid-market customers that meet our ideal customer profile*** and with whom we can develop a lasting strategic relationship.

181. In response to a follow-up question about the "sequential" loss of new customers and "SMB churn" from an analyst at Defendant Piper Sandler, Defendant Vattuone answered: "So in terms of Q3, given our learnings from the last couple of quarters, we are really most focused on customer quality and adding enterprise and mid-market customers that really meet our ideal customer profile. I can tell you that ***SMB was the largest contributor to the customer count decrease in Q3***."

182. Market analysts quickly noted both the weakened Q4 2021 outlook and the continued churn issues. On November 10, 2021, for example, analysts at Defendant JPMorgan lowered their price target from $32 per share to $22 per share in a report titled "3Q21: Working Towards Stabilization." The report explains:

> (1) Total customer count declined by ~1% sequentially to 2,054, ***largely driven by continued SMB churn***. (2) Net new ARR of $3.1M brought September quarter total ARR to $167.2M, and this metric was negatively impacted by the fact that ***slightly more than half of the total renewal cohort were first-time renewals***.
> (3) Though renewal-related headwinds are beginning to abate, the percentage of first-time renewals should still represent ~30% of the total renewal cohort in the fourth quarter.

183. On November 10, 2021, analysts at Defendant Canaccord lowered their price target from $25 per share to $19 per share in a report titled "A little bit of good, a little bit of bad, but not enough to change our view in either direction; HOLD." The report explains:

> [A]ttrition remains a challenge at the low-end of the market as ON24 works through a ***slew of first-time renewals that signed on during the depths of the pandemic***. To that point, ***the firm's total customer count actually declined sequentially – a dynamic we had yet to see play out in this model*** – and guidance suggests that revenue will decline year-over-year in Q4, which is heavily

> influenced by lower services revenue (subscription should grow about 10%).

184. The November 10, 2021, Canaccord report further explains:

> ***[O]utsized logo churn continued***, bringing total customer count down by 24 sequentially to 2,054 (+7% y-o-y) – ***logo churn was primarily attributed to SMB cohorts that became first-time customers during the pandemic primarily looking for one-time alternatives to in-person events***. The number of >$100K ARR customers increased by 14 to 359 in Q3, which was also a decline in net adds to that group, although it now accounts for ~67% of total ARR.

The report also notes:

> Management alluded to longer sales cycles as it focuses its GTM efforts on acquiring enterprise and mid-market customers that tend to be more strategic and complex in nature. ***In terms of first-time renewals who purchased in the COVID influenced year ago period, management noted this cohort had decreased meaningfully q-o-q and represented ~50% of total renewals this quarter***. Further, it is expected to drop to ~30% of total renewals in Q4, and Q1/22 will mark the last COVID influenced quarter – the ***expectation is these one-time COVID buyers will largely churn off or settle, and the firm will be able to move forward with churn characteristics that more closely align with pre-COVID historical norms***.

185. On November 10, 2021, analysts at Defendant Piper Sandler also lowered their price target from $40 per share to $25 per share in a report titled "COVID Hangover Persists; Lowering 2022 ARR Estimates and Reducing PT to $25." The report explains that "While ARR exceeded $150M+ exiting last year, ***eroding customer renewals rate and contract downsizing over the last two quarters has pressured ARR growth to moderate meaningfully*** to an estimated 11% y/y this year."

186. The November 10, 2021, Piper Sandler report further explains:

> Despite a slight improvement in ARR build in Q3 (+$3.1M q/q vs. $1.1M during Q2), we are ***lowering 2022 revenue estimates by $11M to better reflect near-term headwinds***. Additionally, we are lowering our PT to $25 from $40 on ***increasing execution risks, lower estimates, and a lower multiple*** given our updated growth outlook.

The report stresses:

> ***ON24 continued to see headwinds from first-time renewals***, but noted that both the percentage of first-time renewals in the renewal cohort and the dollar value of churn declined q/q. Despite a $1.4M beat to the midpoint of Q3 revenue guidance, full-year 2021

> revenue guidance was only raised $0.4M at the midpoint and continues to represent a ***moderation to 29% y/y growth from 76% growth in 2020***.

187. On November 10, 2021, analysts at Defendant William Blair analyzed ON24's weak financial outlook in a report titled "Mixed Quarter With Solid Quarterly Results but Underwhelming Guidance." The report explains:

> ON24 did not flow the entire revenue beat through its updated full-year revenue guide, implying ***continued weakness into the fourth quarter***. Although ON24's guidance plans are disappointing, we believe that management is taking a conservative stance to its fourth-quarter guidance, which factors in ***similar churn and down-sell dynamics that the company experienced in the second and third quarter this year***. Of note, ON24's COVID-19 renewal cohort is expected to represent just 30% of the overall renewal base in the fourth quarter (down from 50% in the third quarter and 60% in the second quarter).

The report stresses: "Despite the conservative guidance, we believe there may still be a few ***tough quarters ahead for ON24 as it works through renewal cycles for its COVID cohort of customers*** and laps difficult comps. The 2022 guide next quarter will be critical, and we believe first-half revenue figures still pose some risk of being underwhelming."

188. The November 10, 2021, William Blair report further explains: "In the third quarter, total customers fell by 1.2% sequentially to 2,054 ***as ON24 continues to see elevated churn dynamics in its SMB customer base***."

189. After the market closed on February 28, 2021 one year after the IPO, ON24 announced its financial results for the fourth quarter and full year ended December 31, 2021, or Q4 and FY 2021. In its Q4 2021 earnings release, ON24 provided its financial outlook for the first quarter ended March 31, 2022 ("Q1 2022"). Specifically, ON24 reported that it expects "total revenue of $47 to $48 million"—***$4.5 million less*** at the midpoint versus analysts' consensus of $52 million total revenue. ON24 also reported that it expects a non-GAAP operating loss of $(8) to $(7) million and a non-GAAP net loss per share of $(0.17) to $(0.15)—***$4.4 million and $0.10 per share worse*** at the midpoints versus analysts' consensus of $(3.1) million operating loss and $(0.06) net loss per share, respectively.

190. In the same Q4 and FY 2021 earnings release, ON24 also provided its financial outlook for the full year ended December 31, 2022 ("FY 2022"). Specifically, ON24 reported that it expects total revenue of $200 to $204 million—***$21.4 million less*** at the midpoint versus analysts' consensus of $223.4 million total revenue. ON24 also reported that it expects a non-GAAP operating loss of $(30) to $(27) million and a non-GAAP loss per share of $(0.64) to $(0.58)—***$22.8 million and $0.50 per share less*** at the midpoints versus analysts' consensus of $(5.7) million operating loss and $(0.11) loss per share.

191. During the related Q4 and FY 2021 earnings call held on February 28, 2022, Defendant Sharan explained: "Looking ahead, we believe that Q1 will mark the trough for 2022. By far, our ***largest challenge in 2021 was the first time renewal cohort*** which is 4x the dollar value of first-time renewals in 2019 and had a churn rate that was approximately double that are [sic] first-time renewals in 2019." Defendant Vattuone elaborated on customer churn:

> Our dollar-based net retention rate, or NRR, ended the year at 97%. As a reminder, NRR is a lagging indicator and reflects the ***impact of elevated churn that we experienced over the past few quarters with first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs*** as well as some customers that rationalized their expansions.

192. During the same Q4 and FY 2021 earnings call, Defendant Vattuone explained: "Our ***largest challenge that we experienced in 2021 was the first-time renewal cohort***, which was 4x the dollar value of first-time renewals in 2019, and ***we experienced a churn rate that was approximately double that of the 2019 cohort***."

193. Defendant Vattuone blamed ON24's weak FY 2022 outlook on customer churn: "We expect a non-GAAP operating loss in the range of $30 million to $27 million and a non-GAAP net loss per share of $0.64 to $0.58 per share using 49 million basic and diluted shares outstanding. As I mentioned, we faced headwinds in 2021, ***primarily from the elevated churn within first-time renewal cohorts and rationalization*** from large expansions during COVID."

194. In response to a follow-up question about churn from an analyst at Defendant William Blair, Defendant Vattuone answered: "Now we've always run this company prudently,

but we are making targeted investments to drive growth, but the major issue really has been churn." Defendant Sharan added:

> Let me add, Arjun, to what Steve just said is ***churn has been our biggest issue***. If you look at 2021, I mean, we did quite well on growth ARR but the -- ***we couldn't outrun the churn***. And if you look at the numbers we talked about, the first-time renewal cohort where we saw the maximum churn, that size was 4x what it was in Q1 in 2019 and the churn of the first hand renewal cohort was twice what it was in 2019.

195. Market analysts quickly noted both the weak Q1 and FY 2022 outlook and the continued churn issues. On February 28, 2022, for example, analysts at Defendant JPMorgan lowered their price target from $22 per share to $16.50 per share in a report titled "4Q21: Almost Out of the Woods." The report explains:

> The December quarter was not too bad on the surface, but the ***churn/usage still has another quarter of pandemic headwinds to get through*** before we start to see ARR improvement. We do believe that ARR will be the leading metric to seeing overall improvement in revenue growth, but the ***one more quarter of headwinds does have us cutting our estimates again*** and that leads to the reduction in price target.

196. The February 28, 2022, JPMorgan report further explains:

> (1) ***On24 continues to experience elevated levels of churn, specifically in the first-time renewal cohort***. In January, a handful of customers with large expansions amid COVID-19 began to reassess their post-pandemic digital budgets and in turn showed higher than anticipated rationalization. This combined with a three-point revenue headwind related to a reduction in professional services and overages is resulting in FY22 revenue guidance of $202M at the midpoint, which is ~$23M below our previous estimate.... (3) Dollar-based net retention came in at 97%, down from 149% in the year-ago period and reflecting the ***impact of elevated churn over the past few quarters***. This was the first time that the company disclosed net retention in FY21 and the 97% level represents a steep discount to the pre-pandemic range of ~105-110%.

197. On March 1, 2022, analysts at Defendant Piper Sandler downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $25 per share to $17 per share in a report titled "Lowering to Neutral; Churn and Return to Travel Heighten Execution Risks." The report explains:

> Guidance reflects challenges ahead and increased investments. ***Top and bottom-line guidance came in below Street expectations*** for multiple reasons:

> - ***Churn from first-time renewals***: ***Q1 includes a large proportion of first-time renewals, many of which have already reduced spend on the platform as they 'rationalize' their pandemic expansions***. The 2021 first-time renewal cohort was 4x the dollar value with a churn rate 2x the size of the 2019 first-time renewal cohort. An ARR growth trough and elevated churn are expected in Q1.
>
> - Increased investments: ON24 plans to make targeted investments in customer success, the enterprise sales motion, the partner ecosystem, product innovation, and public cloud infrastructure. As such, non-GAAP operating loss guidance for 2022 is ($30M)-($27M) vs. Street expectations of ($5M).

198. On March 1, 2022, analysts at Defendant William Blair downgraded ON24's common stock from "outperform" to "market perform" and analyzed ON24's weak results and financial outlook in a report titled "Disappointing 2022 Outlook as Customers Rationalize Spend; Downgrading to Market Perform." The report explains: "[F]irst quarter and full year 2022 revenue guidance were below expectations as the company is anticipating ***higher-than-expected downsell and spend rationalization from its customers***. This is largely due to COVID-19 transitioning from pandemic to endemic as businesses return to more normal operations."

199. The March 1, 2022, William Blair report further explains:

> This is driving some of ON24's customers to reassess their budgets related to digital experiences, such as webinars and virtual events. The company noted that this is ***largely concentrated in customers that signed large expansions during COVID-19. However, these customers are having a meaningful impact on the company's ability to grow in 2022, as guidance calls for revenue to be flat at the high end and down 2% at the low end***. Given the change in the company's growth prospects as a result of fading pandemic effects, we believe the next few quarters will likely be tough for ON24 as it focuses on reaccelerating the business for growth in a post-pandemic world.

200. The March 1, 2022, William Blair report stresses:

> ***Downsell dynamics and churn were an ongoing challenge in 2021 as the COVID-19 cohort of customers came up for renewal for the first time***. While management reiterated its confidence that first quarter 2022 will be the last quarter impacted by the COVID-19 renewal cohort, ***customer rationalization of spend creates another headwind for growth in the same quarter***. As the world moves past COVID-19, companies across industries are beginning to revisit their digital experience budgets to optimize their strategy. During January 2022, management saw a handful of customers that have previously expanded their usage as much as 3 times during COVID-19 begin to reassess their post-COVID spend. While some rationalization is normal and forecast, this ***current rationalization***

> ***is higher than expected*** and hits at an earlier time than expected with bookings more heavily weighted toward the beginning of the quarter.

201. On March 1, 2022, analysts at Defendant Canaccord lowered their price target from $19 per share to $15 per share in a report titled "Another wave of renewal headwinds early in Q1 take a bite out of '22 growth; maintain HOLD." The report explains:

> The challenge, and ***what drove the disappointing 2022 guide, came after the quarter as January was an unusually large enterprise customer renewal month, and ON24 saw more significant contraction than expected***. These were customers generally renewing for the first time post-COVID, though many were multi-year customers that expanded on a co-terminus basis during the pandemic, and now they're rationalizing spend as some digital engagement is anticipated to be replaced with in-person activity.

202. The March 1, 2022, Canaccord report further explains:

> Management was clear to point out that many of these customers are still renewing at 2x their pre-COVID run-rate, but that's ***in many cases down from 3x at the peak of COVID, which is a change the team did not properly anticipate. This headwind, along with a reduction in professional services revenue, has ON24 guiding for what is essentially a zero revenue growth year in 2022***, which is more than $20M below our prior expectation. We expect that Q1 should mark the growth trough and that results should improve over the course of the year, but even so, we expect ON24 will be little more than a low-double digit ARR grower by the end of 2022.

203. The March 1, 2022, Canaccord report stresses:

> While ON24 had a decent Q4 relative to expectations, its ***revenue outlook came in weaker than anticipated due to significant spend rationalization from several large customers that had signed large expansion deals during COVID and were renewing for the first time since then***. For perspective, these customers had expanded as much as 3x during COVID, and while their average spend is still materially higher than it was pre-COVID, they're now re-assessing their post-COVID digital marketing budgets.

204. Since the IPO, the value of ON24 common stock shares has collapsed from the IPO price of $50.00 per share to $18.86 per share on November 3, 2021 (***a 62% decline from the IPO price***), the date this Action was filed, and to an all-time low of $12.05 per share on March 14, 2022 (***a 76% decline from the IPO price***).

## V. CLASS ACTION ALLEGATIONS

205. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired ON24 publicly traded common stock pursuant and/or traceable to the Offering Documents for ON24's IPO, and who were damaged thereby (the "Class"). Excluded from the Class: the Defendants and the Individual Defendants' immediate family members; the officers, directors, affiliates of ON24 and the Underwriter Defendants, at all relevant times, including ON24's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired ON24 common stock through any such plan(s); any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

206. The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered over 8,560,930 shares of common stock in the IPO. Record owners and other members of the Class may be identified from records maintained by ON24 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

207. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

208. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

209. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

(b) whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

210. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI. CAUSES OF ACTION

### COUNT I
### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### Against All Defendants

211. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

212. This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant ON24, each of the Individual Defendants, and each of the Underwriter Defendants.

213. This cause of action does not sound in fraud. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This Count is based solely on strict liability as to ON24 and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

214. The Offering Documents issued in connection with the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to

make the statements made not misleading, and omitted material facts required to be stated therein.

215. ON24 is the registrant and issuer of the common stock sold pursuant to the Offering Documents. As such, ON24 is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, ON24 is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

216. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

217. The Individual Defendants each signed the Registration Statement and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Individual Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

218. Each of the Underwriter Defendants served as the underwriters for the IPO and qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15 U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as an underwriter of the securities offered in the IPO pursuant to the Offering Documents, had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that

would make the statements misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make the statements therein not misleading. As such, each of the Underwriter Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

219. None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of those statements.

220. Each of the Defendants named in this Count issued, caused to be issued, and participated in the issuance of materially untrue and misleading written statements to the investing public that were contained in the Offering Documents, which misrepresented and failed to disclose, *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant violated Section 11 of the Securities Act.

221. Lead Plaintiff and the Class have sustained damages. The value of ON24 common stock has declined substantially subsequent to and due to violations by Defendants named in this Count.

222. At the time of their purchases of ON24 common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based and the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

**COUNT II**
**FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT**
**<u>Against the Individual Defendants</u>**

223. Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

224. This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

225. This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Individual Defendants committed intentional or reckless misconduct or that any of the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

226. The Individual Defendants each were control persons of ON24 by virtue of their positions as directors and/or senior officers of ON24. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of ON24.

227. Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO. Because of their positions of control and authority as senior officers and/or directors, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

228. As control persons of ON24, each of the Individual Defendants is liable jointly and severally with and to the same extent as ON24 for its violation of Sections 11 of the Securities Act.

## VII. PRAYER FOR RELIEF

229. WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment as follows:

(a) Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b) Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c) Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

(d) Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

## VIII. JURY TRIAL DEMANDED

230. Lead Plaintiff demands a trial by jury.

Dated: March 18, 2022

Respectfully submitted,

LABATON SUCHAROW LLP

*/s/ Alfred L. Fatale III*

Jonathan Gardner (admitted pro hac vice)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jgardner@labaton.com
dschwartz@labaton.com
afatale@labaton.com
mduenas@labaton.com

*Lead Counsel for Lead Plaintiff Leadersel Innotech ESG*

Thornton Law Firm LLP
David Bricker (CA SBN 158896)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, California 90212
Telephone: (310) 282-8676
Facsimile: (310) 388-5316
Email: dbricker@tenlaw.com

*Liaison Counsel for Lead Plaintiff Leadersel Innotech ESG*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 18, 2022, I was authorized to electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*<u>/s/ Alfred L. Fatale III</u>*
Alfred L. Fatale III