Jonathan Gardner (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
         dschwartz@labaton.com
         afatale@labaton.com
         mduenas@labaton.com

*Lead Counsel for Lead Plaintiff
Leadersel Innotech ESG*

[*Additional Counsel on Signature Page*]

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| In re ON24, Inc. Securities Litigation | ) Case No. 4:21-cv-08578-YGR |
| | ) |
| | ) ECF CASE |
| | ) |
| | ) **LEAD PLAINTIFF'S MEMORANDUM** |
| | ) **OF POINTS AND AUTHORITIES IN** |
| | ) **OPPOSITION TO DEFENDANTS'** |
| | ) **MOTION TO DISMISS** |
| | ) |
| | ) Judge: Hon. Yvonne Gonzalez Rogers |
| | ) Date:   August 16, 2022 |
| | ) Time:  2:00 p.m. |
| | Courtroom:    1, 4th Floor |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF THE ISSUES .............................................................................................. 1

INTRODUCTION .................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 3

APPLICABLE LEGAL STANDARDS .................................................................................... 7

ARGUMENT ........................................................................................................................... 10

I.      THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY MISLEADING STATEMENTS AND OMISSIONS ............................................................................... 10

     A.    Materially Misleading Statements About ON24's Customers and Financial Condition ........................................................................................................ 11

          1.    The Complaint Alleges Specific Misstatements Were Rendered Materially Misleading by the Omission of Contemporaneous Facts........ 11

          2.    The Former Employees Allegations Demonstrate Falsity ...................... 13

          3.    Post-IPO Events Bolster the Inference of Falsity .................................. 15

     B.    Omission of Known Trends and Inadequate Risk Factors ................................. 16

          1.    Inadequate Risk Factors ........................................................................ 16

          2.    Known Trends ....................................................................................... 18

     C.    The Misstatements Are Not Protected by the Bespeaks Caution Doctrine .......... 19

     D.    The Challenged Opinion Statements Are Actionable in Context ........................ 20

     E.    Defendants' Attempt to Cast Certain Statements as Puffery Fails...................... 23

CONCLUSION ........................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Allied Nevada Gold Corp. Sec. Litig.*,
743 F. App'x 887 (9th Cir. 2018) ................................................................................. 23

*In re Alphabet, Inc. Sec. Litig.*,
1 F.4th 687 (9th Cir. 2021) ..................................................................................10, 17

*In re Apple Inc. Sec. Litig.*,
2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ...........................................................15, 16, 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ................................................................................................... 7

*In re Atossa Genetics Inc. Sec. Litig.*,
868 F.3d 784 (9th Cir. 2017) ..................................................................................... 20

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................... 7

*In re Bear Stearns Mortg. Pass-Through Certificates Litig.*,
851 F. Supp. 2d 746 (S.D.N.Y. 2012) ....................................................................... 19

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ................................................................................................... 7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) ................................................................................. 9, 16

*Boston Ret. Sys. v. Uber Techs., Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ............................................................... 8

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ........................................................... 23

*In re Celera Corp. Sec. Litig.*,
2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ............................................................. 19

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ................................................................................. 8, 21

*In re Cloudera, Inc. Sec. Litig.*,
2021 WL 2115303 (N.D. Cal. May 25, 2021) ...........................................................19, 20

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997) ..................................................................................... 16

*In re CPI Card Grp. Inc. Sec. Litig.*,
2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ............................................................. 10

*In re DDi Corp. Sec. Litig.*,
2005 WL 3090882 (C.D. Cal. July 21, 2005) ............................................................. 12

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995) ........................................................................................... 15

*Friedman v. Rayovac Corp.*,
  295 F. Supp. 2d 957 (W.D. Wis. 2003) ............................................................................ 12

*In re Fusion-io, Inc. Sec. Litig.*,
  2015 WL 661869 (N.D. Cal. Feb. 12, 2015) .................................................................... 16

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983) ........................................................................................................... 7

*Johnson v. Riverside Healthcare Sys.*, LP
  534 F.3d 1116 (9th Cir. 2008) ........................................................................................... 8

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................................. 8

*Kipling v. Flex Ltd.*,
  2020 WL 2793463 (N.D. Cal. May 29, 2020) ................................................................. 19

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ........................................................................... 13

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011) ............................................................................................. 12

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
  416 F.3d 940 (9th Cir. 2005) ........................................................................................... 19

*Lorenz v. Safeway, Inc.*,
  241 F. Supp. 3d 1005 (N.D. Cal. 2017) ........................................................................... 21

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) ........................................................................17, 19

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013) ............................................................................. 23

*Mingbo Cai v. Switch, Inc.*,
  2019 WL 3065591 (D. Nev. July 12, 2019) ............................................................10, 17, 18

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................................. 13

*Mulligan v. Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942 (N.D. Cal. 2014) ............................................................................... 23

*Nathanson v. Polycom, Inc.*,
  2015 WL 12964727 (N.D. Cal. Apr. 16, 2015) .................................................................. 9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) .............................................................................................7, 21, 22, 23

*Pino v. Cardone Cap., LLC*,
  2021 WL 3502493 (C.D. Cal. Apr. 27, 2021) ..............................................................19, 20

*Pirani v. Slack Techs., Inc.*,
    445 F. Supp. 3d 367 (N.D. Cal. 2020) ................................................................. 10

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020) ............................................... 19, 20

*Plotkin v. IP Axess Inc.*,
    407 F.3d 690 (5th Cir. 2005) ................................................................................ 15

*In re QuantumScape Sec. Class Action Litig.*,
    2022 WL 137729 (N.D. Cal. Jan. 14, 2022) ........................................................ 22

*In re Restoration Robotics, Inc. Sec. Litig.*,
    417 F. Supp. 3d 1242 (N.D. Cal. 2019) ............................................................... 12

*Ret. Tr. v. RH, Inc.*,
    302 F. Supp. 3d 1028 (N.D. Cal. 2018) ................................................................. 9

*Rodriguez v. Gigamon Inc.*,
    325 F. Supp. 3d 1041 (N.D. Cal. 2018) ............................................................... 25

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ................................................................................ 16

*Schueneman v. Arena Pharms., Inc.*,
    840 F.3d 698 (9th Cir. 2016) ................................................................................ 12

*SEC v. Todd*,
    642 F.3d 1207 (9th Cir. 2011) .............................................................................. 10

*In re Silver Wheaton Corp. Sec. Litig.*,
    2016 WL 3226004 (C.D. Cal. June 6, 2016) ....................................................... 13

*Silverstrand Invs. v. AMAG Pharms., Inc.*,
    707 F.3d 95 (1st Cir. 2013) .............................................................................. 17, 18

*In re. Splash Tech. Holdings, Inc. Sec. Litig.*,
    2000 WL 1727377 (N.D. Cal. Sept. 29, 2000) .................................................... 20

*In re STEC Inc. Sec. Litig.*,
    2011 WL 2669217 (C.D. Cal. June 17, 2011) ...................................................... 12

*Steckman v. Hart Brewing, Inc.*,
    143 F.3d 1293 (9th Cir. 1998) .............................................................................. 10

*Sudunagunta v. NantKwest, Inc.*,
    2017 WL 8810760 (C.D. Cal. Sept. 20, 2017) .................................................... 10

*Tadros v. Celladon Corp.*,
    2016 WL 5870002 (S.D. Cal. Oct. 7, 2016) .......................................................... 8

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ............................................................................................... 7

*Tongue v. Sanofi*,
    816 F.3d 199 (2d Cir. 2016) ................................................................................. 22

*In re Twitter, Inc. Sec. Litig.*,
   506 F. Supp. 3d 867 (N.D. Cal. 2020) ............................................................................17, 18

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014) ..............................................................7, 8, 18

*Yourish v. Cal. Amplifier*,
   191 F.3d 983 (9th Cir. 1999) ...................................................................................... 16

*Zucco Partners, LLC v. Digimarc Corp.*,
   552 F.3d 981 (9th Cir. 2009) .................................................................................. 9, 13

**Statutes**

15 U.S.C. § 77k ........................................................................................................ *passim*

15 U.S.C. § 77o .......................................................................................................... 1, 7

Securities Exchange Act of 1934 ...................................................................................13, 16, 24

PSLRA ...................................................................................................................... 9, 23

**Other Authorities**

17 C.F.R. § 229.105(a) ............................................................................................... 10

17 C.F.R. § 229.303(b)(2)(ii) ...................................................................................... 10

17 C.F.R. § 230.408........................................................................................................ 10

Rule 8........................................................................................................................ 9, 16

Rule 8(a)...................................................................................................................... 8

Rule 9(b) ..................................................................................................................9, 16, 25

Rule 408 .................................................................................................................... 10

Leadersel Innotech ESG ("Lead Plaintiff") respectfully submits this Memorandum of Points and Authorities in Opposition to ON24 Defendants' Motion to Dismiss Consolidated Class Action Complaint and Accompanying Memorandum of Points and Authorities ("Motion") (ECF No. 83),[1] Underwriter Defendants' Joinder in  ON24 Defendants' Motion (ECF No. 85), and in Response to ON24 Defendants' Request for Consideration of Documents Incorporated into Complaint and for Judicial Notice ("Notice Request") (ECF No. 84).

## STATEMENT OF THE ISSUES

1.    *Falsity.*  Whether the Motion should be denied because the Complaint plausibly states a claim under Section 11 of the Securities Act of 1933 (the "Securities Act") that ON24's IPO registration statement omits then-existing material facts about customer churn and demand necessary to make statements contained in the registration statement not misleading.

2.    *Omission of Known Trends or Uncertainties and Risk Factors.*  Whether the Motion should be denied because the Complaint plausibly states a claim under Section 11 of the Securities Act that Defendants violated their duties under Items 105 and 303 of SEC Regulation S-K by omitting from ON24's IPO registration statement significant risk factors and known trends and uncertainties about customer churn and demand that were required to be disclosed.

3.    *Control Person Liability.*  Whether the Motion should be denied because the Complaint plausibly states a claim under Section 15 of the Securities Act that the Individual Defendants controlled ON24 and are liable for primary Section 11 violations.

## INTRODUCTION

This strict liability securities class action—brought solely under Sections 11 and 15 of the Securities Act—arises from ON24's February 2021 IPO of over 8.5 million shares of common stock.  Priced at $50 per share, the IPO generated more than $428 million for ON24 and the selling stockholders, while the banks that underwrote the IPO collected over $29 million in fees.

---

[1] Citations to paragraphs ("¶") are to paragraphs in the Consolidated Class Action Complaint filed on March 18, 2022 (the "Complaint") (ECF No. 80).  Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout.  "Defendants" collectively refers to ON24, Inc. ("ON24" or the "Company"); the "Individual Defendants" who signed the registration statement for ON24's initial public offering ("IPO"), ¶¶27-37; and the "Underwriter Defendants" that underwrote the IPO.  ¶¶38-52.

ON24 offers customers a subscription-based, digital experience platform for interactive webinars, virtual events, and multimedia content experiences. Prior to the COVID-19 pandemic, ON24 targeted large, enterprise customers who would integrate the Company's platform with their own systems. These customers generated "sticky" recurring revenue by renewing annual contracts and adding new ON24 products and features to existing contracts, thereby generating more recurring revenue. In the decade before the IPO, ON24 moved away from customers interested in only one-off events, who did not generate recurring revenue.

Unbeknownst to investors in the IPO, ON24 changed its business model during the COVID-19 pandemic to target small- and medium-sized business ("SMB") customers and other one-time customers who needed a substitute for in-person events. ON24 and the Individual Defendants were acutely aware of the risk of churn from these one-time customers, as their high churn risk was documented in "churn reports," tracked in Salesforce and other software systems, and discussed on a customer-by-customer basis in monthly meetings led by Defendant Sharan throughout 2020. These one-time customers gave ON24 up to six months' notice of nonrenewal.

Although these one-time customers were not ideal, ON24 shifted its strategy to sign up one-time customers in an effort to accelerate revenue in the short term before the IPO. By November and December 2020, overall customer demand had declined. Given declining demand and the magnitude of one-time customers whose contracts were set to expire in 2021, at the time of the IPO ON24 already faced material customer churn and weaker-than-expected revenues, operating losses, and losses per share in 2021.

Investors in the IPO were not aware of ON24's business strategy shift or the very real and inevitable risk of high churn from one-time customers in 2021, because the registration statement and prospectus for the IPO (the "Offering Documents") omitted these very facts. Defendants are liable under Section 11 of the Securities Act because the omission of these material facts from the Offering Documents rendered statements therein—which painted a picture of a company poised to capitalize on its existing customer base—materially misleading in context. Defendants also violated their duties to disclose these known trends and uncertainties and material risks under Items 303 and 105 of SEC Regulation S-K.

After the IPO, ON24 reported customer losses and quarter after quarter of weaker-than-expected revenues, larger-than-expected losses, and elevated churn amongst first-time, one-time, and SMB customers. Due to the materially misleading statements and omissions in the Offering Documents, ON24's stock collapsed from the $50 per share IPO price to $18.86 per share (*a 62% decline*) by November 3, 2021.

## FACTUAL BACKGROUND

***ON24 and Its Business.*** Headquartered in San Francisco, ON24 is a cloud-based, digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. ¶¶3, 26.

ON24's four "Experience" products include: a live, interactive webinar; a live, large scale virtual event experience; an always-on, multimedia content experience; and a curated, multimedia content experience. ¶¶4, 54. ON24 collects first-person data to power an artificial intelligence/machine learning ("AI/ML") engine and offers third-party app integrations. ¶¶55.

As a subscription-based company, ON24 derives revenue from sales of subscriptions to its products. ¶¶6, 56. In order to grow, ON24 must continually secure new customers and maintain and expand relationships with existing customers by renewing subscriptions and "upselling" additional products or features. *Id.* "Downselling," by contrast, is a term ON24 and analysts use to refer to customers removing products or features from their contract. *See, e.g.*, ¶¶101, 165, 171. Downselling results in a reduction in revenue. *See, e.g.*, ¶198. ON24 sells annual subscriptions and bills clients on an annual or monthly basis. ¶57. Importantly, over the past decade, prior to the COVID-19 pandemic, ON24 de-emphasized one-off digital conference revenue to focus on "stickier," recurring platform revenue. ¶58. ON24's business model was to target customers who would integrate its products, *i.e.*, customers likely to renew and upsell.

According to ON24, COVID-19 led businesses to operate more digitally which led to explosive growth. ¶¶7, 59. For example, revenue increased 59% for the nine months ended September 30, 2020 versus the nine months ended September 30, 2019. ¶60. ON24 conceded its growth was "partly in response to the COVID-19 pandemic" but maintained it could "achieve significant organic growth by expanding penetration of [its] existing customer base." ¶¶65-66.

However, as detailed in the Complaint and more fully discussed below, ON24 achieved this explosive growth by shifting its focus during the pandemic to accept customers with one-time only needs that ON24 knew would not renew (or would downsell) at the end of their one-year contracts. ¶¶88-91, 96-101. In the nine months leading up to the IPO (starting in April 2020), ON24 signed up a significant number of new customers for one-year contracts that did not plan to renew or planned to downsell. ¶¶9, 147(a). A larger-than-typical percentage of these new customers were high-churn SMB customers (with historically high churn rates) and customers focused on one-time events who did not integrate ON24's products into their systems—customers ON24 had traditionally spurned. ¶¶77, 106, 147(a)-(b), 166, 171. Unbeknownst to investors, ON24's relaxed new customer qualification criteria during the pandemic would inevitably lead to a reduction in renewals as the contracts for these one-time customers expired starting in April 2021. ¶¶82-86, 88, 94, 96-97, 100-03.

ON24 and the Individual Defendants were aware of this shift in focus and the impact it would have on the Company post-IPO. The Individual Defendants received regular updates and attended monthly calls to discuss churn risk including a discussion of every client and which clients were likely not to renew. ¶¶80-85. The Individual Defendants knew these customers did not integrate ON24's products and were not ON24's typical, repeat customer. ¶¶86-91. Whether a client was expected to renew was also tracked in Salesforce. ¶¶ 80-82, 105. Customers would advise ON24 as much as six months in advance that they would not renew. ¶102. ON24 even implemented a special lower commission rate for its salesforce during the pandemic for customers who were only interested in a one-time purchase. ¶106.

***Defendants' Materially Misleading Offering Documents.*** The Complaint alleges two bases of Section 11 liability. First, thirteen statements in the Offering Documents were rendered materially misleading by omission of then-existing facts. ¶¶144-46, 149-53, 157-61. Second, Defendants violated their duties under Items 105 and 303 of SEC Regulation S-K to disclose significant risks and known trends and uncertainties that would have (or were reasonably likely to have) a materially unfavorable impact on ON24's post-IPO financial results. ¶155.

Misleading Statements by Omission. In the Offering Documents, ON24 made thirteen

statements that in context were materially misleading as they projected a Company well positioned to capitalize on the expansive growth it achieved during the pandemic. The Offering Materials touted ON24's: (1) growing and "highly engaged and loyal customer base," including more than 1,900 customers as of September 30, 2020, ¶¶6, 61, 144-45; (2) intent to leverage its "land and expand model" to further grow and expand new subscriptions within its existing customers, ¶¶145,149; (3) "consistent ARR growth" before COVID-19, which accelerated in 2020 "partially" in response to COVID-19, ¶146; (4) increase in "the proportion of multi-year subscriptions as the number of larger customers has increased[,]" ¶151; (5) intent to "continue to focus on the acquisition of new customers with 2,000 or more employees, or Enterprise customers, and to expand the usage of [ON24's] platform within these larger accounts[,]" ¶152; and (6) "significant opportunity to further increase sales among existing customers[,]" including "by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell." ¶153. Certain statements downplay the risk of clients not renewing as a mere possibility when ON24 knew that risk was inevitable as it had at least six months' notice that many customers picked up in 2020 would not renew in 2021.

<u>Omitted Known Trends and Inadequate Risk Factors.</u> In violation of Defendants' duties to disclose known trends or uncertainties under Item 303, the Offering Documents failed to disclose that, *inter alia*: before COVID-19, ON24 was already aware of high churn among SMB customers, which the pandemic amplified; ON24 had relaxed its qualification criteria and reversed its mandate to avoid one-time only customers in order to capture non-recurring customers during COVID-19; ON24 knew up to six months in advance that many new customers obtained from April 2020 forward would not renew; and, as a result, at the time of the IPO, ON24 faced inevitable, material customer churn, weaker than expected revenues, and larger than expected operating losses and losses per share in 2021. ¶148(c)-(e), (h)-(i). Defendants violated Item 105, ¶155, by couching its risk warnings related to, *e.g.*, ON24's ability to attract new customers, retain and upsell existing customers, and the impact of COVID-19 lessening, as mere possibilities while omitting these very "risks" had materialized at the time of the IPO. ¶¶155-62.

***Post-IPO Events.*** When the one-time, SMB customers inevitably did not renew in 2021,

ON24 reported high churn, weaker expected revenues, and larger expected losses compared to analysts' consensus and the Company's own guidance.  ¶¶163-203.  For second quarter 2021 ("Q2 2021"), which closed five months after the IPO, ON24 reported a loss of 167 customers, ¶173, a 9% decline in customers since the IPO.  ¶¶61.  ON24 admitted "[l]ess sticky SMB customers accounted for roughly 50% of this churn," while 60% of the entire renewal customer base were first-time renewals, *i.e.*, the first-time renewal "cohort."  ¶171. ON24 also provided weaker-than-expected revenue and earnings guidance for third quarter 2021 ("Q3 2021") and for full-year ("FY") 2021 versus analysts' consensus.  ¶¶163-64.

Six months after the IPO, during the second quarter 2021 earnings call, Defendant Sharan acknowledged ON24 "experienced higher-than-expected churn and downsell from customers we signed up in the second quarter of last year during the peak of COVID.  This higher churn was primarily in the first-time renewal cohort, customers who signed up 1-year contracts [for the first time] last year and who were up for renewal."  ¶18, 165.  Defendant Vattuone added that the "share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort.  We saw high churn and downsell within the first-time renewals cohort, which primarily included *a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events*."  ¶19, 166.  Analysts at Canaccord estimated at least half of renewals in that "COVID cohort chose not to renew."  ¶173.  A William Blair report noted many non-renewing customers "*were outside the customer profile the company typically targets*.  Of those customers who churned, about 50% were SMB, whereas ON24 is primarily enterprise focused."  ¶177.

Nine months after the IPO, during the third quarter 2021 earnings call, Defendant Sharan acknowledged that ON24 "continue[s] to face headwinds from those renewals[,]" while Defendant Vattuone explained: "We faced *headwinds with respect to those first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs*."  ¶¶179-80.  Defendant Vattuone added that "SMB [churn] was the largest contributor to the customer count decrease in Q3."  ¶¶180-81.  Canaccord reported that the "churn was primarily attributed to SMB cohorts that became first-time customers during the pandemic primarily looking for one-time alternatives to in-person events."  ¶184.

One year after the IPO, during the fourth quarter 2021 ("Q4 2021") earnings call, Defendant Sharan admitted that ON24's "largest challenge in 2021 was the first-time renewal cohort which is 4x the dollar value of first-time renewals in 2019 and had a churn rate that was approximately double that are [sic] first-time renewals in 2019." ¶191.  Defendant Vattuone added that ON24's lower NRR "reflects the impact of *elevated churn that we experienced over the past few quarters with first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs*."  ¶191.

## APPLICABLE LEGAL STANDARDS

***Pleading Standard.***  In assessing the Motion, the Court must consider the complaint in its entirety, "accept all factual allegations ... as true[,]" and construe them in the light most favorable to the plaintiff.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).  A complaint "does not need detailed factual allegations," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The Securities Act "protects investors by ensuring that companies issuing securities ... make a full and fair disclosure of information relevant to a public offering." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 178 (2015).  Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering[,]" *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983), *e.g.*, the issuer, underwriters, and any person signing a registration statement.  Section 15 makes an issuer's "control persons" liable for primary Section 11 violations.  15 U.S.C. § 77o.[2]

The materiality of an omission is a fact-specific analysis that should ordinarily be assessed by the fact finder.  *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *9 (N.D. Cal. Oct. 31, 2014).  A fact is material where "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988).

---

[2] Because the Complaint establishes a Section 11 claim and Defendants do not seek to dismiss Section 15 claims on independent grounds, Motion at 20, Section 15 claims must be sustained.

Significantly, Defendants rightfully acknowledge that these Securities Act claims are subject to the permissive notice pleading standards of Rule 8(a).  Motion at 7; *see also City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 624 (9th Cir. 2017); *Violin Memory*, 2014 WL 5525946 at *8 (Rule 8(a) requires only "that a plaintiff provide a short and plain statement of the claim showing that [plaintiff] is entitled to relief"). "This is not an onerous burden" as "[s]pecific facts are not necessary; the statement need only give the defendant[s] fair notice of what ... the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare Sys.*, LP, 534 F.3d 1116, 1122 (9th Cir. 2008).

***Judicial Notice and Incorporation by Reference.***  Lead Plaintiff does not challenge the incorporation-by-reference of Exhibits 1-2 and 5-7 to the Declaration of David Wiener ("Wiener Decl.") (ECF Nos. 83-4-5, 8-10), or the Court taking judicial notice of Exhibits 1-8 (ECF Nos. 83-4-11).[3]  However, Defendants take liberties with the application of these rules.  Citing *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), Defendants argue the "Court need not accept as true allegations that contradict matters properly subject to judicial notice."  Motion at 11.  But, "[j]ust because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018).  Judicial notice is taken not for the truth of the matter asserted, but for the purpose of showing information was available to the market.  *Boston Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020).  It is improper to assume the truth of an incorporated document where, as Defendants have done in their Motion, such assumptions are used to dispute well-pled facts.  *Id.* at *2.

***Confidential Witnesses.***  The standard to apply to confidential witness allegations under Rule 8 and pure Securities Act claims appears to be an open question.[4]  However, Defendants do

---

[3] Lead Plaintiff does object to Defendants' inclusion of Motion Appendices A and B, which constitute an improper page limit extension. *See Violin Memory*, 2014 WL 5525946 at *1, n.2 (chastising defendants for filing a chart of alleged omissions without leave).  To the extent the Court considers the Appendices, it should do so only for excerpted material, not argumentative portions. *Tadros v. Celladon Corp.*, 2016 WL 5870002, at *8, n.5 (S.D. Cal. Oct. 7, 2016).

[4] Lead Counsel has not found any case asserting only Securities Act claims and applying Rule 8 that has analyzed the standard for confidential witnesses.  The cases discussing this issue have arisen under Rule 9(b) and the heightened standards of the PSLRA.

not dispute that the former employees are "described with sufficient particularity to establish their reliability and personal knowledge" under Rule 9(b).[5] *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009). The Complaint satisfies the *Zucco* standard through "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged ..., the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia." *Id.*; *see also City Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. RH, Inc.*, 302 F. Supp. 3d 1028, 1044 (N.D. Cal. 2018) (*Zucco* standard met where CWs' "dates of employment and professional roles are provided"). Specifically, the Complaint details the FEs' dates of employment, their professional roles at ON24, meetings the FEs attended including with Defendant Sharan, the FEs' access to churn, retention, and sales data on Salesforce, Forrester, Gartner, and Totango software systems, and correspondence and conversations with other ON24 employees and customers. ¶¶78-143.

Unable to challenge the reliability of the FE allegations,[6] Defendants inaccurately argue the Complaint offers only "vague and conclusory allegations drawn from a handful" of "low- and entry-level sales personnel." Motion at 6, 10. First, any factual dispute over confidential witness statements "must at least await discovery." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Second, it is exactly these "low level" employees—account executives and salespeople who worked directly with customers and who were employed well before and through the IPO, ¶¶78-143—who would be in position to know about ON24's shift in business model and the intent of ON24's customers. Third, far from being vague, the FE accounts provide details of emails, calls, and meetings (including with Defendant Sharan), the software ON24 used to track customers, and first-hand accounts of the FEs' experiences with customers.

***Defendants' Additional Duties to Disclose.*** Defendants were required to comply with Item 303 of SEC Regulation S-K by "[d]escrib[ing] any known trends or uncertainties that have

---

[5] The Court should ignore any attempt by Defendants to raise for the first time on reply whether the FEs have been described with sufficient particularity. Arguments raised for the first time in a reply brief are deemed waived. *Nathanson v. Polycom, Inc.*, 2015 WL 12964727, at *1 (N.D. Cal. Apr. 16, 2015) (collecting cases including four Ninth Circuit opinions).

[6] Even if Defendants had challenged the FE's reliability, any attack on confidential witnesses at the pleading stage before discovery is premature. *Applied Signal*, 527 F.3d at 985.

had or that [the registrant expects will] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii); *see also Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998) ("omission of facts required to be stated under Item 303 will produce liability" under the Securities Act).  Like materiality, whether a given fact or pattern constitutes a trend is a factual inquiry not appropriate at the motion to dismiss stage.  *Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 386-87 (N.D. Cal. 2020); *see also SEC v. Todd*, 642 F.3d 1207, 1220-21 (9th Cir. 2011) (whether adverse facts were adequately disclosed is a mixed question for the trier of fact); *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *4-5 (S.D.N.Y. Oct. 30, 2017) (plaintiff need only allege facts to support plausible *inference* that issuer "knew of a trend" requiring Item 303 disclosure).

In addition, Defendants were required to comply with Item 105 (formerly 503) of SEC Regulation S-K by "provid[ing] under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky" that "adequately describes the risk."  17 C.F.R. § 229.105(a).  Boilerplate risk factors do not satisfy Item 105.  *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019).[7]  "Risk disclosures that speak[] entirely of as-yet-unrealized risks and contingencies and do not alert[] the reader that some of these risks may already have come to fruition can mislead reasonable investors."  *In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021).

## ARGUMENT

**I.    THE COMPLAINT ADEQUATELY ALLEGES MATERIALLY MISLEADING STATEMENTS AND OMISSIONS**

The Complaint alleges the Offering Documents did not disclose then-existing material adverse facts about ON24's customers and financial condition that (1) rendered thirteen statements in the Offering Documents materially misleading by omission and (2) violated Defendants' duties to disclose significant risks under Item 105 and known trends and uncertainties under Item 303.  Remarkably, Defendants' Motion—and even Appendix A to their

---

[7] Defendants were also required to disclose all material information necessary to make the Offering Documents not misleading.  17 C.F.R. § 230.408.  Whether a registrant complied with Rule 408 turns on materiality, a question for the fact finder.  *Sudunagunta v. NantKwest, Inc.*, 2017 WL 8810760, at *10 (C.D. Cal. Sept. 20, 2017).

Motion (ECF No. 83-1 at 8)—seemingly concedes Statement No. 6 (¶151) is actionable because the Motion does not specifically challenge Statement No. 6 on the basis of falsity or argue that it is an inactionable opinion, puffery, or protected under the bespeaks caution doctrine.

### A. Materially Misleading Statements About ON24's Customers and Financial Condition

#### 1. The Complaint Alleges Specific Misstatements Were Rendered Materially Misleading by the Omission of Contemporaneous Facts

The Offering Documents painted a picture of a Company that was on an upward trajectory, was adding many new customers and could be expected to benefit from those customers renewing and upselling post-IPO. ON24 touted that it: has "over 1,900 ... highly engaged and loyal" customers; has a "[g]rowing base of customers across verticals" and would "leverage our land and expand model to further penetrate customers across these verticals"; has "consistent ARR growth each quarter reflect[ing] our success in acquiring new customers and expanding subscriptions with existing customers"; and "drives expansion of new subscriptions within our existing customer base by selling subscriptions to additional parts of customers' organizations, expanding into new regional divisions and upselling new solutions." ¶¶144-46, 49. However, these rosy statements did not tell the whole truth.

These statements were materially misleading by omission. First, ON24 had changed its business model at the onset of COVID-19. Recognizing that many small businesses needed alternatives to in-person events during the pandemic, ON24 did away with its policy to only bring on customers with recurring needs. ¶58. This shift allowed ON24 to quickly grow revenue in the short term (and in the lead-up to the IPO) as it brought on smaller customers with one-time needs. ¶¶148(a)-(d). Second, these customers told ON24 starting no later than April 2020 and into 2021 that they did not intend to renew or they would downsell, giving as much as six months' notice. These new customers were not "loyal" in any sense of the term; their contracts had a set expiration date one year from inception in 2021, with little to no hope of renewal or upselling. *Id.* Third, ON24's ARR growth did not "reflect" reality at the time of the IPO; customer demand had already declined in November and December 2020, ¶148(h), and ON24 was facing material churn, downselling, and weaker-than-expected revenues and larger-

than-expected losses from customers whose one-year contracts were set to expire.  ¶148(i).

Courts have found that misleading statements about a company's customers and demand are actionable under the Securities Act.  *See*, *e.g.*, *In re DDi Corp. Sec. Litig.*, 2005 WL 3090882, at *13 (C.D. Cal. July 21, 2005) ("Prospectus misrepresented the recent and then-current state of DDi's business affairs" by omitting that demand had "dropped off precipitously" and "many of DDi's customers [had] stopped doing business with [DDi]"); *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1261 (N.D. Cal. 2019) (statement about "aggregate installed base growth of approximately 34%" amongst customers actionable half-truth because it omits that "a significant portion ... had not yet been installed"); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 720 (2d Cir. 2011) (actionable omission about loss of contract with large customer and the "concomitant potential negative impact").  Statements of fact are actionable where they omit material information that render them misleading.  *Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) ("it is well-established that a statement that is technically true can still be misleading"); *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7-9 (C.D. Cal. June 17, 2011) (statement about existing contract actionable where defendant failed to disclose it "was a ***one-off type of deal at the time it was signed***").

Once a company chooses to tout positive information to the market, it is bound to do so in a manner that would not mislead investors, including disclosing adverse information that cuts against the positive information.  *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016).  Here, the Offering Documents touted how ON24 would be able to monetize its loyal customer base by renewing and upselling them.  ¶¶150-53.  ON24's statements were misleading by omission because rather than driving growth of ***multi-year*** subscriptions with large, enterprise customers, expanding the usage of ON24's platform among larger customers, and further penetrating its existing customer base through upselling, ON24 had instead shifted its business model during the pandemic and signed up many ***small- and medium-sized*** business or SMB customers that historically have high churn rates and ***one-time event*** customers who did not integrate ON24's platform into their sales and marketing ecosystems because they did not plan to renew or planned to downsell.  ¶¶106, 148(a)-(b).  Simply put, investors were misled about the

nature of ON24's customers and the likelihood they would renew in 2021.

### 2.    The Former Employees Allegations Demonstrate Falsity

Defendants largely ignore the FE allegations in arguing there are no contemporaneous facts showing falsity.  Motion at 16.  Defendants posit that the Complaint "offers nothing to support its claims beyond vague and conclusory allegations drawn from ... low-level ... sales employees" who "do not allege that any metric ... was misstated or that a single dollar of revenue was recognized improperly."  Motion at 10.  Defendants' myopic view of the FEs is unavailing.

First, as detailed above, the Complaint satisfies *Zucco* by describing each "confidential witness with sufficient particularity to establish [that witness's] reliability and knowledge." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013, 1026, n.20 (N.D. Cal. 2020) (CWs in "positions to possess knowledge of the information they provided").  Defendants do not argue otherwise.  Accordingly, the Court must accept these accounts as accurate on this Motion.

Second, Defendants' efforts to make this case about whether the Offering Documents *misstated* actual metrics or figures or whether ON24 restated its financials, Motion at 10, 18-19, is a red herring.  *See In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) ("that the financial statements for the year in question were not restated does not end [a] case when [plaintiff] has otherwise met the pleading requirements"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) (same).  Defendants argue falsity is not shown because "ON24's revenue and ARR continued to grow year-over-year in the three quarters immediately following the IPO."  Motion at 17.  However, this misconstrues the Complaint which does not assert such a claim.  That ON24 was able to attract new clients in the year after its IPO does not undermine the misleading nature of statements about its client base and its expectations to renew and upsell then-existing customers at the time of the IPO.[8]

The Complaint alleges an undisclosed decline in *customer demand* and that ON24 faced material *customer churn, downselling, and weaker than expected revenues, operating losses,*

---

[8] Accordingly, Defendants' citations to two Exchange Act cases about inaccurate metrics and figures, Motion at 19, are inapposite.  The plaintiff in *In re Nimble Storage, Inc. Sec. Litig.* failed to plead facts showing that "disclosed numbers were false," 252 F. Supp. 3d 848, 853, (N.D. Cal. 2017), while the plaintiff in *In re Intel Corp. Sec. Litig.* did not plead facts showing performance figures about processors were inaccurate.  2019 WL 1427660, at *12 (N.D. Cal. Mar. 29, 2019).

*and losses per share in 2021*.  ¶¶148(h)-(i).  When the new one-year contracts expired, ON24 reported a second quarter 2021 loss of 167 customers (9% decline from the time of the IPO) and a third quarter 2021 net loss of 24 customers.  ¶¶61, 173, 184.  In each of the three quarters following the IPO, ON24 also provided weaker-than-expected revenue and earnings guidance versus analysts' consensus and/or ON24's prior guidance:

| PROJECTED PERIOD[9] | PROJECTED REVENUES (in millions) | | PROJECTED NON-GAAP OPERATING LOSSES (in millions) | | PROJECTED NON-GAAP LOSSES PER SHARE | |
|---|---|---|---|---|---|---|
| | ON24 Prior Guidance *($ miss)* | Analysts' Consensus *($ miss)* | ON24 Prior Guidance *($ miss)* | Analysts' Consensus *($ miss)* | ON24 Prior Guidance *($ miss)* | Analysts' Consensus *($ miss)* |
| Q3 2021 Third Quarter Ended 9/30/2021 ¶163 | $47.5-$48.5M | | $(4.0)-$(3.0)M | | $(0.09)-$(0.07) | |
| | -- | $51.2M *($3.2M)* | -- | $(2.60)M *($0.9M)* | -- | $(0.05) *($0.03)* |
| Q4 2021 Fourth Quarter Ended 12/31/2021 ¶178 | $51.0-$52.0M | | -- | | -- | |
| | -- | $52.3M *(0.8M)* | -- | -- | -- | -- |
| Q1 2022 First Quarter Ended 3/31/2022 ¶189 | $47-$48M | | $(8)-$(7)M | | $(0.17)-$(0.15) | |
| | -- | $52M *($4.5M)* | -- | $(3.1)M *($4.4M)* | -- | $(0.06) *($0.10)* |
| FY 2021 Full Year Ended 12/31/2022 ¶164 | $201.2-$204.2M | | $(4.3)-$(1.3)M | | $(0.13)-$(0.06) | |
| | $207.5-$210.5M *($6.3M)* | $209.1M *($6.4M)* | $(2.0)-$(1.0)M *($2.3M)* | $(0.2)M *($2.6M)* | $(0.08)-$(0.02) *($0.05)* | $0.0 *($0.10)* |
| FY 2022 Full Year Ended 12/31/2022 ¶190 | $200-$204M | | $(30)-$(27)M | | $(0.64)-$(0.58) | |
| | -- | $223.4M *($21.4M)* | -- | $(5.7)M *($22.8M)* | -- | $(0.11) *($0.50)* |

During earnings calls following these quarters, the Individual Defendants were forced to admit that ON24's expected financial results were being lowered because of high churn and downselling from customers signed up in 2020 during the peak of COVID primarily among

---

[9] ON24 provided its financial outlook for future periods in the prior period earnings release, *e.g.*, third quarter 2021 guidance provided in second quarter 2021 earnings release.  ¶¶163-64.

SMB customers that did not integrate ON24's systems.  ¶¶163-168.  Further, FE-2 recounted how demand declined dramatically in winter 2020 once lockdown restrictions had begun to relax.  ¶98.  FE-4 recalled declining demand in November/December or early winter 2020.  ¶121.  FE-5 also recalled that demand declined during November/December 2020, due in part to market saturation, uncertainty regarding COVID-19, and competition.  ¶125.  The FEs also corroborate the customer churn allegations.  For example, FE-2 recalled 40-50% churn amongst his customers, ¶100, figures that are strikingly close to the 50% SMB customer churn ON24 disclosed after the IPO.  ¶166.  FE-2 recalled customers providing as much as six months' notice of non-renewal in 2020 and 2021.  ¶102.  FE-3 stated the pandemic amplified SMB customer churn.  ¶106.  FE-4 recalled that single event, "quick fix" customers reluctantly signed up for one-year contracts for one event because ON24 required a one-year subscription.  ¶¶115, 120.

Finally, Defendants' argument that "not a single one of these one-year customer contracts had expired ... at the time of the IPO," Motion at 17-18, 21, 24, does not undermine that Defendants had a duty to disclose ON24's shift in business model toward high churn customers and that many of its 2020 customers already told ON24 they were not going to renew in 2021.

### 3.   Post-IPO Events Bolster the Inference of Falsity

"[A]llegations of later-emerging facts can, in some circumstances, provide warrant for inferences about an earlier situation.... [I]t is not unwarranted to infer that when a company's big deal collapses so fast, something was amiss at the outset."  *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("three to four months" between positive statements and adverse disclosures "shed[s] light on the financial condition of the companies at the time of the announcements") (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) ("even six months after the Class Period, substantial amounts of ... inventory still dated from 1993 and 1994 ... supports the inference that inventory during the Class Period was similarly dated")); *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995) (three months between positive statements and adverse disclosures "is circumstantial evidence that the optimistic statements were false when made"); *In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10-11 (N.D. Cal. Nov. 4, 2020) (announcement that Apple "will miss its earnings guidance two months after setting that

guidance ... bolsters the inference that defendants knew that [] statements were misleading").

Just six months passed between ON24's February 3, 2021 IPO and Defendants' August 10, 2021 admissions that ON24 saw high churn and downsell "from customers we signed up in the second quarter of [2020] during the peak of COVID" and "within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events." ¶¶18-19, 165-66. Defendant Sharan admitted: "if they don't integrate our platform in this onetime use case, that's not the customer I want." ¶168.

Defendants wrongly argue that "[l]ater statements establish falsity only where they are of the 'I knew it all along' variety and specifically contradict earlier statements." Motion at 21-22. First, it is well-settled in the Ninth Circuit that "shortness of time is circumstantial evidence that the optimistic statements were false when made." *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997); *Applied Signal*, 527 F.3d at 988, n.5 (temporal proximity of misstatement and disclosure bolstered the inference that statement was misleading when made). Second, Defendants mistake the probative value of post-IPO events that support an inference of falsity under Rule 8, and whether admissions "establish" falsity or scienter for Exchange Act fraud claims under Rule 9(b), as in Defendants' cited authorities. *Cf. Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999) (statement "do[es] not satisfy Rule 9(b)'s particularity requirements"); *Ronconi v. Larkin*, 253 F.3d 423, 433 (9th Cir. 2001) (statement "does not raise a strong inference of intentional or deliberately reckless falsity or deception"); *In re Fusion-io, Inc. Sec. Litig.*, 2015 WL 661869, at *18 (N.D. Cal. Feb. 12, 2015) (applying Rule 9(b)). Defendants' post-IPO admissions are probative of falsity under Rule 8.

### B.     Omission of Known Trends and Inadequate Risk Factors

Offering documents must disclose the "material factors that make an investment ... speculative or risky" in a way that "adequately describes the risk" (under Item 105) and known trends and uncertainties (under Item 303). The Offering Documents here did neither.

#### 1.     Inadequate Risk Factors

The SEC has advised that "[g]eneric or boilerplate discussions do not tell the investors how the risks may affect their investment." *Silverstrand Invs. v. AMAG Pharms., Inc.*, 707 F.3d

95, 103 (1st Cir. 2013). Even voluminous risk disclosures do not satisfy Item 105 where "defendants identify only general statements that the company faced risks." *Switch*, 2019 WL 3065591 at *6. Here, the Offering Documents included incomplete risk factors that "discuss the hypothetical risk" of customer churn and the impact of COVID-19 while omitting the "present reality of such" risks. *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 776, n.7 (N.D. Cal. 2020).

The Offering Documents warned, *e.g.*, that: as "the impact of COVID-19 lessens, there *may* be reduced demand for our platform, and our revenue growth rate *may* decline," ¶158; "*if* fewer ... renewals occur as the impact of COVID-19 lessens, our cash [flows] and deferred revenue[s] as of future dates *may* decrease[,]" ¶159; and "customers *may* not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, *if* they renew at all." ¶160. Each risk factor is couched as a mere possibility when the truth was these risks had already materialized, as ON24 well knew. *Alphabet*, 1 F.4th at 703-04 (warning of "risks that 'could' or 'may' occur is misleading to a reasonable investor when [issuer] knew that those risks had materialized").

Defendants concede, as they must, that "generic risks in the abstract can potentially be misleading if the risk has already come to fruition." Motion at 20-21. Defendants then ignore this standard in arguing that ON24's "on-point risk disclosures ... explained the historical effects that the COVID-19 pandemic had on the Company's growth rate and warned that this accelerated growth *may* not continue[,]" Motion at 19, and that "customers are not obligated to and *may* not renew their subscriptions after their existing subscriptions expire." Motion at 20. Try as they might, Defendants cannot escape the fact that the Offering Documents risk warnings are generic warnings about what "might" happen.

Defendants' reliance on *In re Twitter, Inc. Sec. Litig.*, 506 F. Supp. 3d 867, 883 (N.D. Cal. 2020) is misplaced. Motion at 20. The issue in *Twitter* was whether Twitter's risk warning that "changes to existing products ... could fail to attract users" was misleading given Twitter's decision six days after the risk warning was issued to stop sharing user data, which would lead to a decline in advertising revenue. *Twitter*, 506 F. Supp. 3d at 883 (risk warning issued before the decision to stop sharing data was not misleading since it had not yet come to fruition).

Here, by contrast, ON24 had already made the decision to change its business model, signed up many one-time customers in 2020 who did not integrate ON24's systems, had already been told many of those customers would not renew or would downsell, and saw demand wane, which would inevitably impact revenue and earnings.  Investors were entitled to know these facts.  *See Switch*, 2019 WL 3065591 at *6 (undisclosed "sales strategy along with its potential effects on revenue" are "precisely the type of risk[s] that" issuers are required to disclose).

### 2.   Known Trends

ON24 knew demand declined in November and December 2020, and given declining demand and the magnitude of one-year customers who would not renew, ON24 expected material customer churn, weaker revenues, losses, and losses per share in 2021.  ¶¶148(h)-(i).  "[A]ny omission of facts required to be stated under Item 303 will produce liability under Section 11."  *Violin Memory*, 2014 WL 5525946 at *15; *Switch*, 2019 WL 3065591 at *5 (same).

Defendants' argument that the Complaint alleges neither "any facts about what any ON24 Defendant knew at the time of the IPO" nor "any material effects on ON24's sales, revenue, or income," Motion at 23-24, ignores the Complaint's allegations.  The Complaint alleges that Defendant Sharan and other C-level employees attended five-hour, monthly "sales and client success" meetings—held the first or second week of every month before and after the IPO—to discuss churn risk, "every customer, what was going well and what was not, which clients were likely going to renew, and which were not.  ¶¶85-85.  According to FE-1, there were discussions during these meetings that the small business cohort did not have good retention rates, and this information could be seen in Salesforce.  ¶86.  FE-1 recalled that "churn reports" were produced and discussed at these monthly meetings led by Defendant Sharan "where he would go through every customer to discuss their status on the churn reports[,]" including "customers designated as having a high risk of churn[,]" and that other executives received this report regularly.  ¶94.

FE-1 also sent regular email updates concerning enterprise sales and accounts to C-level employees, including Defendant Sharan, and the same was required for the small business cohort. ¶82.  FE-2 recalled that "concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to

indicate if a customer had indicated they were engaging ON24 only due to the pandemic." ¶103. Further, it defies common sense to suggest that the Individual Defendants were unaware of ON24's shift during the pandemic to allow one-time customers and the effect that would have on customer churn in 2021. Where, as here, a complaint "pleads that [the issuer] knew of the [trends] prior to its IPO," an Item 303 trend is adequately pled. *Lyft*, 484 F. Supp. 3d at 776, n.7.

### C.    The Misstatements Are Not Protected by the Bespeaks Caution Doctrine

Defendants summarily conclude that four statements are "forward-looking statements" protected by the bespeaks caution doctrine because the "cautions that accompanied [these] statements ... were meaningful." Motion at 13-14. However, the four statements Defendants identify, Motion at 14 (citing Statement Nos. 2, 5, 7-8, ¶¶145, 150, 152-53), were rendered misleading by omission of historical facts and are, therefore, not protected by the bespeaks caution doctrine. Omissions by their very nature are of existing fact. *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 948 (9th Cir. 2005) ("We now expressly ... hold that extension of the bespeaks caution doctrine to statements of historical fact is inappropriate"); *In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) ("failure to alert investors to" existing problem was "not forward-looking; rather, it was an omission of a historical fact"); *In re Bear Stearns Mortg. Pass-Through Certificates Litig.*, 851 F. Supp. 2d 746, 768-69 (S.D.N.Y. 2012) ("bespeaks caution doctrine ... does not apply to cases ... where a plaintiff alleges omissions or misrepresentations of historical fact"). The Offering Documents omitted ON24's strategy shift to target one-time, event-only customers, which would lead to high churn in 2021 as these customers elected not to renew as they told ON24 they would.

Accordingly, Defendants' authorities, Motion at 14, 16, are all inapposite, as each case involved statements about future expectations and projections—not omissions of then-present facts as alleged here. *See, e.g., Kipling v. Flex Ltd.*, 2020 WL 2793463, at *10 (N.D. Cal. May 29, 2020) (statements about projections forward-looking); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *15 (N.D. Cal. July 21, 2020) (statements about plans and objectives for future operations forward-looking); *In re Cloudera, Inc. Sec. Litig.*, 2021 WL 2115303, at *5, *18 (N.D. Cal. May 25, 2021) (statement that a future "merger would improve" defendant's customer

relationships forward-looking because they relate to "the operational and economic opportunities of the merger"); *Pino v. Cardone Cap., LLC*, 2021 WL 3502493, at *11 (C.D. Cal. Apr. 27, 2021) (statements about internal rate of return projections forward-looking); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 2000 WL 1727377, at *11 (N.D. Cal. Sept. 29, 2000) (statement about issuers' two customers' "purchasing patterns in the future" forward-looking).

To the extent the Court finds that omissions can be subject to the bespeaks doctrine, Defendants' argument fails for several independent reasons. First, Defendants cherry-pick parts of the challenged statements while ignoring large portions that do not touch on the future. For example, Statement No. 2 discusses ON24's existing customer base and ON24's current intent to "further penetrate" existing customers, ¶145; Statement No. 7 discusses ON24's present intent, ¶152; and Statement No. 8 discusses ON24's then-existing opportunity to "increase sales among existing customers." ¶153. These non-forward-looking statements cannot be protected.

Second, the broad, generic warnings Defendants rely upon are not sufficient as they do not directly relate to the alleged material adverse facts and are "vague enough to ... obscure[] the issue of concern to reasonable investors." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017). For example, generic warnings that customers may not renew obscures that ON24 shifted its strategy to sign up one-time, event-only, and SMB customers and that material customer churn was inevitable in 2021. ¶¶148(a)-(i); *see Atossa*, 868 F.3d at 798 ("[d]ismissal on the pleadings under the bespeaks caution doctrine ... requires a stringent showing: There must be sufficient cautionary language or risk disclosure such that reasonable minds could not disagree"). Defendants have failed to show the Offering Documents included specific cautionary language, because the "cautions" Defendants cite, Motion at 14-16, did not disclose the specific, then-existing material adverse facts, trends, uncertainties, and risks. *See infra* I.A., I.B.

**D.    The Challenged Opinion Statements Are Actionable in Context**

Defendants seek to disqualify three statements as inactionable opinions, arguing "[t]here was good reason for optimism about the business, and ON24 warned of the risks." Motion at 22-23 (citing Statement Nos. 4-5, 8, ¶¶149-50, 153). But "literal accuracy is not enough: An issuer must as well desist from misleading investors by saying one thing and holding back another." *Id.*

at 192-93 ("magic words" like we believe or we think "can preface nearly any conclusion, and the resulting statements ... remain perfectly capable of misleading investors").

"*Omnicare* establishes three different standards for pleading falsity of opinion statements." *Align Tech., Inc.*, 856 F.3d at 615-16. Opinions are actionable if: (1) "the speaker did not hold the belief professed" (subjective disbelief); (2) "the supporting fact [the speaker] supplied [is] untrue" (embedded untrue facts); or (3) the plaintiff alleges "facts going to the basis for the issuer's opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context" (omissions). *Id.* Defendants conclude—sans analysis—that the Complaint does not allege "that a statement of fact contained within an opinion statement is materially misleading" (prong two), or any "facts ... going to the basis of any of the opinions" (prong three). Motion at 23 & n.6. Defendants are wrong.

As an initial matter, "an investor reads each statement within such a document, whether of fact or of opinion, in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information." *Omnicare*, 575 U.S. at 190; *see also Lorenz v. Safeway, Inc.*, 241 F. Supp. 3d 1005, 1023 (N.D. Cal. 2017) (complaint "should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible"). Ignoring this law, Defendants quote isolated excerpts of challenged statements to argue they are inactionable opinions. For Statement No. 4, the Complaint **bolds and italicizes** the misstatement and presents it in context of its surrounding text, ¶149, but Defendants quote the **unchallenged** preceding sentence ("We believe....") and omit the latter half of the actual challenged statement. Motion at 22. The part of Statement No. 4 that is alleged to be misleading is a present tense statement ("Our land and expand model **drives** expansion of new subscriptions **within our existing customer base**...."), not an opinion. While Statement No. 8 begins with the words "we believe," it discusses "penetrating our existing customer base" and increasing "sales among existing customers." These statements are misleading without full disclosure of the changed nature of ON24's customer base.

Even if Statement Nos. 4, 5, and 8 are opinions, each is actionable under *Omnicare*'s second embedded untrue facts prong. For Statement No. 4, ¶149, which discusses ON24's "land and expand business model" that would purportedly "drive[] expansion of new subscriptions

within our existing customer base[,]" the embedded untrue fact is that ON24's then-existing customer base was comprised of its traditional clients who regularly renew and upsell. The truth was ON24's customer base included one-time, event-only customers that had given up to six months' notice of nonrenewal. ¶¶154(c)-(d). In Statement No. 5, ON24 touted its growing "opportunity to help businesses convert digital engagement into revenue." ¶150. The embedded untrue fact there was a client base interested in achieving further digital engagement. To the contrary, a material portion of ON24's client base was not interested in further converting to digital engagement as they had turned to ON24 as a one-time replacement to in person events. ¶¶154(b)-(f). In Statement No. 8, ON24 discussed achieving "significant growth by retaining and further penetrating our existing customer base ... and through upsell and cross sell[,]" and an increase in sales "among existing customers." ¶153. However, rather than having a customer base that was primed for upselling (the embedded untrue fact), ON24's existing customers included many one-time customers that planned not to renew or downsell. ¶¶154(a), (c), (f). *See In re QuantumScape Sec. Class Action Litig.*, 2022 WL 137729, at *16 (N.D. Cal. Jan. 14, 2022) (opinion actionable where the supporting fact behind it is "an assertion capable of being proven true or false").

Finally, each statement is actionable under *Omnicare*'s third prong. Opinions, "though sincerely held and otherwise true as a matter of fact, may nonetheless be actionable if the speaker *omits* information whose omission makes the statement misleading to a reasonable investor." *Tongue v. Sanofi*, 816 F.3d 199, 210 (2d Cir. 2016) (citing *Omnicare*, 575 U.S. at 194). Facts going to the basis of ON24's purported opinion statement were omitted:

(Statement No. 4)   While touting ON24's land and expand model as a way to expand subscriptions within its existing customers, ¶149, ON24 omitted the fact that it had shifted to signing up one-time, event-only customers who did not fit its land and expand model and who were unlikely to renew, much less upsell. ¶¶154(c)-(d), (f);

(Statement No. 5)   While discussing its "opportunity to help businesses convert digital engagement into revenue ..., which has been accelerated by the COVID-19 pandemic[,]" ¶150, ON24 failed to disclose that its shift during COVID-19 to one-time customers inhibited its ability to convert customers into buying additional digital products. ¶¶154(e)-(f); and

(Statement No. 8)   While touting its ability to achieve growth by "penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell[,]" and "further increasing sales among existing customers[,]" ¶153, ON24 failed to disclose that a material number of existing customers did not plan to renew or would downsell. ¶154(g).

Defendants' omission of these adverse facts, which go the heart of its purported opinion statements, render such statements materially misleading to a reasonable investor.  *See, e.g., In re Allied Nevada Gold Corp. Sec. Litig.*, 743 F. App'x 887, 887-88 (9th Cir. 2018) (opinions actionable where "plaintiff offered allegations from former employees" that omitted issues were "obvious" and "at least one defendant was present" at meetings where issues were discussed).

### E.    Defendants' Attempt to Cast Certain Statements as Puffery Fails

Defendants make equally unavailing arguments that four statements concerning ON24's customers and growth were inactionable puffery.[10]  Motion at 11-13 (citing Statement Nos. 1-3, 8, ¶¶144-46, 153).  Defendants' arguments fail for the simple reason that the statements conveyed verifiable information about the then-current state of ON24's existing business which were incomplete and misleading in context.  *Omnicare*, 575 U.S. at 183-84 (a determinate, verifiable statement is not mere puffery); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (statements not puffery if they are "misrepresentations of existing facts" even though speaker knew the contrary was true).

Defendants point to only a few excerpts and select words from the four challenged statements.  Having stripped these statements of their critical context, Defendants run afoul of the Ninth Circuit practice to "analyze the context in which the statements were made" when "determining whether statements amounted only to puffery."  *In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013) ("What might be innocuous puffery ... standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation") (citing *Casella v. Webb*, 883

---

[10] True puffery is not actionable under the PSLRA because the law "deems such statements so amorphous as to be ***immaterial***[,]" but determining whether a statement is material entails fact-intensive assessments more properly left to the jury.  *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 966-67 (N.D. Cal. 2014) (dismissal warranted on puffery grounds only where the statement is "so obviously unimportant to a reasonable investor that reasonable minds could not differ").  In any event, the Complaint alleges the materiality of the omissions given, *inter alia*: (1) the size of ON24's expected revenue and losses misses after the IPO, *see* chart *infra* I.A.2; (2) markets analysts' reactions after the adverse post-IPO disclosures, *see, e.g.*, ¶172 ("ONTF in the penalty box.... Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID, and in particular from SMB buyers.... ***To be clear, these are not normally ON24's target customer***"); and (3) the 62% decline in ON24's stock price from the IPO to the first filed complaint following post-IPO disclosures of omitted facts.  ¶204.

F.2d 805, 808 (9th Cir. 1989)).

For example, Defendants challenge an excerpt of Statement No. 1 (¶144), by arguing that whether ON24 had a "highly engaged and loyal customer base" is just a "vague, enthusiastic statement about its customer base." Motion at 11. Statement No. 1, however, conveys much more: "As of September 30, 2020, we had over 1,900 customers[,]" not a "single customer contributed more than 5% of our total revenue" for 2019 or the nine months ended September 30, 2020, and "[w]e have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time." ¶144. This statement is actionable because it positively touts ON24's entire customer base as loyal with ability to upsell while omitting that a material portion of that base now consists of one-time, event-only, and high churn SMB customers, many of whom had given up to six months' notice they were not going to renew. ¶¶148(c)-(d).

Here, as in *In re Apple Inc. Sec. Litig.*, although investors understand corporate optimism may be unreliable, "a party cannot create a positive impression of an area it knows to be doing poorly." 2020 WL 2857397, at *15 (N.D. Cal. June 2, 2020). A reasonable investor would find it important to know that a material portion of ON24's customer base had already told ON24 they would not renew or would downsell in 2021. The metrics ON24 provided, Motion at 12, do not insulate Defendants as the market understood those metrics to be duplicatable—and did not understand ON24 shifted its focus to non-repeat, one-time customers. Statement No. 2 discusses ON24's growing base of customers which will allow the Company to leverage its land and expand model to upsell and "further penetrate customers." ¶145. Statement No. 3 discusses the ARR growth reflecting successfully upselling customers. ¶146. And Statement No. 8 discusses achieving continued growth by upselling existing customers. ¶153. These are statements intended to persuade investors that ON24 has a large client pool ripe for upselling.

Defendants try, but fail, to shoehorn this case into the fact patterns from two very different cases this Court has heard. Motion at 12-13. As an initial matter both cases assert fraud-based claims under the Exchange Act and applied Rule 9(b) standards. *Nimble Storage* is further distinguishable because that case concerned whether the issuer, knowing its enterprise segment was underperforming, simply inflated its enterprise customer base by "relabeling

commercial accounts as enterprise accounts" and whether "the numbers disclosed to the public were false." 252 F. Supp. 3d at 852. The Court held that the plaintiff failed to adequately plead that any allegedly relabeled clients were actually included in publicly disclosed numbers. *Id.* at 853. *Intel* is inapposite because that case concerned "non-verifiable vague statements" about Intel's platforms and processor performance, including statements that Intel's platforms "improve" performance and security and "optimize" interconnectivity and that Intel's processors offer "unprecedented" power and "outstanding" performance. 2019 WL 1427660 at *12. Here, by contrast, the misstatements at issue are verifiable statements of fact concerning ON24's customer base as it existed at the time of the IPO. *See*, *e.g.*, Statement No. 3 ("Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with *existing* customers"), ¶146; Statement No. 8 ("We believe we can achieve significant growth by retaining and further penetrating our *existing* customer base"). ¶153. Statement Nos. 1-3 and 8 are actionable because they go "beyond feel good optimistic statements" and provide a "concrete description" of the past and present state of ON24's affairs. *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018).

## **CONCLUSION**

For the forgoing reasons, Defendants' motion to dismiss should be denied in its entirety.

Dated: June 16, 2022

Respectfully submitted,

LABATON SUCHAROW LLP

 /s/ Alfred L. Fatale III
Jonathan Gardner (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Marco A. Dueñas (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jgardner@labaton.com
        dschwartz@labaton.com
        afatale@labaton.com
        mduenas@labaton.com

*Lead Counsel for Lead Plaintiff*

*Leadersel Innotech ESG*

David Bricker (CA SBN 158896)
THORNTON LAW FIRM LLP
9595 Wilshire Boulevard, Suite 900
Beverly Hills, California 90212
Telephone: (310) 282-8676
Facsimile: (310) 388-5316
Email: dbricker@tenlaw.com

*Liaison Counsel for Lead Plaintiff*
*Leadersel Innotech ESG*