UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

|  |  |
|---|---|
|  | )  C-21-08578 YGR |
|  | ) |
|  | )  OAKLAND, CALIFORNIA |
| IN RE ON24, INC. SECURITIES | ) |
| LITIGATION, | )  MARCH 27, 2023 |
|  | ) |
|  | )  PAGES 1-41 |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

FOR THE PLAINTIFFS:     LABATON SUCHAROW LLP
                        BY:  ALFRED L. FATALE III
                             MARCO A. DUENAS
                        140 BROADWAY
                        NEW YORK, NEW YORK  10005

FOR THE DEFENDANTS:     MORRISON & FOERSTER
                        BY:  DAVID J. WIENER
                             ANNA ERICKSON WHITE
                        425 MARKET STREET
                        SAN FRANCISCO, CALIFORNIA  94105

FOR THE UNDERWRITER     MORGAN LEWIS & BOCKIUS
DEFENDANTS:             BY:  CHARLENE S. SHIMADA
                        ONE MARKET STREET, SPEAR STREET TOWER
                        SAN FRANCISCO, CALIFORNIA  94105

REMOTELY REPORTED BY:   LEE-ANNE SHORTRIDGE, CSR, CRR
                        CERTIFICATE NUMBER 9595

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
TRANSCRIPT PRODUCED WITH COMPUTER

OAKLAND, CALIFORNIA                    MARCH 27, 2023

P R O C E E D I N G S

(COURT CONVENED AT 9:05 A.M.)

THE CLERK:  YOU MAY BE SEATED.

AND, YOUR HONOR, WE'RE CALLING CV-21 -- ONE SECOND, LET ME RECORD BACKUP FOR THE COURT REPORTER.

YOUR HONOR, WE'RE CALLING CV-21-8578, IN RE: ON24, INC. SECURITIES LITIGATION.

PLEASE STEP FORWARD AND STATE YOUR APPEARANCES FOR THE RECORD, PLEASE.

MR. FATALE:  GOOD MORNING, YOUR HONOR.

ALFRED FATALE FROM LABATON SUCHAROW FOR THE PLAINTIFF. I'M JOINED BY MY COLLEAGUE, MARCO DUENAS.

THE COURT:  GOOD MORNING.

MR. DUENAS:  GOOD MORNING, YOUR HONOR.

MR. WIENER:  GOOD MORNING, YOUR HONOR.

DAVID WIENER FOR THE ON24 DEFENDANTS, JOINED BY MY COLLEAGUE, ANNA ERIKSON WHITE.

THE COURT:  OKAY.

MS. SHIMADA:  GOOD MORNING, YOUR HONOR.

CHARLENE SHIMADA FROM MORGAN LEWIS & BOCKIUS LLP ON BEHALF OF THE UNDERWRITER DEFENDANTS.

THE COURT:  OKAY.  GOOD MORNING.

OKAY.  ARE THE TWO OF YOU ARGUING THE ENTIRE MOTION?  OR IS THERE DIVISION THAT I SHOULD KNOW ABOUT?

MR. FATALE:  ENTIRE, YOUR HONOR.

MR. WIENER:  SAME HERE.

THE COURT:  OKAY.  LET'S GO AHEAD AND START WITH THE DEFENSE.  IT'S YOUR MOTION.

WHAT I WOULD TEND TO DO IN THESE CASES IS EITHER GO THROUGH THE STATEMENTS INDIVIDUALLY OR YOU CAN GO IN A GROUP, I'LL HEAR ARGUMENT FROM YOU, AND THEN REBUTTAL.  SO YOU SHOULD BOTH STAY AT THE PODIUMS.

YOU MAY PROCEED.

MR. WIENER:  THANK YOU, YOUR HONOR.

THE CENTRAL THEORY OF PLAINTIFF'S COMPLAINT IGNORES, IT'S ACTUALLY CONTRADICTED BY THE UNDISPUTED --

THE COURT:  OKAY.  I'M GOING TO STOP YOU RIGHT THERE. LET ME MAYBE DO THIS A DIFFERENT WAY.

EVERYBODY AGREES THAT THE STANDARD IS NOT REALLY IN DISPUTE; RIGHT?

MR. FATALE:  YES, YOUR HONOR.

THE COURT:  OR THERE WAS SOME DISCUSSION ABOUT THE STANDARD IN THE PAPERS, SO LET'S TALK ABOUT THE STANDARD FOR A MOMENT.

IS THERE A DISPUTE ABOUT THE STANDARD, OR NOT?

MR. WIENER:  THERE'S NO DISPUTE THAT RULE 8 APPLIES.

MR. FATALE:  YOUR HONOR, THE DEFENDANTS SAY THAT IN THEIR PAPERS, AND THEN THEY LOOK FOR EXACTLY WHAT THEY WOULD LOOK FOR IF THERE WAS A 9(B) CASE.

THE COURT:  OKAY.  SO YOU AGREE RULE 8 --

MR. FATALE:  THE WHO, WHAT, WHERE --

THE COURT:  THE STANDARD FOR RULE 8 APPLIES?

MR. WIENER:  YES.

THE COURT:  OKAY.  THAT'S THE STANDARD I'M GOING TO APPLY.  OKAY.  RULE 8 APPLIES.

NOW, I REALLY DON'T WANT INTRODUCTIONS.  WHAT I WANT IS TO GET TO THE HEART OF THE ISSUE.  WHICH STATEMENTS DO YOU WANT TO TALK ABOUT FIRST?

MR. WIENER:  SO I THINK WE COULD GO IN ORDER, IF THAT'S EASIEST FOR YOUR HONOR.

THE COURT:  WE'RE GOING TO GET THROUGH THEM ALL.  THE QUESTION IS, ARE WE GOING TO DO THEM INDIVIDUALLY OR DO YOU WANT TO GROUP THEM?

IF YOU'RE GOING TO GROUP THEM, THEN YOU TELL ME WHICH ONES YOU'RE GROUPING TOGETHER.

IF NOT, WE'LL START AT STATEMENT 1, PARAGRAPH 144 OF THE COMPLAINT.

MR. WIENER:  SO I WOULD GROUP THE RISK FACTOR STATEMENTS TOGETHER.  THAT'S ONE GROUP.

THE COURT:  OKAY.

MR. WIENER:  I THINK THE OTHER STATEMENTS CAN PROBABLY ALL BE THEN ADDRESSED INDIVIDUALLY.  I THINK THE RISK FACTORS ARE PROBABLY THE EASIEST GROUP TO DO SEPARATELY.

THE COURT:  OKAY.  SO GIVE ME THOSE NUMBERS JUST SO

THAT I MAKE SURE I'M FOLLOWING YOU.

MR. WIENER:  SO THE RISK FACTOR STATEMENTS ARE 9 THROUGH 13.

THE COURT:  OKAY.  GO AHEAD.

MR. WIENER:  OKAY.

THE COURT:  LET'S TALK ABOUT THOSE IN PARTICULAR, 9 THROUGH 13.

MR. WIENER:  I'LL START WITH 1.

I JUST THINK THOSE ARE A SEPARATE GROUPING.  IT'S PROBABLY EASIEST TO ADDRESS THEM AFTER GOING THROUGH THE OTHERS.

THE COURT:  OKAY.  SO YOU WANT TO START WITH 1?

MR. WIENER:  YES, PLEASE, YOUR HONOR.

THE COURT:  OKAY.  GO AHEAD.

MR. WIENER:  SO STATEMENT 1 IS A SUBJECTIVE STATEMENT ABOUT ON24'S CUSTOMER BASE.  IT SAYS MERELY THAT IT'S A HIGHLY ENGAGED AND LOYAL CUSTOMER BASE THAT HAS ALLOWED THE COMPANY TO GROW REVENUE WITH THEM OVER TIME.

THE COURT:  OKAY.  SO AS OF THE -- THEY'VE HIGHLIGHTED, AS OF SEPTEMBER 30TH, 2020, WE HAD OVER 1900 CUSTOMERS.

MR. WIENER:  CORRECT.

THE COURT:  CORRECT?

MR. FATALE:  CORRECT.

THE COURT:  BUT THAT'S NOT -- THERE'S NOTHING THAT YOU'RE CLAIMING THAT'S ACTUALLY A MISREPRESENTATION WITH

RESPECT TO THAT NUMBER, ARE YOU?

MR. FATALE:  NO.  THIS IS A CASE ABOUT OMISSIONS, AND OMISSIONS THAT WERE CREATED BY HALF TRUTHS.

THE COURT:  OKAY.  SO EVERYBODY AGREES THAT THAT STATEMENT IN AND OF ITSELF, OR AT LEAST THE NUMBER IN AND OF ITSELF, IS NOT DRIVING THE -- IS NOT AN AFFIRMATIVE MISREPRESENTATION?

MR. FATALE:  CORRECT.

THE COURT:  OKAY.  GO AHEAD.

MR. WIENER:  AND THERE ARE NO FACTS ALLEGED -- SO, FIRST, THAT STATEMENT IS NOT OBJECTIVELY VERIFIABLE AND, THEREFORE, IT'S NOT ACTIONABLE UNDER NINTH CIRCUIT LAW.

THE COMPLAINT --

THE COURT:  THERE'S NO WAY TO VERIFY WHETHER THE 1900 CUSTOMERS WERE HIGHLY ENGAGED AND LOYAL?

MR. WIENER:  I DON'T THINK SO, YOUR HONOR, NO.

THE COURT:  RESPONSE?

MR. FATALE:  YOUR HONOR, I DO THINK THAT'S -- I DO THINK THAT'S VERIFIABLE, AND, IN FACT, THE CONFIDENTIAL WITNESSES TALK ABOUT THE DATA THAT EXISTED AT THE COMPANY AT THE TIME OF THE IPO THAT WAS CONTRARY TO THAT STATEMENT, THAT DURING THE PANDEMIC, THEY HAD CUSTOMERS -- THEY HAD A CHANGE IN BUSINESS STRATEGY FROM ENGAGED LOYAL USE CUSTOMERS TO ONE-TIME USE CLIENTS WHO TOLD THEM, FLAT OUT, WE'RE IN A PANDEMIC AND WE'RE HIRING YOU FOR THIS ONE EVENT; NO, DON'T TALK TO ME ABOUT

YOUR OTHER SERVICES, THIS IS ALL WE'RE USING YOU FOR.

AND SO I DO THINK THAT IS OBJECTIVELY VERIFIABLE WHEN WE'VE ALLEGED FACTS SHOWING THAT THERE WAS CONTRARY INFORMATION AT THE COMPANY.

THE COURT:  ALL RIGHT.  SO IF THE FACTS -- IF PLAINTIFFS CAN SHOW THAT THESE WERE ONE-TIME CUSTOMERS AS OPPOSED TO LONG-TERM CUSTOMERS, LET'S JUST SAY IF THEY CAN SHOW THAT THEY'RE ONE-TIME CUSTOMERS, ISN'T THAT PROOF THAT THEY'RE NOT HIGHLY ENGAGED AND LOYAL?

MR. WIENER:  WELL, NO, YOUR HONOR.

I MEAN, THE COMPANY DISCLOSED THE FACTS THAT PLAINTIFFS ARE ALLEGING WERE CONCEALED.  PLAINTIFFS ARE SAYING THAT DURING THE PANDEMIC, THE COMPANY SHIFTED TO A NEW BUSINESS MODEL WITH SHORT-TERM, ONE-YEAR CONTRACTS FROM SMALL CUSTOMERS WHO DIDN'T ENGAGE WITH THE ENTIRE PRODUCT SET AND HAD LIMITED USE CASES.

BUT THE COMPANY DISCLOSED METRICS ON ALL OF THOSE POINTS, DISCLOSED THE PROPORTION THAT WERE ANNUAL RECURRING REVENUE THAT WAS ATTRIBUTABLE TO MULTI-YEAR CONTRACTS, THEY DISCLOSED THE NUMBER OF CUSTOMERS THAT WERE 100K CUSTOMERS, THAT WERE MORE THAN $100,000 IN ANNUAL RECURRING REVENUE.

AND THAT NUMBER INCREASED DURING THE PANDEMIC, IT DIDN'T GO DOWN, JUST LIKE THE PERCENTAGE OF MULTI-YEAR SUBSCRIPTIONS. THAT WAS A HIGHER NUMBER DURING THE PANDEMIC THAN IT WAS BEFORE.

AND THE COMPANY DISCLOSED THE PERCENTAGE OF CUSTOMERS THAT

HAD SUBSCRIPTIONS FOR MULTIPLE PRODUCTS.  IT DISCLOSED HARD METRICS ON THESE POINTS THAT PLAINTIFFS CONTEND MAKE THIS SUBJECTIVE STATEMENT MISLEADING.

AND THEY DON'T CHALLENGE ANY OF THOSE HARD METRICS.  THE STATEMENT CAN'T BE MISLEADING IN LIGHT OF THE HARD METRICS ON THE VERY POINT THAT PLAINTIFF CLAIMS WAS CONCEALED.

THE COURT:  ALL RIGHT.  I KEEP INTERRUPTING, SO GO BACK.  STATEMENT 1, DO YOU WANT TO SAY ANYTHING ELSE ABOUT STATEMENT 1?

MR. WIENER:  WELL, YOUR HONOR, I THINK IT REALLY GOES TO MOST OF THESE STATEMENTS.  IT'S THE SAME TYPE OF ARGUMENT, SAME REASON THAT PLAINTIFF CAN'T ALLEGE THAT THESE STATEMENTS THAT ARE SUBJECTIVE STATEMENTS ABOUT THE CUSTOMER BASE ARE MISLEADING.

THAT ARGUMENT FAILS BOTH BECAUSE THERE ARE NO FACTS ACTUALLY ALLEGED SHOWING THAT THERE WAS ANY MATERIAL CHANGE DURING THE PANDEMIC.

PLAINTIFF CITES C.W.'S THAT SAY THAT SOME UNSPECIFIED NUMBER OF CUSTOMERS AT SOME UNSPECIFIED TIME SUGGEST THAT THERE MIGHT BE INTENTION NOT TO RENEW SIX MONTHS LATER.

THAT'S EXACTLY THE TYPE OF FACT, OR THE TYPE OF ALLEGATION THAT'S NOT SUFFICIENT TO STATE A CLAIM AS THE NINTH CIRCUIT HELD IN IN RE: STAC.

SO A DECISION IN THE FUTURE BY ANOTHER ENTITY THAT HASN'T YET BEEN MADE, THAT'S NOT A FACT THAT HAS TO BE DISCLOSED.

THE COURT:  RESPONSE?

MR. FATALE:  THIS IS A CENTRAL MISCHARACTERIZATION OF THE COMPLAINT THAT HAS BEEN FORCED UPON US THROUGH DEFENSE BRIEFING.

IT'S NOT THAT THERE WAS A SHIFT TO ONE-YEAR CONTRACTS. IT'S OUR ALLEGATION THAT THE COMPANY'S BUSINESS MODEL WAS, AND ALWAYS WAS, ONE-YEAR CONTRACTS.  IT WAS A SHIFT TO ONE-TIME CUSTOMERS, NOT WE'RE SIGNING UP FOR A YEAR AND WE'RE GOING TO USE YOU FOR A YEAR.  NO, WE'RE JUST SIGNING UP FOR ONE EVENT.

THE OTHER MANIPULATION IS THAT THERE'S -- YOU KNOW, THEY SOLD THE COMPANY AS A SUBSCRIPTION-BASED COMPANY THAT HAD RECURRING REVENUE.

WHEN YOU LOOK AT THE REGISTRATION STATEMENT AS A WHOLE -- AND THIS IS WHERE IT GETS A LITTLE DIFFICULT HERE BECAUSE THIS GOING STATEMENT BY STATEMENT WORKS VERY WELL IN A SECTION 10 CASE, BUT IN A SECTION 11 CASE, THE QUESTION IS WHETHER THE REGISTRATION STATEMENT AS A WHOLE WAS MISLEADING.

JUDGE SEEBORG SAID, IN THE UBER DECISION THAT WE CITE IN THE PAGES -- THE PIN SITE IS STAR 11, I DON'T HAVE THE WHOLE SITE IN FRONT OF ME, BUT IT'S IN OUR INDEX -- THE QUESTION IN A SECTION 11 CASE LIKE THIS IS, DID THE REGISTRATION STATEMENT PORTRAY A STATE OF FACTS ABOUT THE COMPANY THAT WAS DIFFERENT THAN WHAT THE ACTUAL STATE OF FACTS WERE, TAKEN AS A WHOLE, LOOKING AT THE REGISTRATION STATEMENT?

AND, YOU KNOW, WE'LL GO THROUGH THE STATEMENTS, FINE.  BUT

I WOULD CHARACTERIZE THIS CASE AS A CASE OF OMISSION, AND THEY DON'T REALLY ENGAGE IN THE DUTIES THAT THEY HAD TO ALLEGE THIS TREND THAT WE ALLEGE, AS WELL AS AN OMISSION CAUSED -- YES, THERE WAS AN OMISSION CAUSED BY THESE MISLEADING STATEMENTS, BUT THERE WAS ALSO A PURE OMISSION ELEMENT OF THIS CASE THAT I THINK HAS GONE UNADDRESSED.

THE COURT:  OKAY.

MR. WIENER:  YOUR HONOR, THEY STILL HAVE TO ALLEGE THAT A STATEMENT WAS RENDERED MISLEADING BY THAT OMISSION, OR WHAT THEY ALSO TRIED TO DO IS SAY REGULATION S.K. WAS VIOLATED BY THE FAILURE TO DISCLOSE SOME TREND.

AS WE EXPLAINED IN BRIEFING, THERE WAS NO TREND DISCLOSED AT THE TIME OF THE IPO.  NONE OF THESE CONTRACTS THAT PLAINTIFF ALLEGES WAS ENTERED INTO DURING COVID HAD COME UP FOR RENEWAL OR WERE CANCELLED AT THE TIME OF THE IPO.

AND ON24 WARNED OF THE RISK AND EXPLAINED THAT DURING COVID, COVID HAD SIGNIFICANTLY IMPACTED THE GROWTH RATE OF THE COMPANY, AND ON24 WARNED THAT IF THE PANDEMIC-RELATED RESTRICTIONS EASED OR CHANGED AFTER THE IPO, THAT COULD AFFECT RENEWAL RATES AS THOSE CUSTOMERS MIGHT GO BACK TO USING IN-PERSON MARKETING ACTIVITIES IN LIEU OF DIGITAL ALTERNATIVES THAT HAD BECOME MORE POPULAR DURING THE PANDEMIC.

THE COURT:  NOW, THERE ARE ALLEGATIONS IN THE COMPLAINT THAT AT SOME TIMES, AS MUCH AS SIX TIMES IN ADVANCE, SIX MONTHS IN ADVANCE, MANAGEMENT KNEW THAT THERE WERE NOT --

THAT THESE CUSTOMERS WERE NOT GOING TO RENEW.

HOW WAS THAT DISCLOSED?

MR. WIENER:  SO, YOUR HONOR, I THINK THAT ALLEGATION FAILS FOR SEVERAL REASONS.

ONE, THAT'S FROM ONE C.W. TALKING ABOUT THAT C.W.'S --

THE COURT:  OKAY.  WELL, THAT ARGUMENT FAILS BECAUSE I HAVE TO ASSUME FOR PURPOSES OF THIS MOTION THAT IT'S ACCURATE.

MR. WIENER:  EVEN ASSUMING IT'S ACCURATE, YOUR HONOR, IT'S STILL ONE C.W. ABOUT THAT C.W.'S CUSTOMERS.

THAT DOESN'T SAY ANYTHING ABOUT THE OVERALL LEVEL OF THE COMPANY.  THE FACT THAT ONE CUSTOMER OR TWO CUSTOMERS TOLD THAT C.W. SAYS NOTHING ABOUT RENEWAL RATES OF THE COMPANY AS A WHOLE.

THE COURT:  THIS ISN'T RULE 9.  THIS IS RULE 8, AND I HAVE TO ASSUME IT'S TRUE.  SO --

MR. WIENER:  SO SETTING THAT ASIDE THEN, YOUR HONOR, I THINK STAC IS ON POINT.  PLAINTIFFS IGNORED IT ENTIRELY IN THEIR BRIEFING.  THERE THE PLAINTIFF ALLEGED THEIR REGISTRATION STATEMENT WAS RENDERED MISLEADING BY THE FACT THAT COMPANIES FAILED TO DISCLOSE THAT MICROSOFT WAS DEVELOPING A COMPETING PRODUCT.  PLAINTIFFS ALLEGE THAT MICROSOFT HAD TOLD THE DEFENDANT THAT THAT WAS OCCURRING, AND THAT THAT -- THAT THE DEFENDANT'S STATEMENT THAT IT COULD OFFER NO ASSURANCE THAT MICROSOFT WOULD NOT DEVELOP A COMPETING PRODUCT WAS THEREFORE

MISLEADING BECAUSE IT KNEW THAT, IN FACT, MICROSOFT WAS DEVELOPING THAT PRODUCT.

THE NINTH CIRCUIT REJECTED THAT ARGUMENT AND SAID THAT YOU CAN'T KNOW THE INTENTIONS OR WHAT A DIFFERENT ENTITY WILL DO IN THE FUTURE.

HERE WE HAVE --

THE COURT:  THAT'S DIFFERENT FROM YOUR CUSTOMER BASE. THIS ISN'T -- THIS ISN'T ZOOM TELLING YOU WHAT IT MAY OR MAY NOT DO.  THESE ARE YOUR CUSTOMERS TELLING YOU WHAT THEY ARE GOING TO DO.  THAT'S THE ALLEGATION.

MR. WIENER:  RIGHT, AND THAT'S A NEGOTIATING POSITION TAKEN SIX MONTHS IN ADVANCE OF THE RENEWAL.  THE CUSTOMER MAY OR MAY NOT FOLLOW THROUGH WITH THAT IN THE FUTURE.

THAT'S ESPECIALLY TRUE HERE WHEN YOU HAVE THE UNCERTAINTY PRESENTED BY THE PANDEMIC.  PLAINTIFF'S ALLEGATION IS THAT THESE CUSTOMERS ONLY SIGNED UP BECAUSE OF THE PANDEMIC.

ON24 WARNS OF THAT RISK.

AND NO ONE KNEW WHAT THE STATE OF THE PANDEMIC AND RELATED RESTRICTIONS WOULD BE SIX MONTHS LATER.

THE COURT:  RESPONSE?

MR. FATALE:  YOUR HONOR, ONE OF THE RISK FACTORS -- THE RISK FACTOR IS THAT GENERALIZED RISK DISCLOSURE, WE MAY -- CLIENTS MAY NOT RENEW.  WE GOT ALL THESE CLIENTS AT THE START OF THE PANDEMIC AND THEY MIGHT NOT RENEW.

WHAT IS MISSING FROM THAT IS THEY MIGHT NOT RENEW BECAUSE

THEY'RE TELLING US THEY'RE NOT GOING TO RENEW BECAUSE THEY'RE THESE ONE-TIME USE CLIENTS THAT OUR BUSINESS MODEL IS DIFFERENT THAN AS WE'RE PORTRAYING TO YOU.

SO IT WAS NOT THE PARTICULARIZED RISK STATEMENT THAT THEY WISH IT WAS.

AS FOR THE STATEMENTS OF C.W.'S IN THIS CASE, IT -- IT'S -- THEY SHOW WHAT'S AT THE COMPANY, THAT DEFENDANTS -- MAYBE THEY DIDN'T DISCOVER IT.  MAYBE THEY DIDN'T KNOW IT.

IT'S KNOWN OR KNOWABLE IN A SECTION 11 CASE.  IT WAS THEIR DUTY TO FIND OUT WHAT THE STATE OF IT WAS.

I THINK WE'VE ALLEGED MORE HERE, BUT I THINK WE COULD HAVE ALLEGED LESS FOR THE PURPOSES OF THIS COMPLAINT.

THE COURT:  ALL RIGHT.

RESPONSE?

MR. WIENER:  YOUR HONOR, THE RISK FACTOR IS NOT GENERALIZED.  IT SAID, OUR RECENT REVENUE GROWTH HAS BEEN SIGNIFICANTLY IMPACTED BY INCREASE IN DEMAND FOR OUR PLATFORM AND PRODUCTS FOLLOWING THE ONSET OF THE COVID-19 PANDEMIC AND RELATED RESTRICTIONS, SO RELATED TO CAUTIONARY MEASURES.

AS THE IMPACT OF COVID-19 LESSENS, THERE MAY BE REDUCED DEMAND FOR OUR PLATFORM.

IT'S ALSO POSSIBLE THAT IF THE EFFECTS OF THE COVID-19 PANDEMIC SUBSIDE, OUR CUSTOMERS AND THEIR USERS WILL RESUME IN-PERSON MARKETING ACTIVITIES IN A WAY THAT DECREASES THE USAGE OF OUR PLATFORM.

THAT'S WARNING OF EXACTLY THE RISK THAT PLAINTIFFS ARE TALKING ABOUT, THAT CUSTOMERS THAT ONLY SIGNED CONTRACTS BECAUSE OF COVID-19-RELATED RESTRICTIONS WOULD NOT RENEW IF THE PANDEMIC-RELATED RESTRICTIONS SUBSIDED.

THAT WAS ALL CONTINGENT ON FUTURE EVENTS THAT PLAINTIFFS CONCEDE WERE MONTHS IN THE FUTURE.

MR. FATALE:  YOUR HONOR, IF I MAY SPEAK TO THIS FUTURE PART OF WHAT WE'RE ALLEGING?

THE COURT:  YES.

MR. FATALE:  THANK YOU.

ITEM 303, WHICH IS THE TREND PART, THE TREND DUTY THAT CREATES THE DUTY TO DISCLOSE UNKNOWN TRENDS AND UNCERTAINTIES, UNDERSTANDS THAT THE EFFECT OF THAT, THE RESULT OF THAT MIGHT HAPPEN AFTER THE OFFERING.  THAT'S WHY IT'S TRENDS AND UNCERTAINTIES THAT THEY HAVE TO DISCLOSE.

SO, OF COURSE, WHEN YOU HAVE ONE-YEAR CONTRACTS, THE IMPACT OF THAT ISN'T GOING TO BE UNTIL THOSE COME UP TO RENEW IN THE SECOND, THIRD, AND FOURTH QUARTER OF 2021.

AND WE ALLEGE THE DROP-OFF IN THESE PERIODS.

THE COURT:  HAS -- HAS ANY COURT DEFINED "TREND" IN TERMS OF LENGTH OR ANYTHING ELSE?  IS THERE -- IS THERE ANY -- IS THERE ANY NORMATIVE DEFINITION UPON WHICH THE COURT CAN LOOK AT THAT TERM?

MR. FATALE:  YOUR HONOR, JUDGE KAPLAN IN THE CPI CARD GROUP CASE THAT WE CITE IN OUR BRIEFS -- AGAIN, I DON'T HAVE

THE PIN CITE RIGHT IN FRONT OF ME, BUT IT'S IN OUR INDEX -- SPOKE DIRECTLY TO THIS POINT AND SAID THAT THE DURATION OF THE TREND -- WHETHER THE DURATION EQUALS A TREND IS A QUESTION OF FACT NOT TO BE RESOLVED AT A MOTION TO DISMISS STAGE.

MR. WIENER:  SO, YOUR HONOR, WE CITED BOTH THE PIVOTAL AND THE COSTANZO CASES THAT BOTH REJECTED CLAIMS LIKE THOSE PRESENTED HERE.

AND IN THE CPI CASE --

THE COURT:  HOLD ON.  HOLD ON.

WHAT WAS JUDGE KAPLAN'S CASE?

MR. FATALE:  ONE SEC.  I'LL FIND IT IN MY NOTES.

IN RE: CPI GROUP.  IT IS 2017 WESTLAW 4941597.

THE COURT:  ANY CIRCUIT CASE FROM THE PLAINTIFFS?

MR. FATALE:  NOT THAT COMES TO MIND AT THE MOMENT, YOUR HONOR.

THE COURT:  OKAY.  AND WHAT'S DEFENSE CASE?

MR. WIENER:  SO PIVOTAL, IN RE: PIVOTAL SECURITIES LITIGATION, AND COSTANZO --

THE COURT:  HOLD ON.  HOLD ON.  WHY DOESN'T YOUR MOTION HAVE A TABLE OF AUTHORITIES?

MR. WIENER:  I BELIEVE IT DOES, YOUR HONOR.  IT'S AFTER THE TABLE OF CONTENTS.

THE COURT:  IT'S AFTER WHAT?

MR. WIENER:  IT'S AFTER THE TABLE OF CONTENTS.

THE COURT:  OKAY.  AND YOU SAID IN RE:?

MR. WIENER:  PIVOTAL SECURITIES LITIGATION.

THE COURT:  OKAY.  THAT WAS JUDGE BREYER?

MR. WIENER:  YEP.  AND THEN COSTANZO VERSUS DXC.
MR. DEFILIPPO ADDRESSED THESE CLAIMS.

THE COURT:  SAME QUESTION TO YOU.

MR. WIENER:  I'M NOT AWARE OF ANY CIRCUIT.

THE COURT:  ANY CIRCUIT CASES?

ALL RIGHT.  SO KAPLAN SAYS TREND IS A QUESTION OF FACT?

MR. WIENER:  YOUR HONOR, IF I MAY, ON CPI, I THINK IT
ACTUALLY SHOWS WHAT --

THE COURT:  NO, NO.  WHAT I WANT TO KNOW IS, WHAT
SPECIFICALLY DID BREYER SAY ABOUT DEFINING THE TERM "TREND"?

MR. WIENER:  I DON'T KNOW THAT THERE'S A NORMATIVE
DEFINITION LIKE YOU SAID.

THE COURT:  THAT'S WHY I WAS -- THAT WAS THE QUESTION
I ASKED, AND THAT'S THE CASE YOU CITED.  SO NOW I SHOULD STRIKE
THIS FROM MY NOTES?

MR. WIENER:  THOSE ARE THE CASES WE CITED THAT ARE
ADDRESSING THIS CLAIM, ANALYZING THE CLAIM.

I DON'T KNOW THAT THERE'S A SPECIFIC DEFINITION AS TO
TEMPORAL LENGTH OR --

THE COURT:  SO THEY DIDN'T -- SO JUDGE FREEMAN AND
JUDGE BREYER DID NOT, IN FACT, DEFINE "TREND"?

MR. WIENER:  THEY ADDRESSED THE TREND ISSUE IN THE
CONTEXT OF THE ALLEGATIONS THERE.

I DON'T KNOW THAT THEY PROVIDED A GENERAL DEFINITION.

THE COURT:  DOES ANYBODY AT YOUR TABLE KNOW WHETHER OR NOT THEY DID?  NO?

MR. WIENER:  I CAN LOOK INTO IT, YOUR HONOR, IF YOU'D LIKE IF THAT WOULD BE HELPFUL.  I DON'T KNOW OFF THE TOP OF MY HEAD WHETHER THEY APPLIED A SPECIFIC DEFINITION ALONG THE LINES OF WHAT YOU'RE ASKING FOR.

THE COURT:  ALL RIGHT.  BUT KAPLAN DID DEFINE IT?

MR. FATALE:  HE SAID IT WAS A QUESTION OF FACT THAT HE DIDN'T NEED TO GET TO, OR HOW LONG IT -- HOW LONG DOES SOMETHING NEED TO BE BEFORE A TREND?

AND IN THIS CASE, YOUR HONOR, WE'RE ALLEGING SOMETHING THAT'S THREE-QUARTERS OF THE YEAR.

THE COURT:  WELL, THAT'S WHY I'M ASKING, BECAUSE IT'S NOT CLEAR TO ME THAT THAT'S A TREND.

MR. FATALE:  UNDERSTOOD, YOUR HONOR.

THE COURT:  SO WHAT WAS THE TREND THAT KAPLAN -- WHAT WAS THE LENGTH OF THE EVENT THAT KAPLAN WAS ADDRESSING IN TERMS OF A TREND?

MR. FATALE:  IT WAS A SIX MONTH BUILD UP OF INVENTORY.

THE COURT:  ALL RIGHT.  AND WHAT ABOUT IN IN RE: PIVOTAL?  WHAT WAS THE ALLEGED TREND THERE?  WHAT WAS THE LENGTH?

MR. WIENER:  SO IT RELATED TO ALLEGATIONS ABOUT

INADEQUACIES OF THE PRODUCT, AND THE PLAINTIFFS WERE ALLEGING THAT THAT CREATED UNCERTAINTY ABOUT FUTURE SALES.

THE COURT:  WHAT WAS THE -- WHAT WAS THE TEMPORAL ENVIRONMENT OF THE COMPLAINT?

MR. WIENER:  WELL, THE PLAINTIFFS WERE SIMPLY SAYING THAT BECAUSE OF THE PRODUCT DEFICIENCIES, THAT CREATED UNCERTAINTY --

THE COURT:  THEY HAD NO TIME -- I MEAN, IT'S A SECURITIES CASE.  OF COURSE THEY HAD TIME IN THERE.

MR. WIENER:  I THINK -- SO THE ALLEGATION WAS ABOUT A PRODUCT DEFICIENCY THAT EXISTED THE ENTIRE TIME PERIOD.

THE COURT:  WHICH WAS HOW LONG?

MR. WIENER:  I DON'T KNOW THE EXACT NUMBER OF MONTHS, YOUR HONOR, BUT --

THE COURT:  SO IT WAS MONTHS, NOT YEARS?

MR. WIENER:  I BELIEVE SO.  I BELIEVE THAT WAS THE RELEVANT TIME PERIOD IN THAT CASE.

THE COURT:  DO YOU KNOW ABOUT COSTANZO?

MR. WIENER:  SO THAT HAD TO DO WITH ALLEGATIONS REGARDING A COST CUTTING INITIATIVE AFTER A MERGER.  AND SO IT WAS AROUND THE FIRST OF THE YEAR OF THE MERGER, FOLLOWING THE MERGER, IT WAS A COST CUTTING INITIATIVE.

BUT, YOUR HONOR, I THINK THERE'S A MORE FUNDAMENTAL PROBLEM HERE THAN THE LENGTH OF TIME HERE.  THAT'S NOT REALLY THE ISSUE I THINK FROM OUR PERSPECTIVE.

THE COURT:  WELL, I KNOW IT'S NOT FROM YOUR PERSPECTIVE, OBVIOUSLY.  YOU DIDN'T FOCUS ON THIS ISSUE.

GO AHEAD.

MR. WIENER:  SO THERE WAS NO TREND AT ALL.

THE COURT:  I KNOW THAT'S WHAT YOU SAY, RIGHT?  BUT YOUR PERSPECTIVE IS COLORED BY YOUR CLIENT'S DESIRE TO HAVE THIS MOTION GRANTED.  YOU ARE NOT ASSUMING THE FACTS IN THE SAME WAY I'M ASSUMING THEM.

THE TREND THAT IS ACTUALLY ALLEGED, WHETHER OR NOT IT IS TRUE, THE TREND THAT THEY ARE ALLEGING IS THAT YOU KNEW THAT THESE CLIENTS WERE NOT COMING BACK.  YOU KNEW IT WAS A TREND BECAUSE OF THE QUANTITY AND BECAUSE OF THE CIRCUMSTANCES, AND YOU DIDN'T DISCLOSE IT.

I DON'T KNOW IF THAT'S A TREND, WHICH IS WHY I'M ASKING THE QUESTION.

BUT YOU DON'T -- THE PROBLEM IS YOU'RE NOT EVEN ENGAGING WITH WHAT THE PLAINTIFFS ARE ACTUALLY ALLEGING.

THAT'S FINE, BUT THAT'S NOT WHAT I'M GOING TO DO.

MR. WIENER:  BUT, YOUR HONOR, THERE'S NO TREND BECAUSE NONE OF THOSE CUSTOMERS HAD ACTUALLY NOT RENEWED.  THEY HADN'T CANCELLED CONTRACTS.  THERE WAS NO RENEWAL UP THAT HAD FAILED.

THEY DON'T ALLEGE A CHANGE IN RENEWAL RATES.  THAT WOULD BE A TREND, A CHANGE IN RENEWAL RATES BEFORE THE IPO.

THERE WAS NO DECISION MADE BY --

THE COURT:  SO IF YOU HAD 1,000 CUSTOMERS TELL YOU, "WE'RE NOT GOING TO RENEW," IF YOU HAD 50 PERCENT OF YOUR CUSTOMERS TELL YOU, "WE'RE NOT GOING TO RENEW BECAUSE WE THINK WE'RE COMING OUT OF COVID," YOUR ARGUMENT IS THAT'S NOT A TREND?

MR. WIENER:  I THINK IT WOULD DEPEND ON THE CIRCUMSTANCES THAT WERE ALLEGED, AND --

THE COURT:  THAT'S --

MR. WIENER:  -- HOW IT COMPARED TO PRIOR NEGOTIATIONS WITH CUSTOMERS.

IF CUSTOMERS --

THE COURT:  THAT'S SOMETHING THAT I CANNOT DECIDE AT THIS POINT BECAUSE THAT'S NOT IN THE COMPLAINT.

THAT MAY BE YOUR DEFENSE MOVING FORWARD, BUT THAT'S NOT RELEVANT TO MY ANALYSIS.

MR. WIENER:  SO, YOUR HONOR, THE COMPANY DISCLOSED THAT GROWTH OCCURRED BECAUSE OF COVID AND RELATED PANDEMIC-RELATED RESTRICTIONS.

THE COURT:  BUT THEY DIDN'T SAY, "AND WE EXPECT THAT GROWTH WILL THEN DECREASE AT A SIMILAR RATE ONCE COVID SUBSIDES," RIGHT?

MR. WIENER:  THEY WARNED OF THE RISK THAT DEMAND COULD DECLINE.

THE COURT:  ANSWER MY QUESTION.  DID THEY SAY IT THE WAY I SAID IT?

MR. WIENER:  THEY DID NOT SAY THOSE WORDS, YOUR HONOR.

BUT, IN FACT, IN REALITY, WHAT ENDED UP HAPPENING -- AND WHAT THE PLAINTIFFS RELY ON TO SHOW THIS TREND IN POST-IPO RESULTS -- GROWTH CONTINUED AFTER THE IPO.  THERE WAS MORE CUSTOMERS THROUGHOUT THIS ENTIRE PERIOD AFTER THE IPO THAN THERE WERE AT THE TIME OF THE IPO.

THE COURT:  ALL RIGHT.

ADDRESS THAT.  HOW IS IT A PROBLEM IF YOU HAVE MORE CUSTOMERS AFTER THAN BEFORE?

MR. FATALE:  THIS IS LOOKING PAST THE ALLEGATION, WHICH IS THE TYPE OF CUSTOMERS, THAT COVID WAS A SHIP THAT RAISED -- YOU KNOW, A TIDE THAT RAISED ALL SHIPS.

AND, YES, THEY DID GET MORE CUSTOMERS AND, YES, THEY DID GET CUSTOMERS THAT RENEWED.

THEY DID NOT DISCLOSE THE FACT AS TO THE QUALITY OF THE CUSTOMERS UNDER THEIR NEW BUSINESS STRATEGY OF GOING AFTER PEOPLE WHO WERE ONLY GOING TO SIGN UP FOR ONE-TIME EVENTS.

MR. WIENER:  YOUR HONOR, IF I MAY?

THE COURT:  YOU MAY.

MR. WIENER:  YEAR OVER YEAR REVENUE GROWTH IN 2021, SO AFTER THE IPO, WAS DOUBLE DIGITS.  IT WAS 30 PERCENT REVENUE GROWTH FROM 2021 COMPARED TO 2020, THE PANDEMIC INFLUENCED YEARS, THE YEAR THAT PLAINTIFF ALLEGED WAS INFLATED BY THIS CHANGE IN BUSINESS STRATEGY.

IN THE THREE QUARTERS IMMEDIATELY AFTER THE IPO, DOUBLE DIGIT, OR EVEN TRIPLE DIGIT IN ONE QUARTER, REVENUE GROWTH. ANNUAL RECURRING REVENUE GROWTH OF 90 PERCENT, 44 PERCENT, AND 20 PERCENT.  THE TREND WAS CONTINUED GROWTH.

PLAINTIFFS CAN'T SQUARE THAT WITH THEIR ALLEGATION THAT THERE WAS A COLLAPSE IN DEMAND BEFORE THE IPO.  IT'S FUNDAMENTALLY INCONSISTENT WITH IT.

THE COURT:  ALL RIGHT.

RESPONSE?

MR. FATALE:  GROWTH OF WHAT, YOUR HONOR?  THAT'S THE MISSING POINT.  GROWTH OF WHAT TYPE OF CUSTOMERS?

AND THE FACT THAT THERE WASN'T THE DROP-OFF IMMEDIATELY AFTER THE IPO IS BECAUSE THESE ARE ONE-YEAR CONTRACTS AS ALLEGED.  THEY WERE ONE-TIME USE, BUT THEY WERE ONE-TIME CONTRACTS.

SO, YES, THERE ISN'T THIS OFF THE CLIFF THE MINUTE AFTER THE IPO.  IT'S QUARTER AFTER QUARTER THAT THERE'S THIS CHURN THAT DEFENDANTS ADMIT IN THEIR POST-IPO STATEMENTS IN THIS TIME PERIOD TALKING ABOUT THIS HIGH LEVEL OF CHURN AND THE SMALL BUSINESSES WHO WERE ONE-TIME USE AND WHO ARE NOT OUR IDEAL CUSTOMERS, THE CUSTOMERS THAT THEY HAD PORTRAYED, YOU KNOW, NOT IDEAL, NOT LIKE THE CUSTOMERS WE WERE PORTRAYING IN OUR SUBSCRIPTION RECURRING REVENUE-BASED BUSINESS MODEL IN THE REGISTRATION STATEMENT.

MR. WIENER:  YOUR HONOR, PLAINTIFFS ALLEGE, AS YOUR

HONOR POINTED OUT, THAT SOME UNSPECIFIED NUMBER OF CUSTOMERS SAID, SIX MONTHS IN ADVANCE, THAT THEY WOULD NOT RENEW.  LET'S SAY --  IF THAT WAS SIX MONTHS IN ADVANCE BEFORE THE IPO, THAT WOULD HAVE BEEN IN, YOU KNOW, LATE SECOND QUARTER, EARLY THIRD QUARTER OF 2020.

IF YOU LOOK ONE YEAR AFTER THAT, WE HAVE 43 PERCENT YEAR OVER YEAR REVENUE GROWTH IN Q2 2021 COMPARED TO 2020; 16 PERCENT REVENUE GROWTH YEAR OVER YEAR IN Q3 2021 VERSUS Q3 2020.

SO WHATEVER THEY'RE SAYING OCCURRED CAN'T BE SQUARED WITH THE POST-IPO RESULTS.

THE COURT:  OKAY.

RESPONSE?

MR. FATALE:  YOUR HONOR, THEY SELECT THOSE THREE MONTHS POST-IPO EXACTLY BECAUSE THAT IS THE PERIOD WHERE THESE CONTRACTS ARE STILL IN PLACE AND SLOWLY COMING OFF THE BOOKS.

IF YOU TOOK JUDICIAL -- IF YOUR HONOR TOOK JUDICIAL NOTICE OF THE STOCK PRICE TODAY AND WHAT HAS HAPPENED TO THE COMPANY SINCE -- AND WE'LL GET INTO THAT IN DISCOVERY, WHAT HAPPENED -- BUT THIS COMPLAINT WAS WRITTEN AT A POINT IN TIME, THEY FOCUS ON THE THREE MONTHS AFTER, AND THERE'S ANOTHER STORY TO BE TOLD THAT'S CONTRARY HERE.

BUT THAT'S THE POINT.  LOOKING AT THE COMPLAINT AND WHAT'S ALLEGED IN THE COMPLAINT IS NOT THE COUNTERFACTUAL STORY THAT DEFENDANTS TELL IN THEIR MOTION TO DISMISS, AND I DON'T THINK

IT'S APPROPRIATE TO DRAW THOSE INFERENCES IN DEFENDANT'S FAVOR ON A MOTION TO DISMISS UNDER 8(B) SAYING THAT, OH, IT WAS NEGOTIATING POSITIONS TAKEN BY THE CUSTOMERS.

THAT MIGHT BE TRUE, BUT THAT'S NOT THE ALLEGATION IN THE COMPLAINT.

THE COURT:  ALL RIGHT.  YOU TALK ABOUT -- YOU TALK ABOUT GROWTH, BUT THE COMPLAINT ALLEGES 76 PERCENT LOSS IN STOCK PRICE.

SO HOW DO YOU -- YOU CLAIM THEY'RE NOT SQUARING YOUR ARGUMENTS.  HOW DO YOU ADDRESS THE FACT THAT THE STOCK PRICE WENT FROM 50 TO 12?

MR. WIENER:  SO, YOUR HONOR, THEY'RE MAKING A GUIDANCE CLAIM.  THEY'RE CLAIMING THAT ANALYSTS EXPECTED THE COMPANY TO GROW AT A MORE RAPID RATE.

BUT THEY'RE NOT ACTUALLY --

THE COURT:  SO DO I HAVE THIS NUMBER WRONG?  DID THE STOCK NOT GO FROM 50 TO 12?

MR. FATALE:  YES, AND IT'S AT 8 RIGHT NOW.

THE COURT:  SO THIS ISN'T AN ISSUE OF WHAT ANALYSTS ARE SAYING.  THIS IS A 76 PERCENT DROP.

I'M NOT FOLLOWING YOUR ARGUMENT.

MR. WIENER:  SO THE STOCK PRICE REFLECTS EXPECTATIONS ABOUT THE FUTURE, RIGHT?  PLAINTIFFS ARE ALLEGING THAT THERE WERE MISSTATEMENTS OR OMISSIONS ABOUT HISTORICAL CONDITIONS.

THE FACT THAT THE COMPANY DIDN'T GROW AS MUCH --

THE COURT:  IT DIDN'T GROW AT ALL.  IT LOST VALUE, THREE-QUARTERS OF ITS VALUE.

MR. WIENER:  I'M REFERRING TO THE ACTUAL BUSINESS ITSELF, REVENUE, CUSTOMERS, THINGS LIKE THAT.

THE MARKET MAY HAVE EXPECTED ADDITIONAL GROWTH OF REVENUE IN CUSTOMERS AND IMPUTED THAT INTO THE STOCK PRICE ABOUT EXPECTATIONS FOR THE FUTURE, AND THEN WHEN THAT DIDN'T COME TO PASS, THE STOCK PRICE FELL.

BUT THAT DOESN'T SHOW THAT THERE WERE MISSTATEMENTS OR OMISSIONS ABOUT HISTORICAL CONDITIONS, WHICH IS WHAT PLAINTIFF IS TRYING TO SHOW HERE AND WHAT THEY NEED TO SHOW IN ORDER TO STATE A CLAIM.

THE COURT:  ALL RIGHT.  DOES ANYBODY WANT TO SAY ANYTHING ABOUT STATEMENT 2 IN PARTICULAR?  AND I KNOW MANY OF THESE ARGUMENTS CUT ACROSS THE WHOLE, BUT BACK TO THE SPECIFICS.  STATEMENT 2, ANYTHING?

MR. WIENER:  SO I THINK MANY OF THE ARGUMENTS DO CUT ACROSS THE WHOLE.  AGAIN, I'LL POINT OUT THERE ARE SPECIFIC NUMBERS IN HERE ABOUT THE NUMBER OF CUSTOMERS AND THE ACTUAL GROWTH IN THE NUMBER.  THEY DON'T CHALLENGE ANY OF THAT.  THEY DON'T CHALLENGE THE SPECIFICS OF THESE STATEMENTS.

AND AS TO THE OMISSIONS ARGUMENT, I THINK THE ARGUMENTS CUT ACROSS.

THE COURT:  STATEMENT 2, ANYTHING MORE SPECIFICALLY?

MR. FATALE:  NO, YOUR HONOR.

THE COURT: ALL RIGHT.

STATEMENT 3?

MR. WIENER: SAME POINT. AND I'LL JUST POINT OUT AGAIN HERE THAT EVEN WITHIN THIS STATEMENT, IT'S EXPLICIT THAT THIS GROWTH WAS AT LEAST IN PART ATTRIBUTABLE TO THE PANDEMIC. THERE WAS NO SECRET THAT ON24'S DEMAND WAS INFLUENCED BY PANDEMIC-RELATED RESTRICTIONS.

THE COURT: ANYTHING ON THAT?

MR. FATALE: YOUR HONOR, AS WITH 2 AND THE OTHER STATEMENTS, IT'S CREATING A FALSE IMPRESSION OF WHAT THE BUSINESS MODEL IS THAT THEY'RE -- THAT THEY'RE FOCUSSED ON EXPANDING SUBSCRIPTIONS AND THAT THEY'RE FOCUSSED ON GROWING -- YOU KNOW, LAND AND EXPAND.

AND THAT ISN'T THE BUSINESS MODEL THAT EXISTED AT THE TIME OF THE IPO ANYMORE, AND THAT'S WHY, YOU KNOW, GOING BACK TO THE STOCK DROP PART, WHAT ARE ANALYSTS DOING? THEY'RE AT -- THEY'RE FIGURING OUT WHAT FUTURE CASH FLOWS ARE GOING TO BE.

SO THE VALUE OF A COMPANY THAT'S SUBSCRIPTION-BASED WITH RECURRING REVENUE IS VERY DIFFERENT THAN THE VALUE OF A COMPANY THAT WENT AFTER THE UNIDEAL CUSTOMER AND HAS A LOT OF CHURN AND ONE-TIME USE.

MR. WIENER: SO, YOUR HONOR, TO RESPOND TO THAT POINT SPECIFICALLY, ANALYSTS ARE ALSO LOOKING AT THINGS LIKE GUIDANCE. THEY'RE ALSO CREATING THEIR OWN FINANCIAL MODELS BASED ON THINGS LIKE GUIDANCE THAT THE COMPANY GAVE AFTER THE

IPO.

THE PLAINTIFF DOESN'T CHALLENGE THAT POST-IPO GUIDANCE. THERE'S NOTHING IN THE PROSPECTUS OR REGISTRATION STATEMENT PROVIDING GUIDANCE FOR THE FUTURE.

THE COURT:

(PAUSE IN PROCEEDINGS.)

THE COURT:  I ALWAYS TRY TO GET THE MIC OFF BEFORE DOING THAT.  I USUALLY SNEEZE IN THREES, FOURS, AND SOMETIMES FIVES.

OKAY.

MR. WIENER:  AND THEN AS TO THE POINT ABOUT THE BUSINESS MODEL, AS I SAID BEFORE, ALL OF THESE POINTS THAT THEY'RE RAISING, SHORT-TERM CUSTOMERS, SMALLER, NON-ENTERPRISE CUSTOMERS, AND CUSTOMERS THAT WEREN'T PRIMED FOR UPSELLING AND DIDN'T HAVE SUBSCRIPTIONS TO MULTIPLE PRODUCTS, THERE'S HARD METRICS DISCLOSED ABOUT EACH OF THOSE POINTS.  INVESTORS COULD ASSESS WHETHER THEY THOUGHT THE MIX OF CUSTOMERS WAS BETTER, WORSE, OR THE SAME DURING THE PANDEMIC AS IT WAS BEFORE.

ALL THAT WAS DISCLOSED IN HARD NUMBERS.

THE COURT:  OKAY.  NUMBER 4?  ANYTHING ON THE SPECIFICS?

MR. WIENER:  SAME -- SAME THING HERE, YOUR HONOR.  I THINK ALL ARGUMENTS CUT ACROSS ON THAT ONE, TOO.

MR. FATALE:  SAME.

THE COURT:  NUMBER 5?

MR. WIENER:  SAME POINT HERE.

AND, AGAIN, I'LL JUST EMPHASIZE THAT WITHIN THE TEXT OF THE STATEMENT THAT THEY CHALLENGE, IT EMPHASIZES THAT THIS DIGITAL ENGAGEMENT AND USE OF DIGITAL OPPORTUNITIES HERE WAS ACCELERATED BY THE COVID-19 PANDEMIC.

MR. FATALE:  SAME, YOUR HONOR.  I BELIEVE WE'VE ALLEGED CONTRARY FACTS AT THE COMPANY.

THE COURT:  OKAY.  HOW ABOUT 6, 7, AND 8?

MR. WIENER:  SO 6 SPECIFICALLY KIND OF MAKES THE POINT THAT I WAS JUST MAKING A MOMENT AGO.  THE STATEMENT DISCUSSES AN INCREASE IN PROPORTION OF MULTI-YEAR SUBSCRIPTIONS AND PROVIDES METRICS ON THOSE POINTS THAT THEY DON'T CHALLENGE.

SO HOW THEY CAN ALLEGE -- THEY CAN'T ALLEGE PLAUSIBLY THAT THIS WAS NOT DISCLOSED, THE NUMBER OF ONE-YEAR CONTRACTS OR SHORT-TERM CONTRACTS OR LONG-TERM CONTRACTS THE COMPANY HAD.

WHEN IT'S DISCLOSED IN HARD NUMBERS, THEY DON'T CHALLENGE IT.

MR. FATALE:  AGAIN, YOUR HONOR, IT'S NOT AN ALLEGATION ABOUT ONE-YEAR CONTRACTS.  IT'S ABOUT ONE-TIME USE CONTRACTS THAT WE'RE TOLD THEY WERE NOT GOING TO RENEW.

THE COURT:  I DON'T UNDERSTAND WHY PLAINTIFFS ARGUE THAT THERE WAS A CONCESSION WITH RESPECT TO STATEMENT 6.  DEFENDANTS CERTAINLY TAKE ISSUE WITH THAT IN THEIR REPLY BRIEF.

DO YOU WANT TO BE HEARD ON THAT ISSUE?

MR. FATALE:  SO DEFENDANT'S POINT IS, I BELIEVE --

YOU KNOW, I LOOKED AT THEIR CHART AND THERE WASN'T A NON-ACTIONABILITY ARGUMENT FROM WHAT I UNDERSTAND NOW READING THEIR REPLY, SO THERE WASN'T A PUFFERY OR AN OPINION ARGUMENT.

BUT THEIR ARGUMENT, AS I UNDERSTAND IT, THAT NOTHING IS FALSE BECAUSE OF THEIR -- THE FACTS THAT THEY WANT TO READ INTO THE COMPLAINT, THEREFORE, IT'S NOT ACTIONABLE.

IT'S NOT ACTIONABLE NOT BECAUSE OF ONE OF THOSE LEGAL STANDARDS, BUT BECAUSE UNDER THEIR FACT SET, THIS ISN'T A CASE.

THE COURT:  SO YOU AGREE THAT THERE WAS NOTHING CONCEDED WITH RESPECT TO STATEMENT 6?

MR. FATALE:  YES, AFTER READING THEIR REPLY, I UNDERSTAND NOW.

THE COURT:  OKAY.

DO YOU WANT TO BE HEARD ON THAT?

MR. WIENER:  YOUR HONOR, WE ARGUED IN THE MOTION THAT NO STATEMENT WAS FALSE OR MISLEADING FOR ALL THE REASONS WE SET FORTH.

THE CHART AND THESE ADDITIONAL GROUNDS ARE JUST ADDITIONAL GROUNDS THAT WOULD URGE DISMISSAL ON THE OTHER STATEMENT.

STATEMENT 6 IS NOT A STATEMENT OF PUFFERY BECAUSE IT'S A STATEMENT THAT IS OBJECTIVELY VERIFIABLE, SO IT'S NOT A STATEMENT OF A CORPORATE OFFICER, FOR EXAMPLE.

SO WE STILL ARGUE THAT IT'S NOT FALSE OR MISLEADING, AS PLAINTIFFS ACKNOWLEDGE.

AND AGAIN, TO GO BACK TO THE POINT THAT I MADE ABOUT

SPECIFIC HARD METRICS, IT'S STATING EXACTLY WHAT'S BEING STATED HERE IN OUR CHALLENGE.

THE COURT:  ALL RIGHT.  7 OR 8?  ANYTHING MORE WITH RESPECT TO 7 OR 8?

MR. WIENER:  I THINK THE SAME ARGUMENTS APPLY, YOUR HONOR.

MR. FATALE:  YES, YOUR HONOR.

WHAT'S MISSING IS THE, BUT THERE'S BEEN THIS CHANGE.

THE COURT:  OKAY.  AND THEN YOU WANTED TO TALK ABOUT 9 THROUGH 13 AS A GROUP?

MR. WIENER:  CORRECT, YEAH.  I THINK THE RISK FACTORS ALL PRESENT THE SAME ISSUES WITH THOSE.  PLAINTIFF'S ARGUMENT HERE IS THAT THE RISK FACTORS THEMSELVES ARE MISLEADING BECAUSE THEY SPEAK ABOUT IT AS A MAY OR AN IF, LIKE A CONTINGENT EVENT WHEN, IN FACT, IT HAD ALREADY COME TO PASS.  THAT'S PLAINTIFF'S ARGUMENT.

THAT JUST DOES NOT FIT WITH THE TIMING OF THE IPO.  NONE OF THESE CONTRACTS HAVE NOT BEEN RENEWED.  THEY HAVE NOT BEEN CANCELLED.

IT WAS A CONTINGENT EVENT DEPENDENT ON BOTH THE CUSTOMER'S ULTIMATE DECISION, AND ALSO THE STATE OF THE PANDEMIC AND RELATED RESTRICTIONS AND HOW THAT WOULD AFFECT DEMAND.

SO THE COMPANY APPROPRIATELY DISCLOSED THAT THESE WERE THINGS THAT MAY OR MAY NOT HAPPEN IN THE FUTURE.

AND AS WE ALL KNOW, YOU KNOW, PANDEMIC RESTRICTIONS AND

WAVES OF THE PANDEMIC HAPPENED IN FITS AND STARTS.  THERE WAS EASING, THERE WAS CONTINUED LOCKDOWNS, THINGS LIKE THAT.

NO ONE COULD HAVE KNOWN WHAT WAS GOING TO HAPPEN IN THE FUTURE, SO THE COMPANY APPROPRIATELY DISCLOSED IT AS A RISK THAT WAS CONTINGENT ON FUTURE EVENTS.

MR. FATALE:  YOUR HONOR, THE FACT THAT THE RENEWAL HASN'T HAPPENED, YOU KNOW, FITS INTO THE SAYING THAT'S QUOTED IN A LOT OF THESE CASES, DON'T -- YOU CAN'T WARN YOUR HIKING COMPANION THAT THERE'S A DITCH AHEAD WHEN THERE'S REALLY THE GRAND CANYON.

UNDER DEFENDANT'S READING, THAT THE RENEWALS HAD ALREADY COME DUE, YOU WOULD ONLY HAVE TO WARN YOUR HIKING COMPANION WHEN THEY WERE STANDING OVER THE GRAND CANYON.

BUT THAT'S NOT IT.  YOU HAVE TO WARN THAT IT'S COMING UP AND WHY AND THE PARTICULAR FACTS, NOT JUST A GENERAL, THERE MAY BE ROUGH TERRAIN AHEAD.

MR. WIENER:  WELL, YOUR HONOR, I THINK THAT ACTUALLY MAKES OUR POINT FOR US.  NO ONE HAD FALLEN IN THE DITCH YET, AND, IN FACT, THERE WAS NO DITCH AT ALL HERE BECAUSE GROWTH CONTINUED AFTER THE IPO.

BUT WHAT WAS WARNED HERE IS THAT IF COVID-RELATED RESTRICTIONS EASED, CUSTOMERS MAY RESUME TRADITIONAL IN-PERSON MARKETING ACTIVITIES.

THAT'S NOT SOMETHING THAT HAD ALREADY HAPPENED.  NO ONE KNEW WHAT WAS GOING TO HAPPEN WITH THE PANDEMIC THREE MONTHS,

SIX MONTHS, A YEAR LATER.

SO IT'S APPROPRIATELY WARNED OF AS SOMETHING THAT'S CONTINGENT ON FUTURE EVENTS.

MR. FATALE:  EXCEPT ON24 WAS TOLD BY THEIR CLIENTS THAT THEY WEREN'T GOING TO RENEW.

AND WE KEEP FOCUSSING ON THIS GROWTH THAT CONTINUED, BUT THE FIRST QUARTER --

THE COURT:  SO DO YOUR CONFIDENTIAL WITNESSES HAVE INFORMATION THAT PROVIDES MORE OF A -- MORE INFORMATION ABOUT THE QUANTITY OF CLIENTS THAT THEY SAY ACTUALLY WERE GOING TO LEAVE?  I MEAN, ARE WE TALKING ABOUT 10?  5?  100?

MR. FATALE:  I DON'T THINK 10 IS THE INFERENCE DRAWN FROM THE FACTUAL ALLEGATIONS IN THE COMPLAINT.  I THINK THE INFERENCE DRAWN FROM THE FACTUAL ALLEGATIONS IN THE COMPLAINT IS 50, 60 PERCENT.

WHAT HAPPENS AFTER SECOND QUARTER --

THE COURT:  YOU DON'T SAY 50 OR 60 PERCENT, AND I DON'T KNOW HOW I'M SUPPOSED TO -- WHAT FACTS YOU HAVE IN THE COMPLAINT FROM WHICH I'M SUPPOSED TO DRAW THAT INFERENCE.  THAT'S WHY I'M ASKING THE QUESTION.

MR. FATALE:  I UNDERSTAND.

THE COURT:  SO, ONE, WHAT IS IN THE COMPLAINT FROM WHICH I CAN DRAW THAT INFERENCE?  AND, TWO, DO YOU HAVE ACTUALLY -- IF I THINK IT'S NOT ENOUGH, DO YOU HAVE MORE INFORMATION?

MR. FATALE:  IF IT IS NOT ENOUGH, I CAN SAY THAT WE COULD PUT FORWARD MORE INFORMATION.  I KNOW THAT WE HAVE BEEN CONTINUING TO GET CALLS FROM FORMER EMPLOYEES SINCE WE FILED THE COMPLAINT AND COULD DEVELOP THAT FURTHER IF THAT WAS THE STICKING POINT, YOUR HONOR.

THE COURT:  BUT YOU WOULD BE ABLE TO ALLEGE WHAT?

MR. FATALE:  I'D HAVE TO TALK TO THE C.W.'S.  I WOULDN'T WANT TO SAY WHAT THEY TOLD ME WITHOUT TELLING THEM THAT I'M GOING TO, YOU KNOW, TELL A JUDGE WHAT THEY SAID.

THE COURT:  SO YOU DON'T -- YOU CAN'T TELL ME -- AS WE SIT HERE TODAY, YOU DON'T HAVE ANY SENSE?  OR IS YOUR SENSE 50 TO 60 PERCENT?  OR YOU JUST DON'T KNOW?

MR. FATALE:  I ALLEGED THE BEST SENSE I HAD.  I WOULDN'T GO FURTHER THAN WHAT'S IN THE COMPLAINT.

THE COURT:  ALL RIGHT.  SO TELL ME, THEN, WHAT PARAGRAPH YOU BELIEVE HAS THE BEST INFORMATION THAT CURRENTLY I CAN REVIEW ON THAT TOPIC.

MR. FATALE:  I FEEL YOUR HONOR IS LOOKING FOR A NUMBER, AND THERE IS NOT A NUMBER IN THE COMPLAINT.  IT IS TALKING ABOUT HIGH CHURN RATES.  IT IS TALKING ABOUT THAT THIS WAS INCREASING, THAT THIS WAS SIGNIFICANT.

DEFENDANTS THEMSELVES, IN THE SECOND QUARTER OF 2021, IT'S 160 CLIENTS THAT LEAVE.  IT'S A 9 PERCENT DECREASE.

THEY SAY THEMSELVES AFTERWARDS, IT'S BECAUSE OF THIS CLIENT BASE THAT WE WENT AFTER PRE-PANDEMIC.  IT'S BECAUSE

THEY'RE NOT IDEAL CUSTOMERS.

AND THAT COLLABORATES WHAT THE CONFIDENTIAL WITNESSES WERE SAYING WAS THAT WE WERE SIGNING UP ALL THESE, ALL THESE NON-IDEAL CUSTOMERS THAT WERE TELLING US THEY WERE GOING TO LEAVE, AND THEN IT PROVES OUT IN THE NUMBERS THAT DEFENDANTS DISCLOSED AFTER THE IPO.

MR. WIENER:  SO, YOUR HONOR --

MR. FATALE:  BUT I THINK IF YOU TAKE THE ALLEGATIONS TOGETHER --

THE COURT:  HOLD ON.  I DON'T REMEMBER, ARE THOSE NUMBERS IN THE COMPLAINT THAT YOU JUST GAVE TO ME?

MR. FATALE:  YES.  ONE MOMENT.  LET ME JUST GET MY CITATION.

MR. WIENER:  I BELIEVE IT'S PARAGRAPH 173 THAT COUNSEL IS REFERENCING.

THE COURT:  OKAY.

YOU WERE GOING TO SAY SOMETHING?

MR. WIENER:  YEAH, AND -- SO, YOUR HONOR, THAT'S JUST A MISREPRESENTATION OF WHAT'S DISCLOSED IN THAT QUARTER. THERE'S A NET INCREASE OF CUSTOMERS.

OF COURSE, LIKE ANY COMPANY, SOME CUSTOMERS ARE NOT GOING TO RENEW AND THEN NEW CUSTOMERS WILL BE SIGNED UP.  THERE'S A NET INCREASE, WHICH IS WHAT PARAGRAPH 173 DISCLOSES, 183 NEW CUSTOMERS, AND A LOSS OF 167 CUSTOMERS.

SO COUNSEL REFERENCED A 9 PERCENT DECREASE FROM THE TIME

OF THE IPO.  THAT'S JUST NOT TRUE.  THERE WAS AN INCREASE IN CUSTOMERS COMPARED TO THE IPO.  THAT'S TRUE IN Q1, Q2, Q3, AND Q4 OF 2021 COMPARED TO 2020.

MR. FATALE:  I DON'T THINK THAT THEY'RE CONTRARY TO THEMSELVES, THAT THEY CONTINUED TO SIGN UP SHORT-TERM CUSTOMERS -- YOU KNOW, ONE-TIME USE CUSTOMERS OR CONTINUED TO SIGN UP NON-IDEAL CUSTOMERS THAT THEY THEMSELVES ARE GOING TO ROLL OFF THE BOOKS IN THE FUTURE.

THAT, YOU KNOW, THE BUSINESS MODEL OF GETTING SHORT-TERM REVENUE IS CONTINUING IS NOT CONTRARY TO THE FACT THAT WE'VE ALLEGED THAT THE CUSTOMER BASE HAS CHANGED IN AN UNDISCLOSED WAY AT THE TIME OF THE IPO.

THE COURT:  SO YOU ARGUED, MR. --

IS IT WIENER OR WIENER?

MR. WIENER:  WIENER.

THE COURT:  -- WIENER, THAT IT'S NOT ACCURATE, BUT THAT'S ALL I HAVE.  AS I RECALL, I DON'T HAVE THAT REPORT LISTED AS ONE WHICH ANYONE SOUGHT JUDICIAL NOTICE OF.

MR. WIENER:  SO A FEW THINGS, YOUR HONOR.  ONE, I THINK IT'S ACTUALLY APPARENT FROM THE PARAGRAPH IN THE COMPLAINT ITSELF.  IT SAYS, ON24 ADDED 183 NEW LOGOS, SO NEW COMPANIES, NEW CUSTOMERS, WHICH WAS OFFSET BY 167 CUSTOMER DEPARTURES.  SO 183 IS 16 MORE THAN 167.

AND THEN ALSO, IF YOU LOOK AT EXHIBIT 8 TO MY DECLARATION, FOR EXAMPLE, THAT'S THE 10(K) THAT'S DISCLOSED AT THE END OF

THE YEAR, THAT SHOWS ON PAGE 43 OF EXHIBIT 8, THAT DOES A COMPARISON OF 2021 CUSTOMER NUMBERS TO 2020, AND THAT SHOWS THE INCREASE.

IT'S ALSO IN PARAGRAPH 184 OF THE COMPLAINT, WHICH IS THE OTHER PARAGRAPH THAT PLAINTIFFS CITE WHEN MAKING THIS ARGUMENT ABOUT THE NUMBER OF CUSTOMERS IN THEIR OPPOSITION BRIEF.  AND, AGAIN, THAT PARAGRAPH ITSELF CITES A 7 PERCENT YEAR OVER YEAR INCREASE IN THE NUMBER OF CUSTOMERS.

THERE WAS A SEQUENTIAL DECLINE FROM Q2 2021, WHICH IS SIX MONTHS AFTER THE IPO, THERE WAS A SEQUENTIAL DECLINE, BUT ACTUALLY A 7 PERCENT YEAR OVER YEAR INCREASE IN THE NUMBER OF CUSTOMERS SINCE Q3 2020, WHICH IS THE PERIOD DISCUSSED BY THE PROSPECTUS.  SO, AGAIN, THAT'S AN INCREASE IN THE NUMBER OF CUSTOMERS.

PAIR THAT WITH THE INCREASE IN ARR, THE INCREASE IN REVENUE, THE INCREASE IN SUBSCRIPTION REVENUE, IT'S NOT PLAUSIBLE TO DRAW, TO MAKE THE INFERENCES THAT PLAINTIFFS ARE ASKING THE COURT TO DRAW IN LIGHT OF THESE ALLEGATIONS IN THE COMPLAINT AND THE POST-IPO RESULTS THAT PLAINTIFF RELIES UPON.

MR. FATALE:  YOUR HONOR, OF COURSE THE COMPANY AND DEFENDANTS ARE GOING TO PORTRAY THEIR RESULTS IN GOOD LIGHT.

BUT LOOK AT HOW ANALYSTS, WHAT INFERENCES THE ANALYSTS DREW FROM THEN.  IN PARAGRAPH 175 OF THE COMPLAINT, THEY CALL -- YOU KNOW, AN ANALYST CALLED ARR STALLED IN THE REPORT. AND THEN IN PARAGRAPH 7, THE ANALYSTS ARE PARTICULARLY FOCUSSED

ON THAT THE CHURN WAS ABOUT 50 PERCENT SMALL BUSINESSES, WHEREAS ON24 IS PRIMARILY ENTERPRISE FOCUSSED.

THEY'RE SURPRISED BY THAT, TOO, THE SMALL BUSINESS FOCUS.

SO IT IS AN INFERENCE THAT CAN BE DRAWN IN OUR FAVOR, AND INVESTORS ARE DRAWING THOSE INFERENCES.

MR. WIENER:  YOUR HONOR, I GO BACK TO WHAT I SAID BEFORE.  THEY HAVE TO SHOW CURRENT OR HISTORICAL CONDITION AT THE TIME OF THE IPO.

THE FACT THAT SIX MONTHS, NINE MONTHS, TWELVE MONTHS LATER THERE WAS HIGHER THAN EXPECTED CHURN UNDER A SUBSET OF THE POPULATION OF CUSTOMERS AFTER COVID RESTRICTIONS BEGAN TO EASE, THAT DOESN'T SHOW ANYTHING ABOUT THE CONDITIONS AT THE TIME OF THE IPO.

AND THE COMPANY WARNED OF THE RISK THAT IF COVID-RELATED RESTRICTIONS DID EASE, CUSTOMERS MAY GO BACK TO THE IN-PERSON MARKETING ACTIVITIES THAT THEY HAD TYPICALLY DONE THAT COMPETED WITH ON24'S PRODUCT OFFERINGS.

THAT CAME TO PASS, BUT THAT DOESN'T SHOW THAT THERE WAS AN EXISTING CONDITION AT THE TIME OF THE IPO THAT THE COMPANY DIDN'T DISCLOSE.

MR. FATALE:  I THINK THAT RULE WOULD COMPLETELY SUBSUME 303.  COMPANIES -- FOR ANY COMPANY THAT HAD ANNUAL RENEWAL SUBSCRIPTIONS AND HAD FACTS SHOWING AT THE TIME OF THE IPO THAT THE CONTRACTS WERE NOT GOING TO BE RENEWED BECAUSE, OH, IT DOESN'T HAPPEN UNTIL AFTER THE IPO.

MR. WIENER:  OH, SO WHAT WOULD BE REQUIRED THEN IS TO WARN OF THE RISK OF POTENTIAL NON-RENEWALS, AND THAT WAS THE RISK THAT THE COMPANY WARNED OF.

THE COMPANY EXPLAINED THAT CUSTOMERS HAD SIGNED UP DURING THE PANDEMIC, THAT THERE WAS GROWTH CAUSED BY THE PANDEMIC-RELATED RESTRICTIONS, AND THAT IF, WHEN IT CAME TIME FOR THOSE CUSTOMERS TO RENEW, THOSE PANDEMIC RESTRICTIONS WEREN'T IN PLACE, IT WAS POSSIBLE THAT THOSE CUSTOMERS WOULD CONTINUE TO THEIR TRADITIONAL OFFERINGS, WHAT THEY USED TO DO BEFORE THE PANDEMIC.

SO THE COMPANY DID WARN OF THAT RISK.

THE COURT:  OKAY.

ANYTHING ELSE YOU WANT TO SAY ABOUT 9 THROUGH 13?

MR. WIENER:  I THINK THAT COVERS IT, YOUR HONOR.

MR. FATALE:  NO, YOUR HONOR.  I THINK WE CAME FULL CIRCLE RIGHT THERE AT THE END.

THE COURT:  OKAY.

ALL RIGHT.  ANYTHING ELSE YOU WANT TO SAY GENERALLY?  ANY OTHER ARGUMENTS YOU WANT TO MAKE?

MR. WIENER:  WELL, YOUR HONOR, I WILL JUST POINT OUT THAT THERE'S ONLY ONE PARAGRAPH IN THE COMPLAINT THAT MAKES THIS POINT ABOUT SIX MONTH NOTICE OF RENEWAL, WHICH I THINK WAS ONE OF THE THINGS YOUR HONOR WAS FOCUSSED ON.

THAT'S PARAGRAPH 102, AND THIS IS ONE C.W. SAYING THAT HE RECALLED CUSTOMERS INFORMING HIM AS MUCH AS SIX MONTHS IN

ADVANCE DURING 2020 AND 2021 THAT THEY WERE NOT GOING TO RENEW THEIR CONTRACTS.

THERE'S NO OTHER FACTUAL ALLEGATION IN THERE ABOUT WHETHER THIS HAPPENED TO OTHER SALES PEOPLE, HOW IT COMPARED TO THE PAST, OR ANY OTHER FACTUAL ALLEGATIONS THAT WOULD ALLOW THE COURT TO DRAW AN INFERENCE ABOUT THE PREVALENCE OF THIS.

OF COURSE THERE'S SOME CUSTOMERS THAT ARE GOING TO RENEW, SOME CUSTOMERS WILL NOT.  THAT'S TRUE OF ANY COMPANY.

THE FACT THAT THIS SALESPERSON WAS TOLD THAT BY SOME UNKNOWN NUMBER OF THEIR CLIENTS AT SOME UNKNOWN POINT IN TIME DOES NOT ALLOW THE COURT TO DRAW AN INFERENCE THAT THE PLAINTIFFS ARE ASKING YOU TO DRAW.

THE COURT:  ANYTHING ELSE YOU WANT TO SAY?

MR. FATALE:  SURE, JUST ON THAT POINT, AND THEN ONE FINAL THING.

YOU KNOW, I THINK THAT UNDER THE PLEADING STANDARD, IF WE HADN'T USED THE TERM "FORMER EMPLOYEES" AND WE JUST TOOK THEIR FACTS AND ALLEGED THEM AND SAID, YOU KNOW, AT THE TIME OF THE IPO, CUSTOMERS WERE SAYING THAT THEY WEREN'T GOING TO RENEW THEIR CONTRACT SIX MONTHS IN ADVANCE, I THINK THAT'S NOTICE PLEADING, YOUR HONOR.  IT PUTS THEM ON NOTICE OF THE CLAIM AND THE FACTS THAT UNDERLIE THAT CLAIM THAT WE HAVE PRE-DISCOVERY.

AND THE ONLY POINT THAT I WANT TO RAISE, AND IT WAS THE POINT THAT I CAME IN HERE AFTER READING THE BRIEFS, WAS THAT -- BECAUSE I DO THINK THEY SPEAK A LITTLE BIT PAST EACH OTHER --

IS JUST THAT, YES, WE GO THROUGH THE STATEMENTS, AND THAT'S ONE OF THE WAYS YOU CAN HAVE FALSITY UNDER SECTION -- THAT'S ONE OF THE WAYS THAT YOU CAN HAVE A SECTION 11 CLAIM.

BUT THERE'S ALSO OMISSIONS.  SECTION 11 HAS THREE PRONGS: WHETHER THERE WAS AFFIRMATIVE MISREPRESENTATION; WHETHER THERE WAS A HALF TRUTH, MEANING SOMETHING WAS SAID THAT WASN'T FULLY TRUE; OR WHETHER SOMETHING WASN'T DISCLOSED THAT THERE WAS A DUTY TO DISCLOSE.

AND I THINK, YOU KNOW, IT'S REALLY THAT THIRD ONE THAT, WHEN I READ THE PAPERS AGAIN BEFORE THIS, THAT STOOD OUT TO ME AS WHAT THIS CASE IS ABOUT.

MR. WIENER:  WELL, YOUR HONOR, SO THE OMISSION HAS TO RENDER A STATEMENT MISLEADING, OR THEY CAN DO IT THROUGH SOMETHING THAT'S REQUIRED TO BE DISCLOSED BY AN S.E.C. REGULATION, AND SO THAT GOES BACK TO THE TRENDS AND UNCERTAINTIES ARGUMENT THAT WE DISCUSSED EARLIER.  THERE'S NOT JUST A FREESTANDING REQUIREMENT THERE.  IT HAS TO FIT INTO ONE OF THOSE TWO BUCKETS.

MR. FATALE:  EXACTLY, YOUR HONOR.  THERE HAS TO BE A DUTY, AND WE ALLEGED THOSE DUTIES IN ITEM 105, ITEM 303.

THE COURT:  OKAY.

ANYTHING ELSE?

MR. WIENER:  NOTHING ELSE FROM ME, YOUR HONOR.

MR. FATALE:  NO, YOUR HONOR.  THANK YOU.

THE COURT:  OKAY.  SO I KNOW THIS HAS BEEN PENDING A

VERY LONG TIME, AND IT CERTAINLY IS NOT MY PRACTICE.  I DON'T LIKE IT.  BUT WE -- THAT THINGS HAVE GOTTEN TO DELAYED.

BUT WE HAVE BEEN IN A JUDICIAL EMERGENCY FOR A VERY LONG TIME.  WE ARE NOW GETTING HELP.  HELP IS STILL NOT HERE.

BUT I AM FINALLY GETTING THROUGH MY BACKLOG, SO I WILL TRY TO GET SOMETHING TO YOU AS SOON AS REASONABLY POSSIBLE.  AND, AGAIN, IT'S NOT THE WAY I LIKE TO -- IT'S NOT THE WAY I LIKE TO HANDLE MY DOCKET, BUT SOMETIMES IT'S UNAVOIDABLE.

SO THANK YOU VERY MUCH.  I'LL TAKE IT UNDER SUBMISSION.

WE'RE ADJOURNED.

MR. WIENER:  THANK YOU, YOUR HONOR.

MR. FATALE:  THANK YOU, YOUR HONOR.

(THE PROCEEDINGS WERE CONCLUDED AT 9:59 A.M.)

CERTIFICATE OF REPORTER

I, THE UNDERSIGNED OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA, 280 SOUTH FIRST STREET, SAN JOSE, CALIFORNIA, DO HEREBY CERTIFY:

THAT THE FOREGOING TRANSCRIPT, CERTIFICATE INCLUSIVE, IS A CORRECT TRANSCRIPT FROM THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

_____
LEE-ANNE SHORTRIDGE, CSR, CRR
CERTIFICATE NUMBER 9595

DATED:  APRIL 7, 2023