United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

IN RE ON24, INC. SECURITIES LITIGATION

Case No.: 4:21-cv-8578-YGR

**ORDER GRANTING THE MOTION TO DISMISS;**

**ORDER GRANTING THE MOTION FOR JOINDER**

Re: Dkt. Nos. 83 and 85

Lead plaintiff Leadersel Innotech ESG brings this putative class action against ON24, Inc. ("Corporate Defendant"), Sharat Sharan, Steven Vattuone, Irwin Federman, Denise Persson, Holger Staude, Dominique Trempont, Barry Zwarenstein (together, "Individual Defendants"), and Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, KeyBanc Capital Markets Inc., Robert W. Baird & Co. Incorporated, Canaccord Genuity LLC, Needham & Company, LLC, Piper Sandler & Co., and William Blair & Company, L.L.C (together, "Underwriter Defendants"). Corporate Defendant, Individual Defendants, and Underwriter Defendants are collectively referred to as defendants.

In summary, the Consolidated Class Action Complaint (Dkt. No. 80, "CCAC") alleges violations of the Securities Act of 1933 ("Securities Act") in connection with the initial public offering ("IPO") of ON24 which is a cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. (CCAC ¶ 26.) The CCAC challenges thirteen statements made in the registration statement and prospectus issued in advance of ON24's IPO. Plaintiff alleges that defendants did not disclose how a changed business strategy led them to

United States District Court
Northern District of California

recruit short-term subscribers in the lead-up to the IPO to the detriment of initial investors post-IPO.  The CCAC contains strict liability and negligence claims under Section 11 of the Securities Act and violations of Section 15 of the Securities Act and Items 105 and 303 of Regulation S-K of the Securities and Exchange Commission ("SEC").

Defendants move to dismiss on the grounds that (i) none of the statements are materially false or misleading and (ii) without a primary violation of Section 11, the Section 15 claim must also fail. (Dkt. No. 83, "MTD.")[1] In addition, Underwriter Defendants seek to join the motion to dismiss (Dkt. No. 85). Having carefully considered the papers submitted, the pleadings in this action, the argument presented at the March 27, 2023, hearing, and for the reasons set forth below, the Court hereby **GRANTS** both Underwriter Defendants' joinder motion and defendants' motion to dismiss with leave to amend.

## I.      BACKGROUND

### A.      FACTUAL BACKGROUND

The CCAC and judicially-noticed documents allege as follows:

ON24 is a corporation headquartered in San Francisco, California that provides a cloud-based digital experience platform for interactive webinars, virtual events, and multimedia content experiences. (CCAC ¶ 26.) Founded in 1998 by co-founder and CEO Sharat Sharan, ON24 helps companies turn customer engagement into revenue by turning end-user data into buying signals and

---

[1] Defendants have also filed a request for judicial notice and present eight documents in support thereof. (Dkt. No. 84.) For each, defendants request either judicial notice or incorporation of the document by reference. Plaintiff generally does not oppose this request.  (Dkt. No. 86, "Opp." at 8.) To the extent the request is granted, the Court does not take judicial notice for the truth asserted within the documents. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018). Judicial notice is appropriate for "adjudicative fact[s]" that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(a)–(b). The request includes notice of eight exhibits: (1) ON24's Registration Statement, filed with the SEC on January 8, 2021, and amended on January 25, 2021; (2) ON24's Prospectus, filed on February 4, 2021; (3) ON24's March 17, 2021, Form 8-K; (4) ON24's May 12, 2021, Form 8-K; (5) ON24's August 10, 2021, Form 8-K; (6) ON24's November 9, 2021, Form 8-K; (7) ON24's February 28, 2022, Form 8-K; and (8) ON24's March 14, 2022, Form 10-K. Judicial notice of SEC filings is appropriate. *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008). Moreover, the CCAC incorporates by reference Exhibits 1, 2, 6, and 7.  *See Khoja,* 899 F.3d at 1002 (holding that a court may consider a document incorporated if the complaint necessarily relies on it and no party questions its authenticity).

2

behavioral insights. (*Id.* ¶ 53.) The corporation derives its revenue from subscriptions to its various products. (*Id.* ¶¶ 53, 56.) As a subscription-based company, ON24 must attract new customers or upsell existing customers by selling them new subscriptions. (*Id.* ¶ 56.) The subscription agreements are primarily annual and billed in advance. (*Id.* ¶ 57.)

With the onset of the COVID-pandemic and the increased need for cloud-based platforms to conduct virtual meetings, ON24 experienced explosive growth. (*Id.* ¶¶ 7, 59.) ON24 told investors this was "partly in response to the COVID-19 pandemic." (*Id.* ¶ 66.) For example, in the nine months after September 30, 2020, ON24's revenue increased by 59% as compared to the year before. (*Id.* ¶ 60.) Its customer base increased from 760 customers as of December 31, 2015, to over 1,900 customers as of September 30, 2020. (*Id.* ¶ 61.) Annual recurring revenue ("ARR")—which is driven by ON24's ability to acquire new customers and to maintain and expand its relationship with existing ones—grew similarly, with $61.2 million ARR reported as of December 31, 2018, to $138.9 million as of September 30, 2020. (*Id.* ¶ 63.) Finally, during the pandemic ON24's net retention rate ("NRR")—which reflects ON24's recurring revenue from existing customers—also grew. (*Id.* ¶ 64.)

In the three quarters preceding the IPO—the quarters ending on June 30, 2020, September 30, 2020 and December 31, 2020—ON24 changed its business model. (*Id.* ⁋ 9.) ON24 began to enroll new customers that were atypical. Many were small- to medium-sized businesses ("SMB") or otherwise atypical customers that wanted to use ON24's platform for one-time events. (*Id.* ⁋ 9.) These "quick fixes" still required one-year subscriptions. (*Id.* ⁋ 114.)

Five former employees, set out here as confidential witnesses, describe how ON24 started to pursue new customers. (*Id.* ⁋ 72.) The employees explain that there were monthly calls, attended regularly by the Individual Defendants, to discuss customer acquisition and retention. (*Id.* ⁋⁋ 84–85.) One employee "recalled that during the COVID-19 pandemic, ON24 signed up anybody and everybody regardless [of whether] they were considered to be a good customer for the Company." (*Id.* ⁋ 88.) Internal pressure "to meet quotas in the face of increased pressure and declining demand" existed. (*Id.* ⁋ 113.) Much of this pressure was "centered around" the company going public. (*Id.* ⁋ 138.)

Employees were required to track clients' expectation for renewal, a metric internally known as "churn." (*Id.* ⁋ 92.) Once the COVID-19 pandemic restrictions began to ease, one employee stated that there was a "dramatic decline in demand." (*Id.* ⁋ 98.) Employees noticed high churn among customers because ON24 was a pandemic purchase. (*Id.* ⁋ 100.) In this regard, ON24 experienced customer-churn in three ways: clients were using ON24's products only as a temporary solution; customers were not renewing one-time purchases; and customers were electing to "down sell," or remove features from their subscription. (*Id.* ⁋ 101.) One employee recalled that customers would tell him as much as six months in advance that they planned to cancel their subscriptions. (*Id.* ⁋ 102.) Before the IPO, during the winter of 2020, demand "really dropped off" because of "market saturation" and "uncertainty regarding COVID-19." (*Id.* ⁋ 125.) ON24 had already known, before COVID-19 hit, that SMB customers had high churn but the pandemic "amplified things." (*Id.* ⁋ 106.) The concerns with customer turnover were discussed at the monthly meeting with the Individual Defendants. (*Id.* ⁋ 103.) Defendant Sharan closely monitored the performance of the sales team. (*Id.* ⁋ 141.)

On February 3, 2021, ON24 conducted its IPO, in which it sold 8,560,930 shares of common stock to the public at $50.00 a share. (*Id.* ¶ 67.) The IPO was conducted pursuant to, and the sale of ON24 stock was solicited by, several documents that were filed by ON24 and the Underwriter Defendants with the SEC, including (i) a January 8, 2021, registration statement with a January 25, 2021, amendment, which was declared effective by the SEC on February 2, 2021 (the "Registration Statement") and (ii) a February 4, 2021, final prospectus (the "Prospectus" and, together with the Registration Statement, the "Offering Documents"). (*Id.* ¶ 69.)

**B.    CHALLENGED STATEMENTS**

Plaintiff challenges thirteen statements contained in the Offering Documents as misleading. Specifically, they read:

Statement 1 (*id.* ¶ 144)[2]:
> ***As of September 30, 2020, we had over 1,900 customers*** in more than 40 countries, including three of the five largest global

---

[2] All emphasis shown is original to the CCAC. Plaintiff notes it only challenges the emphasized portions of the statements; the rest is provided for context.

United States District Court
Northern District of California

technology companies, four of the five largest U.S. banks, three of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue. No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020. ***We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time***, and achieve an NRR of 147% as of September 30, 2020. Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.

Statement 2 (*id.* ¶ 145):

> ***Growing base of customers across verticals. We have a large and diverse set of customers across a broad set of industries. We have grown our customer base from approximately 760 customers as of December 31, 2015 to over 1,900 customers in more than 40 countries as of September 30, 2020***, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global industrial manufacturing companies, in each case measured by 2019 revenue. ***We intend to leverage our land and expand model to further penetrate customers across these verticals***.

Statement 3 (*Id.* ¶ 146):

> Key Factors Affecting Our Performance
> * * *
> Annual Recurring Revenue
>
> We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR amounts exclude professional services, overages from subscription customers and Legacy revenue. Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020. ***Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic***.

5

United States District Court
Northern District of California

Statement 4 (*id.* ¶ 149):

Our Growth Strategy

We intend to drive the growth of our business and the adoption of our solutions by executing the following strategies:

• Expand within existing customers. We believe we can achieve significant organic growth by expanding penetration of our existing customer base. ***Our land and expand model drives expansion of new subscriptions within our existing customer base by selling subscriptions to additional parts of existing customers' organizations, expanding into new regional divisions and upselling new solutions***. In addition, we are developing new applications for our platform, including partners training and employee recruiting and forms of indirect marketing, such as education, enrollment and benefits programs.

Statement 5 (*id.* ¶ 150):

Businesses today primarily use automated solutions, such as digital advertising and email, for marketing. While these automated solutions reach large numbers of prospective customers, they have generally failed to deepen customer engagement because they were designed with the simple purpose of pushing marketing messages in one direction—from the business to the prospective customer. For businesses to succeed, we believe their sales and marketing strategies must evolve from the era of automation to the era of engagement. Our platform provides an innovative way both to scale the digital marketing and deepen prospective customer engagement. We believe ***our opportunity to help businesses convert digital engagement into revenue will continue to grow as industries modernize their sales and marketing processes, which has been accelerated by the COVID-19 pandemic***.

Statement 6 (*id.* ¶ 151):

The terms of our subscription agreements are primarily annual and, to a lesser extent, multi-year. We bill for the full term in advance or on an annual or monthly basis, depending on the terms of the agreement. We recognize subscription revenue ratably over the term of the subscription period beginning with the date customers are granted access to our platform. Our contracts typically require payments in annual installments. ***We have seen an increase in the proportion of multi-year subscriptions as the number of larger customers has increased***. Customers with multi-year subscription agreements accounted for 21% and 27% of ARR as of December 31, 2018 and September 30, 2020, respectively. See "—Key Business Metrics—Annual Recurring Revenue" for further information regarding how we calculate ARR.

United States District Court
Northern District of California

Statement 7 (*id.* ¶ 152):

> ***We intend to continue to focus on the acquisition of new customers with 2,000 or more employees, or Enterprise customers, and to expand the usage of our platform within these larger accounts***. We follow a named account coverage approach with aligned account teams, including sales, account management and customer success. After establishing a customer relationship with a business unit of an Enterprise, we seek to expand to new business units, divisions, departments and geographic regions, as well as increase subscriptions to additional products, which we refer to as "attachments," and expand product use cases.

Statement 8 (*id.* ¶ 153):

> We believe ***we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell***. Our multi-dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment. As we continue to drive more actionable revenue generating marketing insights, we believe that ***we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization***. Our ability to pursue this opportunity will require us to scale our sales and marketing organizations and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period.

Statement 9 (*id.* ¶ 157):

> Investing in our common stock involves risks, which are discussed more fully under "Risk Factors." You should carefully consider all the information in the prospectus, including under "Risk Factors," before making an investment decision. ***These risks include, but are not limited to, risks relating to***:
> •     ***Our ability to sustain our recent growth rate in the future, attract new customers and expand sales to existing customers;***
> •     ***Fluctuation in our performance, our history of net losses and expected increases in our expenses;***
> •     ***Competition and technological development in our markets and any decline in demand for our solutions or generally in our markets;***
> •     ***Our ability to expand our sales and marketing capabilities and otherwise manage our growth;***
> •     ***The impact of the COVID-19 pandemic***.

Statement 10 (*id.* ¶ 158):

> *We may not be able to sustain our recent revenue growth rate in the future*.
>
> For the year ended December 31, 2019, our revenue increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. *Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed*.

Statement 11 (*id.* ¶ 159):

> *Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business*.
>
> Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. *For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens*. Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. *If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease*. Fluctuation in quarterly results may negatively impact the value of our securities. *Factors that may cause fluctuations in our quarterly results or operations include*:
> - *Our ability to retain and expand customer usage;*
> - *Our ability to attract new customers*.

United States District Court
Northern District of California

Statement 12 (*id.* ¶ 160)

> **Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects**.

> We derive, and expect to continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products. As such, our business depends on our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling additional solutions. Our business is largely subscription-based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire. **As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all. Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options**. In order to grow our business, we must continually add new customers and replace customers who choose not to continue to use our platform. Any decrease in user satisfaction with our solutions or support may result in negative online customer reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow.

> **In addition to striving to attract new customers to our platform, we seek to expand the usage of our solutions by our existing customers by increasing the number of departments, divisions and teams that use our solutions within each of our customers. If we fail to expand the usage of our solutions by existing customers or if customers fail to purchase other solutions from us, our business, financial condition and results of operations would be harmed**.

Statement 13 (*id.* ¶ 161):

> **Our results of operations may be adversely impacted by the COVID-19 pandemic.**

> **[T]he economic impacts of COVID-19 have affected and may continue to affect customer and prospective customer spending on technology such as ours, particularly for businesses involving in-person interactions, such as hospitality, manufacturing and professional services businesses. These customers may experience reduced revenue and revised budgets, which may adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, customer retention, and**

United States District Court
Northern District of California

*the value or duration of subscriptions, all of which could adversely affect our operating results*.

\* \* \*

*Due to our subscription-based business model, the effect of the COVID-19 pandemic may not fully be reflected in our results of operations until future periods*. In addition, uncertainty regarding the impact of COVID-19 on our future operating results and financial condition may result in our taking cost-cutting measures, reducing the level of our capital investments and delaying or canceling the implementation of strategic initiatives, any of which may negatively impact our business and reputation. *The global macroeconomic effects of the COVID-19 pandemic and related impacts on our customers' business operations and their demand for our solutions may persist for an indefinite period, even after the COVID-19 pandemic has subsided*.

Of the thirteen statements, the first eight were made in the registration statement and the last four in the prospectus.

Importantly, plaintiff does not allege that these statements were misleading in their own right. Instead, plaintiff alleges the challenged statements were misleading when made because they:

failed to disclose and misrepresented the following significant, then-existing material events, trends, and uncertainties that ON24 had already been facing at the time of the IPO: (i) ON24 signed up new customers for 1-year contracts during the second, third, and fourth quarters of 2020 that planned either to not renew or downsell, a larger-than-typical percentage of which were [SMB] customers, non-ideal customers focused on one-time events, and one-time use cases that planned either not to renew or downsell; and (ii) given declining demand and the magnitude of new, 1-year customers that ON24 signed up during the second, third, and fourth quarters of 2020 that were either not renewing or were going to downsell, ON24 already faced material customer churn and downselling at the time of the IPO.

(*Id.* ⁋ 147.)

C.    EVENTS FOLLOWING THE IPO

After ON24's IPO, the company reported lower than expected revenues. (*Id.* ⁋ 164.) Just six months after the IPO, Sharan admitted that ON24 had experienced "higher-than-expected churn and downsell from customers" signed up during the peak of the COVID-19 pandemic, many of which came from "the first-time renewal cohort." (*Id.* ⁋ 165.) This disclosure caused market analysts to

10

downgrade ON24's stock. (*Id.* ¶ 170.) Analysts at underwriter defendant JP Morgan, for example, lowered the common stock's price target from $85.00 to $32.00 per share. (*Id.*) In its report, JP Morgan explained that the "major issue is the increase in churn and [customer] down-sell that will likely cause the platform revenue to decelerate." (*Id.*) Analysts stressed that the problem was that "[m]anagement's previous guidance had not factored in enough churn from smaller accounts." (*Id.*) One underwriter defendant, Canaccord, downgraded ON24's common stock from "buy" to "hold" because of "elevated churn" from "first-time renewals who had signed up for one-year deals at the height of COVID." (*Id.* ¶ 172.) This was ON24's "largest renewal cohort ever," but Canaccord emphasized that the cohort was mostly made up of clients who were "not normally ON24's target customer." (*Id.* ¶¶ 172–73.) By November 10, 2021, JP Morgan noted that ON24's ARR for the fourth quarter of 2021 was "negatively impacted" by the continued churn of first-time customers acquired during the COVID-19 pandemic in the lead up to ON24's IPO. (*Id.* ¶ 182.) Another underwriter defendant, Piper Sandler, stated that though ON24's ARR had had continued to grow in 2021, "eroding customer renewal rates and contract downsizing over the last two quarters has pressured ARR growth to moderate meaningfully." (*Id.* ¶ 185.) Almost a year after its IPO, Sharan reflected that the "largest challenge in 2021 was the first time renewal cohort." (*Id.* ¶ 191.) More to the point, the CEO said that "churn has been [ON24's] biggest issue." (*Id.* ¶ 194.)

The value of ON24 common stock fell from $50.00 when the company went public to $12.05 at the time the CCAC was filed, a 76% decline. (*Id.* ¶ 204.)

## II.    LEGAL FRAMEWORK

### A.    RULE 8

To survive a Rule 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim for relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The requirement that the court must "accept as true" all allegations in the complaint is "inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* The parties do not dispute

that Fed. R. Civ. P. 8(a) applies.[3] The Court therefore analyzes the complaint under a plausibility, not particularity, standard. Even without Fed. R. Civ. P. 9(b), however, plaintiff must still plead sufficient facts to state a plausible claim. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## III.  ANALYSIS

### A.  JOINDER

The Underwriter Defendants seek to join ON24 and the Individual Defendants' motion to dismiss. (Dkt. No. 85.) Plaintiff does not oppose joinder. The Court therefore **GRANTS** the joinder motion.

### B.  SECTION 11

Plaintiff alleges that all thirteen statements at issue were materially misleading for the same reason. ON24 failed to disclose that in the three quarters leading up to the IPO, ON24 relaxed its qualification criteria to enroll new, 1-year customers that it knew planned either not to renew or to downsell and, given declining demand and the magnitude of these one-time purchases, ON24 was already facing material customer churn at the time of IPO that inevitably led to investor losses. By omitting this information, plaintiff continues, defendants' risk disclosures did not fulfill Items 303 and 105.

In their motion to dismiss, defendants challenge the sufficiency of plaintiff's Section 11 claim for various reasons, namely, that some of the challenged statements are (1) "expressions of corporate optimism"; (2) forward-looking statements protected by the bespeaks-caution doctrine; and (3) none of the challenged statements were misleading when made. Defendants also generally argue that plaintiff's claims fail because they are made up of legal conclusions instead of well-pled facts. The Court starts with this final argument first. To effectively address the rest, the Court sorts the challenged statements into headings based on defendants' arguments for dismissal.

---

[3] Though Section 11 does not have a fraud element, the particularity requirements of Rule 9(b) may still apply to a Section 11 claim that sounds in fraud. *In re Daou Systems, Inc.*, 411 F.3d 1006, 1027 (9th Cir. 2005). Here, the CCAC states that "[t]his cause of action does not sound in fraud." (CCAC ¶ 213.) Defendants do not object to this characterization.

United States District Court
Northern District of California

United States District Court
Northern District of California

### 1.    *Conclusory Allegations*

Defendants argue plaintiff's claims should be dismissed because they consist of legal conclusions unsupported by factual allegations. Plaintiff responds it sufficiently alleged that ON24 failed to disclose that, at the time of the IPO, ON24 faced material customer churn. In support, plaintiff points to the statements made by its five confidential witnesses.

To state a claim under Section 11, a plaintiff must prove that (1) the Offering Documents contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment. *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1161 (9th Cir. 2009) (cleaned up). Not all adverse events must be disclosed. "Disclosure is required [by the Securities Act] only when necessary to make statements made, in the light of the circumstances under which they were made, not misleading." *Matrixx*, 563 U.S. at 44 (cleaned up). Omissions, therefore, are actionable only when what is omitted renders what is included misleading. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*, 575 U.S. 175, 179 (2015) ("Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out.") When "a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017) (citing *Omnicare*, 575 U.S. at 1332).

The Court agrees that plaintiff's theory of omission, the crux of why it believes all thirteen statements are misleading, is not supported by sufficient facts. Plaintiff alleges that (1) the Offering Documents omitted to tell potential investors that ON24 had changed its business strategy to pursue one-time, atypical customers; and (2) this omission was material because the resulting customer churn was material. About customer churn, confidential witnesses say: "that the Company knew a lot of the COVID business was not going to stick" (CCAC ⁋ 79); "there were open discussions during meetings and within the Company that the small business cohort did not have good retention rates" (*id.* ⁋ 86); "the churn who signed on during the pandemic was a concern from an account

United States District Court
Northern District of California

management perspective" (*id.* ¶ 96); "Defendant Sharan not only misled investors, but also employees about the sustainability of ON24's performance . . . ON24's success was characterized as a success in itself and not something dependent on the circumstances of the pandemic . . . [an] increase in quotas were instituted despite a dramatic decline in demand once lockdown restrictions had begun to relax" (*id.* ¶ 98); one confidential witness said "there were instances that he would notice 40-50% churn among his customers" (*id.* ¶ 100); another stated that "churn was occurring in several ways . . . this represented a huge downturn" and "customers inform[ed] him as much as six months in advance, during 2020 and 2021, that they were not going to renew their contracts" (*id.* ¶¶ 101–02); "the Company was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things" (*id.* ¶ 106); "there was a lot of new business in the first few months of the pandemic, which then leveled out shortly before and after the Company's IPO" (*id.* ¶ 107); "the Company expected more from the sales team despite the declining demand, failing to adjust to the changes from the beginning of the pandemic" (*id.* ¶ 121); "after a lot of early success, things really dropped off and demand declined during November/December 2020" (*id.* ¶ 125); and "when account executives saw what was happening regarding demand . . . [salespersons] informed them that opportunities were no longer coming in like they were previously" (*id.* ¶ 143).

These statements, taken as true, demonstrate that ON24 lost some customers in the lead up to the IPO. They do not establish, however, that ON24 faced material customer churn at the time the statements were made. Twenty-twenty vision does not apply. Even taking all inferences in favor of plaintiff at this stage, none of the confidential witnesses provide a factual foundation for its theory that demand for ON24's products declined to the point that omitting that information materially misled investors at the time. Statements like there was "high churn," a "dramatic decline in demand" and "things really dropped off" are, without some quantification to put them into context, bald allegations. For example, plaintiff does not allege that defendants knew that, out of ON24's 1,900 customers, 40-50% planned to downsell or not renew. Instead, plaintiff alleges that one confidential witness said that there were "instances" where he would notice a "40-50%" churn of *his* customers. It is unclear from the CCAC how many customers this one confidential witness

had or how many times he saw this degree of churn. Without more, the Court cannot determine whether the fact that ON24 omitted to tell investors about customer churn was materially misleading.

Because plaintiff's CCAC hinges on the significance of customer churn, the lack of a factual foundation is fatal. The Court therefore **GRANTS** defendants' motion to dismiss with leave to amend.  To avoid unnecessary motions practice, however, the Court addresses the rest of defendants' arguments.

### 2.    *Corporate Optimism and Puffery*

Defendants argue that Statement Nos. 1, 3, and 8 are nonactionable because they are "no more than subjective expressions of optimism" and puffery. Plaintiff disagrees, asserting that when properly put in context, the statements "conveyed verifiable information about the then-current state of ON24's existing business which was incomplete and misleading in context."

An actionable statement must be "capable of objective verification." *Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1275 (9th Cir. 2017). "[V]ague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *In re Restoration Robotics, Inc. Sec. Litig.*, 417 F. Supp. 3d 1242, 1255 (N.D. Cal. 2019) (cleaned up). "When valuing corporations . . . investors do not rely on vague statements of optimism like 'good,' 'well-regarded,' or other feel-good monikers. This mildly optimistic, subjective assessment hardly amounts to a securities violation." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010).

**Statement No. 1.** Without more specific allegations, this statement amounts to no more than puffery. Defendants stated that they had "more than 1,900 customers" who are "highly engaged and loyal." (CCAC ⁋ 144.) Plaintiff argues that this statement was misleading because it failed to warn investors that a significant number of customers were, in fact, planning to unsubscribe or downsell. The CCAC does not quantify this churn. Alone, this Court has found that descriptive statements like customers are "highly engaged" and "loyal" are not actionable.

15

*In re Nimble Storage, Inc. Securities Litig.* is instructive. There, plaintiff alleged that defendants knew they were "not effectively penetrating the enterprise segment but concealed this fact by touting the growth of its enterprise customer base while at the same time relabeling commercial accounts as enterprise accounts." 252 F. Supp. 3d 848, 852 (N.D. Cal. 2017). Defendants stated their customer base had increased by 140 clients throughout the class period. *Id.* Plaintiff presented no particularized evidence that defendants had misrepresented the number of clients. *Id.* Rather, plaintiff alleged that defendants' statement that it added enterprise clients at a "record pace" was misleading. *Id.* This Court found that, absent more particularized allegations that sales data was misreported, such "generally optimistic statements" were not actionable. *Id.* (internal citation omitted). Similarly here, without more particularized allegations, statements like ON24's 1,900 customers are "highly engaged and loyal" are incapable of objective verification.

**Statement No. 3.** This statement is inactionable for much the same reasons as Statement No. 1. Defendants state that their "consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic." (CCAC ⁋ 146.) Judicially-noticed documents demonstrate that this statement is accurate: defendants reported that ARR increased quarter after quarter, including the quarter *after* the IPO. Plaintiff actually acknowledges this growth, pre-IPO, in their CCAC and notes that ON24 said the growth was "partly in response to the COVID-19 pandemic." (*Id.* ⁋⁋ 63, 66.) Plaintiff argues this metric is misleading but, without more, it is unclear why. Investors can read such numbers and accompanying cautionary language telling them that this was in part due to the COVID-19 pandemic, and judge for themselves the risks. *See In re Nimble Storage*, 252 F. Supp. 3d at 853–54 (noting that, sales and profit data, when accurately reported, are rarely subject to misinterpretation even when accompanied by generally optimistic statements (cleaned up)). This is especially true because, in the risk factors, defendants stressed that subscriptions and revenue could decrease as the impact of the COVID-19 pandemic lessened. (CCAC ⁋ 159.)

**Statement No. 8.** Without more particularized allegations, the Court also finds that Statement No. 8 is inactionable as a subjective, feel-good statement. Defendants state that they

"believe they can achieve significant growth by retaining and further penetrating our existing customer base" and they have a "significant opportunity to further increase sales among existing customers." (CCAC ⁋ 153.) Statements like "significant opportunity" and "significant growth" are, as alleged, too vague to be actionable. *See, e.g., Police Retirement Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (N.D. Cal. 2014) (finding that statements like an opportunity is "still very, very large" are corporate puffery). Unless plaintiff can provide further factual foundation for its theory that customer churn was material, such generally optimistic statements appear to be puffery.

Plaintiff's reliance on this Court's decision in *In re Apple Sec. Litig.* is unavailing. There, Apple reported that its new iPhone "got off to a really great start" a few days before it shut down its production line entirely because it was doing so poorly. No. 19-cv-2033-YGR, 2020 WL 2857397, at *15 (N.D. Cal. June 2, 2020). With such evidence in mind, this Court admonished Apple that it could not "affirmatively create a positive impression of an area it knows to be doing poorly." *Id.* Plaintiff does not provide nearly this level of factual support for its claims. This admonishment is therefore inapplicable.

The Court therefore **GRANTS** defendants' motion to dismiss as to Statement Nos. 1, 3 and 8 on the grounds of puffery with leave to amend.

### 3.   *Bespeaks Caution Doctrine*

Defendants argue that Statement Nos. 2, 5 and 7 are protected by the bespeaks caution doctrine. Plaintiff responds that those three statements "were rendered misleading by omission of historical facts and are, therefore, not protected."

The bespeaks caution doctrine "provides a mechanism by which a court can rule as a matter of law . . . that defendants' forward-looking representations contained enough cautionary language or risk disclosure to protect the defendant against claims of securities fraud." *In re Atossa Genetics Inc. Sec. Litig.*, 868 F.3d 784, 798 (9th Cir. 2017) (internal citation and quotations omitted). A dismissal on the pleadings based on the bespeaks caution doctrine is justified only by a "stringent" showing that "reasonable minds could not disagree that the challenged statements were not misleading." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 947 (9th Cir. 2005)

United States District Court
Northern District of California

17

(internal citation and quotations omitted). The bespeaks caution doctrine applies only when "the truth or falsity of the statement cannot be discerned until some point in time after the statement is made." *Mallen v. Alphatec Holdings, Inc.*, 861 F.Supp.2d 1111, 1126 (S.D. Cal. 2012).

**Statement No. 2.** This statement is forward-looking. Defendants state they have "a large and diverse set of customers across a broad set of industries . . . [and they] intend to leverage [their] land and expand model to further penetrate customers." (CCAC ⁋ 145). Phrases, like this one, expressing an "intention" are unactionable as forward-looking because they express a plan to do something in the future. *In re Restoration Robotics Inc.*, 417 F. Supp. 3d at 1256. The truth or falsity of this statement could not be discerned until after IPO. It was also accompanied by meaningful cautions: defendants told potential investors that the failure to "retain, or expand the usage of, and upsell our products to existing customers would harm our business and growth prospects." (CCAC ⁋ 160.)

**Statement No. 5.** This is also a forward-looking statement protected by adequate cautionary language. Defendants state that they "believe our opportunity to help businesses convert digital engagement into revenue will continue to grow as industries modernize their sales and marketing processes, which has been accelerated by the COVID-19 pandemic." (*Id.* ⁋ 150.) The first problem for plaintiff, as stated above, is that statements like we "believe" are generally too vague to be actionable. *See In re Restoration Robotics*, 417 F. Supp. 2d at 1255. Moreover, the Ninth Circuit has found that similar statements, like "we continue to expect . . . to grow," were inactionable because they "plainly project expectations for future growth." *Police Retirement Sys. of St. Louis*, 759 F.3d at 1058.  In addition, this projection was couched in cautionary language: defendants noted in the Offering Documents that these were "forward looking statements" and warned customers that, as the impact of the COVID-19 pandemic lessened, demand for their products might also decrease. (CCAC ⁋ 159.) The accompanying language is sufficient to put investors on notice that ON24's rosy projections for the future might not materialize.

**Statement No. 7.** For much the same reasons, the Court finds that Statement No. 7, as alleged, is also purely forward-facing. Defendants state "[w]e intend to continue to focus on the acquisition of new customers with 2,000 or more employees, or Enterprise customers, and to

18

United States District Court
Northern District of California

expand the usage of our platform within these larger accounts." (*Id.* ¶ 152.) Plaintiff does not provide sufficient factual allegations to support its theory that ON24 had, in fact, stopped focusing on the acquisition of Enterprise customers. Given that, defendants were only stating a present expectation for future plans. This was accompanied by meaningfully cautionary language.  Again, defendants tell investors that their "recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed." (*Id.* ¶ 158.)

The Court therefore **GRANTS** the motion to dismiss with leave to amend as to Statement Nos. 2, 5, and 7 on the ground they are protected by the bespeaks caution doctrine.[4]

### 4.    *False or Misleading Statements*

Defendants argue that none of the statements are actionable because plaintiff has not shown how they could be false or misleading. Plaintiff disagrees. The Court has addressed most statements above and will address Statement Nos. 9–13 below. Here, the Court analyzes the two remaining statements, Nos. 4 and 6.

Under Section 11, plaintiffs must plead "contemporaneous statements or conditions" showing the "misleading nature of the statements when made." *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001). For an omission to be misleading, "it must affirmatively create an impression of the state of affairs that differs in a material way from the one that actually exists." *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (citation omitted).

***Statement No. 4*** provides that defendants' "land and expand model drives expansion of new subscriptions within our existing customer base by selling subscriptions to additional parts of existing customers' organizations, expanding into new regional divisions and upselling new

---

[4] Plaintiff's reliance on *Livid Holdings* is, at this point, misplaced. In *Livid Holdings*, the Ninth Circuit held that the bespeaks caution doctrine does not extend to "statements of historical facts." 416 F.3d at 948. Because plaintiff has not adequately pled that high customer churned happened, much less that ON24 knew it was happening before IPO, this holding does not apply.

solutions." (CCAC ¶ 149.)  Plaintiff's theory on why this statement is misleading eludes. On its face, the statement reads like a description of how ON24 upsells its customers. The CCAC itself notes that one of ON24's strategies for growth was upselling customers in this manner. (CCAC ¶ 6.) Even taking all of plaintiff's allegations as true, this description of ON24's land and expand model would not change. Plaintiff has therefore not shown how the alleged omission of ON24's customer churn affirmatively created a state of affairs that differs from the one that actually exists as explained in Statement No. 4.

*Statement No. 6.* As alleged, plaintiff also fails to show how this statement is false or misleading. Defendants state that they have "seen an increase in the proportion of multi-year subscriptions as the number of larger customers has increased." (CCAC ¶ 151.) While the statement above contains vague terms like "increase," the next statement (which is unchallenged) contains data, namely: "Customers with multi-year subscription agreements accounted for 21% to 27% of ARR as of December 31, 2018, and September 30, 2020, respectively." (*Id.*) Plaintiff offers no contemporaneous facts that challenge these figures. As stated above, such data, when accurately reported, will rarely give rise to a securities violation. *See In re Nimble Storage*, 252 F. Supp. 3d at 853–54. Instead, plaintiff contends that this statement was misleading because ON24 knew, prior to IPO, that there was high customer churn. Without more, the allegation that the statement necessarily misleads relies on the bald allegations discussed above.  Alone, there is no basis to conclude it is misleading.

Plaintiff's reliance on *In re Restoration Robotics* does not persuade. There, Judge Davila held that a company materially misled investors when it told them it had experienced a 34% increase in sales of a certain type of system. 417 F. Supp. 3d at 1261. Though technically accurate, plaintiffs adequately alleged this figure was a "half-truth" because the company had lumped together both domestic and foreign sales without telling investors that those systems sold internationally had not yet been installed and therefore revenue in that area had fallen. *Id.* Plaintiffs succeeded there because they demonstrated that the number of sales was aggregated in such a way as to mislead investors about expected revenue. In other words, because increased sales did not necessarily equate to increased revenues, the court found that plaintiffs had stated a claim. Plaintiffs

here have missed a step. They did not adequately plead that defendants' data was a "half-truth" because they did not show that increased multi-year subscriptions do not necessarily equate to increased revenues. Without that connection, ON24's data point simply reads as on point.

For those reasons, the Court **GRANTS** the motion to dismiss with leave to amend as to Statement Nos. 4 and 6 on the ground that, as alleged, they are not misleading.

### 5. *Risk Factors*

Finally, plaintiff challenges the adequacy of various of ON24's risk factors, Statement Nos. 9–13. Plaintiff alleges that were materially misleading because they failed to "warn of significant, then-materialized risks posed by ON24's one-time and event only customers that planned to either not renew or downsell." (CCAC ⁋ 156.) Defendants disagree, arguing that the risks factors were abundant and specific and, moreover, the risk of which plaintiff sought warning—the alleged churn of one-time customers who subscribed less than a year before the IPO—did not occur until after the IPO and therefore ON24 could not have disclosed this churn in its Offering Documents.

"Section 11 does not require the disclosure of all information a potential investor might take into account when making [their] decision." *Rubke*, 551 F.3d at 1163. A company is not required to forecast future events or caution about contingencies outside of its control. *In re Stac*, 89 F.3d 1399, 1406–07 (9th Cir. 1996). For that reason, risk factors are materially misleading only if they failed to warn of risks that had already come to fruition. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009).

Plaintiff challenges the following risk factors:

- **Statement No. 9:** Defendants warned investors that some of the risks entailed were: (1) their "ability to sustain our recent growth rate in the future, attract new customers and expand sales to existing customers;" (2) "fluctuation in [their] performance"; (3) competition and "any decline in demand for our solutions;" (4) their "ability to expand our sales and marketing capabilities and otherwise manage our growth; (5) "the impact of the COVID-19 pandemic" (CCAC ⁋ 157)

- **Statement No. 10:** Defendants warned that they "may not be able to sustain our recent revenue growth rate in the future . . . Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions

as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed" (CCAC ⁋ 158)

- **Statement No. 11:** "Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business . . . For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens . . . If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease." Defendants warned that factors that might influence fluctuation were their "ability to retain and expand customer usage" and their "ability to attract new customers" (CCAC ⁋ 159)

- **Statement No. 12:** "Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects . . . As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all. Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options . . . In addition to striving to attract new customers to our platform, we seek to expand the usage of our solutions by our existing customers by increasing the number of departments, divisions and teams that use our solutions within each of our customers. If we fail to expand the usage of our solutions by existing customers or if customers fail to purchase other solutions from us, our business, financial condition and results of operations would be harmed" (CCAC ⁋ 160)

- **Statement No. 13:** "Our results of operations may be adversely impacted by the COVID-19 pandemic . . . [T]he economic impacts of COVID-19 have affected and may continue to affect customer and prospective customer spending on technology such as ours, particularly for businesses involving in-person interactions, such as hospitality, manufacturing and professional services businesses. These customers may experience reduced revenue and revised budgets, which may adversely affect our customers' ability or willingness to purchase subscriptions to our platform, the timing of subscriptions, customer retention, and the value or duration of subscriptions, all of which could adversely affect our operating results . . . Due to our subscription-based business model, the effect of the COVID-19 pandemic may not fully be reflected in our results of operations until future periods . . . The global macroeconomic effects of the COVID-19 pandemic and related impacts on our customers' business operations and their demand for our solutions may persist for an indefinite period, even after the COVID-19 pandemic has subsided" (CCAC ⁋ 161)

In short, plaintiff's argument with respect to each of these statements hinges on the allegation that ON24 faced material customer churn. Because plaintiff has not put forth sufficient facts in support of that theory, its claims against these risk-factor statements also fail.

Defendants argue that plaintiff's claims fail for a second reason. Namely, at the time of the IPO, they could not have known that customers who still had time left in their one-year subscription

22

United States District Court
Northern District of California

were not going to renew. In other words, even if plaintiff was able to demonstrate there was high churn from customers who subscribed in the three quarters prior to IPO, that churn would not be felt until *post* IPO. Defendants cite to the Ninth Circuit's decision in *In re Stac*, 89 F.3d 1399 (9th Cir. 1996) for support.

In *In re Stac*, plaintiff argued that defendants knew that another company, Microsoft, was developing a competing product and should have disclosed that as a certainty rather than masking it as a contingency. *Id.* at 1406. Because defendants did not do so, the plaintiff there argued that the risk disclosures were misleading. The Ninth Circuit held otherwise, finding that companies are not "required to forecast future events." *Id.* Even if Microsoft had informed defendants that it planned to introduce a competing product, defendants would not have been liable for failing to disclose that information because "they could not have known whether Microsoft would truly do so." *Id.* Defendants argue that, similarly, even if customers attained in the three quarters leading up to IPO had told ON24 that they might not renew their one-year subscription, ON24 could not have truly known whether they would unsubscribe until after IPO, when their subscription would have run.

Plaintiff does not acknowledge, much less respond, to *In re Stac*. Instead, plaintiff repeats defendants' post-IPO acknowledgement of high customer churn contributing to the falling stock price. While the Court agrees that such statements are circumstantial evidence for plaintiff's claims, they do not make up for the lack of factual allegations prior to the IPO. Plaintiff cannot use these post-IPO statements, work backwards, and arrive at a violation pre-IPO. Rather, plaintiff must allege: first, that there was material customer churn; second, that this material churn existed in the quarters leading up to the IPO; and, third, that defendants knew about it. One confidential witness's statement that an unspecified number of *his* customers informed him "as much as six months in advance" that they were not going to renew their contracts is not sufficient to meet this burden. (CCAC ¶ 102.)

Because the Court dismisses plaintiff's claims for failure to provide sufficient factual foundation, it need not reach defendants' second argument.

For those reasons, the Court **GRANTS** the motion to dismiss as to Statement Nos. 9–13 on the grounds that, as alleged, they are not misleading.

### C.    ITEMS 303 AND 105

Lastly, defendants argue plaintiff fails to state a claim that they violated either Item 303 or 105 of SEC Regulations S-K.

Item 303 requires offering documents to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or incomes from continuing operations." 17 C.F.R. §§ 229.303(a)(3)(iii). A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have a material effect on the registrant's financial condition or results of operation." *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998). Similarly, Item 105 requires that issuers "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229105(a).

Plaintiff's Item 303 and 105 claims fail for much the same reason as the rest. Plaintiff has not provided sufficient factual support for its claim that ON24 was experiencing significant customer churn. As alleged, therefore, plaintiffs have not met their burden of showing that ON24 violated its duty to disclose this information under Items 303 and 105.

For those reasons, the Court **GRANTS** the motion to dismiss with leave to amend as to plaintiff's Item 303 and 105 claims.

### D.    SECTION 15

Because plaintiff has not stated a primary claim under Section 11, its Section 15 claim also fails. *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F.Supp.2d 958, 969 (N.D. Cal. 2010) (internal citation omitted). The Court therefore **GRANTS** the motion to dismiss with leave to amend as to plaintiff's Section 15 claim.

## IV.    CONCLUSION

For the reasons stated above, the Court **GRANTS** defendants' Motion for Judicial Notice and Underwriter Defendants' Motion for Joinder. The Court also **GRANTS** defendants' motion to dismiss with leave to amend.

Given comments made by counsel at the hearing, it is not clear whether plaintiff can amend consistent with its Fed. R. of Civ. P. 11 obligations. Thus, within fourteen (14) days of this order, plaintiff shall file a notice indicating whether it can amend. If not, a final order of dismissal shall issue sua sponte.  If so, the amended complaint shall be filed within thirty-five (35) days of the order. A response thereto shall be filed twenty-one (21) days thereafter.[5]

This Order terminates Docket Numbers 83 and 85.

**IT IS SO ORDERED**.

Date: July 7, 2023

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

---

[5] Parties are reminded that new arguments cannot be raised in a subsequent motion which could have been raised in the first instance.  Further, plaintiff shall provide the Court with a redline version of the changes to CCAC pursuant to the Court's Standing Order.