Jonathan Gardner (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Charles J. Stiene (*pro hac vice* forthcoming)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:   jgardner@labaton.com
        dschwartz@labaton.com
        afatale@labaton.com
        cstiene@labaton.com

*Lead Counsel for Lead Plaintiff
Leadersel Innotech ESG*

*[Additional Counsel on Signature Page]*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| In re ON24, Inc. Securities Litigation | Case No. 4:21-cv-08578-YGR<br><br>ECF CASE<br><br>**FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>DEMAND FOR JURY TRIAL<br><br>Dept: Courtroom 1, 4th Floor<br>Judge: Honorable Yvonne Gonzalez Rogers |

## <u>TABLE OF CONTENTS</u>

I.      NATURE OF THE ACTION AND BACKGROUND...........................................................1

II.     JURISDICTION AND VENUE ........................................................................................8

III.    PARTIES.........................................................................................................................9

        A.      Lead Plaintiff.......................................................................................................9

        B.      Defendants ...........................................................................................................9

                1.      Corporate Defendant...............................................................................9

                2.      The Individual Defendants ....................................................................10

                3.      The Underwriter Defendants .................................................................11

IV.     SUBSTANTIVE ALLEGATIONS ................................................................................13

        A.      ON24 and its Business.......................................................................................13

        B.      ON24's Pre-IPO Growth ...................................................................................14

        C.      ON24 Conducts the IPO ....................................................................................16

        D.      Defendants' Materially False and Misleading Offering Documents .....................17

                1.      Former ON24 Employees Substantiate the Allegations that the
                        Offering Documents Were Materially False and Misleading .....................17

                        a.      Former Employee 1 ......................................................17

                        b.      Former Employee 2 ......................................................20

                        c.      Former Employee 3 ......................................................23

                        d.      Former Employee 4 ......................................................23

                        e.      Former Employee 5 ......................................................26

                        f.      Former Employee 6 ......................................................30

                        g.      Former Employee 7 ......................................................31

                        h.      Former Employee 8 ......................................................33

                2.      The Offering Documents Contained Materially False and Misleading
                        Statements About ON24's Customers and Financial Condition ..................36

3.      The Offering Documents Contained Materially False and Misleading "Risk Factors" About ON24's Customer Base that Falsely Described Certain Risks as Potential When Such Risks Had Already Manifested and Would Occur Shortly After the IPO ........................................................ 42

4.      The Offering Documents' Independently Actionable Omissions of Trends, Uncertainties, and Significant Risks ............................................. 45

E.      Events Following the IPO ....................................................................... 47

V.      CLASS ACTION ALLEGATIONS .................................................................. 58

VI.     CAUSES OF ACTION ................................................................................... 59

COUNT I FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT Against All Defendants .......................................................................................... 59

COUNT II FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT Against the Individual Defendants .......................................................................... 62

VII.    PRAYER FOR RELIEF .................................................................................. 63

VIII.   JURY TRIAL DEMANDED ........................................................................... 63

1    Court-appointed Lead Plaintiff, Leadersel Innotech ESG ("Lead Plaintiff"), individually and

2    on behalf of a class of similarly situated persons and entities, alleges the following upon information

3    and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal

4    knowledge. Lead Plaintiff's information and belief is based upon, among other things, the

5    investigation undertaken by Court-appointed Lead Counsel, Labaton Sucharow LLP, which included

6    a review and analysis of: (i) regulatory filings made by ON24, Inc. ("ON24" or the "Company") with

7    the U.S. Securities and Exchange Commission (the "SEC"); (ii) Company press releases, transcripts

8    of earnings calls, and other public statements issued and disseminated by the Company; (iii) Company

9    website and marketing materials; (iv) price and volume data for ON24 common stock; (v) research

10   reports from securities and financial analysts; (vi) news and media reports concerning the Company

11   and other facts related to this action; (vii) interviews with former ON24 employees; and (viii) other

12   publicly available materials and data. Lead Counsel's investigation into the factual matters alleged

13   herein continues and many of the relevant facts are known only by the Defendants (as defined herein)

14   or are exclusively within their custody or control. Lead Plaintiff believes that substantial additional

15   evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for

16   discovery.

17   **I.     NATURE OF THE ACTION AND BACKGROUND**

18   1.    The claims asserted herein are strict liability claims for violations of Sections 11 and

19   15 of the Securities Act of 1933 (the "Securities Act") relating to ON24's initial public offering (the

20   "IPO"), commenced on or about February 3, 2021, of over 8,560,930 shares of common stock at a

21   price of $50.00 per share. This federal securities class action is brought on behalf of a Class (as defined

22   herein) of all persons and entities who purchased or otherwise acquired ON24 publicly traded

23   common stock pursuant and/or traceable to the Offering Documents (as defined herein) issued in

24   connection with the IPO, and who were damaged thereby.

25   2.    Congress passed the Securities Act in the hopes of restoring investor confidence after

26   corporate scandals and the stock market crash of 1929. The Securities Act requires that those who

27   sell securities to the investing public do so on the basis of accurate and fulsome disclosure. The

28   Securities Act creates liability for false, misleading, and incomplete statements made in connection

1   with public securities offerings in order to protect investors and maintain confidence in our public
2   markets.

3       3.    ON24 touts itself as offering a leading, cloud-based digital experience platform that
4   enables businesses to convert customer engagement into revenue through interactive webinars,
5   virtual events, and multimedia content experiences. ON24's customers include business-to-business
6   ("B2B") companies that seek sales and marketing strategies to generate revenue through
7   personalized and interactive digital customer engagement. ON24 is led by co-founder, President,
8   and Chief Executive Officer ("CEO") Defendant Sharat Sharan ("Sharan").

9       4.    ON24 offers four "Experience" products: (1) ON24 Elite, a live, interactive webinar;
10  (2) ON24 Virtual Environment, a live, large scale virtual event experience; (3) ON24 Engagement
11  Hub, an always-on, multimedia content experience; and (4) ON24 Target, a curated, multimedia
12  content experience.

13      5.    ON24's Experience products are "backed" by two enhanced functionality solutions:
14  (1) ON24 Intelligence, an analytics tool that captures first-person data to power the artificial
15  intelligence ("AI")/machine learning ("ML") engine within ON24's platform; and (2) ON24
16  Connect, an ecosystem of third-party application integrations.

17      6.    ON24 derives revenue and cash flow from sales of subscriptions to its products. As a
18  subscription-based Company, ON24 must attract new customers and maintain and expand
19  relationships with existing customers, including by "upselling" additional solutions. In order to
20  grow, ON24 must continually secure new customers and renew or upsell existing customers. In the
21  Offering Documents, ON24 touted its "highly engaged and loyal customer base," including 1,900
22  customers in more than 40 countries as of September 30, 2020.

23      7.    With the shift to a more digital world in 2020 due in part to the COVID-19
24  pandemic, ON24 had purportedly hit a watershed moment and, as a result, was experiencing
25  explosive growth.  For example, in the nine months ended September 30, 2020, ON24's revenue
26  increased by 59% as compared to the year before.  Its customer base increased from 1,241
27  customers as of December 31, 2018, to 1,918 customers as of September 30, 2020.  Annual
28  recurring revenue ("ARR")—which is driven by ON24's ability to acquire new customers and to

maintain and expand its relationship with existing ones—grew similarly, with $61.2 million ARR reported as of December 31, 2018, to $138.9 million as of September 30, 2020.  Further, ON24's net retention rates ("NRR")—which reflects ON24's recurring revenue from existing customers— also grew from 107% as of December 31, 2018, to 147% as of September 30, 2020.

8.      On or about February 3, 2021, ON24 conducted the IPO focused heavily on these September 30, 2020 results and raised more than *$428 million* in gross proceeds for the shares ON24 offered to the public, while the banks that underwrote the IPO collected over *$29 million* in fees. In other words, the IPO was a great success for Defendants; however, the IPO was disastrous for investors.

9.      Unbeknownst to investors, in the three quarters preceding the IPO, ON24 had changed its business model away from focusing on attracting enterprise customers, who were long term subscribers that would renew their contracts, generate recurring revenue, and increase their spend in future years through subscribing to additional products and services. During the three quarters preceding the IPO, ON24 signed up new customers, for one-year or less contracts, who told ON24 that they planned to either not renew or "downsell," meaning they were planning to reduce the scope of their subscription by removing features, and, therefore, generate less revenue for the Company. A larger-than-typical percentage of these new customers were small- and medium-sized business ("SMB") customers. These customers were described internally as "atypical" or "COVID" customers because they were nonideal customers focused on temporary remote solutions or one-time events, and, again, planned to either not renew or downsell.

10.     Within months of the IPO, ON24 disclosed materially adverse and previously existing but undisclosed conditions, trends, uncertainties, and risks at the Company that pre-dated the IPO, including high churn, nonrenewals, and downselling amongst customers signed up during the second, third, and fourth quarters of 2020. For the second quarter ended June 30, 2021 ("Q2 2021"), for example, higher churn was primarily in the first-time renewal cohort, which accounted for over 60% of the total renewal cohort, while SMB customers accounted for 50% of ON24's total "logo churn," *i.e.*, the number of logos or customers lost during that period.

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

3

11.     Former ON24 employees substantiate the allegations concerning ON24 customers that planned to either not renew or downsell.[1] According to Former Employee 3 ("FE-3"), ON24 was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things. FE-3 explained that ON24 had instituted special, lower commission rates that were applied to accounts where the customer was interested in a one-time purchase and was not expected to renew. According to FE-3, these lower commission rates for one-time purchasers confirmed that ON24 knew which customers fell into that category. FE-3 advised that ON24 tracked information through Salesforce including customer purchases, renewals, customers that were active, and customers that were dormant. When asked whether ON24 would have known that the small business customers who purchased single event or one-year subscriptions would not have renewed their services, FE-3 replied that they would have.

12.     Former Employee 1 ("FE-1") recalled that during the COVID-19 pandemic, ON24 signed anybody and everybody up regardless of if they were considered to be a good customer for the Company. In reference to ON24's business during COVID-19, FE-1 recalled that the Company knew a lot of the COVID business was not going to stick including their enterprise business. FE-1 explained that there were always monthly calls with Defendant Sharan and other C-level employees to discuss clients, including churn risk and potential for expansion. He went on to recount that the C-suite employees at ON24 were very involved and that there was a monthly call (held both before the IPO and after) called the "sales and client success meeting."

13.     According to FE-1, those monthly meetings lasted around five hours and everyone from employees of the small business cohort to the executives, including Defendant Sharan, participated. According to FE-1, there were open discussions during meetings and within ON24 that the small business cohort did not have good retention rates and that this information could be seen in Salesforce metrics. In reference to a customer's expectation for renewal, FE-1 recalled that employees were required to track their clients' expectation for renewal in Salesforce in a field

---

[1] For ease of comprehension and readability, the Amended Complaint uses the pronoun "he" and possessive "his" in connection with the former ON24 employees. This convention, however, is not meant to identify the actual gender of any of the former employees.

labeled "churn" as "low, medium, or high." According to FE-1, "churn reports" were produced and were discussed at the monthly meetings that were led by Defendant Sharan where he would go through every customer to discuss their status on the churn reports. FE-1 added this included all the customers designated as having a high risk of churn and the reports would often be color coded green, yellow, orange, and red to signify likelihood of renewal.

14.     According to Former Employee 2 ("FE-2"), ON24 failed to adequately qualify potential customers, including ensuring they had an appropriate use case, from the beginning of the pandemic and throughout 2021. FE-2 recalled that there were instances that he would notice 40-50% churn amongst his customers and this was consistent throughout his entire team—which represented more than 25% of ON24's total business. FE-2 explained that the "instances" of 40-50% churn among his customers was a reflection of the percentage of new customers and the large number of accounts that stated they were not going to renew because ON24 was a COVID-related expense. FE-2 explained that the initial periods of a high influx of COVID-related customers occurred in March through May 2020 and again in June and July 2020 because of the large number of in-person events held in these timeframes that customers needed an immediate virtual solution to replace.

15.     FE-2 explained that churn was occurring in several ways: clients were only using ON24 as a COVID-19 solution and electing not to renew at all; customers were not renewing one-time purchases (such as an event manager); or customers were electing to downsell and remove features from their contract. FE-2 stated that this represented a huge downturn.

16.     FE-2 recalled that 80% of new customers acquired after the COVID pandemic (beginning in March 2020) told him six months in advance that they would not be renewing their contracts. FE-2 also noted that existing customers, who added new products or features to adapt to the pandemic, told him that these were "one-time" use purchases. FE-2 recalled all CSMs on his team having similar experiences. FE-2 added that, throughout 2020, the sales and customer success teams were experiencing the same issue—that customers were indicating they were going to churn because ON24 was simply a COVID related expense.

17.     FE-2 explained that the concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to indicate if a customer had indicated they were a "one-time" or "COVID related customer."

18.     Former Employee 5 ("FE-5") recalled that, after a lot of early success, things really dropped off and demand declined during November/December 2020. FE-5 explained that market saturation and uncertainty regarding COVID-19 played crucial roles. FE-5 added that new competition was springing up and offering customers the ability to hold one-off events at more reasonable prices, and that ON24 began losing potential clients during initial calls. FE-5 agreed that the Company became less particular about its prospective clients as time went on, whereas previously ON24 had only wanted a particular client profile.

19.     According to Former Employee-7 ("FE-7"), in the early stages of COVID, the Company was signing "a ton" of short-term event-based deals with subscriptions of one-year or less that were different than the typical deal ON24 signed with customers. FE-7 explained that these customers churned at a "super high rate." FE-7 recalled that this cohort of customers churned at upwards of 80% and had no intention to use the webcast capabilities regularly. FE-7 explained that many of these customers had "no intention" to stay on beyond their initial contract and he indicated in Salesforce that they had a high probability of churn as early as one month after they had signed their initial contract. FE-7 explained that he initially received an influx of approximately 20 "atypical" customers during a two- or three-week period, which was "insane" in comparison to the typical volume of new customers. FE-7 continued to say that this was the same for the other members of his team, and their books exceeded the amount they were originally intended to. FE-7 explained that out of the 80-100 accounts in his book in 2020 that 25-30 were atypical and estimated that "maybe" one did not churn. FE-7 added that the churn rate amongst his team on these accounts was 75-80%.

20.     Further Former Employee-8 ("FE-8") explained that as a Senior Customer Success Manager he was "responsible for churn" and had approximately 200 customers in his order book. FE-8 added that, during 2020, he had 137 customers in his book with contract values ranging from $5,000 to $100,000. According to FE-8, the number of customers on each CSM's book varied

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

6

depending on the ARR of the accounts, as the Company wanted each CSM to have approximately the same book value. FE-8 added that the number of accounts per CSMs focused on mid-market customers varied between approximately 40 to 140 accounts.

21.     FE-8 explained that 43% of his accounts from 2020 were going to churn or downsell. FE-8 added that during 2020, 50% of new accounts that were up for renewal were likely to churn. FE-8 recalled that the volume of accounts poised to churn was consistent and every CSM was asking "what can we do?" related to the fact that bonuses are based on renewals. FE-8 continued to say that these accounts were set to come up for renewal in Q1 2021 since they signed on in Q1 2020, and that churn was going to occur and "rear [its] ugly face."

22.     FE-8 explained that there were monthly All-Hands Meetings attended by current CEO Sharat Sharan where a full review of all accounts took place. FE-8 recalled specifically an All-Hands Meeting within two months after "everything shut down" on March 7, 2020, where Sharan acknowledged that the influx of customers were "not our [ON24's] ideal customers," but that they were a "revenue generator." FE-8 continued to say that Sharan instructed employees that "we will deal with the churn later in the year" and that "we [ON24] know they will most likely churn."

23.     These then-existing material facts confirmed by the FEs—and other then-existing material facts that were undisclosed until after the IPO—about ON24's one-time, event-only, and SMB customers that planned to either not renew or downsell were omitted from the Offering Documents and rendered the Offering Documents' statements materially false and misleading in context.

24.     On August 10, 2021, for example, Defendant Sharan claimed that ON24 "experienced higher-than-expected **churn and downsell from customers we signed up in the second quarter of last year** during the peak of COVID. This **higher churn was primarily in the first-time renewal cohort**, customers who signed up 1-year contracts last year and who were up for renewal." Defendant Sharan added that "the **lower churn was primarily in the SMB**."

25.     Also on August 10, 2021, ON24's Chief Financial Officer ("CFO") Defendant Steven Vattuone ("Vattuone") admitted:

> [T]he *share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort. We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events* who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

26.     Following these disclosures, market analysts downgraded ON24's stock, including analysts at Defendant JP Morgan and Defendant Canaccord.  Defendant JP Morgan explained that the "major issue is the increase in churn and [customer] down-sell that will likely cause the platform revenue to decelerate" and stressed that "[m]anagement's previous guidance had not factored in enough churn from smaller accounts."  Defendant Canaccord downgraded ON24 stock because of "elevated churn" from "first-time renewals who had signed up for one-year deals at the height of COVID."  This was ON24's "largest renewal cohort ever," but Defendant Canaccord emphasized that the cohort was mostly made up of clients who were "not normally ON24's target customer." By November 10, 2021, Defendant JP Morgan noted that ON24's ARR for the fourth quarter of 2021 was "negatively impacted" by continued churn of first-time customers acquired during the COVID-19 pandemic in the lead up to ON24's IPO.  Another Defendant, Piper Sandler, stated that though ON24's ARR had continued to grow in 2021, "eroding customer renewals rate and contract downsizing over the last two quarters has pressured ARR growth to moderate meaningfully." Almost a year after its IPO, Defendant Sharan reflected that the "largest challenge in 2021 was the first time renewal cohort."  More to the point, Defendant Sharan said that the "churn has been [ON24's] biggest issue."

27.     As a result of the undisclosed adverse facts alleged herein that existed at the time of the IPO, ON24 common stock plummeted, falling from the IPO price of $50.00 per share to close at $18.86 per share on November 3, 2021, the date this Action was filed.  ON24's stock price has never recovered and has continued to significantly decline, closing at $6.83, on September 1, 2023.

## II.     JURISDICTION AND VENUE

28.     The claims asserted herein arise under and pursuant to Section 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o.

29.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act, 15 U.S.C. § 77v, and 28 U.S.C. § 1331.

30.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b), (c), and (d). Many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of untrue statements of material facts, occurred in this District.

31.     In connection with the acts alleged in this Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of national securities exchanges.

## III.     PARTIES

### A.     Lead Plaintiff

32.     As set forth in the Certification filed in this Action on January 3, 2022 (Dkt. No. 36-2), Lead Plaintiff Leadersel Innotech ESG purchased ON24 common stock in the IPO pursuant and/or traceable to the Offering Documents. Lead Plaintiff purchased ON24 common stock at a time when only shares offered in the IPO were in the market. Lead Plaintiff suffered damages as a result of the violations of the federal securities laws alleged herein. On February 3, 2022, the Court appointed Leadersel Innotech ESG as Lead Plaintiff in this Action (Dkt. No. 67).

### B.     Defendants

#### 1.     Corporate Defendant

33.     Defendant ON24 is a Delaware corporation headquartered at 50 Beale Street, 8th Floor, San Francisco, California 94105. ON24 claims it provides a leading, cloud-based digital experience platform that enables businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. ON24's stock is listed under the ticker symbol "ONTF" on the New York Stock Exchange ("NYSE").

### 2. The Individual Defendants

34.     At the time of the IPO, Defendant Sharat Sharan, a co-founder of the Company, was ON24's President and CEO and served as a member of ON24's board of directors (the "Board"). Defendant Sharan sold 147,453 shares of ON24 common stock in the IPO for $7.4 million.

35.     At the time of the IPO, Defendant Steven Vattuone was ON24's CFO.

36.     At time of the IPO, Defendant Irwin Federman ("Federman") was a director on the Board and a member of the Audit Committee.

37.     At time of the IPO, Defendant Denise Persson ("Persson") was a director on the Board.

38.     At time of the IPO, Defendant Holger Staude ("Staude") was a director on the Board and a member of the Compensation Committee. At the time of the IPO, Defendant Staude was also an employee of Underwriter Defendant Goldman Sachs & Co. LLC.

39.     At time of the IPO, Defendant Dominique Trempont ("Trempont") was a director on the Board and a member of the Audit Committee and the Compensation Committee.

40.     At time of the IPO, Defendant Barry Zwarenstein ("Zwarenstein") was a director on the Board and a member of the Audit Committee and the Compensation Committee.

41.     Defendants Sharan, Vattuone, Federman, Persson, Staude, Trempont, and Zwarenstein are collectively referred to herein as the "Individual Defendants."

42.     Each of the Individual Defendants signed the Registration Statement.

43.     Each of the Individual Defendants participated in the preparation of the Offering Documents and in the making of the materially inaccurate, misleading, and incomplete statements alleged herein. In particular, the Individual Defendants reviewed, edited, and approved the Offering Documents, participated in the IPO and solicited the purchase of ON24 common stock in the IPO to serve their financial interests and those of ON24.

44.     The Individual Defendants conducted the roadshow along with the Underwriter Defendants to solicit the purchase of ON24 common stock in the IPO. The Individual Defendants each also reviewed, approved, and delivered to investors the IPO's roadshow presentation, talking points, and script.

### 3.    The Underwriter Defendants

45.    Defendant Goldman Sachs & Co. LLC ("GS&Co.") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant GS&Co. was allocated 3,145,029 shares in the IPO to sell to the investing public.

46.    Defendant J.P. Morgan Securities LLC ("JPMorgan") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant JPMorgan was allocated 2,714,204 shares in the IPO to sell to the investing public.

47.    Defendant KeyBanc Capital Markets Inc. ("KeyBanc") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant KeyBanc was allocated 775,487 shares in the IPO to sell to the investing public.

48.    Defendant Robert W. Baird & Co. Incorporated ("Baird") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Baird was allocated 385,242 shares in the IPO to sell to the investing public.

49.    Defendant Canaccord Genuity LLC ("Canaccord") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Canaccord was allocated 385,242 shares in the IPO to sell to the investing public.

50.    Defendant Needham & Company, LLC ("Needham") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially inaccurate, misleading, and incomplete Offering Documents. Defendant Needham was allocated 385,242 shares in the IPO to sell to the investing public.

51.    Defendant Piper Sandler & Co. ("Piper Sandler") was an underwriter for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of the materially

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

11

1   inaccurate, misleading, and incomplete Offering Documents. Defendant Piper Sandler was allocated
2   385,242 shares in the IPO to sell to the investing public.

3          52.     Defendant William Blair & Company, L.L.C. ("William Blair") was an underwriter
4   for the IPO, serving as a financial advisor for and assisting in the preparation and dissemination of
5   the materially inaccurate, misleading, and incomplete Offering Documents. Defendant William
6   Blair was allocated 385,242 shares in the IPO to sell to the investing public.

7          53.     Defendants GS&Co., JPMorgan, KeyBanc, Baird, Canaccord, Needham, Piper
8   Sandler, and William Blair are collectively referred to herein as the "Underwriter Defendants."
9   Defendants ON24, the Individual Defendants, and the Underwriter Defendants are collectively
10  referred to herein as the "Defendants."

11         54.     The Underwriter Defendants are investment banking houses that specialize, among
12  other things, in underwriting public offerings of securities. The Underwriter Defendants'
13  participation in and their solicitation of purchases of ON24 common stock in the IPO was motivated
14  by their financial interests. Collectively, the Underwriter Defendants received over $29 million in
15  fees and commissions in connection with their sale of ON24 common stock in the IPO.

16         55.     The Underwriter Defendants determined that in return for their share of the IPO's
17  proceeds, they were willing to merchandise ON24 common stock in the IPO. The Underwriter
18  Defendants worked with the Individual Defendants to prepare and arrange a roadshow prior to the
19  IPO during which they, and the Individual Defendants, met with investors and presented highly
20  favorable information about the Company, its operations, and its financial prospects.

21         56.     The Underwriter Defendants also demanded and obtained an agreement for ON24
22  that ON24 would indemnify and hold the Underwriter Defendants harmless from any liability under
23  the federal securities laws. They also made certain that ON24 had purchased millions of dollars of
24  directors' and officers' liability insurance.

25         57.     The Underwriter Defendants assisted ON24 and the Individual Defendants in
26  planning the IPO, and purportedly conducted an adequate and reasonable investigation into the
27  business and operations of ON24, an undertaking known as a "due diligence" investigation. The due
28  diligence investigation was required of the Underwriter Defendants in order to engage in the IPO.

During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning ON24's operations and financial prospects.

58.     In addition to availing themselves of virtually unbridled access to internal corporate documents, the Underwriter Defendants had access to the Company's lawyers, management, and directors and top executives (including the Individual Defendants) to determine: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which the Company's common stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about the Company would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants and the Company's lawyers, management, directors, and top executives (including the Individual Defendants), at a minimum, the Underwriter Defendants were negligent in not knowing of the materially untrue statements and omissions contained in the Offering Documents as detailed herein.

59.     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and to be declared effective in connection with offers and sales of the Company's common stock pursuant and/or traceable to the IPO and the Offering Documents, including to Lead Plaintiff and the Class.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     ON24 and its Business

60.     ON24's self-professed "mission" is to "transform the way businesses drive revenue and customer engagement through data-rich digital experiences." Founded in 1998 and led by co-founder and CEO Sharat Sharan, ON24 serves B2B company customers by providing a cloud-based digital experience platform for interactive webinars, virtual events, and multimedia content experiences, either live or on-demand. The platform prioritizes two-way engagement between businesses and their customers by turning end-user data into buying signals and behavioral insights that enable businesses to convert customer engagement into revenue.

61.     ON24 offers four "Experience" products: (1) ON24 Elite, a live, interactive webinar that engages prospective customers in real-time and on-demand; (2) ON24 Virtual Environment, a

live, large scale virtual event experience that engages prospective customers in real-time and on-demand; (3) ON24 Engagement Hub, an always-on, multimedia content experience that engages specific prospective customer segments; and (4) ON24 Target, a curated multimedia content experience that engages specific prospective customer segments to drive a desired action.

62.     ON24's Experience products are "backed" by two enhanced functionality solutions: (1) ON24 Intelligence, an analytics tool that captures first-person data to power the artificial intelligence/machine learning, or AI/ML, engine within ON24's platform; and (2) ON24 Connect, an ecosystem of third-party application integrations.

63.     ON24 derives revenue and cash flow from sales of subscriptions to its products. As a subscription-based Company, ON24 depends on its ability to attract new customers and maintain and expand relationships with existing customers, including by expanding customer usage by "upselling" additional solutions. In order to grow its business, ON24 must continually secure new customers and renew or upsell existing customers.

64.     The terms of ON24 subscription agreements are primarily annual and the Company bills clients for the full term in advance on an annual or monthly basis.

65.     Although ON24 used to facilitate one-off digital conferences, the Company de-emphasized this legacy revenue over the past decade and now focuses on "stickier," recurring platform revenue.

**B.      ON24's Pre-IPO Growth**

66.     ON24 proudly touted to investors that due to the changes in how businesses were operating more digitally in response to the COVID-19 pandemic, the Company had experienced explosive growth in the new, more digital world.

67.     For example, for the nine months ended September 30, 2020, the Company's revenue increased by 59% as compared to the nine months ended September 30, 2019:

| | Year Ended December 31, | | Nine Months Ended September 30, | |
| | 2018 | 2019 | 2019 | 2020 |
| | | | (unaudited) | |
| | (in thousands, except share and per share data) | | | |
| **Consolidated Statements of Operations Data:** | | | | |
| Revenue: | | | | |
| Subscription and other platform | $ 66,079 | $ 72,589 | $ 53,368 | $ 81,379 |
| Professional services | 16,529 | 16,544 | 11,825 | 22,276 |
| Total revenue | 82,608 | 89,133 | 65,193 | 103,655 |
| Cost of revenue: | | | | |
| Subscription and other platform(1) | 14,232 | 16,730 | 12,571 | 14,405 |
| Professional services(1) | 10,689 | 10,411 | 7,666 | 8,883 |
| Total cost of revenue | 24,921 | 27,141 | 20,237 | 23,288 |
| Gross profit | 57,687 | 61,992 | 44,956 | 80,367 |
| Operating expenses: | | | | |
| Sales and marketing(1) | 46,980 | 47,773 | 35,460 | 40,495 |
| Research and development(1) | 14,343 | 15,730 | 11,660 | 13,272 |
| General and administrative(1) | 13,299 | 14,590 | 10,928 | 14,370 |
| Other gains from operations | (850) | — | — | — |
| Total operating expenses | 73,772 | 78,093 | 58,048 | 68,137 |
| Income (loss) from operations | (16,085) | (16,101) | (13,092) | 12,230 |
| Interest expense, net | 1,052 | 1,029 | 799 | 633 |
| Other expense, net | 256 | 42 | 134 | 226 |
| Income (loss) before provision for income taxes | (17,393) | (17,172) | (14,025) | 11,371 |
| Provision for income taxes | 198 | 355 | 44 | 123 |
| Net income (loss) | $ (17,591) | $ (17,527) | $ (14,069) | $ 11,248 |
| Change in Class B-1 preferred stock redemption value | — | (10,047) | (7,547) | — |

68.     Importantly, ON24 highlighted how "key business metrics" such as the number of customers grew because of purported "[i]ncreasing awareness" of ON24's platform and offerings. In particular, the Company's customer base grew from 760 customers as of December 31, 2015 to over 1,900 customers as of September 30, 2020:



69.     The Company described this customers base as "highly engaged" and "loyal."

70.     According to ON24, at the time of IPO, the Company was "focused on continuing to grow the number of customers that use [its] platform[,]" and "[d]espite [its] strong growth to date,"

1    ON24's "market [was] still relatively underpenetrated" and there was "significant opportunity to

2    attract many more customers across industries, market segments and regions."

3         71.    ARR—which is driven by ON24's ability to acquire new subscription customers and

4    to maintain and expand its relationship with existing subscription customers—similarly exploded

5    prior to the IPO growing from $61.2 million as of December 31, 2018, to $138.9 million as of

6    September 30, 2020:

| | December 31, | | September 30, | |
|---|---|---|---|---|
| | 2018 | 2019 | 2019 | 2020 |
| | | (dollars in thousands) | | |
| Customers | 1,241 | 1,401 | 1,342 | 1,918 |
| ARR | $61,249 | $76,852 | $69,997 | $138,872 |
| NRR | 107% | 108% | 106% | 147% |
| $100k Customers | 116 | 144 | 129 | 271 |

10        72.    As noted in these figures, the Company also reported massive growth in its NRR—

11   which reflects ON24's ability to retain and organically grow revenue from existing customers.

12        73.    Finally, ON24 told investors that this growth was "partly in response to the COVID-

13   19 pandemic." This partial candor aside, Defendants omitted to disclose and misrepresented, as

14   further alleged below, that material adverse events, trends, uncertainties and risks had already

15   developed at the time of the IPO that were putting ON24's growth story to an end.

16        **C.    ON24 Conducts the IPO**

17        74.    On or about February 3, 2021, ON24 conducted its IPO, in which it sold 8,560,930

18   shares of common stock to the public. The IPO, which was priced at $50 per share, generated over

19   $428 million in gross proceeds for ON24 and the selling stockholders, while the Underwriter

20   Defendants collected over $29 million in fees.

21        75.    The Underwriter Defendants also had an overallotment option to purchase up to an

22   additional 1,284,139 shares of common stock from ON24 at the $50 per share IPO price, which, if

23   exercised in full, would raise over $64 million in additional gross proceeds for ON24 and generate

24   over $4.4 million in additional fees for the Underwriter Defendants.

25        76.    The IPO was conducted pursuant to, and the sale of ON24 stock was solicited by,

26   several documents that were filed by ON24 and the Underwriter Defendants with the SEC and

27   disseminated to the investing public, including: (i) an January 8, 2021 registration statement on

28   Form S-1, which following amendment on January 25, 2021, was declared effective by the SEC on

February 2, 2021 (the "Registration Statement"); and (ii) a February 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus" and, together with the Registration Statement, the "Offering Documents").

77.    The Prospectus states that investors "should rely only on the information contained in this prospectus and any free writing prospectus that we may provide to you in connection with this offering."

78.    The Prospectus also states: "You should not assume that the information contained in this prospectus is accurate as of any date other than its date. Our business, financial condition, results of operations and prospects may have changed since that date."

### D.    Defendants' Materially False and Misleading Offering Documents

#### 1.    Former ON24 Employees Substantiate the Allegations that the Offering Documents Were Materially False and Misleading

79.    Eight former ON24 employees ("FEs") cited herein substantiate the allegations of the Amended Complaint and paint a vastly different picture of the Company's state of affairs prior to and at the time of the IPO than the one portrayed in the Offering Documents.[2]

#### a.    Former Employee 1

80.    Former Employee 1 or FE-1 was an ON24 account executive from January 2019 through September 2021. FE-1's responsibilities included handling enterprise sales and accounts.

81.    In reference to ON24's business during COVID, FE-1 recalled that the Company knew a lot of the COVID business was not going to stick including their enterprise business.

82.    FE-1 recalled that ON24 used at least three different systems to track sales, clients, and other information including Salesforce, Forrester, and Gartner. He added that Totango was used to track outreach, contacts to clients, and every interaction with clients. FE-1 advised that Totango showed how long it had been since ON24 last heard from a client.

83.    FE-1 went on to clarify that he was not sure if Gartner was still in use and that Salesforce, Forrester, and Totango were more prevalently used during his tenure. FE-1 explained

---

[2] Lead Plaintiff believes that the details of the FEs' identities contained herein are sufficient to satisfy the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure. Lead Plaintiff can provide additional information to the Court through an *in camera* submission.

1  that these systems were used to track all meetings with and notes about clients and that all entries

2  made by a customer success manager ("CSM") would be time stamped in the system.

3    84. FE-1 recounted how he regularly sent updates to C-level employees via email,

4  including Defendant Sharan, and that the same was required for the small business cohort.

5    85. FE-1 explained that there were always monthly calls with Defendant Sharan and

6  other C-level employees to discuss clients, including churn risk and potential for expansion.

7  According to FE-1, all updates went through the directors and above.

8    86. FE-1 recounted that weekly meetings were held with his supervisor to discuss

9  accounts and that the same thing was required of the small business cohorts. He went on to recount

10 that the C-suite employees at ON24 were very involved and that there was a monthly call (held both

11 before the IPO and after) called the "sales and client success meeting." According to FE-1, those

12 monthly meetings lasted around five hours and everyone from employees of the small business

13 cohort to the executives, including Defendant Sharan, participated.

14   87. At these meetings, employees discussed every customer, what was going well and

15 what was not, which clients were likely going to renew, and which were not. According to FE-1,

16 these meetings typically took place during the first or second week of every month. FE-1 recalled

17 that ON24 skipped the meetings in February and March of 2021 but that he was still required to

18 give account details to C-level employees via email. He went on to recall that the monthly meetings

19 started back up in April 2021.

20   88. According to FE-1, there were open discussions during meetings and within the

21 Company that the small business cohort did not have good retention rates and that this information

22 could be seen in Salesforce metrics. He added that employees knew when clients would be signing

23 up and going away.

24   89. FE-1 explained that every time an employee met with a client upcoming renewals

25 were discussed, and employees were required to put a note in Salesforce regarding that conversation

26 and update their superior as well.

27   90. FE-1 recalled that during the COVID-19 pandemic, ON24 signed anybody and

28 everybody up regardless of if they were considered to be a good customer for the Company. FE- 1

explained that a "good customer" was measured by the Company as (1) having multiple products within their business and (2) fully integrated or having internal customer relationship management ("CRM") or large integration programs like Oracle to handle the data.

91.     FE-1 explained that during the COVID-19 pandemic whoever wanted a contract got one, whereas before the Company wanted customers that would sign on for three of ON24's four or five product offerings.

92.     FE-1 explained that during this period a lot of eventual clients were scrambling to put on conferences or events. According to FE-1, ON24 was historically interested in customers who would use ON24's platform for meetings with investors, marketing meetings, or large internal meetings, whereas the new COVID-19 related customers were looking to buy maybe five to ten events.

93.     According to FE-1, ON24 had never serviced these customers before and that previously they were looking for a greater degree of integration with ON24's products. When asked if the Company had shifted towards event only clients during the pandemic, FE-1 described the shift towards event only customers as 100% accurate.

94.     In reference to a customer's expectation for renewal, FE-1 recalled that employees were required to track their clients' expectation for renewal in Salesforce in a field labeled "churn" as "low, medium, or high." He added that the client success team regularly tracked this field in Salesforce.

95.     FE-1 explained that the Customer Success team would be present on all client calls and were responsible for updating Totango, which served as their Salesforce equivalent. FE-1 added that all managers through C-level employees had access to these systems.

96.     According to FE-1, "churn reports" were produced and were discussed at the monthly meetings that were led by Defendant Sharan where he would go through every customer to discuss their status on the churn reports. FE-1 added this included all the customers designated as having a high risk of churn and the reports would often be color coded green, yellow, orange, and red to signify likelihood of renewal. According to FE-1, executives received this report regularly.

### b.     Former Employee 2

97.     Former Employee 2 or FE-2 worked in sales at ON24 before and after the IPO. During 2020, FE-2 was a member of a team of four to five Customer Success Managers ("CSMs") working with mid-market or commercial customers. FE-2 explained that these customers had between 100 and 10,000 employees and contracts were on average between $25,000 and $100,000 with some multi-year agreements worth upwards of $500,000. FE-2 explained that the majority of ON24's business was with customers that fell into the category of customers with 10,000 employees or less. According to FE-2, during his tenure, he had between 80 to 300 customers in his book of business and, during 2020, he had between 100 and 150 customers.

98.     According to FE-2, the churn of customers who signed on during 2020, and throughout the renewal process in 2021, was a concern from an account management perspective, but Defendant Sharan was only concerned with revenue. FE-2 stated that ON24 was signing on everyone and did not care about their potential use cases.

99.     FE-2 explained that ON24 was intended to be used as a marketing tool, not an internal use product, which is what many customers were intending to use it for. According to FE-2, ON24's pre-pandemic customers used ON24 as an "externally" focused tool, but during the pandemic customers were using it as an internal communication tool. FE-2 continued to say there were "constant issues" when trying to use ON24 in this manner, including bandwidth and outages and that this contributed to "lots of churn." FE-2 stated that ON24 signed on customers that only intended to use the product for a single event as well. FE-2 recalls these concerns being escalated to management, but not addressed.

100.     According to FE-2, Defendant Sharan not only misled investors, but also employees about the sustainability of ON24's performance. FE-2 recalled that ON24's success was characterized as a success in itself and not something dependent on the circumstances of the pandemic. FE-2 explained that this materialized in the form of increased quotas in winter 2020 in the lead up of the IPO. According to FE-2, the increase in quotas were instituted despite a dramatic decline in demand once lockdown restrictions had begun to relax.

101.     According to FE-2, customer success managers or CSMs would attempt to track the reason behind why customers signed on to determine if they were COVID-19 related customers. FE-2 explained that when CSMs would go to account executives for clarification, they would be told that the account executives were being told to just sell and did not have time to qualify customers. FE-2 explained that ON24 failed to adequately qualify potential customers, including ensuring they had an appropriate use case, from the beginning of the pandemic and throughout 2021.

102.     FE-2 explained that, throughout 2020, the sales and customer success teams were experiencing the same issue—that customers were indicating they were going to churn because ON24 was simply a COVID related expense. According to FE-2, there were instances that he would notice 40-50% churn amongst his customers and this was consistent throughout his entire team, all of which had similar sized books of business. FE-2 added that his team represented more than 25% of ON24's total business.

103.     FE-2 explained that the "instances" of 40-50% churn among his customers was a reflection of the percentage of new customers and the large number of accounts that stated they were not going to renew because ON24 was a COVID-related expense. FE-2 added that the initial periods of a high influx of COVID-related customers occurred in March through May 2020 and again in June and July 2020 because of the large number of in-person events held in these timeframes that customers needed an immediate virtual solution to replace.

104.     FE-2 explained that ON24 "always" had meetings about contracts that were a churn risk and every month $70,000 to $100,000 of his book was at risk of churning and this was "absolutely" the same for CSMs across his team. FE-2 added that he was seeing $70,000 to $100,000 worth of churn risk each month during 2020. FE-2 explained that this value represented several contracts each month. FE-2 explained that he was receiving three to five new contracts a day during 2020 and ON24 was "signing on anyone," describing this time as "crazy town." FE-2 continued to say that he continued to see the same churn risks month after month.

105.     FE-2 explained that churn was occurring in several ways: clients were only using ON24 as a COVID-19 solution and electing not to renew at all; customers were not renewing one-

time purchases (such as an event manager); or customers were electing to downsell and remove features from their contract. FE-2 stated that this represented a huge downturn.

106.    According to FE-2, of the customers acquired after the COVID pandemic (beginning in March 2020), 80% of new customers told him six months in advance that they would not be renewing their contracts. FE-2 also noted that existing customers, who added new products or features to adapt to the pandemic, alerted him that these were "one-time" use purchases. FE-2 explained that during his discovery call with customers, he asked them what their goals were and how many webinars or events they planned on hosting. FE-2 continued to say that when he was informed that a customer only intended to use a product once, he marked "DNR" (do not renew) in Salesforce to indicate the customer's intent and that this was then escalated to management. FE-2 recalled all CSMs on his team having similar experiences and following similar processes.

107.    FE-2 explained that it seemed like "every call" with customers involved them stating that ON24 was a COVID-related expense, especially amongst SMB and Mid-Market customers. According to FE-2, 40-50% of customers signed on throughout 2020 received a DNR designation. FE-2 recalled that this was true of new customers signing on with ON24 as well as new teams from existing customers. For example, FE-2 explained that a marketing team for a customer routinely used ON24 prior to the pandemic, and then once the pandemic began in 2020, another team from the same customer also signed on with ON24 to use the product but emphasized that it was a COVID-related expense. FE-2 continued to say that it was "super easy" for these other teams from existing customers to sign on with ON24 because ON24 was already an approved vendor for that organization. FE-2 explained that signing these new teams from existing customers often led to DNR designations and down sells.

108.    FE-2 explained that the concerns regarding churn were explained to Defendant Sharan, and towards the end of 2020, there was a revision made to Salesforce to include a field to indicate if a customer had indicated they were a "one-time" or "COVID related customer." FE-2 recalled staff being told to retroactively go back through accounts to indicate if this was the case, in order to better assess which customers would likely churn.

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

22

109.     FE-2 explained that this coincided with current Defendant Sharan and former VP, Customer Success Chris Dishman directing employees to stop talking about churn and anything negative in general as the Company approached its IPO. According to FE-2, churn was an issue amongst both commercial and enterprise accounts during this time, but employees were instructed to "just mark it [churn risk] in Salesforce and stop talking about it."

### c.     Former Employee 3

110.     Former Employee 3 or FE-3 was an ON24 account executive from March 2019 through April 2021. FE-3 was responsible for selling ON24 products to small business and mid-market companies.

111.     In reference to ON24 tracking customer information, FE-3 advised that ON24 tracked information through Salesforce including customer purchases, renewals, customers that were active, and customers that were dormant. When asked whether ON24 would have known that the small business customers who purchased single event or one-year subscriptions would not have renewed their services with ON24, FE-3 replied that they would have.

112.     FE-3 also added that the Company was already aware there was high churn amongst the SMB customers prior to the pandemic, but the pandemic amplified things. FE-3 explained that the Company had instituted special, lower commission rates that were applied to accounts where the customer was interested in a one-time purchase and was not expected to renew. According to FE-3, these lower commission rates for one-time purchasers confirmed that the Company knew which customers fell into that category.

113.     According to FE-3, there was a lot of new business in the first few months of the pandemic, which then leveled out shortly before and after the Company's IPO.

### d.     Former Employee 4

114.     Former Employee 4 or FE-4 worked at ON24 from July 2020 through July 2021 as a sales development representative ("SDR") for the enterprise team and, after the IPO, for the higher education business segment team.

115.     According to FE-4, during his first several months at ON24, business was doing extremely well on the back of the first wave of COVID-19. FE-4 explained that customers were

1   coming directly to ON24, which was unheard of in sales, and the quotas established by the

2   Company were obtainable during these initial months.

3          116.    FE-4 recalled customers needing quick solutions during this period and willing to try

4   new services, like ON24.

5          117.    FE-4 stated that during this period account executives were selective in taking

6   meetings with prospective clients and were only interested in meeting with companies identified as

7   being good potential customers. He explained that when detailing "opportunities," it was necessary

8   to provide very detailed notes to the account executives describing the customer's interest. FE-4

9   added that notes taken when assessing opportunities were important in the beginning of his tenure,

10  but progressively became less crucial over time as account executives became less selective about

11  who they took meetings with.

12         118.    FE-4 explained that it got to the point where account executives would tell him,

13  "Look we just need meetings" to attempt to meet quotas in the face of increased pressure and

14  declining demand.

15         119.    According to FE-4, enterprise level clients were described as having over $500

16  million in revenue and over 1,000 employees. FE-4 recalled that over time ON24 was taking

17  meetings with prospective clients that were simply not an enterprise level opportunity, like the City

18  of Portsmouth or small Christian universities. FE-4 explained that ON24 did have major clients like

19  Deloitte, but he added that outside of these large and established clients, others were not interested

20  in renewing their subscriptions.

21         120.    According to FE-4, there were customers who only wanted to utilize ON24 for a

22  single event: "quick fix" customers who would still require a one-year subscription. FE-4 explained

23  that during the summer and early fall 2020, account executives were not interested in speaking with

24  these potential customers.

25         121.    According to FE-4, things began to change in November 2020 when additional

26  pressure was being placed on account executives and all the employees overall. FE-4 explained that

27  it was around this time that account executives became willing to take meetings with prospective

28

1  clients that were interested in using ON24 for "event only" purposes, which did not signify an ideal

2  customer.

3      122.   FE-4 explained that qualified and unqualified often came down to the way the

4  potential customer planned to use ON24's product and their size. According to FE-4, qualified

5  customers met certain benchmarks, including revenue and number of employees. FE-4 stated that

6  qualified customers were not single event customers; they were going to maybe use the product for

7  a few flagship events at the least.

8      123.   FE-4 explained that unqualified customers were too small in regard to revenue and

9  employee figures or were interested only in using the products for single events. According to FE-4,

10  he was responsible for determining which prospective clients would advance to a meeting with an

11  account executive.

12      124.   FE-4 explained that as time went on and demand decreased that he was more likely

13  to pass on unqualified potential customers to an account executive. FE-4 added that there were

14  times where smaller inbound clients would present themselves, and early on his tenure these would

15  be deemed unqualified, but account executives took meetings with these clients as time went on.

16      125.   FE-4 described how customers would signal to him that they were interested in

17  trying ON24 for one event and reluctantly signing on for the one-year subscription in order to do

18  this. FE-4 explained that some customers had previously established multi-year deals with Zoom at

19  the time and did not want a long-term commitment to ON24 as well. FE-4 explained that ON24 did

20  have an integration with Zoom, which was a selling point for clients especially if they only wanted

21  a one-year subscription. FE-4 described how ON24's Zoom integration made it worth it for these

22  clients, a lot of whom already had Zoom.

23      126.   FE-4 recalled a lot of notes and memos going around in November/December or

24  early winter 2020 hinting that the Company would be going public soon and with that came the

25  additional pressure on staff. FE-4 explained that this pressure continued after the IPO. FE-4

26  explained that from his perspective there was increased pressure for him to set meetings, while

27  account executives were pressured to sign clients, noting that overall the whole sales team was

28

feeling the pressure. According to FE-4, the Company expected more from the sales team despite the declining demand, failing to adjust to the changes from the beginning of the pandemic.

### e. Former Employee 5

127. Former Employee 5 or FE-5 was an ON24 sales development representative or SDR from August 2020 through July 2021. FE-5's responsibilities included handling new business opportunities for mid-market clients, which involved engaging potential customers and setting up meetings with account executives.

128. According to FE-5, demand was very high during the Spring, Summer, and Fall of 2020, so account executives were more selective with what potential customers they took meetings with. FE-5 recalled that during that timeframe, he was exceeding his quotas and even exceeding the more difficult quotas that were implemented thereafter.

129. FE-5 explained that in the beginning there were other companies coming in at a similar price point to ON24, so that did not become an issue until later on. According to FE-5, customers were not using the platform as a replacement for their internal systems, such as Microsoft Teams, and that ON24 was primarily used for marketing purposes through webinars or large company all-hands type of events.

130. FE-5 recalled that, after a lot of early success, things really dropped off and demand declined during November/December 2020. FE-5 explained that market saturation and uncertainty regarding COVID-19 played crucial roles. FE-5 added that new competition was springing up and offering customers the ability to hold one-off events at more reasonable prices, and that ON24 began losing potential clients during initial calls.

131. FE-5 clarified that the drop-off occurred towards the end of 2020 and customer interest continued at the turn of the year. FE-5 explained that ON24 became interested in pursuing a hybrid model to cater to potential clients interested in one-time events, and there were discussions around the possibility of a less strict subscription model. FE-5 agreed that the Company became less particular about its prospective clients as time went on, whereas previously ON24 had only wanted a particular client profile.

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

26

132.     According to FE-5, prior to his employment with the Company, SDRs were focused on large enterprise clients exclusively, and when he joined in August 2020, he was placed on a new team that focused on small and mid-market clients. FE-5 explained that he was instructed to target tech companies in the software as a service ("SaaS") space because these customers were likely to have the necessary resources available to them to afford ON24.

133.     FE-5 explained that over time the focus on tech companies lessened and any prospective client with a suitable "use case" was considered even if it appeared they would have less money available for ON24's products. FE-5 recalled that the instruction was to get clients in the door, regardless of if they satisfied ON24's previously particular prospective customer profile.

134.     FE-5 recalled a shift from inbound to outbound customers, and as 2020 turned to 2021, customers were more interested in "one-off" events. According to FE-5, these prospective clients would express that they did not have the capital that made sense for a subscription like ON24 or they simply did not have a use for a platform such as ON24 any longer. FE-5 added that meetings with clients deemed "event only" were taken on more and more as time went on.

135.     According to FE-5, Webex, Zoom, and later Hopin, served as ON24's primary competition. FE-5 explained that price became the number one objection by customers as time went on. FE-5 added that customers would speak positively about the platform, but ultimately decline to advance the process due to the one-year commitment and the considerable price compared to competitors.

136.     FE-5 clarified that when he initially joined ON24, BrightTALK was essentially ON24's only competitor. FE-5 explained that BrightTALK had a similar platform at a similar price point and at this time Zoom did not yet offer measurements for engagement metrics.

137.     According to FE-5, the competition shift occurred with the shift towards an increased desire for one-off events. FE-5 explained that once this occurred, Zoom and Hopin became greater competitors. FE-5 explained that Hopin's price was based on number of registrants, which was much more attractive for smaller customers, like those that he dealt with. FE-5 recalled that as a member of Commercial Acquisition I, his focus was on prospective customers that had between 25 and 200 employees.

138.     FE-5 recalled Hopin becoming a real issue for ON24 later in 2020, which continued in 2021, as Hopin had become the Company's biggest competition. According to FE-5, Hopin was a cheaper alternative and customers were drawn to its transparent pricing model. FE-5 explained that Hopin was available for one-off events and did not have the same contract requirements as ON24.

139.     FE-5 clarified that that Hopin's prominence rose in 2021, the same time that things began opening up regarding COVID-19 restrictions, and customers had a greater interest in hosting cheap one-time events.

140.     FE-5 added that it was his understanding that ON24 was exploring altering their product suite to cater to one-off events at a more reasonable price point in late 2020, but he is not sure what the status of that possibility ended up being.

141.     According to FE-5, there was a big shift towards hybrid style events, which SDRs began pitching to customers. FE-5 explained that companies were optimistic about hosting in-person events in 2021 and as a result expressed uncertainty regarding their willingness to commit to a one-year subscription. FE-5 continued to say that the hybrid model, which would allow for in-person events to be accessible to those who could not attend, was a selling point SDRs used to try to convince prospective clients of ON24's value.

142.     FE-5 recalled a shift around the time of the IPO in February 2021 and noted that the shift to new quotas for sales staff were announced in either March or April. According to FE- 5, when demand began to drop off the sales staff pushed a lot harder, including more dials and contact increased in late 2020. FE-5 explained that the new quotas were announced without warning and included an increase of 40-45%.

143.     FE-5 explained that the shift was pretty much centered around the IPO and that it was made clear that ON24 going public and its numbers being public as a result contributed to messaging for sales staff to push. According to FE-5, the pressure to increase output did not appear to be coming from sales managers, but instead from the top.

144.     According to FE-5, quotas and key performance indicators ("KPIs") increased for SDRs and account executives, and it was his understanding that Defendant Sharan had a hand in

1    determining these new benchmarks. Through conversations with account executives, FE-5 recalled

2    that it was not just the SDR team whose quotas went up, but also account executives.

3         145.    According to FE-5, Defendant Sharan was tuned in to what was going on with the

4    sales team and was closely monitoring their performance. FE-5 explained that Defendant Sharan

5    played a role in the establishment of the new quotas, noting that it was Defendant Sharan and other

6    executives pushing the sales directors who then pushed the account executives to increase numbers.

7    FE-5 added that he was told that Defendant Sharan oversaw everything.

8         146.    FE-5 explained that in speaking with account executives, it was his understanding

9    that Defendant Sharan was a micro-manager and was hands on with the account executives. For

10   example, FE-5 explained that when contracts were going through, it would have to go through

11   Defendant Sharan and not just the account executives. FE-5 explained that it appeared that the

12   executive team as a whole was closely involved with monitoring the performance of the sales team.

13   FE-5 added that you could see that every decision, from every team, came from Defendant Sharan

14   and that Defendant Sharan wanted control of every aspect of every department.

15        147.    According to FE-5, customers became reluctant over signing one-year deals as time

16   went on, especially in his segment. FE-5 noted that early on customers were somewhat

17   experimenting to see if a platform like ON24 could add value to their business. FE-5 explained that,

18   over time, clients realized ON24 did not add enough to their bottom line to justify the cost of the

19   subscription. FE-5 stated that customers either removed this aspect from their businesses all

20   together or elected to go with a cheaper alternative.

21        148.    FE-5 recalled conversations with account executives where it became apparent that

22   Defendant Sharan was aware when inbound opportunities slowed down. FE-5 stated that in

23   response, the SDRs had to go to an outbound approach, which was seen by all the account

24   executives from the meetings booked by the SDR team. According to FE-5, when account

25   executives saw what was happening regarding demand, they went to the SDRs, who informed them

26   that opportunities were no longer coming in like they were previously. FE-5 explained that this

27   information made its way up the chain of command.

28

f.    **Former Employee 6**

149.    Former Employee 6 or FE-6 was an ON24 Senior Enterprise Customer Success Manager from the spring of 2020 until after the IPO. FE-6 explained that the Enterprise group has two directors that reported to Vice Presidents of Enterprise for North America and Global, who then reported to the C-Suite.  According to FE-6, there were four or five Customer Success Managers under each director, who each carried between $3.5 million and $5 million in their books.

150.    FE-6 explained that when he began working at ON24 at the beginning of COVID, there were customers deemed "COVID customers" including atypical, smaller customers, who did not fit the usual enterprise customer, such as AT&T or an equivalent, and were likely to churn. FE-6 noted that he took on "a lot" of COVID customers in April, May, and June 2020.

151.    FE-6 explained that he had weekly meetings with his sales team, bi-weekly enterprise team meetings, and monthly meetings consisting of all Customer Success personnel. FE-6 continued to say that these were essentially prep for the monthly Sales and Client Success Meetings that served as a "showcase" for the C-Level employees. According to FE-6, at the Sales and Client Success Meetings, current CEO Sharat Sharan "had a habit of dressing people down" and embarrassing them. FE-6 added that Sharan was "more in the weeds than he needed to be" and was "read in well before" the meetings took place.

152.    FE-6 recalled that his team, through his director, "consistently" sent reports up the chain to the Vice Presidents who then passed information to the C-Level executives. According to FE-6, reports were sent bi-weekly or monthly and included "Health Scores," which included color coded charts of customers and served as a "snapshot" of where they were with each customer.

153.    According to FE-6, he became aware a customer may churn as early as six months in advance and in those instances a special one-off churn report was produced that included churn figures and customers ranked, using percentages, based on likelihood of churn. FE-6 added that these were sent "as soon as they had an idea" that a customer may be at risk to churn.

154.    FE-6 recalled that "a lot" of process changes occurred in 2020, including the introduction of a churn flag indicator in Salesforce that was instituted in late 2020 or early 2021. FE-6 explained that the possibility of a customer churning was flagged in Totango and then that

automatically updated Salesforce. FE-6 explained that these entries included notes about "safe plays" or potential ways to keep the customer on board, such as adjusting pricing. FE-6 added that depending on the size of the customer there may be a specific conversation about them and how to retain their business.

155.    FE-6 explained that there was "immense" pressure on the sales teams to get deals closed before the end of quarters and that concessions were offered in order to get deals in before a quarter closed. FE-6 added that "knowing what he knows," based on his experience at ON24, it was likely that this practice was heightened as the IPO approached.

### g.    Former Employee 7

156.    Former Employee 7 or FE-7 was a Customer Success Manager ("CSM") at ON24 for years prior to the IPO until at least 2022. FE-7 was a member of one of two Mid-Market High Growth Expansion teams, each of which had five CSMs during 2020 and reported to one of two directors.

157.    FE-7 explained that in 2020 he had approximately 80 to 100 accounts in his book and each member of the two Customer Success teams in his group had on average 80 accounts.

158.    According to FE-7, in the early stages of COVID, the Company was signing "a ton" of short-term event-based deals with subscriptions of one-year or less that were different than the typical deal ON24 signed with customers. FE-7 explained that these customers churned at a "super high rate." FE-7 said that many of the companies who signed on did not have a use case for continual webcasts, which was the primary use by typical customers. FE-7 explained that many of the atypical customers did not have the resources "point blank" to use the platform as it was intended and how it was utilized for traditional use cases. FE-7 added that these atypical customers continued to be signed on throughout 2020.

159.    FE-7 recalled that this cohort of customers churned at upwards of 80% and had no intention to use the webcast capabilities regularly. FE-7 explained that many of these customers had "no intention" to stay on beyond their initial contract and he indicated in Salesforce that they had a high probability of churn as early as one month after they had signed their initial contract. FE-7 added that he initially received an influx of approximately 20 "atypical" customers during a two- or

three-week period, which was "insane" in comparison to the typical volume of new customers. FE-7 continued to say that this was the same for the other members of his team and their books exceeded the amount they were originally intended to.

160.    According to FE-7, a red flag was when he saw a customer had only used the platform once after several months, a fact which to him was indicative of high likelihood of churn. FE-7 continued to say that initially churn risk was indicated in Salesforce through a notes section, which then was updated to include markers for high, moderate, and low risk of churn. FE-7 explained that there were "a ton" of these customers marked in Salesforce in late 2020 and early 2021. FE-7 recalled that approximately 20% of his book in early 2021 had been marked for high churn risk and they were not willing to use the platform as a typical use case would.

161.    FE-7 explained that out of the 80-100 accounts in his book in 2020 that 25-30 were atypical and estimated that "maybe" one did not churn. FE-7 explained that the churn rate amongst his team on these accounts was 75-80%. FE-7 added that a lot of the deals were one-year deals that came due in 2021, but that there were a handful of six-month deals. According to FE-7, in 2020, CSMs were trying to "get ahead of" churn risk and that accounts were reviewed at least a quarter ahead and sometimes two, in Q3 and Q4 2020. FE-7 explained that, based on conversations with customers and reviewing their usage, their churn risk was determined to be high. FE-7 recalled that there was "so much churn" throughout 2021, as the customers who signed on during 2020 did not renew.

162.    According to FE-7, the two CSM teams met weekly, including former Sr. Director of Customer Success Stephen Wilson and former VP, Customer Success Chris Dishman, and each CSM discussed their individual "Health Report," which detailed the likelihood of churn for each of their customers. FE-7 continued to say that Wilson compiled each team member's individual reports into a single report that was provided to Dishman, and it is understood that the information was passed up the chain of command. FE-7 explained that the Health Reports included the number of customers designated as high, medium, and low risk, respectively. FE-7 recalled attending Sales and Client Success Meetings that were attended by current CEO Sharat Sharan, where Sharan went through high risk and high probability of churn accounts.

163.     According to FE-7, the high rate of churn risk among the atypical customers was "not a secret" and the directors he reported to agreed and were aligned with the concerns of the CSMs. FE-7 explained that it seemed that customers came on with "no intention" of using the platform properly with continual webcasts. FE-7 recalled that looking at the projections for Q1 and Q2 2021, in the lead up to the IPO, that the high risk of churn was "looming."

### h.     Former Employee 8

164.     Former Employee 8 or FE-8 worked at ON24 since 2015 and was a Senior Customer Success Manager at ON24 from September 2019 until November 2020. FE-8 explained that as a Senior Customer Success Manager he was "responsible for churn" and had approximately 200 customers in his order book. FE-8 added that, during 2020, he had 137 customers in his book with contract values ranging from $5,000 to $100,000. According to FE-8, the number of customers on each CSM's book varied depending on the ARR of the accounts, as the Company wanted each CSM to have approximately the same book value. FE-8 added that the number of accounts per CSMs focused on mid-market customers varied between approximately 40 to 140 accounts.

165.     FE-8 recalled hearing "we know we're going to be hit with a lot of churn," but the message was to get as much business as possible. FE-8 continued to say that in meetings with former VP, Customer Success Chris Dishman and VP level employees, they would discuss how they were going to deal with concerns regarding churn and they would use these meetings to prepare for Sharan's questions during the monthly sales calls. FE-8 explained that these meetings would last approximately four hours and Sharan would discuss even low contract value accounts, including those in the SMB and mid-market space.

166.     According to FE-8, when a CSM received a new account, they were instructed to schedule a "kick-off" meeting with the customer within 48 hours. FE-8 recalled that during these meetings, CSMs went over the contract with the customers, who expressed concerns regarding certain products such as "we really didn't want that feature" and "we're not going to use that." FE-8 explained that these were categorized as "mis-sells" and flagged as "DNR" (do not renew) to signify a bad contract, and then escalated to Dishman. According to FE-8, "DNR" was marked in Salesforce on account contracts following the "discovery call" with clients where it was clear they

were likely to churn or certain products they signed on for would churn. FE-8 described his accounts during COVID as "a fire," noting that "more than half" of new accounts had received a DNR designation as he knew when customers were using ON24 as a backup for COVID restrictions and were only going to use it once in place of an in-person event.

167.    FE-8 also explained that there were quarterly meetings for all of the CSMs led by Dishman, where Dishman requested that all CSMs report "DNR" customers, who were likely to churn so he could review them. According to FE-8, if a "large" account in terms of ARR was discussed as going to churn, then Sharan became involved. FE-8 noted that a "large" account that would garner Sharan's attention could be for as little as $5,000.

168.    FE-8 explained that the "writing was on the wall" when he reviewed his book, and he and other CSMs knew they would be "hammered," "chastised," and "belittled" by current CEO Sharat Sharan and leadership when their accounts that were signed on during 2020 came up for renewal and their churn numbers were inevitably very high. FE-8 explained that 43% of his accounts from 2020 were going to churn or downsell. FE-8 noted that during 2020, 50% of new accounts that were up for renewal were likely to churn. FE-8 recalled that the volume of accounts poised to churn was consistent and every CSM was asking "what can we do?" related to the fact that bonuses are based on renewals. FE-8 continued to say that these accounts were set to come up for renewal in Q1 2021, since they signed on in Q1 2020, and that churn was going to occur and "rear [its] ugly face."

169.    FE-8 recalled that all accounts signed in April 2020 came with an "asterisk" and those that signed on for the "Engagement Hub" or "Hub Experience" were most likely to churn. FE-8 recalled customers telling him and the other CSMs that they were going to churn and there were instances where a Company signed on and then wished to cancel their contract after only a few months.

170.    FE-8 explained that any products added, or new customers signed on in April 2020 were going to churn and that it was "not a maybe," especially when customers added the Hub Experience to existing deals or new customers signed on with the Hub Experience. FE-8 recalled

looking ahead to 2021 when reviewing his book and estimating that he would have a 30% renewal rate.

171.    According to FE-8, Totango included "Health Scores" for every account that was automatically calculated based on the usage by the customer. FE-8 explained that green signified the customer was using ON24 as intended, yellow/orange signified that they were approximately using it half as much as intended, and red signified that they were not using the platform or only used it once. FE-8 added that there were a "[expletive] ton" of red accounts.

172.    FE-8 explained that reports were produced for the number of DNR accounts and the number of green, yellow/orange, and red accounts by Dishman and former Chief Customer Success Officer and Head of Office of Transformation Scott Ray. According to FE-8, the reports were provided to Sharan during weekly manager meetings. According to FE-8, following the weekly manager meetings, the managers then instructed individual CSMs which accounts Sharan was going to focus on at the All-Hands Meeting and to be prepared to discuss them. FE-8 explained that Sharan would become upset if a customer was marked red in Totango, but a CSM had not included notes in Salesforce as to why and what was being done to save the account.

173.    FE-8 explained that there were monthly All-Hands Meeting attended by current CEO Sharat Sharan where a full review of all accounts took place. FE-8 recalled specifically an All-Hands Meeting within two months after "everything shut down" on March 7, 2020 where Sharan acknowledged that the influx of customers were "not our [ON24's] ideal customers," but that they were a "revenue generator." FE-8 continued to say that Sharan instructed employees that "we will deal with the churn later in the year" and that "we [ON24] know they will most likely churn." FE-8 explained that Sharan and leadership had "no plan" to address churn later in the year.

174.    FE-8 recalled that concerns about churn risk were brought to Sharan during these meetings "every month." According to FE-8, when concerns were raised to leadership by CSMs regarding churn, the message was that "we [ON24] will deal with it later." FE-8 added that the message that the Company will deal with churn later was carried forward continuously by managers during team vertical meetings.

### 2. The Offering Documents Contained Materially False and Misleading Statements About ON24's Customers and Financial Condition

175.     The Offering Documents misleadingly touted ON24's customer base of *over 1,900* "*highly engaged and loyal customer[s]*" as of September 30, 2020. The Offering Documents stated, in pertinent part, as follows:

> *As of September 30, 2020, we had over 1,900 customers* in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue. No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020. *We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time* and achieve a dollar-based net retention rate, or NRR, of 147% as of September 30, 2020. Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.

176.     The materially false and misleading statements of material fact referenced above in ¶175 violated Section 11 of the Securities Act, which prohibits the omission of information that is necessary to prevent existing disclosures from being misleading, because when the Defendants chose to discuss the size of the Company's customer base and that base's loyalty and high level of engagement, they failed to disclose and misrepresented significant, then-existing material facts, trends, uncertainties, and risks that ON24 had already been facing at the time of the IPO. In particular, the Offering Documents failed to disclose that:

(a)     Beginning with the onset of the COVID-19 pandemic in March 2020, the Company's customer base had transitioned from carefully courted, enterprise customer to a growing influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less (*see, e.g.,* Statements of FE-1 at ¶¶88, 90-93; Statements of FE-2 at ¶¶98-99, 104-105, 107-108; Statements of FE-3 at ¶112; Statements of FE-4 at ¶¶123-24; Statements of FE-5 at ¶132; Statements of FE-6 at ¶¶150, 153; Statements of FE-7 at ¶158-159, 161; Statements of FE-8 at ¶¶173-174);

(b)     It was known at the Company prior to the IPO that a material amount of "atypical" or "COVID" customers entered into subscriptions for short-term use or single events and many other customers had expressly informed members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions when they

came due (*see, e.g.,* Statements of FE-1 at ¶81; Statements of FE-2 at ¶¶105-108; Statements of FE-6 at ¶150; Statements of FE-7 at ¶159; Statements of FE-8 at ¶¶173-174);

(c)     It was known at the Company prior to the IPO that a material amount of services that enterprise customers added during the COVID-19 pandemic were or would be subject to downsell (*see, e.g.*, Statements of FE-1 at ¶81; Statements of FE-2 at ¶105);

(d)     Because the Company entered into subscription deals during this time period with terms less than one-year, including six month subscriptions, atypical subscriptions began to churn prior to the IPO (*see. e.g.*, Statements of FE-2 at ¶¶102-105; Statements of FE-6 at ¶153; Statements of FE-7 at ¶158-159, 161);

(e)     The material churn, *e.g.*, lack of loyalty, that had occurred prior to the IPO and was knowingly going to continue and amplify after the IPO was reported prior to the IPO through an indicator in the Company's Salesforce computer program, generated into reports for management, and discussed with management, including Defendant Sharan, at sales meetings and companywide all hands meetings (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 94, 96; Statements of FE-2 at ¶¶104, 106-108; Statements of FE-3 at ¶¶111-112; Statements of FE-5 at ¶¶145-146; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶165-174); and

(f)     The fact that a material amount of customers were not using the platform or only used it once, *e.g.*, were not highly engaged, was also captured prior to the IPO through the Company's Totango computer program, which tracked every interaction with the Company's customers, and Totango calculated a "Health Score" based on this "use" matrix. The Health Scores like reports generated through Salesforce, were discussed with management, including Defendant Sharan, because it indicated that these customers were or would be downselling their subscriptions or not renewing their subscription (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 95-96; Statements of FE-2 at ¶¶104, 108; Statements of FE-3 at ¶¶111-112; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶167-174).

177.     The Offering Documents misleadingly claimed that ON24's annual recurring revenue or ARR reflects its success in acquiring new customers and expanding subscriptions within existing customers. The Offering Documents stated, in pertinent part, as follows:

Key Factors Affecting Our Performance

\* \* \*

Annual Recurring Revenue

We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription customers. ARR is calculated as the sum of the annualized value of our subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR amounts exclude professional services, overages from subscription customers and Legacy revenue. Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020. *Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic.*

178.     The materially false and misleading statements of material fact referenced above in ¶177 violated Section 11 of the Securities Act, which prohibits the omission of information that is necessary to prevent existing disclosures from being misleading, because when the Defendants chose to discuss the Company's past success in acquiring new customers and expanding subscriptions with existing customers party in response to the COVID-19 pandemic, they failed to disclose and misrepresented significant, then-existing material facts, trends, uncertainties, and risks that ON24 had already been facing at the time of the IPO.  In particular, the Offering Documents failed to disclose that:

(a)     Beginning with the onset of the COVID-19 pandemic in March 2020, the Company's customer base had transitioned from carefully courted, enterprise customer to a growing influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less (*see, e.g.,* Statements of FE-1 at ¶¶88, 90-93; Statements of FE-2 at ¶¶98-99, 104-105, 107-108; Statements of

FE-3 at ¶112; Statements of FE-4 at ¶¶123-24; Statements of FE-5 at ¶132; Statements of FE-6 at ¶¶150, 153; Statements of FE-7 at ¶158-159, 161; Statements of FE-8 at ¶¶173-174);

(b)     It was known at the Company prior to the IPO that a material amount of "atypical" or "COVID" customers entered into subscriptions for short-term use or single events and many other customers had expressly informed members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions when they came due, thus leading to declines in ARR (*see, e.g.,* Statements of FE-1 at ¶81; Statements of FE-2 at ¶¶105-108; Statements of FE-6 at ¶150; Statements of FE-7 at ¶159; Statements of FE-8 at ¶¶173-174);

(c)     It was known at the Company prior to the IPO that a material amount of services that enterprise customers added during the COVID-19 pandemic were or would be subject to downsell (*see, e.g.*, Statements of FE-1 at ¶81; Statements of FE-2 at ¶105);

(d)     The material churn that had occurred prior to the IPO and was knowingly going to continue and amplify after the IPO was reported prior to the IPO through an indicator in the Company's Salesforce computer program, generated into reports for management, and discussed with management, including Defendant Sharan, at sales meetings and companywide all hands meetings (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 94, 96; Statements of FE-2 at ¶¶104, 106-108; Statements of FE-3 at ¶¶111-112; Statements of FE-5 at ¶¶145-146; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶165-174);

(e)     The fact that a material amount of customers were not using the platform or only used it once was also captured prior to the IPO through the Company's Totango computer program, which tracked every interaction with the Company's customers, and Totango calculated a "Health Score" based on this "use" matrix.  The Health Scores, like reports generated through Salesforce, were discussed with management, including Defendant Sharan, because it indicated that these customers were or would be downselling their subscriptions or not renewing their subscription, thus leading to declines in ARR (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 95-96; Statements of FE-2 at ¶¶104, 108; Statements of FE-3 at ¶¶111-112; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶167-174); and

(f)     ON24 began experiencing a material decline in demand in the fourth quarter of 2020 and first quarter of 2021—that Defendant Sharan was aware of—and which continue through and after the IPO (*see e.g.*, Statements of FE-2 at ¶100; Statements of FE-3 at ¶113; Statements of FE-4 at ¶¶118, 121, 124, 126; Statements of FE-5 at ¶¶128-142, 147-148).

179.    The Offering Documents misleadingly claimed that ON24 could achieve significant growth by retaining, upselling, and increasing sales among existing customers. The Offering Documents stated, in pertinent part, as follows:

> We believe ***we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell.*** Our multi-dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment. As we continue to drive more actionable revenue generating marketing insights, we believe that ***we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization.*** Our ability to pursue this opportunity will require us to scale our sales and marketing organization and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period.

180.    The materially false and misleading statements of material fact referenced above in ¶179 violated Section 11 of the Securities Act, which prohibits the omission of information that is necessary to prevent existing disclosures from being misleading, because when the Defendants chose to discuss the Company's ability to achieve significant growth by "retaining and further penetrating [ON24's] existing customer base … through upsell and cross sell" and the Company's "significant opportunity to further increase sales among existing customers," they failed to disclose and misrepresented significant, then-existing material facts, trends, uncertainties, and risks that ON24 had already been facing at the time of the IPO. In particular, the Offering Documents failed to disclose that:

(a)     Beginning with the onset of the COVID-19 pandemic in March 2020, the Company's customer base had transitioned from carefully courted, enterprise customer to a growing influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less (*see, e.g.,* Statements of FE-1 at ¶¶88, 90-93; Statements of FE-2 at ¶¶98-99, 104-105, 107-108; Statements of

1   FE-3 at ¶112; Statements of FE-4 at ¶¶123-24; Statements of FE-5 at ¶132; Statements of FE-6 at

2   ¶¶150, 153; Statements of FE-7 at ¶158-159, 161; Statements of FE-8 at ¶¶173-174);

3           (b)     It was known at the Company prior to the IPO that a material amount of these

4   "atypical" or "COVID" customers entered into subscriptions for short-term use or single events and

5   many other customers had expressly informed members of ON24's sales and customer service

6   teams in 2020 that they were either going to downsell or not renew their subscriptions when they

7   came due, thus undermining "significant growth by retaining and further penetrating [ON24's]

8   existing customer base … through upsell and cross sell" and diminishing a "significant opportunity

9   to further increase sales among existing customers" (*see, e.g.,* Statements of FE-1 at ¶81;

10  Statements of FE-2 at ¶¶105-108; Statements of FE-6 at ¶150; Statements of FE-7 at ¶159;

11  Statements of FE-8 at ¶¶173-174);

12          (c)     It was known at the Company prior to the IPO that a material amount of

13  services that enterprise customers added during the COVID-19 pandemic were or would be subject

14  to downsell (*see, e.g.,* Statements of FE-1 at ¶81; Statements of FE-2 at ¶105);

15          (d)     The material churn that had occurred prior to the IPO and was knowingly

16  going to continue and amplify after the IPO was reported prior to the IPO through an indicator in

17  the Company's Salesforce computer program, generated into reports for management, and discussed

18  with management, including Defendant Sharan, at sales meetings and companywide all hands

19  meetings (*see, e.g.,* Statements of FE-1 at ¶¶82-89, 94, 96; Statements of FE-2 at ¶¶104, 106-108;

20  Statements of FE-3 at ¶¶111-112; Statements of FE-5 at ¶¶145-146; Statements of FE-6 at ¶¶151-

21  154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶165-174);

22          (e)     The fact that a material amount of customers were not using the platform or

23  only used it once was also captured prior to the IPO through the Company's Totango computer

24  program, which tracked every interaction with the Company's customers, and Totango calculated a

25  "Health Score" based on this "use" matrix.  The Health Scores, like reports generated through

26  Salesforce, were discussed with management, including Defendant Sharan, because it indicated that

27  these customers were or would be downselling their subscriptions or not renewing their subscription

28  (*see, e.g.,* Statements of FE-1 at ¶82-89, 95-96; Statements of FE-2 at ¶¶104, 108; Statements of

FE-3 at ¶¶111-112; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶167-174); and

(f)   ON24 began experiencing a material decline in demand in the fourth quarter of 2020 and first quarter of 2021—that Defendant Sharan was aware of—and which continue through and after the IPO (*see e.g.*, Statements of FE-2 at ¶100; Statements of FE-3 at ¶113; Statements of FE-4 at ¶¶118, 121, 124, 126; Statements of FE-5 at ¶¶128-142, 147-148).

### 3.   The Offering Documents Contained Materially False and Misleading "Risk Factors" About ON24's Customer Base that Falsely Described Certain Risks as Potential When Such Risks Had Already Manifested and Would Occur Shortly After the IPO

181.   The Offering Documents inaccurately described as ***potential*** certain risks associated with ON24's ability to sustain recent revenue growth, the impact of the COVID-19 pandemic lessening, and whether new customers will elect not to continue their subscriptions. The Offering Documents stated, in pertinent part, as follows:

> ***We may not be able to sustain our recent revenue growth rate in the future.***
>
> For the year ended December 31, 2019, our revenue increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. ***Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscription as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed.***

182.   The Offering Documents inaccurately described as ***potential*** certain risks associated with the impact of the COVID-19 pandemic lessening, fewer new enrollments, and subscription renewals. The Offering Documents stated, in pertinent part, as follows:

> ***Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business.***
>
> Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. ***For example, our revenue and revenue growth rate may decline in future periods compared to***

*2020 as the impact of COVID-19 lessens.* Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. *If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease.* Fluctuation in quarterly results may negatively impact the value of our securities. *Factors that may cause fluctuations in our quarterly results of operations include . . . our ability to retain and expand customer usage….*

183.     The Offering Documents inaccurately described as *potential* certain risks associated with ON24's ability to retain customers and usage, *i.e.*, prevent downselling, and the impact of the COVID-19 pandemic. The Offering Documents stated, in pertinent part, as follows:

*Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects.*

We derive, and expect to continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products. As such, our business depends upon our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling additional solutions. Our business is largely subscription- based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire. *As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all. Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options.* In order to grow our business, we must continually add new customers and replace customers who choose not to continue to use our platform. Any decrease in user satisfaction with our solutions or support may result in negative online customer reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow.

184.     The materially false and misleading statements of material fact referenced above in ¶¶181-183 violated Section 11 of the Securities Act, which prohibits the omission of information that is necessary to prevent existing disclosures from being misleading, because while noting only the potential negative the impacts of COVID-19 lessening and customers added in 2020 downselling or renewing their subscription *may* have on ON24's business, revenue growth rate, financial condition, and results of operations, the Offering Documents failed to disclose and misrepresented significant, then-existing material facts, trends, uncertainties, and risks that ON24 had already been facing at the time of the IPO. In particular, the Offering Documents failed to disclose that:

(a)      Beginning with the onset of the COVID-19 pandemic in March 2020, the Company's customer base had transitioned from carefully courted, enterprise customer to a growing influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less (*see, e.g.,* Statements of FE-1 at ¶¶88, 90-93; Statements of FE-2 at ¶¶98-99, 104-105, 107-108; Statements of FE-3 at ¶112; Statements of FE-4 at ¶¶123-24; Statements of FE-5 at ¶132; Statements of FE-6 at ¶¶150, 153; Statements of FE-7 at ¶158-159, 161; Statements of FE-8 at ¶¶173-174);

(b)      It was known at the Company prior to the IPO that a material amount of these "atypical" or "COVID" customers entered into subscriptions for short-term use or single events and many other customers had expressly informed members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions when they came due (*see, e.g.,* Statements of FE-1 at ¶81; Statements of FE-2 at ¶¶105-108; Statements of FE-6 at ¶150; Statements of FE-7 at ¶159; Statements of FE-8 at ¶¶173-174);

(c)      The material churn that had occurred prior to the IPO and was knowingly going to continue and amplify after the IPO was reported prior to the IPO through an indicator in the Company's Salesforce computer program, generated into reports for management, and discussed with management, including Defendant Sharan, at sales meetings and companywide all hands meetings (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 94, 96; Statements of FE-2 at ¶¶104, 106-108; Statements of FE-3 at ¶¶111-112; Statements of FE-5 at ¶¶145-146; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶165-174);

(d)      The fact that a material amount of customers were not using the platform or only used it once was also captured prior to the IPO through the Company's Totango computer program, which tracked every interaction with the Company's customers, and Totango calculated a "Health Score" based on this "use" matrix.  The Health Scores, like reports generated through Salesforce, were discussed with management, including Defendant Sharan, because it indicated that these customers were or would be downselling their subscriptions or not renewing their subscription (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 95-96; Statements of FE-2 at ¶¶104, 108; Statements of

FE-3 at ¶¶111-112; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶167-174); and

(e)    ON24 began experiencing a material decline in demand in the fourth quarter of 2020 and first quarter of 2021—that Defendant Sharan was aware of—and which continue through and after the IPO (*see e.g.*, Statements of FE-2 at ¶100; Statements of FE-3 at ¶113; Statements of FE-4 at ¶¶118, 121, 124, 126; Statements of FE-5 at ¶¶128-142, 147-148).

### 4.    The Offering Documents' Independently Actionable Omissions of Trends, Uncertainties, and Significant Risks

185.    Independent of any statement contained in the Offering Documents, the Defendants' violated Section 11 of the Securities Act by failing to disclose certain trends, uncertainties, and significant risk.

186.    Not only does Section 11 of the Securities Act create liabilities for each of the Defendants for affirmative misstatements and the omission of information that is necessary to prevent existing disclosures from being misleading, but Section 11 also creates liability for pure omissions made in contravention of an affirmative legal disclosure obligation. Defendants' omissions violated two such disclosure obligations.

187.    First, Defendants were required to comply with Item 303 of Regulation S-K, 17 C.F.R. § 229.303. Specifically, Item 303 and the SEC's related interpretive releases thereto, require issuers to disclose "events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "***any*** known trends or uncertainties that have had or ***that are reasonably likely to have a material … unfavorable impact on … revenues.***"

188.    Second, Defendants were required to comply with Item 105 of Regulation S-K, 17 C.F.R. § 229.105. Specifically, Item 105 requires that the Offering Documents furnish "the material factors that make an investment in the registrant or offering speculative or risky." Item 105 does not require that the risk be known to management like a trend or uncertainty under Item 303.

189.    The Offering Documents failed to comply with Item 303 in violation of Section 11 for the following reasons:

(a)     The Offering Documents failed to disclose the known trend of, and the significant risk posed by, a transition in the Company's customer base from carefully courted, enterprise customers to an influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less, which began in March 2020;

(b)     The Offering Documents also failed to disclose the known trend, and the significant risk posed by, of a material amount of "atypical" or "COVID" customers, which had entered into subscriptions for short-term use or single events, expressly informing members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions;

(c)     The Offering Documents also failed to disclose the known trend, and the significant risk posed by, enterprise customers downselling services they added to their subscriptions during 2020; and

(d)     The Offering Documents also failed to disclose the known trend, and the significant risk posed by, subscriptions with terms less than one-year, including six month subscriptions, churning prior to and after the IPO.

190.    The trend of a material change in the Company's customer base, the trend of the "atypical" or "COVID customers" who entered subscriptions in 2020 informing the Company in 2020 that they planned to either downsell the services they subscribed to or not renew their subscriptions, the trend enterprise customers downselling services they added to their subscriptions during 2020, and the trend of customer churn beginning during 2020 were known to management because: (i) the Company's Salesforce computer program was used to track customers that informed the Company that they planned to either downsell or not renew their subscriptions; (ii) the Company's Totango computer program was used to track which customers were not using the Company's platform or only used it once and calculated a "Health Score" based on this "use" matrix which indicated that these customers would also be downselling their subscriptions or not renewing their subscription; and (iii) this information from Salesforce and Totango was generated

1    into reports for management, and discussed with management at sales meetings and companywide

2    all hands meetings prior to the IPO.

3         191.    These known trends were at the time of the IPO reasonably likely to, and shortly

4    after the IPO did, cause reported financial information, such as the Company's historical ARR, not

5    to be necessarily indicative of future operating results or of future financial condition and have a

6    materially unfavorable impact on the Company's revenues as customers added in 2020 downsold or

7    did not renew their subscriptions.

8         192.    Even if the trends alleged in ¶189(a)-(d) did not need to be disclosed under Item 303,

9    the Offering Documents also violated Item 105 and Section 11 of the Securities Act by failing to

10   disclose material factors, *i.e.*, the change in the Company's customer base in 2020 and the material

11   amount of customers that planned to and did downsell or not renew their subscriptions, each of

12   which made an investment in ON24 speculative or risky.

13        **E.**     **Events Following the IPO**

14        193.    After the market closed on August 10, 2021, just six months after the IPO, ON24

15   announced its financial results for Q2 2021. In its Q2 2021 earnings release, ON24 provided its

16   financial outlook for the third quarter ended September 30, 2021 ("Q3 2021"). Specifically, ON24

17   reported that it expects total revenue of $47.5 to $48.5 million—***$3.2 million less*** at the midpoint

18   versus analysts' consensus of $51.2 million total revenue. ON24 also reported that it expects a non-

19   GAAP operating loss of $(4.0) to $(3.0) million and a non-GAAP net loss per share of $(0.09) to

20   $(0.07)—***$0.9 million and $0.03 per share worse*** at the midpoints versus analysts' consensus of

21   $(2.60) million operating loss and $(0.05) net loss per share, respectively.

22        194.    In the same Q2 2021 earnings release, ON24 also provided its financial outlook for

23   the full year ended December 31, 2021 ("FY 2021"). Specifically, ON24 reported that it expects

24   total revenue of $201.2 to $204.2 million—***$6.3 million less*** at the midpoints versus ON24's prior

25   guidance of $207.5 to $210.5 million total revenue, and ***$6.4 million less*** at the midpoint versus

26   analysts' consensus of $209.1 million total revenue. ON24 also reported that it expects a non-

27   GAAP operating loss of $(4.3) to $(1.3) million and a non-GAAP loss per share of $(0.13) to

28   $(0.06)—***$2.3 million and $0.05 per share worse*** at the midpoints versus ON24's prior guidance of

$(2.0) to $(1.0) million operating loss and $(0.08) to $(0.02) loss per share, and ***$2.6 million and $0.10 per share worse*** at the midpoints versus analysts' consensus of $(0.2) million operating loss and $0.0 loss per share.

195.    During the related Q2 2021 earnings call held on August 10, 2021, Defendant Sharan claimed that ON24 "experienced higher-than-expected ***churn and downsell from customers we signed up in the second quarter of last year*** during the peak of COVID. This ***higher churn was primarily in the first-time renewal cohort***, customers who signed up 1-year contracts last year and who were up for renewal." Defendant Sharan added that "the total Q3 and Q4 renewal cohorts are meaningfully smaller than Q2. Most importantly, when we look at Q2, the ***lower churn was primarily in the SMB***."

196.    During the same Q2 2021 earnings call, Defendant Vattuone explained:

> [T]he ***share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort. We saw high churn and downsell within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events*** who rush to find alternative solutions to in-person business, but are normally not our primary target audience.

Defendant Vattuone added that, "in the second quarter of 2020, a larger-than-typical percentage of customers added were SMB customers, and these customers accounted for approximately 50% of our logo churn."

197.    In response to a question about churn from an analyst at Defendant Baird, Defendant Vattuone answered, "Now the primary factor for this was our first year renewals, which Sharat mentioned, being over 60% of the renewal mix in Q2. And we did see higher churn and downsell than we were initially expecting."

198.    The same analyst at Defendant Baird followed up with another question about churn, to which Defendant Sharan responded, "One of the things we learned, now that we know the data points and why these people churn, if they don't integrate our platform in this onetime use case, that's not the customer I want."

199.    In response to another question about churn from an analyst at Defendant KeyBanc, Defendant Sharan answered,

First of all, I explained our ideal customer buyer profile, and I think it's important to keep in mind that we focus on solving the sales, marketing and partner engagement platform, right? People who -- customers who integrate our products in their sales and marketing ecosystem. Now we have the churn that we saw was downsell, that we would win back. And we also talked about the SMB customers being -- and the onetime buyers were the large part of the churn. So let me talk about the SMB and onetime buyers. As these folks saw in Q2 that life may return to some form of normalcy, they're focused on going back to physical events and then also probably thought about going back to cheaper point solutions, cheaper virtual event platforms, okay? In some cases, what I would call ankle buyers, okay? And there's also probably a small portion of people who -- our sales and marketing customers but don't care about data and integration. They may have looked at cheaper video conference tools.

200.    Market analysts quickly noted both the weakened third quarter 2021 and full year 2021 outlook and the unexpected churn issues. On August 11, 2021, for example, analysts at Defendant JPMorgan downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $85 per share to $32 per share in a report titled "2Q21: Downgrading to Neutral as Post-Pandemic Churn/Down-Sell Is Bigger than Anticipated." The report explains that the "major issue is the increase in churn and enterprise down-sell that will likely cause platform revenue to decelerate into the first quarter of 2022." The report stresses:

> ***Management's previous guidance had not factored in enough in churn from smaller accounts*** that had driven up professional services revenue, and that causes a double hit to both platform and professional service revenue line items. Separately, a shift back to hybrid and in-person events is seeing some portion of enterprise accounts reducing spend on items like number of licenses and workspaces, and that further impacts platform revenue.

201.    The August 11, 2021, JPMorgan report further explains:

> On24 experienced ***higher than expected churn and down-sell in the June quarter, primarily in the first-time renewal cohort that represented ~60% of the entire renewal base. Less sticky SMB customers accounted for roughly 50% of this churn***, as many of these businesses rushed to adopt digital solutions at the onset of the pandemic but now are either adopting smaller-scale solutions or returning to in-person events.

The report also notes: "FY21 revenue guidance is coming down by ~$6M at the midpoint as a result of these dynamics, in addition to the fact that professional services revenue should decline to 13-14% of total revenue for the full-year, down from its COVID high of ~22% in FY20."

202.    On August 11, 2021, analysts at Defendant Canaccord downgraded ON24's common stock from "buy" to "hold" and lowered their price target from $45 per share to $30 per share in a

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

49

report titled "COVID renewals take a bite out of growth; ONTF in the penalty box, downgrade to HOLD." The report explains:

> Q2 was a transition quarter as vaccinations became widespread and a significant number of transitory customers who had joined ON24's platform out of necessity during the pandemic chose not to renew. ***Elevated churn came primarily from first-time renewals who had signed up for one-year deals at the height of COVID, and in particular from SMB buyers*** within that cohort who had rushed to find alternatives to in-person business for one-time events – 50% of logo churn came from these SMBs. ***To be clear, these are not normally ON24's target customer***, with its platform being far better suited to enterprises, and priced as such.

203.   The August 11, 2021, Canaccord report further explains:

> ON24 added 183 new logos during the quarter, which was offset by 167 customer departures, equating to 8% logo churn in a single quarter. For the sake of comparison, ON24 added 266 net new customers in the year ago quarter – ***we believe this indicates that around half of renewals in that COVID cohort chose not to renew, if not more. This was ON24's largest renewal cohort ever, with the share of first-time renewals accounting for over 60% of the batch*** – the remaining 40% of the cohort saw retention dynamics equivalent to pre-pandemic levels.

The report also notes: "Management lowered its guidance for the year, citing two factors: (1) most obviously, churn and downsell in Q2 was more than anticipated, and those trends are flowing through to future periods; and (2) management expects professional services revenue to decline in conjunction with lower implementation- and one-time event-related fees."

204.   On August 11, 2021, analysts at Defendant Piper Sandler also lowered their price target from $70 per share to $40 per share in a report titled "Largest Renewal Quarter Bites Hard as Customers Downsize; Lowering PT to $40." The report explains that "[m]ixed Q2 results and revised 2H guidance of 5% y/y (vs. 12% prior estimate) ***was clearly more negative than we had anticipated***. Q2 was the largest renewal quarter, and ***it bit hard as enterprise customers downsized contract values*** and was ***further exacerbated by higher SMB churn.***"

205.   The August 11, 2021, Piper Sandler report further explains:

> ***ARR stalled at $164.1M, pressured by renewal downsizing and churn***…. ARR increased just $1M sequentially to $164.1M with strong new customer additions partially offsetting the ***largest quarter of existing customer renewals that selected to downsize the number and volume of virtual events and webinars. SMB churn also contributed to the smallest number of net new customer additions of just 16 q/q in three years.***

The report also notes: "2H guidance lowered by $7M on declining professional services. The *combination of renewal downsizing and higher SMB churn was accentuated by a material reduction in the 2H outlook for professional services.*"

206.    The August 11, 2021, Piper Sandler report also stresses: "Reducing PT to $40 on revised outlook and execution risk. Despite *material estimate cuts, a considerable amount of near-term execution risk, and a potential turnaround that might not materialize until mid- 2022*, we see limited downside risk below our bear-case of $25 (4x CY23E EV/S)[.]"

207.    On August 11, 2021, analysts at Defendant William Blair analyzed ON24's weak results and financial outlook in a report titled "Rocky Second Quarter Impacted By Churn and Downsell in COVID Cohort; Revenue Guidance Lowered for the Year." The report explains:

> At the beginning of the pandemic, many customers looked to ON24 as a quick fix to help them reach their customers in a virtual environment. While this led to explosive growth for the company during 2020, many of them purchased ON24 for a limited use-case (e.g., hosting a small number of webinars) and did not take advantage of the data capture and analytics capabilities that are a core part of ON24's platform. In addition, *many of these customers were outside the customer profile the company typically targets. Of those customers who churned, about 50% were SMB, whereas ON24 is primarily enterprise focused.*

208.    After the market closed on November 9, 2021, just nine months after the IPO, ON24 announced its financial results for the third quarter ended September 30, 2021, or Q3 2021. In its Q3 2021 earnings release, ON24 provided its financial outlook for the fourth quarter ended December 31, 2021 ("Q4 2021"). Specifically, ON24 reported that it expects total revenue of $51.0 to $52.0 million"—*$0.8 million less* at the midpoint versus analysts' consensus of $52.3 million total revenue.

209.    During the related Q3 2021 earnings call held on November 9, 2021, Defendant Sharan claimed that the "third quarter of 2021 marked our lapping the second COVID-influenced quarter. Overall, the dollar value of churn declined quarter-over-quarter, and churn rate was in line with our expectations." Defendant Sharan added: "As we anticipated in Q2, the percentage of first-time renewals in the renewal cohort decreased meaningfully quarter-over-quarter, although *we continue to face headwinds from those renewals.*"

210.    During the same Q3 2021 earnings call, Defendant Vattuone explained:

In Q3, we lapped another COVID-influenced quarter and first-time renewals from customers who purchased in the year ago period represented slightly more than half of the total renewal cohort, a meaningful decline compared to Q2. *We faced headwinds with respect to those first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs.* We also saw some rationalization with midterm additions from the year ago period. Overall, the dollar value of churn declined compared to Q2, and the churn rate was in line with our forecast.

Defendant Vattuone added:

Total customer count declined slightly quarter-over-quarter to 2,054, with *SMB churn representing the largest contributor to the decrease*. Given the learnings from the past couple of quarters, *we are laser-focused on acquiring enterprise and mid-market customers that meet our ideal customer profile* and with whom we can develop a lasting strategic relationship.

211.    In response to a follow-up question about the "sequential" loss of new customers and "SMB churn" from an analyst at Defendant Piper Sandler, Defendant Vattuone answered: "So in terms of Q3, given our learnings from the last couple of quarters, we are really most focused on customer quality and adding enterprise and mid-market customers that really meet our ideal customer profile. I can tell you that *SMB was the largest contributor to the customer count decrease in Q3."*

212.    Market analysts quickly noted both the weakened Q4 2021 outlook and the continued churn issues. On November 10, 2021, for example, analysts at Defendant JPMorgan lowered their price target from $32 per share to $22 per share in a report titled "3Q21: Working Towards Stabilization." The report explains:

(1) Total customer count declined by ~1% sequentially to 2,054, *largely driven by continued SMB churn*. (2) Net new ARR of $3.1M brought September quarter total ARR to $167.2M, and this metric was negatively impacted by the fact that *slightly more than half of the total renewal cohort were first-time renewals.* (3) Though renewal-related headwinds are beginning to abate, the percentage of first-time renewals should still represent ~30% of the total renewal cohort in the fourth quarter.

213.    On November 10, 2021, analysts at Defendant Canaccord lowered their price target from $25 per share to $19 per share in a report titled "A little bit of good, a little bit of bad, but not enough to change our view in either direction; HOLD." The report explains:

[A]ttrition remains a challenge at the low-end of the market as ON24 works through a *slew of first-time renewals that signed on during the depths of the pandemic. To that point, the firm's total customer count actually declined sequentially – a dynamic we had yet to see play out in this model* – and guidance suggests that

revenue will decline year-over-year in Q4, which is heavily influenced by lower services revenue (subscription should grow about 10%).

214.    The November 10, 2021, Canaccord report further explains:

> *[O]utsized logo churn continued*, bringing total customer count down by 24 sequentially to 2,054 (+7% y-o-y) – *logo churn was primarily attributed to SMB cohorts that became first-time customers during the pandemic primarily looking for one-time alternatives to in-person events.* The number of >$100K ARR customers increased by 14 to 359 in Q3, which was also a decline in net adds to that group, although it now accounts for ~67% of total ARR.

The report also notes:

> Management alluded to longer sales cycles as it focuses its GTM efforts on acquiring enterprise and mid-market customers that tend to be more strategic and complex in nature. *In terms of first-time renewals who purchased in the COVID influenced year ago period, management noted this cohort had decreased meaningfully q-o-q and represented ~50% of total renewals this quarter.* Further, it is expected to drop to ~30% of total renewals in Q4, and Q1/22 will mark the last COVID influenced quarter – the *expectation is these one-time COVID buyers will largely churn off or settle, and the firm will be able to move forward with churn characteristics that more closely align with pre-COVID historical norms.*

215.    On November 10, 2021, analysts at Defendant Piper Sandler also lowered their price target from $40 per share to $25 per share in a report titled "COVID Hangover Persists; Lowering 2022 ARR Estimates and Reducing PT to $25." The report explains that "While ARR exceeded $150M+ exiting last year, *eroding customer renewals rate and contract downsizing over the last two quarters has pressured ARR growth to moderate meaningfully* to an estimated 11% y/y this year."

216.    The November 10, 2021, Piper Sandler report further explains:

> Despite a slight improvement in ARR build in Q3 (+$3.1M q/q vs. $1.1M during Q2), we are *lowering 2022 revenue estimates by $11M to better reflect near-term headwinds*. Additionally, we are lowering our PT to $25 from $40 on *increasing execution risks, lower estimates, and a lower multiple* given our updated growth outlook.

The report stresses:

> *ON24 continued to see headwinds from first-time renewals*, but noted that both the percentage of first-time renewals in the renewal cohort and the dollar value of churn declined q/q. Despite a $1.4M beat to the midpoint of Q3 revenue guidance, full-year 2021 revenue guidance was only raised $0.4M at the midpoint and continues to represent a *moderation to 29% y/y growth from 76% growth in 2020.*

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

53

217.     On November 10, 2021, analysts at Defendant William Blair analyzed ON24's weak financial outlook in a report titled "Mixed Quarter With Solid Quarterly Results but Underwhelming Guidance." The report explains:

> ON24 did not flow the entire revenue beat through its updated full- year revenue guide, implying **continued weakness into the fourth quarter**. Although ON24's guidance plans are disappointing, we believe that management is taking a conservative stance to its fourth-quarter guidance, which factors in **similar churn and down- sell dynamics that the company experienced in the second and third quarter this year**. Of note, ON24's COVID-19 renewal cohort is expected to represent just 30% of the overall renewal base in the fourth quarter (down from 50% in the third quarter and 60% in the second quarter).

The report stresses: "Despite the conservative guidance, we believe there may still be a few **tough quarters ahead for ON24 as it works through renewal cycles for its COVID cohort of customers** and laps difficult comps. The 2022 guide next quarter will be critical, and we believe first-half revenue figures still pose some risk of being underwhelming."

218.     The November 10, 2021, William Blair report further explains: "In the third quarter, total customers fell by 1.2% sequentially to 2,054 **as ON24 continues to see elevated churn dynamics in its SMB customer base."**

219.     After the market closed on February 28, 2022, one year after the IPO, ON24 announced its financial results for the fourth quarter and full year ended December 31, 2021, or Q4 and FY 2021. In its Q4 2021 earnings release, ON24 provided its financial outlook for the first quarter ended March 31, 2022 ("Q1 2022"). Specifically, ON24 reported that it expects "total revenue of $47 to $48 million"—**$4.5 million less** at the midpoint versus analysts' consensus of $52 million total revenue. ON24 also reported that it expects a non-GAAP operating loss of $(8) to $(7) million and a non-GAAP net loss per share of $(0.17) to $(0.15)—**$4.4 million and $0.10 per share worse** at the midpoints versus analysts' consensus of $(3.1) million operating loss and $(0.06) net loss per share, respectively.

220.     In the same Q4 and FY 2021 earnings release, ON24 also provided its financial outlook for the full year ended December 31, 2022 ("FY 2022"). Specifically, ON24 reported that it expects total revenue of $200 to $204 million—**$21.4 million less** at the midpoint versus analysts' consensus of $223.4 million total revenue. ON24 also reported that it expects a non- GAAP

operating loss of $(30) to $(27) million and a non-GAAP loss per share of $(0.64) to $(0.58)—**$22.8 million and $0.50 per share less** at the midpoints versus analysts' consensus of $(5.7) million operating loss and $(0.11) loss per share.

221.    During the related Q4 and FY 2021 earnings call held on February 28, 2022, Defendant Sharan explained: "Looking ahead, we believe that Q1 will mark the trough for 2022. By far, our **largest challenge in 2021 was the first time renewal cohort** which is 4x the dollar value of first-time renewals in 2019 and had a churn rate that was approximately double that are [sic] first-time renewals in 2019." Defendant Vattuone elaborated on customer churn:

> Our dollar-based net retention rate, or NRR, ended the year at 97%. As a reminder, NRR is a lagging indicator and reflects the **impact of elevated churn that we experienced over the past few quarters with first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs** as well as some customers that rationalized their expansions.

222.    During the same Q4 and FY 2021 earnings call, Defendant Vattuone explained: **"Our largest challenge that we experienced in 2021 was the first-time renewal cohort**, which was 4x the dollar value of first-time renewals in 2019, and **we experienced a churn rate that was approximately double that of the 2019 cohort."**

223.    Defendant Vattuone blamed ON24's weak FY 2022 outlook on customer churn: "We expect a non-GAAP operating loss in the range of $30 million to $27 million and a non- GAAP net loss per share of $0.64 to $0.58 per share using 49 million basic and diluted shares outstanding. As I mentioned, we faced headwinds in 2021, **primarily from the elevated churn within first-time renewal cohorts and rationalization** from large expansions during COVID."

224.    In response to a follow-up question about churn from an analyst at Defendant William Blair, Defendant Vattuone answered: "Now we've always run this company prudently, but we are making targeted investments to drive growth, but the major issue really has been churn." Defendant Sharan added:

> Let me add, Arjun, to what Steve just said is **churn has been our biggest issue**. If you look at 2021, I mean, we did quite well on growth ARR but the -- **we couldn't outrun the churn**. And if you look at the numbers we talked about, the first-time renewal cohort where we saw the maximum churn, that size was 4x what it was in Q1 in 2019 and the churn of the first hand renewal cohort was twice what it was in 2019.

225.     Market analysts quickly noted both the weak Q1 and FY 2022 outlook and the continued churn issues. On February 28, 2022, for example, analysts at Defendant JPMorgan lowered their price target from $22 per share to $16.50 per share in a report titled "4Q21: Almost Out of the Woods." The report explains:

> The December quarter was not too bad on the surface, but the ***churn/usage still has another quarter of pandemic headwinds to get through*** before we start to see ARR improvement. We do believe that ARR will be the leading metric to seeing overall improvement in revenue growth, but the ***one more quarter of headwinds does have us cutting our estimates again*** and that leads to the reduction in price target.

226.     The February 28, 2022, JPMorgan report further explains:

> (1) ***On24 continues to experience elevated levels of churn, specifically in the first-time renewal cohort***. In January, a handful of customers with large expansions amid COVID-19 began to reassess their post-pandemic digital budgets and in turn showed higher than anticipated rationalization. This combined with a three- point revenue headwind related to a reduction in professional services and overages is resulting in FY22 revenue guidance of $202M at the midpoint, which is ~$23M below our previous estimate…. (3) Dollar-based net retention came in at 97%, down from 149% in the year-ago period and reflecting the ***impact of elevated churn over the past few quarters***. This was the first time that the company disclosed net retention in FY21 and the 97% level represents a steep discount to the pre-pandemic range of ~105-110%.

227.     On March 1, 2022, analysts at Defendant Piper Sandler downgraded ON24's common stock from "overweight" to "neutral" and lowered their price target from $25 per share to $17 per share in a report titled "Lowering to Neutral; Churn and Return to Travel Heighten Execution Risks." The report explains:

> Guidance reflects challenges ahead and increased investments. ***Top and bottom-line guidance came in below Street expectations*** for multiple reasons:
>
> - ***Churn from first-time renewals: Q1 includes a large proportion of first-time renewals, many of which have already reduced spend on the platform as they 'rationalize' their pandemic expansions***. The 2021 first-time renewal cohort was 4x the dollar value with a churn rate 2x the size of the 2019 first-time renewal cohort. An ARR growth trough and elevated churn are expected in Q1.
>
> - Increased investments: ON24 plans to make targeted investments in customer success, the enterprise sales motion, the partner ecosystem, product innovation, and public cloud infrastructure. As such, non-GAAP operating loss guidance for 2022 is ($30M)- ($27M) vs. Street expectations of ($5M).

228.     On March 1, 2022, analysts at Defendant William Blair downgraded ON24's common stock from "outperform" to "market perform" and analyzed ON24's weak results and financial outlook in a report titled "Disappointing 2022 Outlook as Customers Rationalize Spend;

1  Downgrading to Market Perform." The report explains: "[F]irst quarter and full year 2022 revenue

2  guidance were below expectations as the company is anticipating ***higher-than-expected downsell***

3  ***and spend rationalization from its customers***. This is largely due to COVID- 19 transitioning from

4  pandemic to endemic as businesses return to more normal operations."

5      229.    The March 1, 2022, William Blair report further explains:

6
7  This is driving some of ON24's customers to reassess their budgets related to digital
   experiences, such as webinars and virtual events. The company noted that this is
   ***largely concentrated in customers that signed large expansions during COVID-19.***
   ***However, these customers are having a meaningful impact on the company's***
8  ***ability to grow in 2022, as guidance calls for revenue to be flat at the high end and***
   ***down 2% at the low end.*** Given the change in the company's growth prospects as a
9  result of fading pandemic effects, we believe the next few quarters will likely be
   tough for ON24 as it focuses on reaccelerating the business for growth in a post-
10 pandemic world.

11     230.    The March 1, 2022, William Blair report stresses:

12 ***Downsell dynamics and churn were an ongoing challenge in 2021 as the COVID-***
   ***19 cohort of customers came up for renewal for the first time.*** While management
13 reiterated its confidence that first quarter 2022 will be the last quarter impacted by
   the COVID- 19 renewal cohort, ***customer rationalization of spend creates another***
14 ***headwind for growth in the same quarter***. As the world moves past COVID-19,
   companies across industries are beginning to revisit their digital experience budgets
15 to optimize their strategy. During January 2022, management saw a handful of
   customers that have previously expanded their usage as much as 3 times during
16 COVID-19 begin to reassess their post-COVID spend. While some rationalization is
   normal and forecast, this ***current rationalization is higher than expected*** and hits at
17 an earlier time than expected with bookings more heavily weighted toward the
   beginning of the quarter.

18
19     231.    On March 1, 2022, analysts at Defendant Canaccord lowered their price target from

20 $19 per share to $15 per share in a report titled "Another wave of renewal headwinds early in Q1

21 take a bite out of '22 growth; maintain HOLD." The report explains:

22 The challenge, ***and what drove the disappointing 2022 guide, came after the***
   ***quarter as January was an unusually large enterprise customer renewal month,***
23 ***and ON24 saw more significant contraction than expected.*** These were customers
   generally renewing for the first time post-COVID, though many were multi-year
24 customers that expanded on a co-terminus basis during the pandemic, and now
   they're rationalizing spend as some digital engagement is anticipated to be replaced
25 with in-person activity.

       232.    The March 1, 2022, Canaccord report further explains:
26
27 Management was clear to point out that many of these customers are still renewing at
   2x their pre-COVID run-rate, but that's ***in many cases down from 3x at the peak of***
28 ***COVID, which is a change the team did not properly anticipate. This headwind,***
   ***along with a reduction in professional services revenue, has ON24 guiding for***

*what is essentially a zero revenue growth year in 2022*, which is more than $20M below our prior expectation. We expect that Q1 should mark the growth trough and that results should improve over the course of the year, but even so, we expect ON24 will be little more than a low-double digit ARR grower by the end of 2022.

233.    The March 1, 2022, Canaccord report stresses:

While ON24 had a decent Q4 relative to expectations, its *revenue outlook came in weaker than anticipated due to significant spend rationalization from several large customers that had signed large expansion deals during COVID and were renewing for the first time since then.* For perspective, these customers had expanded as much as 3x during COVID, and while their average spend is still materially higher than it was pre-COVID, they're now re-assessing their post-COVID digital marketing budgets.

234.    Since the IPO, the value of ON24 common stock shares has collapsed from the IPO price of $50.00 per share to $18.86 per share on November 3, 2021 *(a 62% decline from the IPO price)*, the date this Action was filed, and to an all-time low of $12.05 per share on March 14, 2022 *(a 76% decline from the IPO price)*.

## V.    CLASS ACTION ALLEGATIONS

235.    Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased or otherwise acquired ON24 publicly traded common stock pursuant and/or traceable to the Offering Documents for ON24's IPO, and who were damaged thereby (the "Class"). Excluded from the Class: the Defendants and the Individual Defendants' immediate family members; the officers, directors, affiliates of ON24 and the Underwriter Defendants, at all relevant times, including ON24's employee retirement and/or benefit plan(s) and their participants and/or beneficiaries to the extent they purchased or acquired ON24 common stock through any such plan(s); any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, or assigns of any such excluded person or entity.

236.    The members of the Class are so numerous that joinder of all members is impracticable. The exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery. Lead Plaintiff believes there are at least thousands of members in the proposed Class as the Company offered over 8,560,930 shares of common stock in the IPO. Record owners and other members of the Class may be identified from

records maintained by ON24 or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

237.   Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Securities Act as set forth herein.

238.   Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

239.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Securities Act;

(b)     whether the Offering Documents contained inaccurate statements of material fact and/or omitted material information required to be stated therein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

240.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## VI.   CAUSES OF ACTION

### COUNT I

### FOR VIOLATION OF SECTION 11 OF THE SECURITIES ACT
### <u>Against All Defendants</u>

241.   Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

First Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws
Case No. 4:21-cv-08578-YGR

59

242.     This cause of action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against Defendant ON24, each of the Individual Defendants, and each of the Underwriter Defendants.

243.     This cause of action does not sound in fraud. Lead Plaintiff does not claim that any of the Defendants committed intentional or reckless misconduct or that any of the Defendants acted with scienter or fraudulent intent. This Count is based solely on strict liability as to ON24 and negligence as to the remaining Defendants. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

244.     The Offering Documents issued in connection with the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted material facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.

245.     ON24 is the registrant and issuer of the common stock sold pursuant to the Offering Documents. As such, ON24 is strictly liable for the materially inaccurate statements contained in the Offering Documents and the failure of the Offering Documents to be complete and accurate. By virtue of the Offering Documents containing material misrepresentations and omissions of material fact necessary to make the statements therein not false and misleading, ON24 is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

246.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

247.     The Individual Defendants each signed the Registration Statement and caused its issuance. The Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Offering Documents. They each had a duty to ensure that such statements were true and accurate and that there were no omissions of material fact that would make the statements misleading. By virtue of each of the Individual Defendants' failure to exercise reasonable care, the Offering Documents contained

1    misrepresentations of material facts and omissions of material facts necessary to make the

2    statements therein not misleading. As such, each of the Individual Defendants is liable under

3    Section 11 of the Securities Act to Lead Plaintiff and the Class.

4           248.    Each of the Underwriter Defendants served as the underwriters for the IPO and

5    qualify as such according to the definition contained in Section 2(a)(11) of the Securities Act, 15

6    U.S.C. § 77b(a)(11). As such, they participated in the solicitation, offering, and sale of the securities

7    to the investing public pursuant to the Offering Documents. Each of the Underwriter Defendants, as

8    an underwriter of the securities offered in the IPO pursuant to the Offering Documents, had a duty

9    to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements

10   contained in the Offering Documents. They each had a duty to ensure that such statements were true

11   and accurate and that there were no omissions of material fact that would make the statements

12   misleading. By virtue of each of the Underwriter Defendants' failure to exercise reasonable care,

13   the Offering Documents contained misrepresentations of material facts and omissions of material

14   facts necessary to make the statements therein not misleading. As such, each of the Underwriter

15   Defendants is liable under Section 11 of the Securities Act to Lead Plaintiff and the Class.

16          249.    None of the untrue statements or omissions of material fact in the Offering

17   Documents alleged herein was a forward-looking statement. Rather, each such statement concerned

18   existing facts. Moreover, the Offering Documents did not properly identify any of the untrue

19   statements as forward-looking statements and did not disclose information that undermined the

20   putative validity of those statements.

21          250.    Each of the Defendants named in this Count issued, caused to be issued, and

22   participated in the issuance of materially untrue and misleading written statements to the investing

23   public that were contained in the Offering Documents, which misrepresented and failed to disclose,

24   *inter alia*, the facts set forth above. By reasons of the conduct herein alleged, each such Defendant

25   violated Section 11 of the Securities Act.

26          251.    Lead Plaintiff and the Class have sustained damages. The value of ON24 common

27   stock has declined substantially subsequent to and due to violations by Defendants named in this

28   Count.

252.     At the time of their purchases of ON24 common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures alleged herein. Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Amended Complaint is based and the time that this action was commenced. Less than three years has elapsed between the time that the securities upon which this cause of action is brought were offered to the public and the time that this action was commenced.

## COUNT II

### FOR VIOLATION OF SECTION 15 OF THE SECURITIES ACT
### <u>Against the Individual Defendants</u>

253.     Lead Plaintiff repeats and realleges each and every allegation above as if fully set forth herein.

254.     This cause of action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against each of the Individual Defendants.

255.     This cause of action does not sound in fraud. Lead Plaintiff does not allege that any of the Individual Defendants committed intentional or reckless misconduct or that any of the Individual Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim. This Count is based solely on negligence and/or strict liability. Lead Plaintiff expressly disclaims any allegations of scienter or fraudulent intent in these non-fraud claims except that any challenged statements of opinion or belief made in connection with the IPO are alleged to have been materially misstated statements of opinion or belief when made.

256.     The Individual Defendants each were control persons of ON24 by virtue of their positions as directors and/or senior officers of ON24. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of ON24.

257.     Each of the Individual Defendants participated in the preparation and dissemination of the Offering Documents, and otherwise participated in the process necessary to conduct the IPO.

Because of their positions of control and authority as senior officers and/or directors, each of the Individual Defendants were able to, and did, control the contents of the Offering Documents, which contained materially untrue information and/or omitted material information required to be disclosed to prevent the statements made therein from being misleading.

258.    As control persons of ON24, each of the Individual Defendants is liable jointly and severally with and to the same extent as ON24 for its violation of Sections 11 of the Securities Act.

## VII.    PRAYER FOR RELIEF

229.    WHEREFORE, Lead Plaintiff, on behalf of itself and the other members of the Class, prays for relief and judgment as follows:

(a)    Determining that this action is a proper class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies set forth in the Securities Act in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees, accountants' fees, and expert fees, and other costs and disbursements; and

(d)    Awarding Lead Plaintiff and the Class such other relief as may be deemed just and proper by the Court.

## VIII.    JURY TRIAL DEMANDED

259.    Lead Plaintiff demands a trial by jury.

Dated: September 1, 2023

Respectfully submitted,
LABATON SUCHAROW LLP

*/s/ Alfred L. Fatale III*

Jonathan Gardner (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
Charles J. Stiene (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
Telephone: (212) 554-1400
Facsimile: (212) 554-1444

1

Email:    jgardner@labaton.com
          dschwartz@labaton.com
2         afatale@labaton.com
          cstiene@labaton.com

3

*Lead Counsel for Lead Plaintiff*
4    *Leadersel Innotech ESG*

5    Lucas E. Gilmore (State Bar No. 250893)
     HAGENS BERMAN SOBOL SHAPIRO LLP
6    715 Hearst Avenue
     Berkeley, California 94710
7    Telephone: (510) 725-3000
     Facsimile: (510) 725-3001
8    Email: lucasg@hbsslaw.com

9    *Liaison Counsel for Lead Plaintiff*
     *Leadersel Innotech ESG*
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 1, 2023, I was authorized to electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*/s/ Alfred L. Fatale III*
Alfred L. Fatale III