Jonathan Gardner (admitted *pro hac vice)*
Alfred L. Fatale III (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Charles J. Stiene (admitted *pro hac vice*)
LABATON SUCHAROW LLP
140 Broadway
New York, New York 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: jgardner@labaton.com
        afatale@labaton.com
        dschwartz@labaton.com
        cstiene@labaton.com

*Lead Counsel for Lead Plaintiff
Leadersel Innotech ESG*

[*Additional Counsel on Signature Page*]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| In re ON24, Inc. Securities Litigation | Case No. 4:21-cv-08578-YGR |
|---|---|
| | **LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT** |
| | Judge:      Hon. Yvonne Gonzalez Rogers<br>Date:       February 6, 2024<br>Time:       2:00 p.m.<br>Courtroom:  1, 4th Floor |

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES ........................................................................................................ ii

STATEMENT OF THE ISSUES .................................................................................................. 1

I.    INTRODUCTION ............................................................................................................. 2

      A.    The Amended Complaint Pleads New Additional Facts that Preclude
            Dismissal ................................................................................................................ 2

      B.    Defendants' Arguments Against Falsity Fail ......................................................... 4

II.   BACKGROUND ............................................................................................................... 5

III.  APPLICABLE LEGAL STANDARDS ........................................................................... 10

IV.   ARGUMENT ................................................................................................................... 10

      A.    The Complaint Sufficiently Pleads Falsity .......................................................... 10

            1.    Statements About ON24's Customers and Financial Condition
                  Were Materially Misleading ..................................................................... 10

                  a.    The False and Misleading Statements Alleged in the
                        Amended Complaint ..................................................................... 10

                  b.    The Amended Complaint Sufficiently Alleges that the
                        Offering Documents' Misstatements and Omissions were
                        Materially Misleading ................................................................... 13

                  c.    Defendants' Attempt to Discount FE Allegations Fails .............. 14

                  d.    ON24's Financial Metrics Do Not Absolve Defendants
                        from Liability ............................................................................... 16

                  e.    Post-IPO Events Bolster the Inference of Falsity ....................... 18

            2.    Risk Factor Statements Were False and Misleading ................................ 19

            3.    The Offering Documents Did Not Abide by the Duty to Disclose
                  Pursuant to Items 303 and 105 ................................................................. 21

            4.    Defendants' Attempt to Cast Certain Statements as Puffery Fails ........... 22

      B.    Section 15 Claims Must be Sustained .................................................................. 25

V.    CONCLUSION ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alphabet, Inc. Sec. Litig.*,
  1 F.4th 687 (9th Cir. 2021) ......................................................................................................21

*In re Apple Inc. Sec. Litig.*,
  2020 WL 6482014 (N.D. Cal. Nov. 4, 2020) ..........................................................................19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).................................................................................................................10

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007).................................................................................................................10

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) ..................................................................................................18

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
  2013 WL 5206216 (S.D. Cal. Sept. 13, 2013)........................................................................23

*Cooper v. Pickett*,
  137 F.3d 616 (9th Cir. 1997) ..................................................................................................18

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597 (S.D.N.Y. Oct. 30, 2017) ...........................................................................5

*In re Facebook, Inc. Sec. Litig.*,
  84 F.4th 844 (9th Cir. 2023) ........................................................................................5, 20, 21

*Friedman v. Rayovac Corp.*,
  295 F. Supp. 2d 957 (W.D. Wis. 2003) ..................................................................................12

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023) ..................................................................................................16

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..................................................................................................16

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
  242 F. Supp. 3d 950 (C.D. Cal. 2017) ...................................................................................13

*In re LDK Solar Sec. Litig.*,
  584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................................................16

*Luna v. Marvell Tech. Grp. Ltd*,
  2016 WL 5930655 (N.D. Cal. Oct. 12, 2016).........................................................................13

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) ...................................................................................20

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
  982 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................................23

*Mingbo Cai v. Switch, Inc.*,
  2019 WL 3065591 (D. Nev. July 12, 2019) ...........................................................................20

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................................15

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015)................................................................................................................23

*Par Inv. Partners, L.P. v. Aruba Networks, Inc.*,
  681 F. App'x 618 (9th Cir. 2017) ..........................................................................................20

*Pirani v. Slack Techs., Inc.*,
  445 F. Supp. 3d 367 (N.D. Cal. 2020), *aff'd*, 13 F.4th 940 (9th Cir. 2021),
  *vacated on other grounds and remanded sub nom. Slack Techs., LLC v.
  Pirani*, 598 U.S. 759 (2023)..............................................................................................4, 20

*Plotkin v. IP Axess Inc.*,
  407 F.3d 690 (5th Cir. 2005) .................................................................................................18

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) .................................................................................25

*Sanders v. Realreal, Inc.*,
  2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)........................................................................21

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) .................................................................................................12

*In re Silver Wheaton Corp. Sec. Litig.*,
  2016 WL 3226004 (C.D. Cal. June 6, 2016) ..........................................................................16

*In re STEC Inc. Sec. Litig.*,
  2011 WL 2669217 (C.D. Cal. June 17, 2011) ........................................................................12

*Sundaram v. Freshworks Inc.*,
  2023 WL 6390622 (N.D. Cal. Sept. 28, 2023) ...........................................................4, 5, 20

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007)..............................................................................................................10

*In re Twitter, Inc. Sec. Litig.*,
    2020 WL 4187915 (N.D. Cal. Apr. 17, 2020) ........................................................................5

*In Re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014).................................................................10, 13

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...............................................................................................15

**Statutes**

15 U.S.C. § 77k..............................................................................................................................16

15 U.S.C. § 77k(a) .........................................................................................................................11

15 U.S.C. § 77o..............................................................................................................................25

Securities Act of 1933............................................................................................... *passim*

**Other Authorities**

17 C.F.R. § 229.105(a)...................................................................................................................21

17 C.F.R. § 229.303(a)(2)(ii) .........................................................................................................21

Fed. R. Civ. P. Rule 8(a)..................................................................................................................1

Fed. R. Civ. P. 8(a) .......................................................................................................................10

Leadersel Innotech ESG ("Lead Plaintiff") respectfully submits this Memorandum of Points and Authorities in Opposition to ON24 Defendants' Motion to Dismiss the First Amended Consolidated Class Action Complaint (the "Motion") and Underwriter Defendants' Joinder in ON24 Defendants' Motion. ECF Nos. 105-106. For the reasons explained below, the Motion should be denied because Lead Plaintiff's First Amended Consolidated Class Action Complaint (the "Amended Complaint") corrects the deficiencies identified in the Court's prior motion to dismiss ruling and amply satisfies the notice pleading standards of Fed. R. Civ. P. Rule 8(a).[1]

**STATEMENT OF THE ISSUES**

1.      *Falsity.* Whether the Motion should be denied because the Amended Complaint plausibly states a claim under Section 11 of the Securities Act of 1933 (the "Securities Act") that ON24's Offering Documents omitted then-existing material facts about the Company's changed customer base, customer churn and downselling, and declining demand—that had occurred prior to ON24's initial public offering ("IPO") and was knowingly going to continue and amplify after the IPO—which made statements contained in the Offering Documents materially misleading.[2]

2.      *Omission of Known Trends or Uncertainties and Risk Factors.* Whether the Motion should be denied because the Amended Complaint plausibly states a claim under Section 11 that the Offering Documents failed to comply with Item 105 and Item 303 of SEC Regulation S-K by omitting significant risk factors and known trends and uncertainties about the Company's changed customer base, customer churn and downselling, and declining demand that were required to be disclosed.

---

[1] Citations to paragraphs ("¶") are to paragraphs in the Amended Complaint (ECF No. 102). Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted throughout. "Defendants" collectively refers to ON24, Inc. ("ON24" or the "Company"), the "Individual Defendants" who signed the registration statement for the IPO (¶¶33-41), and the "Underwriter Defendants" that underwrote the IPO (¶¶45-53).

[2] The Offering Documents include several documents that were filed by ON24 and the Underwriter Defendants with the SEC and disseminated to the investing public, including: (i) a January 8, 2021 registration statement on Form S-1, which following amendment on January 25, 2021, was declared effective by the SEC on February 2, 2021 (the "Registration Statement"); and (ii) a February 4, 2021 final prospectus, which forms part of the Registration Statement, on Form 424(b)(4) (the "Prospectus"). ¶76.

3.    ***Control Person Liability.*** Whether the Motion should be denied because the Amended Complaint plausibly states control person claims under Section 15.

## I.    <u>INTRODUCTION</u>

### A.    The Amended Complaint Pleads New Additional Facts that Preclude Dismissal

Following the Court's instructions in its Order Granting the Motion to Dismiss (ECF No. 96) (the "Order"), the Amended Complaint narrowly focuses on the six statements that the Order identified as potentially actionable and adds the requested additional factual allegations to explain how the Offering Documents were materially false and misleading at the time of the IPO. This Court dismissed the original complaint because it did not demonstrate that "ON24 faced material customer churn at the time the statements were made." Order at 14-15. Thus, the Order instructed Lead Plaintiff to amend the complaint and provide "some quantification" to support the allegations that ON24 experienced material churn and decline in demand. *Id.* The Amended Complaint does just that through new factual allegations that quantify the material customer churn that manifested prior to the Company's IPO and management's knowledge at the time of the IPO of the inevitable increase in customer churn and downselling thereafter.

For example, the Amended Complaint alleges that: (1) Former Employee ("FE") 2 and his team, which represented ***more than 25% of ON24's total business***, noticed ***40-50% churn amongst their customers throughout 2020***[3]; (2) FE-2 recalled that 80% of new customers acquired as soon as March 2020 told him six months in advance that they would not be renewing their contracts; and that existing customers, who added new products or features to adapt to the pandemic, told him that these were "one-time" use purchases—adding that his team had similar experiences; (3) FE-7 recalled that ON24 was signing "a ton" of atypical customers that churned at upwards of 80% and that many of these customers had "no intention" to stay on beyond their initial contract—adding that about 25-30 of the 80-100 accounts in his book in 2020 were atypical; (4) FE-7 stated that the churn rate on atypical accounts amongst his team was 75-80%;

---

[3] As discussed below, a conservative estimate based on FE-2's statements suggests that at least 10% of ON24's total business churned prior to the IPO.

and (5) FE-8 explained that 43% of his accounts from 2020 were going to churn or downsell and that during 2020, 50% of new accounts that were up for renewal were likely to churn—adding that the volume of accounts poised to churn was consistent. ¶¶19, 23 102, 106, 168.

Further, the Amended Complaint alleges facts that show ON24's management, including Defendant Sharan, knew at the time of the IPO of the alleged trends or uncertainties regarding the Company's changed customer base and the related material customer churn and downselling that existed at the time of the IPO, but were omitted from the Offering Documents. These allegations were summarized in a Chart submitted to the Court (ECF No. 104-1 at 25-37), and include:

(1)    the Company's Salesforce computer program tracked clients' expectations for renewal and categorized certain clients as "DNR" (do not renew) customers, who were reported to management, including Defendant Sharan (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 94, 96; Statements of FE-2 at ¶¶104, 106-108; Statements of FE-3 at ¶¶111-112; Statements of FE-5 at ¶¶145-146; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶165-174);

(2)    the Company's Totango computer program, which tracked every interaction with the Company's customers, calculated a "Health Score" based on this "use" matrix that was discussed with management, including Defendant Sharan, because it indicated that these customers were or would be downselling their subscriptions or not renewing their subscriptions (*see, e.g.*, Statements of FE-1 at ¶¶82-89, 95-96; Statements of FE-2 at ¶¶104, 108; Statements of FE-3 at ¶¶111-112; Statements of FE-6 at ¶¶151-154; Statements of FE-7 at ¶¶160-163; Statements of FE-8 at ¶¶167-174);

(3)    management instructed ON24 employees to sign clients regardless of whether they satisfied ON24's particular prospective customer profile in order to generate revenue prior to the IPO (*see, e.g.*, Statements of FE-5 at ¶¶132-134, 141-146; Statements of FE-6 at ¶155; Statements of FE-8 at ¶¶173-174);

(4)    all client accounts were discussed at monthly meetings (*see, e.g.*, Statements of FE-1 at ¶¶85-88);

(5)    client accounts that were at risk of churn were discussed at weekly manager meetings, monthly calls, sales meetings, and companywide all hands meetings (*see, e.g.*, Statements of FE-1 at ¶¶85-88, 96; Statements of FE-2 at ¶104; Statements of FE-6 at ¶151; Statements of FE-7 at ¶162; Statements of FE-8 at ¶¶171-174); and

(6)    there was a revision to the Company's Salesforce computer program to include a field to indicate whether a customer was a "one-time" or "COVID related customer" after concerns regarding churn or downselling were raised to management, including Defendant Sharan (*see, e.g.*, Statements of FE-2 at ¶¶106-

108).

**B.     Defendants' Arguments Against Falsity Fail**

Defendants overread the Court's prior Order and impermissibly misconstrue the facts and allegations within the Amended Complaint in their favor. In doing so, Defendants overlook the newly articulated facts in the Amended Complaint and mentioned above that quantify the material customer churn and downselling, which was present prior to the IPO.

For instance, Defendants inaccurately argue that the new allegations do not mention how many of ON24's customers failed to renew their subscription with ON24 prior to the IPO. Motion at 2. The Amended Complaint clearly contains statements from FEs that provide more than "some quantification" of the number of Company customers that churned prior to the IPO.[4] ¶¶102-103. Specifically, FE-2, who explained that he and his team, which constituted 25% of ON24's total business, noticed 40-50% churn amongst their customers during 2020. *Id*. Likewise, Defendants' argument that the FE Allegations regarding churn risk do "not reflect final decisions by customers" also fails. Motion at 2. The Amended Complaint adequately pleads allegations articulated by FE-8, who explained that any products added or new customers signed on in April 2020 "were going to churn" and that this fact was "not a maybe." ¶170.

That aside, Defendants' reliance on *In re Stac Elecs. Sec. Litig.* is misplaced. 89 F.3d 1399 (9th Cir. 1996); Motion at 11. The Court's decision in *Stac* could be instructive for claims involving the duty to disclose information regarding a single competitor's business, not known trends or uncertainties about an entire cohort of customers. Like other securities actions that plead claims premised upon Item 303, the Amended Complaint adequately pleads "***known trends or uncertainties*** that have had or ***that*** ... [***are***] ***reasonably*** [***likely*** to] have a material … unfavorable impact on … revenues." *See Pirani v. Slack Techs., Inc.*, 445 F. Supp. 3d 367, 385 (N.D. Cal. 2020) (holding that defendants failed to disclose a known trend where future outages could have an unfavorable impact on revenues), *aff'd*, 13 F.4th 940 (9th Cir. 2021), *vacated on other grounds and remanded sub nom*. *Slack Techs., LLC v. Pirani*, 598 U.S. 759 (2023); *Sundaram v.*

---

[4] Statements from FEs shall be referred to as "FE Allegations." ¶¶79-174.

*Freshworks Inc.*, 2023 WL 6390622, at *8 (N.D. Cal. Sept. 28, 2023) (Item 303 violation where "Defendants had knowledge of an adverse trend" and "a reduction in renewal rates and increased churn rates … could materially impact [Defendants'] business, results of operations, and financial condition in future periods."); *In re CPI Card Grp. Inc. Sec. Litig.*, 2017 WL 4941597, at *3–5 (S.D.N.Y. Oct. 30, 2017) (finding existence of a "trend" where customers purchased more EMV cards than they were issuing, which could result in in drop-off in sales after the company's IPO). Here, it is not a question of speculating as to what a single competitor will do, but rather the misrepresentation of the Company's existing customer base and the known trends within the 2020 customer cohort that already manifested and were amplifying at the time of the IPO.

Further, Defendants attempt to avoid liability for the alleged misstatements and omissions by pointing to ON24's financial results and metrics in the Offering Documents or the Company's post-IPO financial results is improper. Despite Defendants' argument to the contrary, the Amended Complaint need not challenge ON24's customer metrics within the Offering Documents or the Company's financial results after the IPO in order to state a claim. *See In re Twitter, Inc. Sec. Litig.*, 2020 WL 4187915, at *10 (N.D. Cal. Apr. 17, 2020) ("[E]ven if the MAU numbers reported on February 5 were accurate, … that would not preclude a finding that a statement containing or surrounded by the accurate MAU numbers was misleading."); *see also In re Facebook, Inc. Sec. Litig.*, 84 F.4th 844, 859 - 860 (9th Cir. 2023) ("case law does not require harm to have materialized for a statement to be materially misleading"). Moreover, the performance of the Company after the IPO is completely consistent with the Amended Complaint's allegation that the trends which started prior to the IPO continued thereafter, *i.e.*, according to the Defendants' own chart, year-over-year revenue growth steadily declined from 102% in 1Q 2021 to negative 2% in 4Q 2021 and year-over-year annual recurring growth ("ARR") growth steadily declined from 90% in 1Q 2021 to 12% in 4Q 2021. *See* Motion at 5.

Accordingly, the Court should deny the Motion.

## II.     BACKGROUND

***ON24 and Its Business.*** ON24 is a cloud-based, digital experience platform that enables

businesses to convert customer engagement into revenue through interactive webinars, virtual events, and multimedia content experiences. ¶¶3, 60. As a subscription-based company, ON24 derives revenue from sales of subscriptions to its products. ¶¶6, 63. To grow, ON24 must continually secure new customers and maintain and expand relationships with existing customers by renewing subscriptions and "upselling" additional products or features. *Id.*

"Downselling," by contrast, which results in a reduction in revenue, is a term ON24 and analysts use to refer to customers removing products or features from their contract. *See* ¶¶9, 183. ON24 sells annual subscriptions and bills clients on an annual or monthly basis. ¶64. Importantly, over the past decade, prior to the COVID-19 pandemic, ON24 de-emphasized one-off digital conference revenue to focus on "stickier," recurring platform revenue. ¶65. ON24's business model was to target customers who would integrate its products, *i.e.*, customers likely to renew and upsell. ¶199.

According to ON24, COVID-19 encouraged businesses to operate more digitally, which led to explosive business growth. ¶¶7, 66. For example, revenue increased 59% for the nine months ended September 30, 2020, versus the nine months ended September 30, 2019. ¶¶7, 67. ON24 conceded its growth was "partly in response to the COVID-19 pandemic," but maintained that it could "achieve significant growth by retaining and further penetrating [its] existing customer base." ¶¶68-73, 179.

On or about February 3, 2021, ON24 conducted the IPO focused heavily on these September 30, 2020 results and raised more than $428 million in gross proceeds for the shares ON24 offered to the public, while the banks that underwrote the IPO collected over $29 million in fees. ¶8. However, unbeknownst to investors, ON24 achieved this explosive growth by shifting its business model away from focusing on attracting enterprise customers—long term subscribers that would renew their contracts, generate recurring revenue, and increase their spend in future years—to signing atypical customers, for one-year or less contracts. *See* ¶¶9, 176. The new customers told ON24 that they planned to either not renew or downsell. *Id.* A larger-than-typical percentage of these new customers were small- and medium-sized businesses ("SMB") with

historically high churn rates. *Id.* SMBs were described internally as "atypical" or "COVID" customers because they were focused on temporary remote solutions or one-time events. *Id.*

Unbeknownst to investors, it was known at the Company prior to the IPO that these atypical customers were either going to downsell or not renew their subscriptions and, similarly, that a material amount of services that enterprise customers added during the COVID-19 pandemic would be subject to downsell. ¶176. Moreover, the subscriptions for atypical customers resulted in material churn prior to the IPO, as many subscriptions were for terms less than one-year, or even six-months. *Id.* ON24 knew that this material churn was going to continue and amplify after the IPO. *Id.*

***Defendants' Materially Misleading Offering Documents.*** The Complaint alleges two bases for Section 11 liability. First, six statements in the Offering Documents were rendered materially misleading by omission of then-existing facts. ¶¶175-184. Second, Defendants violated their duties under Items 105 and 303 of SEC Regulation S-K to disclose significant risks and known trends and uncertainties that would have (or were reasonably likely to have) a materially negative impact on ON24's post-IPO financial results. ¶¶185-192.

<u>Misleading Statements by Omission.</u> In the Offering Documents, ON24 made six statements that in context were materially misleading, also by omission, as they portrayed the Company as well positioned to capitalize on the expansive growth it achieved during the pandemic. For example, the Offering Documents touted ON24's: (1) growing and "highly engaged and loyal customer base," including more than 1,900 customers as of September 30, 2020 (¶175); (2) "consistent ARR growth" before COVID-19, which accelerated in 2020 "partly" in response to COVID-19 (¶177); and (3) "significant opportunity to further increase sales among existing customers[,]" including "by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell" (¶179). Certain statements downplayed the risk of clients not renewing as a mere possibility when ON24 knew that it was at that time already experiencing material churn and downselling and that this would only continue to amplify after the IPO. ¶¶181-184.

<u>Omitted Known Trends and Inadequate Risk Factors.</u> In violation of Defendants' duties to disclose known trends or uncertainties under Item 303, the Offering Documents failed to disclose the significant risks posed by: (1) a transition in the Company's customer base from carefully courted, enterprise customers to an influx of SMB customers, which entered into short-term and/or single event-based deals with subscriptions of one-year or less, beginning in March 2020; (2) a material amount of "atypical" or "COVID" customers, which had entered into subscriptions for short-term use or single events, expressly informing members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions; (3) enterprise customers downselling services they added to their subscriptions during 2020; and (4) subscriptions with terms less than one-year, including six month subscriptions, churning prior to and after the IPO. ¶¶185-192.

Defendants violated Item 105 by failing to disclose material factors (*see* ¶192), such as the change in the Company's customer base in 2020 and the material amount of customers that planned to and did downsell or not renew their subscriptions, each of which made an investment in ON24 speculative or risky. *Id.*

***Post-IPO Events.*** When the SMB customers inevitably continued to not renew after the IPO, ON24 reported high churn and downselling, weaker expected revenues, and larger expected losses compared to analysts' consensus and the Company's own guidance. ¶¶193-233. For Q2 2021, which closed five months after the IPO, ON24 reported a loss of 167 customers, a 9% decline in customers since the IPO. ¶¶68, 203. ON24 admitted "[l]ess sticky SMB customers accounted for roughly 50% of this churn," while 60% of the entire renewal customer base were first-time renewals, *i.e.*, the first-time renewal "cohort." ¶201. ON24 also provided weaker-than-expected revenue and earnings guidance for Q3 2021 and for FY 2021 versus analysts' consensus. ¶¶193-194.

Six months after the IPO, during the second quarter 2021 earnings call, Defendant Sharan acknowledged ON24 "experienced higher-than-expected churn and downsell from customers we signed up in the second quarter of last year during the peak of COVID. This higher churn was

primarily in the first-time renewal cohort, customers who signed up 1-year contracts [for the first time] last year and who were up for renewal." ¶¶24, 195. Defendant Vattuone added that the "share of first-time renewals in Q2 '21 was outsized accounting for over 60% of the cohort. We saw high churn and downsell within the first-time renewals cohort, which primarily included *a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events*." ¶¶25, 196. Analysts at Canaccord estimated that at least half of renewals in that "COVID cohort chose not to renew." ¶203. A William Blair report noted many non-renewing customers "*were outside the customer profile the company typically targets*. Of those customers who churned, about 50% were SMB, whereas ON24 is primarily enterprise focused." ¶207.

Nine months after the IPO, during the third quarter 2021 earnings call, Defendant Sharan acknowledged that ON24 "continue[d] to face headwinds from those renewals[,]" while Defendant Vattuone explained: "We faced *headwinds with respect to those first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs*." ¶¶209-210. Defendant Vattuone added that "SMB [churn] was the largest contributor to the customer count decrease in Q3." ¶¶210-211. Canaccord reported that the "churn was primarily attributed to SMB cohorts that became first-time customers during the pandemic primarily looking for one-time alternatives to in-person events." ¶214.

One year after the IPO, during the fourth quarter 2021 ("Q4 2021") earnings call, Defendant Sharan admitted that ON24's "largest challenge in 2021 was the first time renewal cohort which is 4x the dollar value of first-time renewals in 2019 and had a churn rate that was approximately double that are [sic] first-time renewals in 2019." ¶221. Defendant Vattuone added that ON24's lower NRR (*i.e.*, net retention rates) "reflects the impact of *elevated churn that we experienced over the past few quarters with first-time renewals, particularly with organizations that were not our ideal customer profile and had onetime needs*." *Id.*

As a result of materially misleading statements and omissions in the Offering Documents, ON24's stock collapsed from the $50 per share IPO price to $18.86 per share (a 62% decline) by November 3, 2021. ON24 has never recovered and currently trades at around $7 a share.

## III.    APPLICABLE LEGAL STANDARDS

In assessing a Rule 12(b)(6) motion to dismiss, the Court must consider the complaint in its entirety, "accept all factual allegations . . . as true[,]" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). A complaint "does not need detailed factual allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007), but must simply "contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); Order at 11. The Court must therefore analyze the complaint under a plausibility, not particularity, standard. Order at 12.

The parties do not dispute that Fed. R. Civ. P. 8(a) applies. Motion at 6; Order at 11-12. Rule 8(a) requires that a plaintiff "provide a short and plain statement of the claim showing that [he] is entitled to relief." *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014) (quoting Fed. R. Civ. P. 8(a)(2)). "This is not an onerous burden. Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what . . . the claim is and the grounds upon which it rests." *Id.*

## IV.    ARGUMENT

### A.    The Complaint Sufficiently Pleads Falsity

The Complaint alleges that the Offering Documents did not disclose then-existing material adverse facts about ON24's newfound focus on atypical customers and the associated material churn and downsizing that: (1) rendered six statements in the Offering Documents materially misleading by omission; and (2) violated Defendants' duties to disclose known trends and uncertainties under Item 303 and significant risks under Item 105.

#### 1.    Statements About ON24's Customers and Financial Condition Were Materially Misleading

##### a.    The False and Misleading Statements Alleged in the Amended Complaint

To state a claim under Section 11, a plaintiff must prove that Offering Documents contained (1) a materially untrue statement or omitted a material fact, which was (2) required to

be stated or necessary to make the statements not misleading. 15 U.S.C. § 77k(a). When "a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the issuer's opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" Order at 13 (citing *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 616 (9th Cir. 2017)). Section 11 imposes a "stringent standard of liability on the parties who play a direct role in a registered offering … [l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983); *see also* 15 U.S.C. § 77k(a).

The Amended Complaint adequately alleges that the Offering Documents created the misleading impression that ON24 substantially grew its customer base prior to the IPO and could be expected to benefit from those customers renewing and upselling post-IPO due to changes in how businesses were operating (*i.e.*, more digitally) in response to the COVID-19 pandemic. Specifically, ON24 touted the Company's: (1) growing and "highly engaged and loyal customer base," including more than 1,900 customers as of September 30, 2020 (¶175); (2) "consistent ARR growth" before COVID-19, which accelerated in 2020 "partly" in response to COVID-19 (¶177); and (3) "significant opportunity to further increase sales among existing customers[,]" including "by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell[,]" (¶179). These statements were false and misleading because they omitted "material fact[s] required to be stated" in the Offering Documents. 15 U.S.C. § 77k(a).

***First***, in March 2020, ON24 transitioned its enterprise customer base to a growing influx of atypical customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less. *See, e.g.*, ¶176(a). This shift allowed ON24 to quickly grow revenue in the short term and in the time leading-up to the IPO. *See* ¶¶66-71.

***Second***, prior to the IPO, it was known at the Company that a material amount of atypical

customers entered into subscriptions for short-term use or single events, and that many customers expressly informed members of ON24's sales and customer service teams in 2020 that they were either going to downsell or simply not renew their subscriptions when they came due. *See, e.g.*, ¶176(b).

**Third**, prior to the IPO, it was known at the Company that a material amount of services that enterprise customers added during the COVID-19 pandemic were or would be subject to downsell. *See, e.g.*, ¶176(c).

**Fourth**, because the Company entered into subscription deals during this time period with terms less than one-year, including six-month subscriptions, atypical subscriptions began to churn prior to the IPO. *See, e.g.*, ¶176(d).

**Fifth**, the Company knew that this material churn and lack of loyalty was going to continue and amplify after the IPO and was reported to management prior to the IPO through, *inter alia*, the Company's Salesforce and Totango computer programs—that indicated whether customers were or would be downselling their subscriptions or not renewing their subscriptions— and various meetings with management including sales meetings and companywide all hands meetings. *See, e.g.*, ¶176(e-f).

By choosing to tout positive information to the market, Defendants were "bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information" provided to investors. *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). Even if the statements at issue are factually accurate, they are still actionable when they omit material information that renders them misleading. *See Friedman v. Rayovac Corp.*, 295 F. Supp. 2d 957, 991 (W.D. Wis. 2003) ("a statement that is technically true can still be misleading"); *see also In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *7-9 (C.D. Cal. June 17, 2011) (statement about existing contract deemed actionable where defendant failed to disclose it "was a one-off type of deal at the time it was signed").

### b. The Amended Complaint Sufficiently Alleges that the Offering Documents' Misstatements and Omissions were Materially Misleading

Despite Defendants' contention that the "Court rejected substantively identical allegations" (Motion at 7), the Court's Order did not reject the plausibility of the Amended Complaint's allegations outright. Rather, the Court granted leave to amend with instructions to provide "some quantification" of ON24's material churn and downselling.[5] *See* Order at 14-15. The Order instructed Lead Plaintiff to "provide further factual foundation for its theory that customer churn was material." *See* Order at 17. A fact is material where "disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988). The materiality of an omission is a "fact-specific determination that should ordinarily be assessed by a jury." *Violin Memory*, 2014 WL 5525946, at *9.

The Amended Complaint demonstrates the material nature of the change in customer base and resulting customer churn and downselling through FE allegations. Specifically, the Amended Complaint alleges that FE-2 and his team, which represented ***more than 25% of ON24's total business***, noticed ***40-50% churn amongst their customers throughout 2020***. ¶¶102-103. This means that approximately 10% (25% * 40% = 10%) of existing customers churned prior to the IPO. This metric alone quantifies the materiality of the churn that existed prior to the Company's IPO. *See Luna v. Marvell Tech. Grp. Ltd*, 2016 WL 5930655, at *10 (N.D. Cal. Oct. 12, 2016) (less-than 8% portion of the company's quarterly revenue was material as a matter of law); *see also Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 972 (C.D. Cal. 2017) ("the Chaori receivable made up 3.6% of total losses—and a significantly larger percentage of losses within the Chinese market—may have caused a reasonable investor to find the Chaori receivable material."). Further, this conservative estimate does not account for any additional

---

[5] Defendants conceded and this Court held that "Plaintiff had adequately alleged that ON24 had signed on new customers outside of its traditional 'ideal' customer profile and that 'ON24 lost some customers in the lead up to the IPO[.]'' Motion at 7; Order at 14. Thus, even Defendants agree that the Amended Complaint need only demonstrate the material nature of the customer churn and downselling in order to demonstrate falsity.

churn that ON24 experienced prior to the IPO outside of FE-2's team. Accordingly, the Amended Complaint adequately alleges that ON24 was experiencing material churn and downselling prior to the IPO, rendering the forementioned statement false and misleading.

The allegations also adequately allege that the material churn and downselling would continue and even amplify after the Company's IPO. For example, FE-2 recalled that 80% of new customers acquired as soon as March 2020 told him six months in advance that they would not be renewing their contracts. ¶106. FE-2 added that existing customers, who added new products or features to adapt to the pandemic, told him that these were "one-time" use purchases. *Id.* Moreover, FE-2 recalled that members of his team also had similar experiences. *Id.* Again, this means that approximately 20% of the Company's new customers provided advance notice that they would not be renewing their contracts.

Further, FE-7 recalled that ON24 was signing "a ton" of atypical customers that churned at upwards of 80% and that many of these customers had "no intention" to stay on beyond their initial contract, and that about 25-30 of the 80-100 accounts in his book in 2020 were atypical. ¶¶158-161. FE-7 added that the churn rate on atypical accounts amongst his team was 75-80%. ¶161. Similarly, FE-8 explained that 43% of his accounts from 2020 were going to churn or downsell and did just that during 2020. ¶168. FE-8 added that 50% of new accounts that were up for renewal were likely to churn and recalled that the volume of accounts poised to churn was consistent, to which every Customer Success Manager (CSM) was asking "what can we do?" *Id.*

Accordingly, the Amended Complaint also adequately alleges that the forementioned statements were false and misleading because they failed to disclose that the material churn and downselling would continue and amplify after the Company's IPO.

### c.     Defendants' Attempt to Discount FE Allegations Fails

Because the Amended Complaint now fully quantifies the material nature of ON24's customer churn and downselling, Defendants attempt to discount the FE Allegations. In doing so, Defendants raise two separate arguments. First, Defendants unilaterally created their own standards as to how Lead Plaintiff should demonstrate materiality to argue that the FE Allegations

should be discounted. To be clear, Defendants do not challenge each FE's reliability or knowledge.[6] *See* Motion at 7-10. Second, Defendants argue that "[i]nternal inconsistencies" from FE-2 "render Plaintiff's allegations implausible." Motion at 9. Both of these arguments fail.

Defendants' Motion argues that the FEs failed to allege: (1) companywide churn; and (2) how these churn and renewal rates compared to ON24's historical norms.[7] Motion at 8. The FE Allegations amply support the inference that customer churn and downselling was companywide. As explained, the allegations attributed to FE-2 plausibly demonstrate that approximately 10% of ON24's total customer base at that time had churned. ¶¶102-103. To the extent Defendants contend that each FE must quantify ON24's customer churn and downsell, that is simply not the case. The FE Allegations, taken collectively, demonstrate ON24's undisclosed transition to a new customer base that resulted in explosive growth prior to the IPO, that the Company was experiencing material churn and downselling prior to the IPO, and that the trend of material churn and downselling would continue and amplify thereafter.

As to Defendants' second argument, the attempt to cast doubt upon the accuracy of the allegations attributed to FE-2 fails because the FE Allegations in the Amended Complaint are consistent. For example, Defendants' Motion argues that FE-2's allegations are inconsistent because he allegedly signed "three to five new contracts a day during 2020" and saw churn risk from "only several contracts each month," there is no way that "80% of new customers [were] churning[.]" Motion at 8-9.[8] Put simply, Defendants place far too much emphasis on the word "several" to argue that "several contracts each month" could not add up to 80% of new customers.

---

[6] The Amended Complaint describes each FE "with sufficient particularity to establish [that witness's] reliability and personal knowledge." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009); *see Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1013, 1026, n.20 (N.D. Cal. 2020) (FEs in "positions to possess knowledge of the information they provided"). Defendants do not argue otherwise.

[7] Defendants' Motion raises similar individualized arguments for each FE. Motion at 7-10. These arguments also fail for the reasons explained herein.

[8] Defendants argue, in a footnote, that FE-2's statement that he saw "'instances' of 40-50% churn amongst his customers" is inconsistent. Motion at 9 n.8. However, pursuant to the Court's Order (Order at 14-15), the Amended Complaint provides clarity on what he meant when using the word "instances." *See* ¶¶102-103.

The word "several" here is taken to mean an indefinite number that is more than one. Moreover, other FEs corroborate FE-2's statement that 80% of new customers told him six months in advance that they would not be renewing their contracts, including FE-7. *See* ¶¶158-161[9]; *see Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) ("Though CW18's estimates might not be 100% perfect, the court can consider the fact that they are estimates—not hard facts—without disregarding them entirely.").

### d. ON24's Financial Metrics Do Not Absolve Defendants from Liability

Defendants yet again raise the argument that falsity is not shown because ON24 continued to have "double-digit revenue and ARR growth in 2021."[10] Motion at 8. In doing so, Defendants misconstrue the Amended Complaint's allegations in an attempt to make this case about whether the Offering Documents ***misstated*** actual metrics or figures, or whether ON24 restated its financials.[11] *Id.* The Amended Complaint does not allege such a claim—this is a red herring. *See In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) ("that the financial statements for the year in question were not restated does not end [a] case when [the plaintiff] has otherwise met the pleading requirements"); *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1245-46 (N.D. Cal. 2008) (same). Moreover, the fact that ON24 was able to attract new clients in the year after its IPO does not undermine the misleading nature of statements about its client base and its expectations to renew and upsell then-existing customers at the time of the IPO.

The Complaint alleges an undisclosed decline in demand and that ON24 faced material

---

[9] Even if the Court is inclined to find that certain of FE-2's statements were internally inconsistent, the Court should not discredit the rest of the allegations attributed to FE-2 in the Amended Complaint. *See Glazer Cap. Mgmt., L.P.*, 63 F.4th at 772.

[10] To the extent that Defendants expect Lead Plaintiffs to challenge the accuracy of ON24's Q1 2021 financial results, this would be at odds with the plain language of the underlying statue giving rise to Section 11 under the Securities Act, which limits claims to false and misleading statements or omissions with the registration statement. 15 U.S.C. § 77k.

[11] Lead Plaintiff does not challenge the incorporation-by reference of certain Exhibits to the Declaration of David J. Wiener ("Wiener Decl.") (ECF No. 105-2) or the Court taking judicial notice of Exhibits 1-8 (ECF Nos. 105-3 – 105-8) to the extent that judicial notice is not taken for the truth of the matter asserted. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) ("Just because [a] document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth.").

customer churn and downselling that would ultimately result in weaker than expected revenues, operating losses, and losses per share in 2021. *See, e.g.*, ¶178(a)-(f). When 2020 contracts were not renewed after the IPO, ON24 reported a 2021 Q2 loss of 167 customers (9% decline from the time of the IPO) and a 2021 Q3 net loss of 24 customers. ¶¶68, 203, 214. In each of the three quarters following the IPO, ON24 also provided weaker-than-expected revenue and earnings guidance versus analysts' consensus and/or ON24's prior guidance:

| PROJECTED PERIOD[12] | PROJECTED REVENUES (in millions) | | PROJECTED NON-GAAP OPERATING LOSSES (in millions) | | PROJECTED NON-GAAP LOSSES PER SHARE | |
|---|---|---|---|---|---|---|
| | ON24 Prior Guidance ($ miss) | Analysts' Consensus ($ miss) | ON24 Prior Guidance ($ miss) | Analysts' Consensus ($ miss) | ON24 Prior Guidance ($ miss) | Analysts' Consensus ($ miss) |
| Q3 2021 Third Quarter Ended 9/30/2021 ¶163 | $47.5-$48.5M | | $(4.0)-$(3.0)M | | $(0.09)-$(0.07) | |
| | -- | $51.2M ($3.2M) | -- | $(2.60)M ($0.9M) | -- | $(0.05) ($0.03) |
| Q4 2021 Fourth Quarter Ended 12/31/2021 ¶178 | $51.0-$52.0M | | -- | | -- | |
| | -- | $52.3M (0.8M) | -- | -- | -- | -- |
| Q1 2022 First Quarter Ended 3/31/2022 ¶189 | $47-$48M | | $(8)-$(7)M | | $(0.17)-$(0.15) | |
| | -- | $52M ($4.5M) | -- | $(3.1)M ($4.4M) | -- | $(0.06) ($0.10) |
| FY 2021 Full Year Ended 12/31/2022 ¶164 | $201.2-$204.2M | | $(4.3)-$(1.3)M | | $(0.13)-$(0.06) | |
| | $207.5-$210.5M ($6.3M) | $209.1M ($6.4M) | $(2.0)-$(1.0)M ($2.3M) | $(0.2)M ($2.6M) | $(0.08)-$(0.02) ($0.05) | $0.0 ($0.10) |
| FY 2022 Full Year Ended 12/31/2022 ¶190 | $200-$204M | | $(30)-$(27)M | | $(0.64)-$(0.58) | |
| | -- | $223.4M ($21.4M) | -- | $(5.7)M ($22.8M) | -- | $(0.11) ($0.50) |

During earnings calls following these quarters, the Individual Defendants were forced to

---

[12] ON24 provided its financial outlook for future periods in the prior period earnings release, *e.g.*, third quarter 2021 guidance provided in second quarter 2021 earnings release. ¶¶193-194.

LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
CASE NO. 4:21-CV-08578-YGR

17

admit that ON24's expected financial results were lowered because of high churn and downselling from customers signed up in 2020 during the peak of COVID-19 primarily among SMB customers that did not integrate ON24's systems. ¶¶193-198. Further, FE-2 recounted how demand declined dramatically in winter 2020 once COVID-19 lockdown restrictions had begun to relax. ¶100. FE-4 recalled declining demand in November/December or early winter 2020. ¶126. FE-5 also recalled that demand declined during November/December 2020, due in part to market saturation, uncertainty regarding COVID-19, and competition. ¶130. The FEs also corroborate the customer churn allegations. For example, FE-2 recalled 40-50% churn amongst his and his team's customers (¶¶102-103), figures that are consistent with the 50% SMB customer churn ON24 disclosed after the IPO. ¶196. FE-2 recalled that 80% of new customers acquired as soon as March 2020 told him six months in advance that they would not be renewing their contracts and added that existing customers, who added new products or features to adapt to the pandemic, told him that these were "one-time" use purchases. ¶106. FE-3 stated the pandemic amplified SMB customer churn. ¶112. FE-4 recalled that single event, "quick fix" customers reluctantly signed up for one-year contracts for one event because ON24 required a one-year subscription. ¶¶120, 125.

### e.    Post-IPO Events Bolster the Inference of Falsity

It is well-settled in the Ninth Circuit that "shortness of time is circumstantial evidence that the optimistic statements were false when made." *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988, n.5 (9th Cir. 2008) (temporal proximity of misstatement and disclosure bolstered the inference that statement was misleading when made). Defendants' post-IPO admissions support the inference of falsity because Defendants admitted that ON24 experienced high churn and downselling only six months after the Company's IPO. *See Plotkin v. IP Axess Inc.*, 407 F.3d 690, 698 (5th Cir. 2005) ("three to four months" between positive statements and adverse disclosures "shed[s] light on the financial condition of the companies at the time of the announcements") (citing *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir. 2000) ("even six months after the Class Period, substantial amounts of …

inventory still dated from 1993 and 1994 … supports the inference that inventory during the Class Period was similarly dated")); *see also In re Apple Inc. Sec. Litig.*, 2020 WL 6482014, at *10-11 (N.D. Cal. Nov. 4, 2020) (announcement that Apple "will miss its earnings guidance two months after setting that guidance … bolsters the inference that defendants knew that [] statements were misleading").

Specifically, ON24's IPO occurred on February 3, 2021, and Defendants admitted that ON24 saw high churn and downsell "from customers we signed up in the second quarter of [2020] during the peak of COVID" and "within the first-time renewals cohort, which primarily included a substantial number of SMB buyers and nonideal customer profile buyers focused on onetime events" six months later on August 10, 2021. ¶¶24-25, 195-196. Defendant Sharan admitted: "if they don't integrate our platform in this onetime use case, that's not the customer I want." ¶198.

### 2.    Risk Factor Statements Were False and Misleading

Defendants argue that the three risk factor statements alleged in the Amended Complaint cannot be false and misleading because a company "is not required to forecast future events or caution about contingencies outside of its control." Motion at 11. However, this argument overlooks relevant FE allegations and improperly applies irrelevant case law to the well-pled facts and allegations in the Amended Complaint.

First, as explained herein, the Amended Complaint adequately pleads that ON24 was experiencing the beginning of trending material customer churn and downselling prior to the IPO. Second, as also explained herein, the Amended Complaint adequately pleads that it was known at the Company that the material churn and downselling was going to continue and amplify after the IPO. Defendants' argument that the FE Allegations confirm only a risk of churn that "did not reflect final decisions by customers" also fails. Motion at 2. The Amended Complaint adequately pleads allegations from FE-8, who explained that any products added, or new customers signed on in April 2020 "were going to churn" and that it was "not a maybe," especially when customers added the Hub Experience to existing deals or new customers signed on with the Hub

experience.[13] *See, e.g.*, ¶170.

Defendants' reliance on *Stac*—a decision that is instructive for claims involving the duty to disclose information regarding a single competitor's business, not known trends or uncertainties generally—is misplaced. *See, e.g.*, *Par Inv. Partners, L.P. v. Aruba Networks, Inc.*, 681 F. App'x 618, 619 (9th Cir. 2017) (citing *Stac* to show that companies cannot be held liable for failing to disclose information regarding competitor's business operations); *see also Pirani*, 445 F. Supp. 3d at 388 (citing *Stac* for holding that defendant company was under no duty to report the data and relative capacity of its competitors). To hold otherwise would be contrary to scores of cases that hold incomplete risk factors to be actionable, as well as the requirement under Item 303, which requires the reporting company to disclose "known trends or uncertainties that have had or that … [*are*] *reasonably* [*likely* to] have a material … unfavorable impact on … revenues." *See, e.g., Facebook*, 84 F.4th at 859–60 ("Our case law does not require harm to have materialized for a statement to be materially misleading."); *Slack Techs., Inc.*, 445 F. Supp. 3d at 385 (finding that defendants failed to disclose an internally known trend where future outages could have an unfavorable impact on revenues); *Sundaram,* 2023 WL 6390622, at *8 ("Plaintiff sufficiently plead[] that Freshworks' decelerating growth rates are a trend, the Court finds that Plaintiff sufficiently alleges that Defendants had knowledge of an adverse trend").

Here, the Offering Documents included incomplete risk factors that "discuss the hypothetical risk" of customer churn and the impact of COVID-19 while omitting the "present reality of such" risks. *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 776, n.7 (N.D. Cal. 2020); *Mingbo Cai v. Switch, Inc.*, 2019 WL 3065591, at *6 (D. Nev. July 12, 2019) (even voluminous risk disclosures do not satisfy Item 105 where "defendants identify only general statements that the company faced risks."). The Offering Documents simply disclosed that: as "the impact of COVID-19 lessens, there *may* be reduced demand for our platform, and our revenue growth rate

---

[13] Defendants' argument that the "churn flag indicator" only indicated "the possibility of a customer churning" misses the point. Motion at 12. The "churn flag indicator" supports the inference that it was known by management that the Company was experiencing material customer churn and downselling.

*may* decline" (¶181); "*if* fewer … renewals occur as the impact of COVID-19 lessens, our cash [flows] and deferred revenue[s] as of future dates *may* decrease" (¶182); and "customers *may* not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, *if* they renew at all" (¶183). Each purported risk factor was couched as a mere possibility when the truth was that these risks had already materialized, as ON24 well knew. *See In re Alphabet, Inc. Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that speak[] entirely of as-yet-unrealized risks and contingencies and do not alert[] the reader that some of these risks may already have come to fruition can mislead reasonable investors."). Defendants concede that "risk factors can be materially misleading … if they fail to warn of risks that had already come to fruition." Motion at 11. Because the Amended Complaint adequately alleges that material churn and downselling had already started to come to fruition, the Court should find that the three risk factors pled were false and misleading. *See Facebook*, 84 F.4th at 860 ("it is the fact of the breach itself, rather than the anticipation of reputational or financial harm, that caused anticipatory statements to be materially misleading.").

### 3. The Offering Documents Did Not Abide by the Duty to Disclose Pursuant to Items 303 and 105

Item 303 requires offering documents to disclose "any known trends or uncertainties that have had or that [the registrant] reasonably [expects will] have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(2)(ii). A "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both (1) presently known to management and (2) reasonably likely to have a material effect on the registrant's financial condition or results of operation." Order at 24 (quoting *Steckman v. Hart Brewing, Inc.*, 143 F.3d 1293, 1296 (9th Cir. 1998)); *see Sanders v. Realreal, Inc.*, 2021 WL 1222625, at *21 (N.D. Cal. Mar. 31, 2021) (same). Similarly, Item 105 requires that issuers "provide under the caption 'Risk Factors' a discussion of the material factors that make an investment in the registrant or offering speculative or risky." 17 C.F.R. § 229.105(a). The Offering Documents here did neither.

As explained herein, Defendants knew about and failed to disclose the following trends,

uncertainties, or significant risks in the Offering Documents: (1) a transition in the Company's customer base from carefully courted, enterprise customers to an influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less, beginning in March 2020; (2) a material amount of "atypical" or "COVID" customers, which had entered into subscriptions for short-term use or single events, expressly informing members of ON24's sales and customer service teams in 2020 that they were either going to downsell or not renew their subscriptions; (3) enterprise customers downselling services they added to their subscriptions during 2020; and (4) subscriptions with terms less than one-year, including six month subscriptions, churning prior to and after the IPO. *See* ¶¶185-192. These known trends were at the time of the IPO likely to, and shortly after the IPO did, cause reported financial information, such as the Company's historical ARR, to not necessarily be indicative of future operating results or of future financial condition and have a materially unfavorable impact on the Company's revenues as customers added in 2020 downsold or did not renew their subscriptions.[14] ¶191.

Defendants violated Item 105, (*see* ¶192), by failing to disclose material factors, *i.e.*, the change in the Company's customer base in 2020 and the material amount of customers that planned to and did downsell or not renew their subscriptions, each of which made an investment in ON24 speculative or risky. *Id.* Defendants' argument that ON24 warned investors about the reduced demand, declining growth rate, and the possibility of customers choosing not to continue their subscriptions fails. Motion at 13. As the Amended Complaint adequately alleges that the change in the Company's customer base and the risk of material churn and downselling had already come to fruition.

**4.      Defendants' Attempt to Cast Certain Statements as Puffery Fails**

Defendants argue that three of the six statements pled in the Amended Complaint are inactionable puffery. In doing so, Defendants contend that the Court already found that the three

---

[14] Defendants do not challenge the Amended Complaint's allegations that demonstrate management knew of the alleged trends or uncertainties at the time of the IPO. *See* Chart at 25-37.

challenged statements were nonactionable statements of corporate optimism and "[n]othing has changed." Motion at 14. This is not so. The Court's Order held that "[u]nless plaintiff can provide further factual foundation for its theory that customer churn was material, such generally optimistic statements appear to be puffery." Order at 17. The Amended Complaint adequately pleads allegations demonstrating that ON24 was experiencing material churn and downselling prior to the IPO and that this would continue and amplify thereafter.

Moreover, Defendants' arguments fail because the statements conveyed verifiable information about the then-current state of ON24's existing business which were incomplete and misleading in context. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (a determinate, verifiable statement is not mere puffery); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 305 (S.D.N.Y. 2013) (statements deemed not mere puffery if they are "misrepresentations of existing facts" even though speaker knew the contrary was true). Further, Defendants' Motion improperly stripped these statements of their context and emphasized select words in an effort to challenge these statements. Motion at 14-17; *see In re Bridgepoint Educ., Inc. Sec. Litig.*, 2013 WL 5206216, at *17 (S.D. Cal. Sept. 13, 2013) ("What might be innocuous puffery … standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation") (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)).

For example, Defendants challenge an excerpt of Statement No. 1 (¶175), by arguing that "descriptive statements like customers are 'highly engaged' and 'loyal' are not actionable." Motion at 14. However, when read in its full context, Statement No. 1 conveys much more: "As of September 30, 2020, we had over 1,900 customers[,]" not a "single customer contributed more than 5% of our total revenue" for 2019 or the nine months ended September 30, 2020, and "[w]e have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time." ¶175. This statement is actionable because it positively touts ON24's entire customer base as loyal with the ability to upsell and "grow", while conveniently omitting that a material portion of that base now consists of one-time, single event-only, and high churn atypical

customers, many of whom had given up to six months' notice that they were not going to renew. ¶176(a)-(f). The statement also omits the fact that ON24 was already experiencing a material amount of churn and downselling. *Id.*

Any reasonable investor would find it incredibly important to know that a material portion of ON24's customer base had already churned, downsold, or told ON24 that they would not renew or would downsell in 2021. The metrics ON24 provided (Motion at 15) do not insulate Defendants, as the market understood those metrics to be duplicable—and did not understand ON24 shifted its focus to non-repeat, one-time customers. Statement No. 2 discusses the ARR growth reflecting successfully retaining and upselling customers. ¶177. Statement No. 3 discusses achieving continued growth by retaining and upselling existing customers. ¶179. These are statements intended to persuade investors that ON24 has a large "sticky" customer base ripe for upselling.

Defendants again argue that *In re Nimble Storage, Inc. Sec. Litig.* is instructive in this case. 252 F. Supp. 3d 848, 853 (N.D. Cal. 2017). In light of the Amended Complaint's new allegations, it is not. The Court in *Nimble* was tasked with analyzing the misclassification of customers, *i.e.*, whether they were commercial or enterprise customers, and whether these misclassified customers were actually disclosed to the investors. *Id.* at 852-854. In other words, the Court had to determine whether a misstatement relating to the company's reported increase in 141 Global 5000 customers included the alleged misclassified customers. *Id.* at 853 ("While plaintiff's new focus on the Global 5000 companies and new allegations that non–Global 5000 clients were reclassified from commercial to enterprise may support an inference that defendants mislabeled certain clients, plaintiff's complaint lacks allegations connecting such reclassifications to any numbers actually disclosed by defendants."). In the present case, the allegations within the Amended Complaint do not challenge the classification of customers or that the number of customers reported was inaccurate. Instead, the Amended Complaint alleges, *inter alia*, that ON24 failed to disclose that the Company's explosive growth during the COVID-19 pandemic was in large part a result of the transition to SMB or atypical customers, which led to the

undisclosed customer retention issues. *See, e.g.*, ¶184(a).

Moreover, the misstatements at issue here are verifiable statements of fact concerning ON24's customer base as it existed at the time of the IPO. *See*, *e.g.*, Statement No. 2 at ¶177 ("Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with *existing* customers"); Statement No. 3 at ¶179 ("We believe we can achieve significant growth by retaining and further penetrating our *existing* customer base"). Statement Nos. 1-3 are actionable because they go "beyond feel good optimistic statements" and provide a "concrete description" of the past and present state of ON24's affairs. *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1055 (N.D. Cal. 2018).

**B.     Section 15 Claims Must be Sustained**

Section 15 makes an issuer's "control persons" liable for primary Section 11 violations. *See* 15 U.S.C. § 77o. Because the Amended Complaint establishes a Section 11 claim and Defendants do not seek to dismiss Section 15 claims on independent grounds (Motion at 17), the Section 15 claims must be sustained.

**V.     CONCLUSION**

For the forgoing reasons, Defendants' Motion should be denied in its entirety.

Dated: November 30, 2023          Respectfully submitted,

LABATON SUCHAROW LLP


 */s/ Alfred L. Fatale III*
Jonathan Gardner (admitted *pro hac vice*)
Alfred L. Fatale III (admitted *pro hac vice*)
David Schwartz (admitted *pro hac vice*)
Charles J. Stiene (admitted *pro hac vice*)
140 Broadway
New York, New York 10005
Telephone: (212) 554-1400
Facsimile: (212) 554-1444
Email: jgardner@labaton.com
        afatale@labaton.com
        dschwartz@labaton.com
        cstiene@labaton.com

*Lead Counsel for Lead Plaintiff*
*Leadersel Innotech ESG*

Lucas E. Gilmore (CA SBN 250893)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue
Berkely, California 94710
Telephone: (510) 725-3000
Facsimile: (510) 725-3001
Email: lucasg@hbsslaw.com

*Liaison Counsel for Lead Plaintiff*
*Leadersel Innotech ESG*