Anna Erickson White (CA SBN 161385)
AWhite@mofo.com
David J. Wiener (CA SBN 291659)
DWiener@mofo.com
Christina Dierolf (CA SBN 335258)
CDierolf@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: 415.268.7000
Facsimile: 415.268.7522

Attorneys for Defendants
ON24, INC., SHARAT SHARAN, STEVEN
VATTUONE, IRWIN FEDERMAN, DENISE
PERSSON, HOLGER STAUDE, DOMINIQUE
TREMPONT, and BARRY ZWARENSTEIN

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

In re ON24, Inc. Securities Litigation

Case No.    4:21-cv-08578-YGR

**ON24 DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Judge: Hon. Yvonne Gonzalez Rogers
Date: February 6, 2024
Time: 2:00 p.m.
Courtroom: 1 – 4th Floor

## **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ................................................................................................. 1

II. PLAINTIFF FAILS TO PLEAD A SECTION 11 VIOLATION. ..................................... 2

    A. Plaintiff Does Not Adequately Allege That Any Challenged Statement Was Materially False or Misleading When Made. ............................................. 2

        1. Plaintiff Lacks Any Contemporaneous Facts Showing Falsity. ................. 2

        2. ON24's Post-IPO Results Do Not Demonstrate Falsity. ........................... 6

        3. Plaintiff's Attacks on ON24's Risk Factors Fail. ..................................... 8

        4. Regulation S-K Did Not Impose a Duty to Disclose. ............................. 10

    B. The Challenged Statements of Corporate Optimism Are Not Actionable. ........... 11

III. PLAINTIFF FAILS TO PLEAD CONTROL-PERSON CLAIMS. ................................ 12

IV. CONCLUSION ................................................................................................ 12

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008)............................................................................................ 7

*Cooper v. Pickett*,
137 F.3d 616 (9th Cir. 1997)............................................................................................ 7

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
751 F.3d 990 (9th Cir. 2014) ........................................................................................... 4

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F. 4th 747 (9th Cir. 2023) ........................................................................................... 4

*Johnson v. Costco Wholesale Corp.*,
No. C18-1611 TSZ, 2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ................................... 4

*Knox v. Yingli Green Energy Holding Co.*,
242 F. Supp. 3d 950 (C.D. Cal. 2017) ............................................................................... 3

*In re Bridgepoint Educ., Inc. Sec. Litig.*,
No. 12-CV1737 JM (WMC), 2013 WL 5206216 (S.D. Cal. Sept. 13, 2013) ........................ 12

*In re Facebook, Inc. Sec. Litig.*,
84 F.4th 844 (9th Cir. 2023) ............................................................................................ 9

*In re Foundry Networks, Inc.*,
No. C 00-4823 MMC, 2003 WL 23211577 (N.D. Cal. Feb. 14, 2003).................................. 9

*In re Limelight Networks, Inc. Sec. Litig.*,
No. CV07-01603-PHX-SRB, 2008 WL 11339621 (D. Ariz. Aug. 8, 2008)........................... 9

*In re Stac Elecs. Sec. Litig.*,
89 F.3d 1399 (9th Cir. 1996)......................................................................................... 8, 9

*In re Verifone Sec. Litig.*,
784 F. Supp. 1471 (N.D. Cal. 1992) ................................................................................ 10

*Luna v. Marvell Tech. Grp. Ltd*,
No. 15-cv-05447-RMW, 2016 WL 5930655 (N.D. Cal. Oct. 12, 2016) ............................... 3

*Orellana v. Mayorkas*,
6 F.4th 1034 (9th Cir. 2021) ............................................................................................ 4

*Pirani v. Slack Techs., Inc.*,
445 F. Supp. 3d 367 (N.D. Cal. 2020) ............................................................................... 9

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Rodriguez v. Gigamon Inc.*,
  325 F. Supp. 3d 1041 (N.D. Cal. 2018) ................................................................................ 12

*Siracusano v. Matrixx Initiatives, Inc.*,
  585 F.3d 1167 (9th Cir. 2009) .............................................................................................. 8

*Sundaram v. Freshworks Inc.*,
  No. 22-cv-06750-CRB, 2023 WL 6390622 (N.D. Cal. Sept. 28, 2023)................................... 9

## I.    INTRODUCTION

Like the FAC, Plaintiff's Opposition fails to address the fundamental deficiencies identified by this Court's Order granting Defendants' first motion to dismiss.  Instead, the Opposition, like the FAC, recycles a host of inadequate allegations and arguments that this Court has already rejected.  The handful of new allegations on which the Opposition relies fail to plead a Securities Act claim.

As the Motion showed, the FAC fails to provide the necessary context to assess Plaintiff's "bald allegations" about purported material customer churn before ON24's IPO.  Unable to meet this burden, the Opposition misrepresents the FAC's confidential witness allegations, arguing that Plaintiff has alleged that "at least 10% of ON24's total business churned prior to the IPO."  But none of Plaintiff's new CW allegations say anything about how many of ON24's nearly 2,000 customers failed to renew before the IPO.  The CWs speculate about "COVID customers" that were "going to" churn months *after* the IPO or were identified as "churn *risks*" so that ON24 could develop "potential ways to keep the customer on board" and "retain their business."  As the Court found in the Order, that is not enough.

Plaintiff's speculation about future decisions by ON24's customers is particularly baseless here.  ON24—and its customers—were not able to predict in February 2021 when the effects of the pandemic would lessen.  That is why ON24 warned investors that its growth before the IPO had been "significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic" and that "[a]s the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline."

Plaintiff also still cannot reconcile its allegations with ON24's undisputed results in the quarters after the IPO.  As the Motion showed, these undisputed results directly contradict Plaintiff's theory that high churn rates and declining demand had already manifested at the time of the IPO.  Instead, Plaintiff argues that the Offering Documents were misleading because beginning six months after the IPO, ON24 "provided weaker-than-expected revenue and earnings guidance for Q3 2021 and for FY 2021 versus analysts' consensus and/or ON24's prior guidance."  Plaintiff's argument ignores that the Offering Documents did not contain any

guidance for the periods Plaintiff cites and that ON24's revenue and ARR *grew by double digits* year-over-year in both Q3 2021 and FY 2021 as a whole. The only trend at the time of the IPO was *continued growth*. Falling below analyst expectations six months to one year after an IPO is not a basis for a Securities Act claim, and Plaintiff's effort to make its case one about "missed" expectations merely reinforces the fundamental deficiencies in the FAC.

The Court should dismiss Plaintiff's complaint again—this time with prejudice.

## II.    PLAINTIFF FAILS TO PLEAD A SECTION 11 VIOLATION.

### A.    Plaintiff Does Not Adequately Allege That Any Challenged Statement Was Materially False or Misleading When Made.

In the Order, the Court found that Plaintiff's first complaint was "not supported by sufficient facts" because it lacked factual allegations, including quantifications and companywide context, showing that ON24 experienced material customer churn before the IPO. (Order at 13-15; *see* Mot. at 3.) In the Opposition, Plaintiff argues that it has cured these deficiencies by alleging that: (1) new statements attributed to CWs "demonstrate[] the material nature of the change in [ON24's] customer base and resulting customer churn and downselling" before the IPO (Opp. at 13-16); (2) "customer churn and downselling . . . ultimately result[ed] in weaker than expected revenues, operating losses, and losses per share in" the year after the IPO (Opp. at 16-19); (3) ON24's risk factor statements presented a "'hypothetical risk' of customer churn and the impact of COVID-19" and concealed the "'present reality' of such risks" at the time of the IPO (Opp. at 19-21); and (4) ON24 "did not abide by the duty to disclose" imposed by Items 303 and 105 of Regulation S-K (Opp. at 21-22). Plaintiff's arguments largely repeat (and often copy nearly verbatim) the same arguments rejected by the Court in the Order. As the Motion showed, the few new allegations in the FAC fail to meet Plaintiff's burden.

### 1.    Plaintiff Lacks Any Contemporaneous Facts Showing Falsity.

The Motion showed that none of the new allegations set forth in the FAC provide the factual foundation to establish that "ON24 faced material customer churn at the time the statements were made." (Mot. at 6-10 (citing Order at 14).) Far from rebutting the Motion's showing, the Opposition confirms that the FAC fails to allege (1) the churn and renewal rates that

ON24 experienced for its customer base before the February 3, 2021 IPO and (2) how these churn and renewal rates compared to ON24's historical norms.

Instead, Plaintiff relies on vague and conclusory CW allegations that establish nothing more than that ON24's sales and customer success teams identified customers potentially at risk of not renewing their contracts when they came due months after the IPO. Of course, like any company, some of ON24's customers would renew their contracts and others would not. As this Court found in the Order, Plaintiff's allegations show only that ON24 may have been at risk of losing "some customers in the lead up to the IPO," not that "ON24 faced material customer churn at the time the statements were made." (Order at 14.)

**CW2:** Plaintiff argues that CW2's statements show the "materiality of the churn that existed prior to the Company's IPO" because CW2's team "represented more than 25% of ON24's total business [and] noticed 40-50% churn amongst their customers throughout 2020." (Opp. at 13.) This, Plaintiff contends, "means that approximately 10% . . . of existing customers churned prior to the IPO."[1] (*Id.*) Plaintiff's argument fails for multiple reasons.

First, Plaintiff distorts the actual allegations in the FAC. Nowhere in the FAC does CW2 even purport to quantify customer churn that had already occurred at the time of the IPO. Indeed, the supposed "instances" of "40-50% churn" identified by CW2 were not decisions made before the IPO. Rather, according to the FAC, CW2's estimate addressed customers that "stated they were not ***going to*** renew because ON24 was a COVID-related expense." (¶ 103.[2]) CW2's statements about customers' negotiating positions during the height of the pandemic, in fact, show that "material churn" among new "COVID-related customers" could not have occurred before the IPO. These one-year contracts, which CW2 reports were signed beginning in "March

---

[1] Plaintiff claims that this meets the threshold for materiality, citing *Luna v. Marvell Technology Group Ltd*, No. 15-cv-05447-RMW, 2016 WL 5930655, at *10 (N.D. Cal. Oct. 12, 2016), and *Knox v. Yingli Green Energy Holding Co.*, 242 F. Supp. 3d 950, 972 (C.D. Cal. 2017). (*See* Opp. at 13.) Both cases, however, involve the misstatement of GAAP financial metrics. That has no bearing on whether purported customer churn rates of 10% were materially different from ON24's historical experience. Plaintiff does not allege that any metric in the Offering Documents was misstated, and there are no allegations in the FAC comparing ON24's churn and renewal rates in the periods before the IPO with its historical norms.

[2] Unless otherwise noted, all internal citations are omitted and all emphasis is added.

through May 2020 and again in June and July 2020," were not yet up for renewal and would not be until **months after** the February 2021 IPO.  (*See* ¶ 103.)

Second, as the Motion showed, Plaintiff's purported "quantification" is contradicted by the other allegations attributed to CW2.  Far from "at least 10%" of ON24's customers actually failing to renew before the IPO, CW2 is alleged to have seen "***churn risk***" from ***only*** "***several contracts each month***" before the IPO.  (¶ 104; *see also* Mot. at 8-9.)  The Opposition completely ignores the on-point authority cited in the Motion showing that internal inconsistencies, such as those identified in the Motion, render Plaintiff's allegations implausible.  (Mot. at 9 (citing *Orellana v. Mayorkas*, 6 F.4th 1034, 1043 (9th Cir. 2021); *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 999 & n.8 (9th Cir. 2014); *Johnson v. Costco Wholesale Corp.*, No. C18-1611 TSZ, 2019 WL 6327580, at *8 (W.D. Wash. Nov. 26, 2019)).)  Instead, Plaintiff argues that "Defendants place far too much emphasis on the word 'several' to argue that 'several contracts each month' could not add up to 80% of [CW2's team's] new customers."[3]  (Opp. at 15.)  But that is exactly what the FAC alleges:  CW2 saw "churn risk" from ***only*** "several contracts each month" before the IPO.  (¶ 104.)  Under any reasonable definition of the word, several is "fewer than many."  *See, e.g.*, *Several*, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/several (last visited Jan. 3, 2024); *Several*, The American Heritage Dictionary of the English Language, https://ahdictionary.com/word/search.html?q=several (last visited Jan. 3, 2024); *Several*, Collins English Dictionary, https://www.collinsdictionary.com/us/dictionary/english/several (last visited Jan. 3, 2024).  It is certainly nowhere close to 48-80 contracts per month (that is, 80% of the 60-100 new customer contracts per month that CW2 allegedly signed during 2020).[4]  (Mot. at 8-9.)

---

[3] The case that Plaintiff cites, *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F. 4th 747 (9th Cir. 2023), does not support its argument.  There, the defendants challenged the plaintiffs' reliance on CWs because "the CWs provide no basis for any personal knowledge of corporate-level pipeline … sufficient to plead falsity."  (*Id.* at 771.)  Here, Defendants contest the plausibility of Plaintiff's allegations in light of the FAC's numerous internally contradictory allegations, including those attributed to the CWs individually and as a group.

[4] This contradiction is reinforced by CW2's allegation that only "$70,000 to $100,000 of his book was at ***risk*** of churning" each month.  (¶ 104.)  Accepting Plaintiff's allegation that CW2's contracts "were on average between $25,000 and $100,000" (¶ 97), that would mean that only between one and four of CW2's customers were identified as a churn risk each month.  Again,

Third, Plaintiff's argument that CW2's alleged statements show that "approximately 20% of the Company's new customers provided advance notice that they would not be renewing their contracts" (Opp. at 14) says nothing about whether "ON24 faced material customer churn at the time the statements were made." (Order at 14; Mot. at 7-9.) CW2 identifies nothing more than the *risk* of future churn months after the IPO. As the Court previously recognized, and as discussed further below in Section II.A.3, ON24 was "not required to forecast future events or caution about contingencies outside of its control." (Order at 21.) Moreover, the risk Plaintiff identifies—that, "as the impact of the COVID-19 pandemic lessened, demand for [ON24's] products might also decrease"—was explicitly addressed in the Offering Documents, as the Court found in the Order. (Order at 18-19.)

Finally, Plaintiff still has no response to the fact that ON24's undisputed financial results following the IPO render the allegations attributed to CW2 implausible. ON24 experienced year-over-year revenue *growth of 30%* in 2021 (the first year after the IPO) compared to 2020 (the first year of the pandemic). (*See* Mot. at Figure 1.) And far from losing customers as the effects of the pandemic began to ease, ON24's customer base *grew*—from 1,994 at the end of 2020 to 2,122 at end of 2021. (Mot. at 9.) Those are not the results of a company facing "declining demand" or 80% customer churn at the time of the IPO.

**CW7:** Plaintiff argues that CW7 stated that "that ON24 was signing 'a ton' of atypical customers that churned at upwards of 80%" and that "25-30 of the 80-100 accounts in [CW7's] book in 2020 were atypical." (Opp. at 2, 14.) According to Plaintiff, this "demonstrates the material nature" of "customer churn and downselling" before the IPO. (Opp. at 13.) Plaintiff again mischaracterizes the FAC's allegations and ignores the Motion's showing that CW7 stated that *only "a handful"* of the 25-30 customer contracts Plaintiff cites came due before the IPO. (Mot. at 9-10; ¶ 161.) Plaintiff further ignores that the FAC alleges that even by early 2021, only "20% of [CW7's] book . . . had been marked for high churn *risk*." (¶ 160; *see* Mot. at 10.) As the Motion showed, there are no allegations showing what percent of these "high churn *risk*"

that is nowhere close to 80% of the 60-100 new customer contracts per month that CW2 purportedly signed during 2020. (¶ 104.)

customers actually failed to renew *in 2021*, much less any allegations showing that material companywide churn manifested *before the IPO*.  (Mot. at 9-10.)

**CW8:**  Plaintiff asserts in the Opposition that CW8 "explained that 43% of his accounts from 2020 were going to churn or downsell and *did just that during 2020*."  (Opp. at 14.) Plaintiff again misrepresents the allegations in the FAC.  As the Motion showed, the FAC alleges that CW8 stated that churn would not even begin to manifest until, at the earliest, *Q1 2021*.  (Mot. at 10; ¶ 168.)  And CW8 does not purport to quantify what percentage of his customers actually failed to renew in 2021.  (¶ 168.)  Nor could he.  The FAC alleges that CW8 *left ON24 in November 2020* and was *no longer employed* by ON24 when these alleged COVID-influenced customers' contracts came up for renewal.  (¶ 164.)  As the Motion showed, CW8's statements about the *risk* of churn months after the IPO does not show that "material churn existed in the quarters leading up to the IPO."  (Mot. at 10; *see* Order at 23.)  Rather, as the FAC makes clear, CW8 tracked churn risks precisely so that his team could track "why and *what was being done to save the account*."  (¶ 172.)  That is why companies have sales and customer success teams.

In sum, the CW allegations in the FAC still fail to show that ON24 faced material customer churn at the time of its IPO.  At best, the CW allegations show only that ON24 may have been at risk of losing some customers who had purportedly purchased ON24's products as a COVID-driven "temporary remote solution" in the quarters before the IPO.  (Opp. at 6-7.)  As the Court recognized when evaluating similar allegations in Plaintiff's previous complaint, the CW allegations do not show that this risk had already materialized at the time of the February 2021 IPO, months before the purportedly COVID-influenced contracts came up for renewal. Moreover, ON24 expressly warned investors in the Offering Documents about the effect of the pandemic on demand for ON24's products and warned that "[a]s the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline."  (Ex. 1 at 16.)  Nothing was concealed.

### 2.    ON24's Post-IPO Results Do Not Demonstrate Falsity.

The Opposition argues that "Defendants' post-IPO admissions support the inference of falsity because Defendants admitted that ON24 experienced high churn and downselling only six

months after the Company's IPO."  (Opp. at 16-19.)

This Court rejected this exact argument in the Order, finding that:

> [D]efendants' post-IPO acknowledgement of high customer churn contributing to the falling stock price . . . do not make up for the lack of factual allegations prior to the IPO. Plaintiff cannot use these post-IPO statements, work backwards, and arrive at a violation pre-IPO. Rather, plaintiff must allege: first, that there was material customer churn; second, that this material churn existed in the quarters leading up to the IPO; and, third, that defendant's knew about it.

(Order at 23.)  The FAC fails to meet this burden.

Each statement Plaintiff cites addresses events (customer churn or downselling) that occurred ***months after the IPO***.  (Opp. at 8-9 (discussing statements about churn made on quarterly earnings calls "six months," "nine months," or "one year after the IPO").)  None show the purported falsity of the earlier challenged statements or that "material churn existed in the quarters leading up to the IPO."  (Order at 23.)  Tellingly, Plaintiff again fails to mention ON24's results for the quarter in progress at the time of the IPO, which one would expect to be more probative of then-current conditions.  Plaintiff's selective omission is not surprising:  ON24 reported year-over-year revenue ***growth of 102%*** and year-over-year ARR ***growth of 90%*** in that quarter.[5]  (Mot. 5.)  There was no decline in demand to disclose.

Moreover, Plaintiff's arguments distort ON24's unchallenged results.  Plaintiff asserts that "ON24 reported a 2021 Q2 loss of 167 customers (9% decline from the time of the IPO)," (Opp. at 17), but the statement Plaintiff cites states unequivocally that "ON24 ***added 183 new logos*** during the quarter, which was offset by 167 customer departures," a ***net increase*** of 16 customers in Q2 2021.  (¶ 203.)  And ON24's total customer count ***was higher*** in Q3 2021 and Q4 2021

---

[5] The Opposition repeats Plaintiff's prior attempt to shoehorn its argument into Ninth Circuit cases discussing whether "shortness of time" between statements can be probative of falsity. (Opp. at 18-19.)  As before, the cases on which Plaintiff relies bear no resemblance to the allegations here and undermine Plaintiff's argument.  Each involved "temporal proximity" measured in weeks—not six months—and allegations that subsequent disclosures were in direct conflict with earlier statements.  *Cooper v. Pickett*, 137 F.3d 616, 626 (9th Cir. 1997) (defendants allegedly inflated their reported revenue in violation of GAPP and claimed that the company would complete a stock offering but cancelled the offering three weeks later after insiders sold shares at inflated prices); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988 & n.5 (9th Cir. 2008) (defendants disclosed a "stop-work order" "on the company's largest contract with one of its most important customers" two weeks after touting strong backlog figures).  The Court should reject this argument again.  (Order at 23.)

than it was in the quarters before the IPO.  (*Compare* ¶ 212 (2,054 customers in Q3 2021), *with* ¶ 68 (1,918 customers disclosed in the Offering Documents); *see also* Mot. at 9 (citing Ex. 8 at 43).)  Plaintiff does not and cannot reconcile its conclusory theory with the undisputed fact that ON24's revenue and ARR (i.e., demand) continued to grow by double digits year-over-year in the quarters following the IPO and for FY2021 when compared to FY2020.  That investment analysts projected ON24 to perform even better in the year after the IPO does not show that any statement in the Offering Documents was false or misleading.

### 3. Plaintiff's Attacks on ON24's Risk Factors Fail.

The Opposition recycles the same theory of falsity with respect to the same challenged risk factor statements that the Court already rejected.  (Order at 21-23; Opp. at 19-21; *see* Stmts. 4-6.)  As the Court already found, "[a] company is not required to forecast future events or caution about contingencies outside of its control."  (Order at 21 (citing *In re Stac Elecs. Sec. Litig.*, 89 F.3d 1399, 1406-07 (9th Cir. 1996)).)  For that reason, the Court found that ON24's risk factors could be materially misleading "***only*** if they failed to warn of risks that had already come to fruition."  (Order at 21 (citing *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1181 (9th Cir. 2009)).)  The Court found that Plaintiff's allegations fell short because Plaintiff failed to "put forth sufficient facts in support of [its] theory" that ON24 already "faced material customer churn" at the time of the IPO.  (Order at 22.)  As discussed above, the amendments in the FAC do not change this analysis.  (*See supra* Section II.A.1.)

Plaintiff attempts to sidestep the Court's discussion of *In re Stac* by arguing that the Ninth Circuit's ruling applies only to cases involving a purported "duty to disclose information regarding a single competitor's business."  (Opp. at 20.)  Nothing in the Ninth Circuit's decision limits its holding or analysis to competitors.  Rather, as this Court recognized, *In re Stac* stands for the proposition that "[a] company is not required to forecast future events or caution about contingencies outside of its control."  (Order at 21 (citing *In re Stac*, 89 F.3 at 1406-07).)  Indeed, district courts within the Ninth Circuit have repeatedly applied *In re Stac* to reject allegations based on uncertain speculation regarding what customers may do in the future.  *See, e.g.*, *In re Limelight Networks, Inc. Sec. Litig.*, No. CV07-01603-PHX-SRB, 2008 WL 11339621, at *4 (D.

Ariz. Aug. 8, 2008) (applying *In re Stac* to reject claim based on allegations that major customer had informed defendant company it may significantly alter commercial relationship in the future); *In re Foundry Networks, Inc.*, No. C 00-4823 MMC, 2003 WL 23211577, at *10 (N.D. Cal. Feb. 14, 2003) (falsity not alleged where there were no allegations that customer issues "were certainties" or that defendant "would ***necessarily*** experience decreased revenues because some of its customers were experiencing difficulty raising capital").

The cases Plaintiff cites undermine its argument.  (*See* Opp. at 20-21.)  In each case, the purportedly concealed event ***had already occurred***.  For example, in *In re Facebook, Inc. Securities Litigation*, 84 F.4th 844 (9th Cir. 2023), *amended and superseded on denial of reh'g*, 87 F.4th 934 (9th Cir. Dec. 4, 2023), "[t]he essence of the challenged risk statements [was] that, although Facebook ***knew Cambridge Analytica had improperly accessed and used Facebook users' data***, Facebook represented in its 2016 Form 10-K . . . only the ***hypothetical risk of improper third-party misuse*** of Facebook users' data."  *Id.* at 859.  Similarly, in *Sundaram v. Freshworks Inc.*, No. 22-cv-06750-CRB, 2023 WL 6390622 (N.D. Cal. Sept. 28, 2023), the court found that the plaintiff "sufficiently plead[ed] that [the defendant's] decelerating growth rates [were] a trend" where the plaintiff alleged "that [the defendant] had ***already experienced*** 'a reduction in renewal rates and increased churn rates.'"  (*Id.* at *7-8.)  And in *Pirani v. Slack Technologies., Inc.*, 445 F. Supp. 3d 367 (N.D. Cal. 2020), the plaintiff alleged that the company's "reliability problem was not simply hypothetical" because "during seven out of the twelve months of 2018, [the company] had already failed to meet its uptime guarantee," leading to "the company . . . automatically paying out significant amounts of service credits."  *Id.* at 386.

Here, Plaintiff offers only speculation about what third parties (ON24's customers) might have done months after the IPO.  That is not enough.  The securities laws "do[] not provide a basis of liability where a corporation fails to 'disclose' the future."  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1483 (N.D. Cal. 1992) (rejecting allegations that corporation failed to disclose that "target markets were growing slower than in the previous years; historic sales channels and core markets were showing little future potential"), *aff'd sub nom. In re VeriFone Sec. Litig.*, 11 F.3d 865 (9th Cir. 1993).

As discussed above, none of Plaintiff's new CW allegations say anything about how many of ON24's nearly 2,000 customers did not renew before the IPO, much less establish that ON24 had "already experienced" material churn before the IPO. Indeed, ON24's undisputed results after the IPO show that customer demand continued to increase in the quarters following the IPO. Plaintiff's falsity arguments with respect to ON24's risk factor statements, therefore, fail for the same reasons the Court identified in the Order.

### 4.    Regulation S-K Did Not Impose a Duty to Disclose.

#### a.    Item 303

Plaintiff's Item 303 arguments repeat the same bald assertions and conclusory allegations as the rest of the Opposition's falsity arguments. As the Court found in the Order, "Plaintiff's Item 303 . . . claim[] fail[s] for much the same reason as the rest" of its arguments: "Plaintiff has not provided sufficient factual support for its claim that ON24 was experiencing significant customer churn" at the time of the IPO. (Order at 24.) As the Motion showed, and for the reasons discussed above, the new allegations in the FAC do nothing to cure this deficiency. For the same reasons, Plaintiff's Item 303 claim fails again.

#### b.    Item 105

The Opposition argues that ON24 failed to comply with Item 105 because the Company purportedly failed to disclose that ON24's customer base had "change[d]" during the COVID-19 pandemic and "the risk of material churn and downselling had already come to fruition." (Opp. at 22.) This is the same theory the Court rejected in the Order. Nothing in the FAC undermines the Court's previous ruling. ON24's Offering Documents still affirmatively warned investors that the Company's "recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures" (*see, e.g.*, Order at 19) and that "[a]s the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed." (*See, e.g.*, *id*.) As the Court found, because the FAC does not allege that ON24 was already experiencing material

customer churn at the time of the IPO, these on-point warnings preclude Plaintiff's claim.

### B.    The Challenged Statements of Corporate Optimism Are Not Actionable.

The Court previously held that three of the challenged statements (Stmts. 1-3) were non-actionable statements of corporate optimism. (Order at 15-17; *see* Mot. at 14-17.) Repeating (often nearly verbatim) the already-rejected arguments it made in response to the last motion dismiss, Plaintiff argues that "the statements conveyed verifiable information about the then-current state of ON24's existing business which were incomplete and misleading in context." (Opp. at 22-25.) The language of the statements has not changed, and Plaintiff's arguments are substantively identical to—and rely on the exact same cases as—those rejected in the Order.

Plaintiff repeats its argument that Statement 1 does more than provide "descriptive statements" like "highly engaged" and "loyal" because it includes assertions that ON24 had "over 1,900 customers" and not a "single customer contributed more than 5%" to ON24's total revenue. (Opp. at 23.) Maybe so, but Plaintiff ***does not challenge the accuracy of these verifiable metrics.*** Plaintiff's argument that the "Amended Complaint need not challenge ON24's customer metrics within the Offering Documents. . . to state a claim" (Opp. at 5 (citing *In re Twitter, Inc. Sec. Litig.*, No. 16-cv-05314-JST, 2020 WL 4187915, at *10 (N.D. Cal. Apr. 17, 2020))) misses the point. As the Court previously found, absent allegations that ON24's growth and sales data was misreported, "statements like ON24's 1,900 customers are 'highly engaged and loyal' are incapable of objective verification." (Order at 15-16.) Nothing has changed.

Plaintiff argues that Statement 2 is actionable because the statement "discusses [ON24's] ARR growth reflecting successfully retaining and upselling customers." (Opp. at 24-25.) The Court rejected an identical argument from Plaintiff in the Order. The Court found that "[j]udicially-noticed documents demonstrate that this statement is accurate: defendants reported that ARR increased quarter after quarter, including the quarter ***after*** the IPO." (Order at 16 (emphasis in original).) As the Court recognized, "[i]nvestors can read such numbers and accompanying cautionary language telling them that this was in part due to the COVID-19 pandemic, and judge for themselves the risks." (*Id.*) Plaintiff has no response.

Similarly, Plaintiff argues that Statement 3 is capable of objective verification because it "discusses achieving continued growth by retaining and upselling existing customers." (Opp. at 24-25.) The Court rejected this argument in the Order. As the Court held, "[s]tatements like 'significant opportunity' and 'significant growth' are, as alleged, too vague to be actionable."[6] (Order at 16-17.) The statement has not changed, and neither should the result.

### III.   PLAINTIFF FAILS TO PLEAD CONTROL-PERSON CLAIMS.

As the Motion showed, Plaintiff's claims under Section 15 should be dismissed because Plaintiff has failed to plead a violation under Section 11. (Mot. at 17; *see also* Order at 24.)

### IV.   CONCLUSION

As discussed above and in the Motion, the FAC should be dismissed with prejudice.

Dated:  January 4, 2024

ANNA ERICKSON WHITE
DAVID J. WIENER
CHRISTINA DIEROLF
MORRISON & FOERSTER LLP

By: _____*/s/ Anna Erickson White*_____
ANNA ERICKSON WHITE

Attorneys for Defendants
ON24, INC., SHARAT SHARAN, STEVEN VATTUONE, IRWIN FEDERMAN, DENISE PERSSON, HOLGER STAUDE, DOMINIQUE TREMPONT, AND BARRY ZWARENSTEIN

---

[6] Just as they did in the previous round of briefing, the cases that Plaintiff cites undermine its argument. In *In re Bridgepoint Education, Inc. Securities Litigation*, No. 12-CV1737 JM (WMC), 2013 WL 5206216 (S.D. Cal. Sept. 13, 2013), the court granted the defendant's motion to dismiss and found "[d]efendants' vague, but rosy statements [to] amount to nothing more than puffery." *Id.* at *20. The court explained that "[h]ad Defendants made misleading objective statements about the quality of education provided . . . such as specifically misrepresenting the number of full-time faculty or alleging that they had taken certain steps to assess the quality of education," which they had not, "Plaintiff might have a valid claim." *Id.* In *Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041 (N.D. Cal. 2018), the challenged statements "went beyond just providing subjective or emotive descriptions" and made concrete "factual statements" about the company's sales backlog. *Id.* at 1055. Plaintiff has made no such showing here, as the Court previously found.