UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

IN RE:  ON24, INC. SECURITIES )
LITIGATION                    )     **NO. C 21-08578 YGR**
_____)

Oakland, California
Tuesday, February 6, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

      LABATON KELLER SUCHAROW LLP
      140 Broadway
      New York, New York 10005
  BY: **ALFRED L. FATALE, ATTORNEY AT LAW**
      **CHARLES J. STIENE, ATTORNEY AT LAW**

      HAGENS BERMAN SOBOL SHAPIRO LLP
      715 Hearst Avenue - Suite 202
      Berkeley, California  94710
  BY: **REED R. KATHREIN, ATTORNEY AT LAW**

For Defendants:

      MORRISON & FOERSTER LLP
      425 Market Street
      San Francisco, California  94105
  BY: **DAVID J. WIENER, ATTORNEY AT LAW**
      **CHRISTINA DIEROLF, ATTORNEY AT LAW**

      MORGAN, LEWIS & BOCKIUS LLP
      One Market Spear Street Tower
      San Francisco, California  94105
  BY: **ROBERT H. O'LEARY, ATTORNEY AT LAW**

REPORTED BY:  Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
      United States District Court - Official Reporter

<u>**Tuesday - February 6, 2024**</u>                    <u>**11:02 a.m.**</u>

<u>**P R O C E E D I N G S**</u>

---oOo---

**THE CLERK:**  All rise.  Court is now in session.  The
Honorable Yvonne Gonzalez Rogers presiding.

**THE COURT:**  Good morning, everyone.

(Pause in proceedings.)

**THE CLERK:**  You may be seated.

Good morning, everyone.

Now calling the civil matter 21-CV-08578-YGR, In Re: ON24,
Incorporated Securities Litigation.

Parties, please step forward to the lecterns and state
your appearances for the record.

**MR. FATALE:**  Good morning, Your Honor -- good morning,
Your Honor, Alfred Fatale from Labaton Keller Sucharow on
behalf of Plaintiffs.

**THE COURT:**  Okay.

**MR. KATHREIN:**  Good morning, Your Honor, Reed Kathrein
with Hagens Berman on behalf of Plaintiffs as local counsel.

**MR. STIENE:**  Good morning, Your Honor, Charles Stiene
from Labaton Keller Sucharow, also on behalf of lead Plaintiff.

**MR. O'LEARY:**  Good morning, Your Honor, Robert O'Leary
of Morgan Lewis & Bockius appearing today on behalf of the
underwriter Defendants.

**MR. WIENER:**  Good morning, Your Honor, David Wiener of

1 Morrison & Foerster on behalf of the ON24 Defendants.

2       **MS. DIEROLF:** Good morning, Christina Dierolf of

3 Morrison & Foerster on behalf of the ON24 Defendants.

4       **THE COURT:** Okay. Hold on just a moment.

5                (Pause in proceedings.)

6       **THE COURT:** We have a bunch of lawyers in my jury room

7 that I'm still apparently dealing with. Hold on.

8                (Pause in proceedings.)

9       **THE COURT:** I just need to get my Zoom on. This

10 court, like many other courts, we have a shortage of court

11 reporters. That's why we are on Zoom. It's an internal link

12 so that we can get remote court reporters to help us. Just

13 give me a minute.

14                (Pause in proceedings.)

15       **THE COURT:** Okay. All right. This is round two of --

16 of the complaint, the motion. I will start with the moving

17 party.

18     And if we can lower my mic, it sounds like it is echoing,

19 please.

20     Okay. So, it's Mr. Wiener, is it?

21       **MR. WIENER:** Yes.

22       **THE COURT:** You may proceed.

23       **MR. WIENER:** So, Your Honor, your prior order

24 addressed the same challenge statements and the same theory of

25 falsity.

1    The Court's order set forth a straightforward standard and

2    burden for Plaintiff to meet on the amendment, and that was to

3    plead facts demonstrating that there was material customer

4    churn and decline and demand before the IPO.

5        Plaintiff doesn't dispute that burden, doesn't argue that

6    a law has changed or that the Court got it wrong.

7            THE COURT:  Well, I'm sure they think I got it wrong.

8    They may not argue it, but I think they probably assume I got

9    it -- I'm assuming they think I got it wrong.  But go ahead.

10           MR. WIENER:  So what Plaintiff has done in an attempt

11   to meet that burden, there are four substantive amendments at

12   issue here.

13       There is amended allegations for one CW -- that's CW2 --

14   who was in the last complaint, and there's three new CWs; CW6,

15   7 and 8.

16           THE COURT:  And I will agree with that.  Having, you

17   know, reviewed the redline, I take it you agree with it as

18   well.

19           MR. FATALE:  Yes, Your Honor.

20           THE COURT:  All right.  So we all agree.  Keep going.

21           MR. WIENER:  And those new CW allegations fail for the

22   same three reasons.  We can go through them each individually

23   if you like, but I think there are three deficiencies that cut

24   across all of them.

25       First, none of the CWs say anything about churn or a

decline in demand that actually occurred before the IPO.

They talk about churn risk in the future, and they talk about what they thought customers were going to do months later when their contracts came due.

That's not surprising given Plaintiffs' theory is that ON24 signed on short-term contracts, one-year deals, beginning in March 2020 and extending throughout 2020.

Those contracts necessarily could not have come due before the February 3rd of 2021 IPO.

Plaintiff attempts to characterize these risks as certainties. But as the Court's order found, that's inappropriate here and the facts of this case, as alleged by Plaintiff, and inappropriate legally.

Legally under the *Stac* decision that the Court analyzed, ON24 is not required to forecast future events and predict decisions that its customers would make in the future.

That's especially true here. Given where we were in the pandemic -- in early 2021 at the time of this IPO -- no one, not ON24 or its customers, could have known what was going to happen with the pandemic, when the effects of the pandemic would lessen and when restrictions relating to the pandemic would be eased.

And it's for that exact reason that ON24 warned in the offering documents that as the effects of the pandemic lessened and restrictions eased, its demand for its products may

1    decrease and there may be a decrease in its growth rate.

2        ON24 explained the effects that the pandemic had had on

3    its growth and warned about what would happen if the pandemic

4    eased in the future and those restrictions were no longer in

5    place and its customers returned to in-person activities.

6        A second flaw cutting across Plaintiffs' CW allegations is

7    that they are internally inconsistent.  Plaintiff in the

8    opposition brief points to various numbers; 80 percent,

9    40 percent, 50 percent churn.

10       It says all of those show that there was material churn

11   before the IPO.

12       Well, in addition to not talking about actual non-renewals

13   that occurred before the IPO, those numbers are inconsistent

14   with the specific allegations made by the CWs.

15       Far from saying that 80 percent of contracts were not

16   renewed before the IPO, CW2, for example, says that he saw

17   churn risk -- not even actual churn -- churn risk from only

18   several contracts each month.  Elsewhere he says 70 to $100,000

19   of churn risk each month.

20       And CW2 says that his customers average between $25,000 to

21   a hundred thousand dollars on their contracts.

22       So $70,000 to a hundred thousand dollars of churn risk

23   each month means somewhere between 1 and 4 contracts per month.

24       That is nowhere close to 80 percent of his contracts,

25   nowhere close to 50 percent of his team, and nowhere close to

anything material for ON24's business.

In -- (audio garbled due to video interruption) so after the IPO, he saw churn risk in his book of business for 20 percent of his customers.  That's churn risk, not actual churn.  And it's only 20 percent.

And finally, the final flaw -- this is the same flaw the Court identified last time around -- is that the actual results of ON24 are inconsistent with Plaintiffs' theory and render it implausible.

The company continued to grow up to and after the IPO. The quarter that had just begun when the offering took place -- the offering took place in early February -- so the first quarter of 2021 had just gotten started.

That quarter, far from the dramatic decline in demand, ON24 saw 102 percent revenue growth year-over-year and 90 percent growth in annual recurring revenue.

It didn't stop in that quarter.  For 2021 as a whole, ON24 had a 30 percent revenue growth year-over-year over 2020.

That's inconsistent with Plaintiffs' allegations that there was 50 percent churn or 80 percent churn or a dramatic decline in demand before the IPO.

And for all of those reasons I don't think the amended complaint does anything to cure the deficiencies that the Court identified in the order.

**THE COURT:**  All right.  Response?

1    **MR. FATALE:**  Thank you, Your Honor.

2         The Court's prior order directed us to hone in -- and this

3    time we honed in on six statements out of 13, three affirmative

4    statements that were rendered false due to omission, and three

5    which we say are improper or incomplete risk disclosures.

6         The Court also provided us with a roadmap of how to

7    correct our complaint.

8         One alleged that there was material customer churn at

9    ON24.  Two alleged that the material churn existed in quarters

10   leading up to the IPO.  And three alleged that Defendants knew

11   of the material churn.

12        As -- as my colleague from the Defense firm referenced,

13   there are additional allegations from FE-2 and the additional

14   of FE-6 and 7 and 8.

15        They provide some quantification -- and that was the words

16   from the order -- "provide some quantification" of what the

17   churn was -- and I'm just talking generally now.  I will then

18   turn to the pre-IPO; but FE-2 was talking about how there was

19   indication of 80 percent churn.  He explained that --

20        **THE COURT:**  Well, I find the allegations with respect

21   to him to be quite inconsistent.

22        **MR. FATALE:**  Yes, Your Honor.  One, credibility of a

23   witness is not addressed at motion to dismiss.

24        **THE COURT:**  This isn't credibility.  These are

25   explicit inconsistencies.

1       **MR. FATALE:** Well, Your Honor, at trial witnesses are

2  going to be here and they are going to testify inconsistently,

3  and their memory is going to be inconsistent and estimates are

4  going to be off. And the trier of fact when hearing all of

5  that will determine what the facts of the case were.

6       The Ninth Circuit in *Glazer* recognized that a witness

7  statement might not be a hundred percent true. That doesn't

8  mean you discount them.

9       I'm also faced with -- you know, individuals that work at

10  these companies that we talk to, they don't talk like lawyers.

11  They don't talk in the language of allegations. They talk in

12  paragraphs like normal people do, unlike us. And, you know, I

13  can only use the words that they tell me. I can't put words in

14  their mouth.

15       **THE COURT:** No, you can't. But you also can't take

16  what they say when on its face it's inconsistent without doing

17  something. I mean, you have got a Rule 11 obligation.

18       So do you have any idea -- I mean, let me ask this: How

19  many customers did CW2 actually have in 2020? Does he have a

20  hundred to 150 or the thousands that one might calculate if he

21  was receiving three to five new contracts a day which is what

22  he alleges?

23       **MR. FATALE:** He had -- it was closer to the hundred

24  number. I just want to make sure.

25       **THE COURT:** So, how is it at all --

1    **MR. FATALE:**  He had between 100 and 150 customers

2  between --

3    **THE COURT:**  Okay.  How is it at all plausible that

4  his -- let's see, where does he say it?  Hold on.

5                    (Pause in the proceedings.)

6    **THE COURT:**  So then he says that 80 percent of new

7  customers told him six months in advance that they were not

8  going to reviewing -- to review their contracts and that he

9  received three to five new contracts a day during 2020, which

10  means that in March he would have had 90 customers, which means

11  when you calculate 90 times 12, you are in the thousands.  So

12  how does that make any sense whatsoever?

13    **MR. FATALE:**  Sorry, Your Honor, I'm working through

14  the math.

15                    (Pause in proceedings.)

16    **MR. FATALE:**  So it wouldn't be -- if you added them

17  up, wouldn't it plausibly be that that's how he got to the

18  hundred at the end of the year?

19    **THE COURT:**  So he only worked one month?

20                    (Pause in the proceedings.)

21    **THE COURT:**  Remember, securities cases are not like

22  other cases.  The Ninth Circuit has affirmed dismissals where

23  allegations are internally consistent -- inconsistent.  There

24  is a higher bar in these kinds of cases.

25      And I have a witness here whose numbers are -- on the one

1    hand, he says 100 to 150.  On the other hand, you do some basic

2    math and it's like a thousand.  It makes no sense.

3        He says that he sees instances of churning.  Is it 40 to

4    50 percent churn or 80 percent of his new customers?  I

5    can't -- I can't tell.

6        MR. FATALE:  Well, I think he is talking about two

7    different time periods there.  I think in paragraphs 102 and

8    103 he is talking about 2020, and he says that there were

9    instances of 40 to 50 percent churn among his customers where

10   there is a reflection of the percentage of customers that

11   stated they were not going to renew.

12       And then I think later on, he is talking about a greater

13   time period.  He is saying that all the customers -- the

14   customers acquired after the COVID pandemic beginning in 2020,

15   80 percent of new customers told him in advance that they were

16   not going to review [sic].  It is not our allegation that --

17       THE COURT:  Where is that explained?  How am I

18   supposed to know that?

19       MR. FATALE:  I would -- that was in paragraph 106,

20   Your Honor.

21                    (Pause in proceedings.)

22       THE COURT:  80 percent of what?

23       MR. FATALE:  80 percent of the customers acquired.

24       THE COURT:  Of what?  What does that mean?  80 percent

25   of his hundred?  80 percent of his three to five a day?  What

1    does that mean?

2          **MR. FATALE:**  Yes, 80 percent of new customers, so the

3    atypical customers that came in after the beginning of

4    March 2020.

5          **THE COURT:**  I can't tell what that means in terms of

6    numbers.  What do you mean by that?

7          **MR. FATALE:**  The exact -- we cannot allege with the

8    information we have the exact number of client -- of customers

9    that churned.  I --

10         **THE COURT:**  Okay.  So do you think he has -- so you

11   think he has a hundred to 150 and not a thousand?

12         **MR. FATALE:**  Yes.

13         **THE COURT:**  And 100 to 150 out of how many total?

14         **MR. FATALE:**  At the company, 1,900.

15         **THE COURT:**  So 80 out of 1,900?

16         **MR. FATALE:**  Yes.

17                     (Pause in proceedings.)

18         **MR. FATALE:**  Well, FE-2 says that what he was hearing

19   was similar to what, you know, the other people on his team

20   were hearing similar, more than 50 percent -- 40 to 50 percent

21   or upwards, that customers saying they were going to churn.

22      CW7 says something similar.  He says atypical customer

23   churned at a rate up to 80 percent and particularly said out of

24   80 or 100 customers in 2020, 25 were atypical and maybe one of

25   them did not end up churning.

And he also testifies that a handful of his 20 to 25 atypical customers churned before the IPO.

FE8 also explained that 43 percent of his accounts from 2020 were going to churn or down sell and that volume accounts to poised to churn was consistent when he looked -- you know, they had these team meetings at the company that multiple CWs have talked about where they went through all the customers and talked about it.

So, you know, while there are inconsistencies, there are also consistencies when you compare the statements of different CWs and see collaboration -- collaboration on what was happening prior to the IPO and what they knew.

And it's not only what the company knew about this 2020 cohort. Before 2020, the company already knew that small and medium businesses had poor retention rates. That's why they focused on enterprise companies before the pandemic.

They never told the investing public in their IPO that they transitioned their customer base. Defendants concede that in their papers that even our last complaint sufficiently alleged that the customers -- that we allege that the customer base had changed in 2020.

So, you have a company that knows historically that small and medium businesses are not going to renew at the rate of enterprise companies.

You have now a cohort of the small businesses in 2020 that

not only are the type that historically do not renew, they are the affirmatively telling people at the company they are not going to renew. They are being marked in the computer systems with DNR, do not renew.

There are contracts of less than one year. Defendants say that we allege that there are only one-year contracts. The CWs say that there were contracts of less than one year. There were six-month contracts. There were single event contracts.

**THE COURT:** So --

**MR. FATALE:** Yes.

**THE COURT:** -- CW2 alleges that -- or at least, as I understand it, you believe that CW2 supports the claim that 10 percent of the customer base churned; is that right?

**MR. FATALE:** At least, yes.

**THE COURT:** Okay.

**MR. FATALE:** That --

**THE COURT:** And that's based on the 40 to 50 percent instance of churn or am I supposed to read that as the 80 percent --

**MR. FATALE:** No, no.

**THE COURT:** -- of total customer churn?

**MR. FATALE:** It's based on the 40 or 50 percent. I think he is talking about a smaller period of time here with the 40 and 50 percent and talking about a larger period of time with the 80 percent. And it turned up being 60.

1   **THE COURT:** What am I supposed to understand from the

2   80 percent?

3   **MR. FATALE:** That this was a trend and that it was

4   going to continue and that it was increasing.

5   So that even at the time of the IPO, if there's several or

6   a handful of this cohort of customers that's historically known

7   not to renew and is saying that they are not going to renew and

8   already in practice are starting to not renew, that is a trend

9   that required disclosure because -- and materiality is a little

10  different for an item 303 because item 303 requires disclosure

11  of things that are reasonably likely after the IPO to have an

12  input -- impact on the company's financials.

13  So Defendants new at the time of the IPO based on what was

14  already occurring, what historically occurred with this type of

15  customer, and what customers were telling them that there was

16  an observable business trend that they needed to disclose that

17  reasonably, likely would impact the business.

18  And, Your Honor, this is why this case is different than

19  the decision in *Stac*. In *Stac*, the case was whether a company

20  needed to disclose negotiations with one competitor and the

21  competitor saying we are not going to renew.

22  **THE COURT:** But --

23  **MR. FATALE:** It's --

24  **THE COURT:** But it's -- the numbers suggest even -- I

25  mean, a risk isn't a trend.

1    **MR. FATALE:** No. I agree.

2    **THE COURT:** So how is this not just a risk?

3    **MR. FATALE:** Because it's already starting and it is a

4    reasonable likelihood. That's what item 303 is talking to.

5    This is -- you know, the materiality analysis under item

6    303, which is required in a Section 11 case, which was required

7    because it's called for under form 11, is different than in a

8    10(b) case.

9    This is what was being, you know, discussed between the

10   Plaintiffs bar and the Defense bar in the *McQueary* case two

11   weeks ago in front of the Supreme Court.

12   The Defendant bar does not want item 303 to apply to 10(b)

13   cases because the materiality analysis is lesser because it

14   does speak to future impacts of what was an observable trend at

15   the time.

16   **THE COURT:** Response.

17   **MR. WIENER:** A few things, Your Honor. So starting

18   with CW2, there are, I think, three different sets of numbers

19   that CW2 supplies. And I think Your Honor has keyed in on

20   this.

21   There's paragraph 103 with, quote, "instances," end quote,

22   of 40 to 50 percent churn. That paragraph doesn't say what

23   those instances were, how long they lasted, what it refers to

24   at all.

25   Then, there's paragraph 106 that says 80 percent of new

customers told CW2 six months in advance that they would not be renewing their contracts.

That doesn't say anything about who actually churned, before the IPO or after. It's a statement from the customer about a negotiating position.

Then, there's paragraph 104 where CW2 says that he saw only 70 to $100,000 of churn risk per month.

The most specific of these allegations is the 70 to $100,000 of churn risk, and even that still is still talking about forward looking risk.

But taking that specific number -- $70- to $100,000 per month -- if you look at the average contract value that CW2 alleges of 25,000 to $100,000, that would give you something like one to four customers.

One to four customers per month identified as a churn risk in a company that has 2,000 -- almost 2,000 customers.

And $70- to $100,000 of churn risk in a company that has almost $200 million of annual revenue.

So, not only is this not talking about churn that actually occurred and provided any quantification of that before the IPO, the numbers that are provided of what was actually even identified as a risk during this time are plainly immaterial.

You would never expect any company to have zero customers at risk of not renewing their contracts. You wouldn't need a sales team. You wouldn't need customer support teams.

1    CW7 Counsel referenced.  CW7, again, is specifically

2    talking about risks of churn.  If you look at paragraph 163, it

3    says in the lead-up to the IPO, high risk of churn was looming,

4    not had already occurred.  It was looming.

5    Counsel, referenced six-month contracts.  There's only one

6    reference to a six-month contract in the complaint.  And that's

7    paragraph 161 where CW7 says that there were mostly one-year

8    deals but there were a handful of six-month deals, a handful.

9    And he doesn't say with respect to that handful whether or not

10   they even renewed.

11   CW8, Counsel referenced, again, doesn't say anything about

12   churn that actually occurred.  And there's a reason for that.

13   He left the company in November 2020.

14   These contracts were signed in March through July through

15   August, October.  How could this CW, who left the company in

16   November 2020, know what ended up happening with any of these

17   contracts?  Doesn't say they weren't renewed before the IPO,

18   and he left three months before the IPO even occurred.  So he

19   would have no idea what ended up happening with any of these.

20   **THE COURT:**  Well, going back to CW7, he said in

21   paragraph 19 that customers churned at, quote, "upwards of

22   80 percent."

23   **MR. WIENER:**  So he is referring to a specific cohort

24   of atypical customers.  And if you look in the section of the

25   complaint later on, it goes into CW7's allegations in detail --

more detail.  He is talking about atypical customers, paragraph 158, that were continued to be signed on throughout 2020.

So these customers were still being signed, the renewed customers, throughout 2020.  The IPO was in February of 2021.

If they are still signing on these customers at the end of 2020, any churn upwards of 80 percent within that cohort of customers that CW7 was talking about could not have occurred before the IPS.

So like Your Honor pointed out, that is simply a risk of something happening in the future; and that exact risk is a risk that ON24 disclosed when the pandemic -- if the effects of the pandemic subsided, restrictions lessened, people go back to in-person activities, that there may be a decline in demand.

They could not have disclosed that there was churn at that time because the contracts were not up for renewal.

**THE COURT:**  Okay.  Response on that.

**MR. FATALE:**  Um, yes, Your Honor.  So, I understand Defendants' focus on some math that a CW goes through and takes issue with that.  But when you look at the three CWs we are talking about together -- FE-1, FE-7, FE-8 -- they are talking about -- FE-2 is talking 40 to 50 percent indicating churn.  FE-7 is talking about 80 percent of what he saw.  FE-8 is talking about 43 percent.  What do Defendants disclose after the IPO in the second quarter?

That many of these -- that many of its customers that were

outside the customer profile of the company, that the company usually targets, churned.  Of the churn, 50 percent were the small business -- their small businesses.  Defendants point to the financials, the projections that they were meeting or not meeting afterwards.

If it's going to be their case that it was missing projections, that is what caused the stock price to go down, that is their negative causation defense that they can address at summary judgment.

It is not my burden to plead causation, but in our complaint what we show the analysts are focused on -- what JP Morgan is talking about in our post-IPO section -- they are reporting and focused on the churn that's happening and this transition to a different customer base.

I'm trying to think of what else was addressed there.  Um --

**THE COURT:**  So, again, same questions with respect to CW7.  Talks about percentages but it's very -- this -- you know, it's difficult to parse because, again, there are inconsistencies and not minor inconsistencies.

So, when he talks about 80 percent, is he only talking about the 25 to 30 atypical customers?

**MR. FATALE:**  Yes.

**THE COURT:**  So not the 80 to 100?

**MR. FATALE:**  Correct.  That is how I read 161.

1          (Pause in proceedings.)

2          **MR. FATALE:**  And it was the same across 15.

3          **MR. WIENER:**  Your Honor, if I may on that point, I
4     mean, CW7, paragraph 160, gives an estimate for his book of
5     business in 2021 of 20 percent being marked as high churn risk,
6     not that those customers actually churned; but only 20 percent
7     marked as high churn risk.

8          That's the only estimate of his entire book that is
9     provided.  And, again, that's risk in 2021, not before the IPO,
10    not actual churn but risk after the IPO.

11         **MR. FATALE:**  Your Honor, if I may, it's --

12         **THE COURT:**  So, with respect to CW8, he leaves, what,
13    three months before the IPO?

14         **MR. FATALE:**  Yes, Your Honor.

15         **THE COURT:**  So how does he know whether anything
16    churned?  How does he have any personal knowledge of that?  For
17    him because he left in advance, isn't everything that he says
18    relative to risk?

19         **MR. FATALE:**  It is relevant to what customers told the
20    company.

21         **THE COURT:**  So, I shouldn't look at him at all with
22    respect to materiality in terms of numbers because he left
23    before the IPO?

24         **MR. FATALE:**  Well, Your Honor, so -- I'm trying to
25    make the distinction that customers saying that they are going

1   to churn at a 40 --

2       **THE COURT:**  The people -- you think customers were

3   saying the word "churn"?

4       **MR. FATALE:**  That they were not going to renew.

5       **THE COURT:**  Okay.

6       **MR. FATALE:**  The customer saying that they were not

7   going to renew of a profile that historically did not renew and

8   customer and the sales teams seeing that in the 40 to 60

9   percentage range before the IPO, people saying they were not

10  going to renew, turning out after the IPO that it's 50 percent

11  of the small business people.

12      **THE COURT:**  We don't know that and he doesn't know

13  that; right?  All he knows is that there was a risk because he

14  can't testify as to whether or not they, in fact, did because

15  he wasn't there.

16      **MR. FATALE:**  No.  But Defendants will have to testify

17  whether looking at those numbers, was it reasonably likely that

18  they would not renew under item 303.

19      **THE COURT:**  And when did the -- remind me what the

20  date was of the -- of the actual decrease because right after

21  the IPO, the numbers of customers increased as opposed to

22  decreased.

23      **MR. FATALE:**  Yes.  The customers, they are still

24  continuing to bring in short-term customers; but the growth is

25  slowing because they are not having renewable contracts like

they said they did because people are not renewing.

And that is what analysts are focused on. They are focused on the churn; that this company is not based on recurring revenue like they said they were.

**THE COURT:** All right. What else do you want me to think about?

**MR. WIENER:** Your Honor, there's three quick points that I just wanted to respond to in what Counsel went through.

First, the *Stac* decision, it's in no way limited, the logic or how it's been applied, to situations involving competitors.

None of the cases that Plaintiffs cite limit *Stac* in that way. *Stac* itself doesn't limit itself in that way, and we have cited cases applying *Stac* to situations involving what a customer would do in the future.

That's the *Limelight* and the *Foundry* case, and *VeriFone* is also on point on there although not citing *Stac* directly.

And second, there is no causation argument being made here. We are not saying that -- what the market was responding to. That's not an argument that's relevant here.

The reason that we reference the post-IPO results is because they are inconsistent with and render implausible the allegations that are at the center of the complaint, which is that there is a decline in demand and material churn before the IPO.

1    There's revenue in ARR growth of 102 percent and

2  90 percent in the quarter that was in progress at the time of

3  the IPO.  There was no decline in demand.  Could not have been

4  disclosed because it didn't happen.

5    Even at the end of the year, there is 30 percent revenue

6  growth, year-over-year.

7    And then finally on the trend point, you know, I think

8  Counsel is kind of trying to say different things.  He said two

9  different things here.

10    First, he correctly acknowledged that a trend and a risk

11  are two different things.  For it to be a trend, it has to have

12  actually occurred at the time the statement was made.  That's

13  what all the cases Plaintiff cites say.  And that's what the

14  law requires.

15    The trend has to exist at the time.  But there are no

16  allegations about material churn existing at the time of the

17  IPO.

18    **MR. FATALE:**  May I respond, Your Honor?

19    **THE COURT:**  You may.

20    **MR. FATALE:**  So, the trend needs to be observable at

21  the time of the IPO.  That's what *Sundaram v. Freshworks* talks

22  about.  It says that it was plausible that one quarter could

23  indicate an observable business pattern, but the trend does not

24  need to be complete nor the impact of it in existence at the

25  time of the IPO.

If that were the case, companies could stuff their channels right before the IPO, have a one-year return policy, and get away with it under the securities law.

That is what -- if you read what Defendants are saying about, well, these were one-year contracts and they couldn't have churned yet even though we allege there were six-month contracts, that's the loophole that they are trying to read into the securities law. And to close that loophole --

**THE COURT:** So you don't disagree then that at the end of the year, there was a 30 percent revenue growth. What is it that then was observable and when did it manifest itself and where do I find that in the complaint?

**MR. FATALE:** Sure. Your Honor, what was observable was: One, historically the company knew that small businesses were not sticking customers and did not renew.

That's in paragraph -- it's in several places but paragraph 112 talks about it.

**MR. FATALE:** Throughout the complaint -- you know, what we were just talking about -- this 2020 cohort of small and medium businesses were telling the company that they were not going to renew consistent with the company's historic knowledge about small and medium businesses. It's all before the IPO.

Of the contracts -- whether there were several or a few, and what does several mean and what does a handful mean -- but

1   of the contracts that were less than one year that did come up

2   for renewal, prior to the IPO, according to the CWs, they were

3   not renewed.

4       So management historically knows that small and medium

5   businesses do not renew.  Those customers that the company

6   transitioned to are saying they are not going to renew, and the

7   ones that are coming up for renewal are not renewing.  That is

8   the observable business trend.

9           **THE COURT:**  And when did it manifest?

10          **MR. FATALE:**  It began --

11          **THE COURT:**  Because we know it didn't manifest by the

12   end of the year.  So when did it manifest?

13          **MR. FATALE:**  The third point -- I think each prong of

14   that manifests at a different time.  The historical knowledge

15   manifested even before the pandemic.  The people telling them

16   they are not going to renew happens -- you know, manifests

17   throughout 2020.  And the six-month ones coming due or the

18   several that didn't renew before the IPO manifest before the

19   IPO.  But taken together, it's the beginning of the trend that

20   was observable.  And it continues into 2020.

21          **THE COURT:**  Okay.

22          **MR. FATALE:**  And --

23          **THE COURT:**  I'm not trying to corner you.

24          **MR. FATALE:**  No --

25          **THE COURT:**  I'm trying to understand what your theory

1    is in terms of when the injury manifests.

2            **MR. FATALE:**  I think the trend -- you know, the

3    complete trend of all three manifested at the earliest in the

4    fourth quarter of 2020 and at the latest at the first quarter

5    of the 2020 before the IPO.

6            **THE COURT:**  Wait.  The fourth quarter of 2020 and

7    the --

8            **MR. FATALE:**  I'm sorry, Your Honor.  I misspoke.  You

9    are correct.  I said the fourth quarter of 2020.  I meant to

10   say the first quarter of 2021, which was the quarter right

11   before the IPO.

12           **THE COURT:**  They had more customers.  That can't be

13   the case.

14           **MR. FATALE:**  Maybe I'm missing the -- maybe I'm

15   missing the question.  Are you asking for the materialization

16   of the beginning of the trend or the culmination of the trend?

17           **THE COURT:**  Well, I'm assuming the trend extends --

18   under your theory, the trend goes on for a period of time.

19           **MR. FATALE:**  Correct.

20           **THE COURT:**  Okay.

21           **MR. FATALE:**  Through the end of -- through the end of,

22   you know, the disclosures that happened throughout 2021 when

23   they are saying it is 50 percent churning.  We are still seeing

24   churn.  We are still seeing churn.

25           **THE COURT:**  So when did that begin?

1    **MR. FATALE:** At earliest the fourth quarter of 2020

2   and at latest the first quarter of 2021.

3        **THE COURT:** When did the public realize it?

4        **MR. FATALE:** The second quarter of 20 -- the third

5   quarter -- sorry. I apologize -- the third quarter of 2021

6   when they were reporting -- doing the second quarter report

7   results.

8                     (Pause in proceedings.)

9        **THE COURT:** And that impacted how much of the customer

10  base?

11       **MR. FATALE:** It impacted 50 percent of the small and

12  medium businesses. That's what the company said on August 11,

13  2021.

14      And then the third quarter the company said small and

15  medium business was a large contributor to their customer

16  account decrease in the third quarter. Slightly more than half

17  of the total renewal cohort were first time renewals.

18                    (Pause in proceedings.)

19       **MR. FATALE:** And I think Your Honor is talking

20  about -- is getting towards what constitutes a trend, and we

21  talked about this last oral argument.

22      I would like to just point to the *Sundream* [sic] case

23  again -- *Sundaram* case again where the Court found that it was

24  plausible -- that, you know, the inquiry of what is a trend,

25  the period, is a fact question not to be resolved; and it is

plausible that one quarter of data could indicate an observable business pattern.

You know, and Defendants haven't really attacked us on -- and this was a part of the oral argument last time -- Defendants haven't really attacked us on is it six months or two months or three months that constitutes a trend.

This case -- the *Sundaram* case from the Northern District -- the *CPI Card* case that we cite by Judge Kaplan in the Southern District of New York both talk about it being a question of fact for later just like materiality.

And, you know, so I think under a plausibility standard, when you go through what I have tried to lay out there with the historic, what was being said, what was starting to happen, I think we have plausibly alleged the manifestation of the beginning of a trend at that time period before the IPO.

**MR. WIENER:** Your Honor, if I can just respond to that last point, the *Freshworks* case, *Sundaram*, and the *CPI* case that Counsel just mentioned show exactly what's missing here.

There was a trend in a quarter that those Plaintiffs identified. In the *Freshworks* case, the Plaintiffs alleged that there was a decline in renewal rates in one quarter before the IPO.

So the question there was whether one quarter was enough, not whether they had shown that that trend actually existed at the time.

Here, Plaintiff has not provided any quantification of churn that happened before the IPO. The only mention of contracts that were less than a year were to a handful of contracts, and there is not even a statement about how many of that handful failed to renew before the IPO.

We cannot draw any inference about what happened to the company much less how it compared to its past results from a handful of customers.

So, under those cases that Counsel just cited, there is no observable trend at all before the IPO.

THE COURT:  All right.  Anything else?

MR. O'LEARY:  Yes, Your Honor, may I make a brief statement on behalf of the underwriter Defendants?

THE COURT:  You need to come to the mic and reidentify yourself, Mr. O'Leary.

MR. O'LEARY:  Yes, this is Robert O'Leary of Morgan Lewis on behalf of the underwriter Defendants.

The Section 11 claim is also alleged against the underwriter Defendants.  We have filed a joinder in the motion to dismiss filed by ON24.

And for all of the same reasons that Mr. Wiener has capably articulated today, the Section 11 claim against the underwriters should likewise be dismissed.  Thank you.

THE COURT:  All right.

(Pause in proceedings.)

1    **THE COURT:**  All right.  Anything else I need to think

2    about?

3    **MR. FATALE:**  Just one final point, Your Honor, on the

4    burden here.

5    I think what we have alleged obviously, I think, it gets

6    to the plausibility level.  I think for the quantification the

7    Defendants are saying we needed to allege, I think puts us

8    above what would be required in a PLSRA case, in a Rule 9 case,

9    and particularity.

10   And I think, you know, the Court's prior order when this

11   case was compared to *Nimble* and discussing *Nimble*, it's calling

12   for us to plead particularity because that's what *Nimble* was

13   calling for as a 10(b) case.

14   And the order says four or five times on the page that we

15   need to add -- plead more particularity, more particularity.  I

16   think we have pled particularity -- you know, particular facts

17   and factual allegations that get us past the plausibility

18   standard.

19   **MR. WIENER:**  Just real quickly on that, Your Honor, it

20   wasn't Defendants saying "quantification."  It was the Court's

21   order, and the Court's order went through the analysis of why

22   that was necessary under a Rule 8 standard.

23   The Court applied Rule 8 in that order and correctly

24   identified that in order to plausibly state a claim under these

25   circumstances -- given ON24's disclosures about its customer

base, given ON24's disclosures about the impact of the pandemic on its historical growth, and given ON24's disclosures about the risks of the pandemic lessening in the future and how that could affect the business, what was necessary to plead a plausible claim here was a showing that there was material customer churn before the IPO.

    **MR. FATALE:** I have nothing else, Your Honor.

    **THE COURT:** All right.

    **MR. WIENER:** Nothing else.

    **THE COURT:** I will take it under submission.

    **MR. FATALE:** Thank you, Your Honor, for hearing us again.

    **THE COURT:** Thank you.

    (Proceedings adjourned at 11:53 a.m.)

      ---oOo---

**CERTIFICATE OF REPORTER**

      I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:   February 7, 2024




_____

      Marla F. Knox, CSR No. 14421, RPR, CRR, RMR
      United States District Court - Official Reporter