UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE ON24, INC. SECURITIES LITIGATION

**Case No.:** 4:21-cv-8578-YGR

**ORDER GRANTING THE MOTION TO DISMISS WITH PREJUDICE;**

**ORDER GRANTING THE MOTION FOR JOINDER**

Re: Dkt. Nos. 105 and 106

Pending before the Court is defendants'[1] Motion to Dismiss the First Amended Consolidated Class Action Complaint ("FACCAC").[2] (Dkt. No. 105.) The FACCAC alleges violations of the Securities Act of 1933 in connection with the initial public offering ("IPO") of ON24. The Court had previously granted defendants' motion to dismiss in large part because plaintiff's confidential witnesses did not provide a sufficient factual foundation for its theory that demand for ON24's products declined to the point that withholding that information materially

---

[1] Defendants are: ON24, Inc. ("Corporate Defendant"), Sharat Sharan, Steven Vattuone, Irwin Federman, Denise Persson, Holger Staude, Dominique Trempont, Barry Zwarenstein (together, "Individual Defendants"), and Goldman Sachs & Co. LLC, J.P. Morgan Securities LLC, KeyBanc Capital Markets Inc., Robert W. Baird & Co. Incorporated, Canaccord Genuity LLC, Needham & Company, LLC, Piper Sandler & Co., and William Blair & Company, L.L.C.'s (together, "Underwriter Defendants").

[2] Underwriter Defendants once again filed a Motion for Joinder. (Dkt. No. 106.) That motion is **GRANTED**.

misled investors.[3] (Dkt. No. 96, "Previous Order.") Defendants argue that plaintiff's FACCAC is still fatally conclusory. The Court agrees.

Having carefully considered the papers submitted and the argument presented at the February 6, 2024, hearing, and for the reasons set forth below, the Court **GRANTS** defendants' motion to dismiss **WITH PREJUDICE**.

## I. BACKGROUND

The Court assumes the parties' familiarity with the background in this case, which was detailed in its Previous Order. (Dkt. No. 96.) In its FACCAC, plaintiff adds the following allegations:

In the nine months leading up to September 30, 2020, ON24's revenue increased by 59%. (FACCAC ¶ 7.) Its customer based increased from 1,241 customers as of December 31, 2018, to 1,918 customers by the end of September of 2020. ON24's Annual Recurring Revenue ("ARR") grew similarly, from $61.2 million at the end of 2018 to $138.9 million by September 30, 2020. On February 3, 2021, ON24 conducted its IPO. (*Id.*) It focused "heavily" on these September 30, 2020, results in doing so. (*Id.* ¶ 8.)

Unbeknownst to investors, however, in the three quarters preceding the IPO, ON24 changed its business model from focusing on acquiring long-term, "enterprise" customers to short-term, small- to medium-sized business ("SMB") customers. (*Id.* ¶ 9.) Acquired mostly from March 2020 to July 2020, these new customers were "atypical" or "COVID" customers who signed up for one-year or less contracts. (*Id.* ¶¶ 9, 14.)

The FACCAC expands on the testimony of one confidential witness and includes testimony from three new ones as follows:

    **1.**    **Confidential Witness Two ("CW2"):** CW2 had managed 100 to 150 accounts in 2020. (*Id.* ¶ 97.) In the first nine months of 2020, ON24 gained an influx of new, COVID-era customers which took place in March to May of 2020 and then again in

---

[3] The Court had also previously granted defendants' request for judicial notice of the same exhibits they attach now to the motion to dismiss. For the reasons previously stated, judicial notice of these exhibits remains appropriate on the same grounds. (*See* Dkt. No. 96.)

2

June and July of 2020. (*Id.* ⁋ 103.) In fact, CW2 claims he received three to five new contracts "a day" during 2020 because ON24 was "signing on anyone." (*Id.* ⁋ 104.) He stated, however, that ON24 faced high churn, or turnover, from these customers and that there were "instances" of 40–50% churn amongst his customers. (*Id.* ¶ 14.) CW2 clarified that these "instances" were specific to new, COVID-era clients. (*Id.*) CW2 then "recalled that 80% of new customers acquired after the COVID pandemic (beginning in March 2020) told him six months in advance that they would not be renewing their contracts" because their contract with ON24 was "simply a COVID related expense." (*Id.* ¶ 16.) Later, CW2 states that he saw a "churn risk" of $70,000 to $100,000, which represented "several contracts a month." (*Id.* ⁋ 104.) When CW2 realized that customers were unlikely to renew, he marked them as "DNR" or "do not renew" in Salesforce. (*Id.* ⁋ 106.) According to CW2, 40–50% of customers signed on during 2020 were marked "DNR." (*Id.* ⁋ 107.) CEO Sharan was aware of these churn risks and directed his employees "to stop talking about churn and anything negative in general" in the lead up to the IPO. (*Id.* ⁋ 109.)

2. **Confidential Witness Six ("CW6"):** CW6 was a Senior Enterprise Customer Success Manager from the spring of 2020 until after ON24's IPO. (*Id.* ¶ 149.) CW6 noted that ON24 took on "'a lot of COVID" or "atypical, smaller customers," in April, May, and June 2020. (*Id.* ¶ 150.) CEO Sharan would attend the sales and client success meetings and had a habit of "dressing people down" at them. (*Id.* ⁋ 151.) CW6 and his team would "consistently" send reports up to the C-Level Executives, including CEO Sharan, about customer "Health Scores," which were color-coded charts of customers' strength of engagement. (*Id.* ⁋ 152.) According to CW6, "he became aware a customer may churn as early as six months in advance." (*Id.* ¶ 153.) When churn was a risk for a customer, he sent up these Health Scores to executives. (*Id.*) CW6 noted that the company implemented new processes to determine when a customer was at risk of churning and then new "ways to keep the customer on board, such as adjusting pricing." (*Id.* ⁋ 154.) Depending on the size of

3

|   |   |
|---|---|
| 1 | the customers, CW6 noted, there might be a specific conversation on "how to retain |
| 2 | their business." (*Id.*) |

3. **Confidential Witness Seven ("CW7"):** CW7 was a Customer Success Manager for years prior to the IPO and until 2022. (*Id.* ¶ 156.) According to CW7, "in the early stages of COVID, [ON24] was signing 'a ton' of short-term event-based deals with subscriptions of one-year or less that were different than the typical deal ON24 signed with customers." (*Id.* ¶ 158.) CW7 explained that "these customers churned at a 'super high rate,'" or a churn of "upwards of 80%." (*Id.* ¶ 19.) CW7 also states these customers had "a high probability of churn as early as one month after they had signed their initial contract." (*Id.*) As an example, CW7 states that out of 80–100 accounts he had in 2020, 25–30 did not renew their subscription with ON24. (*Id.*) Separately, however, CW7 stated that in 2021 20% of his customers had been marked "for high churn risk." (*Id.* ¶ 160.) CW7 explained that he knew these customers had a high probability of churning not because his customers told him but because he would see that a customer "had only used the platform once after several months, a fact which to him was indicative of high likelihood of churn." (*Id.* ¶ 160.) Though most customers signed up during the COVID influx had one-year contracts that would be due in 2021, "there were a handful of six-month deals." (*Id.* ¶ 161.) CW7 recalled instances CEO Sharan attended sales and client success meetings and poured through the high risk and high probability of churn accounts. (*Id.* ¶ 162.) Finally, CW7 stated, looking at the projections for the first two quarters of 2021, the "high risk of churn was looming." (*Id.* ¶ 163.)

4. **Confidential Witness 8 ("CW8"):** CW8 was a Senior Customer Success Manager "responsible for churn." (*Id.* ¶ 20.) He explained that, out of approximately 137 customers, he estimated in 2020 that 43% of his accounts "were going to churn or downsell." (*Id.* ¶ 168.) He also recalled that, during 2020, "50% of new accounts that were up for renewal were likely to churn." (*Id.* ¶ 168.) He then stated that, looking ahead to 2021, he estimated that "he would have a 30% renewal rate." (*Id.*

¶ 170.) CW8 recalled an unspecified number of "instances where a Company signed and then wished to cancel their contract after only a few months." (*Id.* ¶ 169.) This chance of churn was known to CEO Sharan, who CW8 recalled stating that these atypical customers were not "ideal" but were a "revenue generator." (*Id.* ¶ 22.) CEO Sharan was closely involved, attending meetings that would last close to four hours and where CEO Sharan would discuss even low value accounts to determine how to deal with potential churn. (*Id.* ¶ 165.) CW8 felt that CEO Sharan would "hammer" or "belittle" the customer success managers once the customers signed on in 2020. (*Id.* ¶ 168.)

The FACCAC challenges the following six statements from the Offering Documents, all of which plaintiff challenged in its original complaint:

Statement 1 (*id.* ¶ 175)[4]:

> ***As of September 30, 2020, we had over 1,900 customers*** in more than 40 countries, including three of the five largest global technology companies, four of the five largest U.S. banks, three of the five largest U.S. banks, three of the five largest global healthcare companies and three of the five largest global industrial and manufacturing companies, in each case measured by 2019 revenue. No single customer contributed more than 5% of our total revenue for the year ended December 31, 2019 or for the nine months ended September 30, 2020. ***We have a highly engaged and loyal customer base that has allowed us to grow our revenue with them over time***, and achieve an NRR of 147% as of September 30, 2020. Our NRR was 107% and 108% as of December 31, 2018 and December 31, 2019, respectively.

Statement 2 (*id.* ¶ 177):

> Key Factors Affecting Our Performance
>
> \* \* \*
>
> Annual Recurring Revenue
>
> We believe that ARR is a key metric to measure our business because it is driven by our ability to acquire new subscription customers and to maintain and expand our relationship with existing subscription contracts as of the measurement date, including existing customers with expired contracts that we expect to be renewed. Our ARR

---

[4] All emphasis shown, again, originates from the FACCAC. Plaintiff notes it only challenges the emphasized portions of the statements; the rest is provided for context.

5

amounts exclude professional services, overages from subscription customers and Legacy revenue. Our ARR was $61.2 million as of December 31, 2018, $63.6 million as of March 31, 2019, $67.2 million as of June 30, 2019, $70.0 million as of September 30, 2019, $76.9 million as of December 31, 2019, $85.9 million as of March 31, 2020, $114.2 million as of June 30, 2020, and $138.9 million as of September 30, 2020. *Our consistent ARR growth each quarter reflects our success in acquiring new customers and expanding subscriptions with existing customers, which was occurring prior to the COVID-19 pandemic and has accelerated in 2020 partly in response to the COVID-19 pandemic*.

Statement 3 (*id.* ¶ 179):

We believe *we can achieve significant growth by retaining and further penetrating our existing customer base with the addition of new users and new products, and through upsell and cross sell*. Our multi-dimensional land and expand model drives onboarding and allows us to acquire customers via free trials, live demos and continuous engagement with an efficient sales and marketing investment. As we continue to drive more actionable revenue generating marketing insights, we believe that *we have a significant opportunity to further increase sales among existing customers across different functional and geographic departments within each respective organization*. Our ability to pursue this opportunity will require us to scale our sales and marketing organizations and otherwise increase our operating expenses, and we may not be successful on the timetable we anticipate, or at all, for any number of reasons, which may cause our results to vary from period to period.

Statement 4: (*id.* ¶ 181):

*We may not be able to sustain our recent revenue growth rate in the future*.

For the year ended December 31, 2019, our revenue increased by 8% as compared to the year ended December 31, 2018. We have experienced significant revenue growth during 2020, with our revenue increasing by 59% for the nine months ended September 30, 2020 as compared to the nine months ended September 30, 2019. *Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline. If these new customers elect not to continue their subscriptions as the impact of COVID-19 lessens, our business, financial condition and results of operations would be harmed*.

6

Statement 5: (*id.* ¶ 182):

> *Our quarterly results may fluctuate significantly and may not fully reflect the underlying performance of our business*.
>
> Our quarterly results of operations and financial condition may vary significantly in the future, and period-to-period comparisons may not be meaningful. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Our quarterly results of operations and financial condition may fluctuate as a result of a variety of factors, many of which are outside of our control and may not fully reflect the underlying performance of our business. *For example, our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens*. Further, because we generally invoice our customers at the beginning of the contractual terms of their subscriptions to our solutions, our financial condition reflects deferred revenue that we recognize ratably as revenue over the contractual term. *If fewer new enrollments or renewals occur as the impact of COVID-19 lessens, our cash and deferred revenue as of future dates may decrease*. Fluctuation in quarterly results may negatively impact the value of our securities. *Factors that may cause fluctuations in our quarterly results or operations include*:
> - *Our ability to retain and expand customer usage;*
> - *Our ability to attract new customers*.

Statement 6: (*id.* ¶ 183):

> *Failure to attract new customers or retain, expand the usage of, and upsell our products to existing customers would harm our business and growth prospects*.
>
> We derive, and expect to continue to derive, a significant portion of our revenue and cash flows from sales of subscriptions to our products. As such, our business depends on our ability to attract new customers and to maintain and expand our relationships with our existing customers, including by expanding their usage and upselling additional solutions. Our business is largely subscription-based, and customers are not obligated to and may not renew their subscriptions after their existing subscriptions expire. *As a result, customers may not renew their subscriptions at the same rate, increase their usage of our solutions or purchase subscriptions for additional solutions, if they renew at all. Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options*. In order to grow our business, we must continually add new customers and replace customers who choose

>not to continue to use our platform. Any decrease in user satisfaction with our solutions or support may result in negative online customer reviews and decreased word-of-mouth referrals, which would harm our brand and our ability to grow.
>
>***In addition to striving to attract new customers to our platform, we seek to expand the usage of our solutions by our existing customers by increasing the number of departments, divisions and teams that use our solutions within each of our customers. If we fail to expand the usage of our solutions by existing customers or if customers fail to purchase other solutions from us, our business, financial condition and results of operations would be harmed***.

Again, plaintiff does not allege that these six statements were misleading on their own. Instead, plaintiff argues that the challenged statements were misleading when made because they failed to disclose that:

a.   Beginning with the onset of the COVID-19 pandemic in March 2020, the Company's customer base had transitioned from carefully courted, enterprise customers to a growing influx of SMB customers, which historically did not have good retention rates, that entered into short-term and/or single event-based deals with subscriptions of one-year or less (*id.* ¶ 176(a))

b.   It was known at the Company prior to the IPO that a material amount of "atypical" or "COVID" customers entered into subscriptions for short-term use or single events and many other customers had expressly informed members of ON24's sales and customer service teams in 2020 that they were going to downsell or not renew their subscriptions when they came due (*id.* ¶ 176(b))

c.   It was known at the Company prior to the IPO that a material amount of services that enterprise customers added during the COVID-19 pandemic were or would be subject to downsell (*id.* ¶ 176(c))

d.   Because the Company entered into subscription deals during this time period with terms less than one-year, including six-month subscriptions, atypical subscriptions began to churn prior to the IPO (*id.* ¶ 176(d))

e.   The material churn, *e.g.*, lack of loyalty, that had occurred prior to the IPO and was knowingly going to continue and amplify after the IPO was reported prior to the IPO

8

|   |   |
|---|---|
| | through an indicator in the Company's Salesforce computer program, generated into reports for management, and discussed with management, including Defendant Sharan, at sales meetings and companywide all hands meetings (*id.* ¶ 176(e)) |
| f. | The fact that a material amount of customers were not using the platform or only used it once, *e.g.*, were not highly engaged, was also captured prior to the IPO through the Company's Totango computer program, which tracked every interaction with the Company's customers, and Totango calculated a "Health Score" based on this "use" matrix. The Health Scores like reports generated through Salesforce, were discussed with management, including Defendant Sharan, because it indicated that these customers were or would be downselling their subscriptions or not renewing their subscription. (*Id.* ¶ 176(f).) |

## II. LEGAL FRAMEWORK

The Court incorporates the legal standard from its Previous Order. The legal standards under Fed. R. of Civ. P. 8 and 12(b)(6) are well-known and not in dispute.

## III. ANALYSIS

### A. SECTION 11

Plaintiff again alleges that the six statements challenged are all misleading for the same reason. During the first nine months of 2020, in response to the COVID-19 pandemic, ON24 changed its business strategy to pursue one-year contracts with atypical customers that it knew by the time of its IPO, in February 2021, would not renew their subscriptions. Because the resulting customer churn was material, plaintiffs argue that defendants violated Section 11 by failing to inform potential investors of this already existing risk. Defendants again respond that plaintiff's Section 11 claim should be dismissed because its theory of the case is: (1) internally inconsistent; (2) belied by ON24's actual customer and revenue metrics at the end of 2021; and (3) sufficiently covered by ON24's risk factors. The Court examines each.

*First*, under Rule 8's plausibility standard, the FACCAC must "contain adequate factual allegations to plausibly infer" that defendants intentionally misled its potential investors in the lead up to the IPO. *Eclectic Properties East, LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 994 (9th

9

1  Cir. 2014). In *Eclectic Properties*, the Ninth Circuit upheld a dismissal under Rules 8 and 9. *Id.* at
2  995. Plaintiffs there alleged that defendants sold them property for $30.1 million when the property
3  was in fact only worth $11.1 million. *Id.* at 998. The Ninth Circuit found that plaintiffs there had
4  not pled sufficient factual allegations to demonstrate that defendants had defrauded or misled them
5  for two reasons. *Id*. First, plaintiffs' theory of the case was implausible because it ignored the more
6  innocent explanation that real estate prices are variable, which was especially true when coupled
7  with the fact that "the culminating events that harmed Plaintiffs took place in the midst of a deep
8  national recession that seriously affected the real estate market." *Id*. Second, plaintiffs alleged that
9  defendants had initially bought the disputed property for $20.3 million but then claimed, with no
10 factual support, that its true market value was only $11.1 million. *Id.* at 999. Because plaintiffs'
11 allegations about the value of the real estate were inconsistent, the Ninth Circuit struck them.

12   So too here. The problem with the FACCAC, to start, is that it is "internally inconsistent"
13 and itself undermines plaintiff's theory of the case, rendering it implausible. *See Orellana v.*
14 *Mayorkas*, 6 F.4th 1034, 1043 (9th Cir. 2021) (citing *Eclectic Properties*, 751 F.3d at 998). The
15 FACCAC is impermissibly inconsistent or vague on three accounts: the estimates of how many
16 customers churned; when those customers were alleged to have churned; and whether there was
17 actual turnover or just churn risk.

18   Plaintiff's allegations about how many customers churned in the lead up to the IPO varies
19 wildly. CW2 initially states that 80% of the customers he acquired during the COVID-pandemic
20 told him they would not renew. He then turns around and says that actually 40–50% of his COVID-
21 era customers were a churn risk, half of what he initially claimed. Later, he states that he signed up
22 three to five new contracts a day during the COVID influx, which would mean he was signing up
23 60–100 customers in a month in 2020. This is despite the fact that he initially states he only had
24 100–150 customers in 2020. More importantly, of these new customers, CW2 states that only
25 "several" a month were churn risks, rather than the 80% (or even 40–50%) he initially states.

26   CW7 fares no better. Much like CW2, CW7 initially states that he saw 80% of his atypical,
27 COVID-driven customers churn. He then states that, out of his 80–100 accounts, 25–30 churned,
28 which means that overall he alleges he saw a 30% churn rate, significantly lower than the 80%

figure might suggest. Even this turns out to be inconsistent, however, because CW7 later concludes that only 20% of his customers were forecast as a high risk of churn for 2021.

CW8 is initially more specific: he states that exactly 43% of his 137 customers were at a risk for churn. In the very next line, however, he states that it was actually 50% of his customers that would churn. He then concludes his testimony by claiming that, in 2021, he expected that only 30% of his customers would renew, which means that he was expecting a 70% turnover rate.

It is not clear from the FACCAC when ON24 actually experienced this allegedly significant customer churn. CW2 states that he noticed "instances" of 40–50% churn but does not clarify when those instances occurred or how long they lasted. (*Id.* ¶ 103.) He also states that he received an "influx" of atypical, one-year contracts from March to May and then June to July of 2020, which means that these accounts would not be up for renewal until March of 2021 at earliest. (*Id.* ¶ 103.) In other words, these customers would not actually churn until after the February 2021 IPO. Thus, the Court considers ultimately whether a known trend was-then established. CW7 states that 75–80% of his atypical customers churned, without specifying when, but then later states that all of his 2020 contracts would not be renewed until 2021 at earliest and that in 2021 he only expected a 20% churn rate. (*Id.* ¶ 160.) CW8 only worked at ON24 from September 2019 to November 2020, yet suggests that he knew his atypical accounts would not renew in the first quarter of 2021.

Moreover, there is too much inconsistency to demonstrate that ON24 was experiencing actual churn versus a risk of churn in the lead up to the February 2021 IPO. Again, CW2 states that he noticed "instances" of actual churn at some unspecified time but also that 80% of accounts told him they were at a *risk* of churn. CW7 stated that 25–30 of his customers did not renew, again without clarifying when they cancelled their subscriptions, but also that the great majority of accounts were one-year contracts that would not come up until 2021 and only a handful of customers signed up for six-month deals. He later also states that only 20% of his customers were marked as a churn risk in 2021. Finally, CW8 stated that 43–50% of his accounts were going to churn but also left in late 2020, well before the February 2021 IPO and when these accounts would actually come up for renewal.

11

As in *Eclectic Properties*, the Court is not required to accept such internally inconsistent and vague allegations, especially when coupled with the fact that subscriptions for the types of digital services ON24 provides are variable and this surge in business occurred for ON24 in the midst of the historic uncertainty surrounding the COVID-19 pandemic. While the Court understands that recollections vary and memories can be imprecise without documents to refresh recollections, the picture painted by plaintiffs' confidential witnesses at best reflects a "risk" of churn. According to the confidential witnesses, churn varied from 20% to 80% of atypical customers. The FACCAC never attempts to estimate the number of atypical customers throughout company, though the confidential witnesses give numbers that range from 25 customers in the year to 60–100 subscribers a month in 2020. It is not clear, from the testimony, that *any* of these customers actually churned in 2020. In fact, most of the confidential witnesses acknowledged that ON24 signed its COVID-driven, atypical customers starting in March to July of 2020. (*Id.* ¶ 22, 103,176(a).) This is consistent with plaintiff's theory of the case—that the atypical, COVID-driven customer influx did not start until March 2020. (*Id.* ¶ 176(a).) Aside from the "handful" of customers who signed six-month contracts, the great majority of these atypical customers then would not have come up for renewal until *after* the February 2021 IPO. This renders at least a part of plaintiffs' theory of the case—that by the February 2021 IPO, ON24 was already facing material customer churn—implausible.

Plaintiff initially responds that the confidential witness testimony establishes that 10% of ON24's customer base churned before the IPO. (Citing FACCAC ¶¶ 102–03.) The argument is contradicted by plaintiff's own complaint. CW2, in this part of the FACCAC, states that his team represented 25% of ON24's business. (*Id.* ¶ 102.) He then states that he noticed "*instances*" of 40–50% churn "*among his customers*," while clarifying that he signed his one-year, COVID-driven contracts in March of 2020 at earliest. (*Id.* ¶ 103 (emphasis supplied).) Plaintiff multiplies the 40% instances CW2 noticed at some indeterminate time to the 25% of ON24's business his team represented to come up with the claim that 10% of ON24's customers churned pre-IPO. CW2, however, neither states that the 40–50% churn occurred throughout his team (simply within his own customer base), when the 40–50% churn occurred (just that he signed up these one-year contracts

12

1 starting in March of 2020, which suggests they would not come up until March 2021 at earliest),
2 and how many customers actually churned (only that there were instances of such churn).

3       Plaintiff then argues that the figures presented by its confidential witnesses are estimates
4 and defendants place too much emphasis on the figures given. As noted above, some inconsistency,
5 especially at the motion to dismiss stage, is not dispositive. Here, however, the level of
6 inconsistency is pervasive and, thus, decisive. It calls into question plaintiff's entire case. Plaintiff's
7 reliance on *Glazer Capital Management, L.P. v. Forescout Technologies, Inc.*, 63 F.4th 747 (9th
8 Cir. 2021) is for that reason inapt. In *Glazer Capital*, defendants took issue with one confidential
9 witness's estimates not because they were internally inconsistent but because they argued that
10 plaintiff had not established his personal knowledge of them. *Id.* at 771. The Ninth Circuit
11 disagreed because, given that confidential witness's title, it was plausible that he would have the
12 requisite knowledge even if his "estimates might not be 100% perfect." *Id.* at 772. *Glazer Capital*
13 says nothing about the type of internal inconsistencies present in the FACCAC.

14       ***Second***, inconsistencies aside, plaintiff's theory that ON24 was either already experiencing,
15 or knew it would encounter, material customer churn by its February 2021 IPO faces an even
16 bigger hurdle—it is completely contradicted by what actually happened to ON24 in 2021.
17 According to plaintiff, anywhere from 20–80% of the atypical, COVID-driven customers decided
18 not to renew their one-year contracts, sometimes as much as six months in advance. ON24, under
19 this theory, should have seen a noticeable, if not dramatic, decline in customers by the end of 2021
20 when these contracts came up for renewal. The opposite is true. ON24's customer base *grew* from
21 1,994 customers in 2020 to 2,122 customers by the end of 2021. (Dkt. No. 105-7 at 3.) Its ARR
22 increased from $138 million in September 2020 to $171 million by December 2021, a 12% year-
23 over-year increase. (*Id.* at 2.) These hard figures render plaintiff's vague allegations of actual churn
24 or churn risk in the lead up to the February 2021 IPO implausible. They suggest not that ON24
25 materially misled investors but instead that CEO Sharan's careful, if at times abrasive, analysis of
26 churn risk served to convince its customers not to cancel their subscriptions after one year.
27 Plaintiff's own complaint is consistent with this more innocent explanation: Several confidential
28 witnesses noted that the CEO closely monitored churn risk to find "potential ways to keep the

13

customer on board" or have a conversation with a customer on "how to retain their business." (FACCAC ¶ 154.)

Plaintiff's reliance on *In re Twitter, Inc. Securities Litig.*, 2020 WL 4187915 (N.D. Cal. Apr. 17, 2020), does not convince otherwise. There, Judge Tigar ruled that, even if Twitter accurately reported its user engagement metrics as they existed during an investors' call, it could not overcome plaintiffs' securities fraud claim because it falsely gave the impression that this trend "has already turned around" when it was in fact negative. *Id.* at *9. Judge Tigar clarified that it did not matter that the numbers Twitter reported at the time were accurate because plaintiffs were specifically challenging Twitter's statement that the "trend has already turned around." *Id.* at *10. By failing to disclose the fact that the actual trend was declining, Twitter's positive spin made otherwise accurate statistics misleading. *Id.* The problem for plaintiff here is that what ON24's 2021 metrics demonstrate is not that they placed a positive spin on a negative trend but rather that plaintiff has spun an implausibly negative story from an incontrovertibly positive trend.

***Third***, though plaintiff's case is explicitly hinged on the actual churn or churn risk that allegedly existed at the time of the February 2021 IPO, it also implicitly raises the claim that ON24 misled potential investors by promising that ON24's business would not simply grow post-IPO but continue to grow at the same explosive rate. For example, the FACCAC alleges that, by discussing ON24's success in 2020, defendants misled potential investors. (FACCAC ¶ 178.) None of the challenged statements, however, promise that ON24 would continue to acquire customers or grow its revenue at the same pre-IPO rate. As the Court found in its Previous Order, statements like "we believe we can achieve significant growth by retaining and further penetrating our existing customer base," for example, are not actionable promises without more particularized allegations that the underlying metrics are deceiving. (Previous Order at 16.) Plaintiff concedes that it is not challenging defendants' reported 2021 customer base and revenue. Without such an allegation, these statements do not amount to a promise that ON24 would sustain its 2020 level of growth.

More importantly, defendants' detailed disclosures warn of the very risks that plaintiff claims ON24 failed to disclose. The Risk Factors state:

> *Our recent revenue growth has been significantly impacted by an increasing demand for our platform and products following the onset of the COVID-19 pandemic and*

14

> *resulting precautionary measures. As the impact of COVID-19 lessens, there may be reduced demand for our platform, and our revenue growth rate may decline.*
>
> \* \* \*
>
> *our revenue and revenue growth rate may decline in future periods compared to 2020 as the impact of COVID-19 lessens.*
>
> \* \* \*
>
> *Renewals of subscriptions may decline or fluctuate because of several factors, such as dissatisfaction with our solutions or support, a customer no longer having a need for our solutions or the perception that competitive products provide better or less expensive options.*

(FACCAC ¶ 181–83.)

Defendants adequately disclosed that, as COVID cooled, their customer acquisition and rate of growth might cool as well. This is precisely what ON24's 2021 metrics demonstrate happened. "Plaintiffs cannot use the benefit of 20-20 hindsight to turn management's business judgment into securities fraud." *Glazier Capital*, 63 F.4th at 782 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1419 (9th Cir. 1994)).

As alleged, plaintiff's theory of the case is internally inconsistent, rendered implausible by the uncontroverted reports of ON24's growth post-IPO, and, in any case, covered by ON24's detailed disclosures. Because the Court previously gave plaintiff leave to amend, and plaintiff merely restated many of the same statements without meaningfully engaging with ON24's 2021 metrics and risk disclosures, any further opportunity to amend would be futile. *See In re Fritz Companies Securities Litig.*, 282 F.Supp.2d 1105, 1109 (N.D. Cal. 2003) (finding that it may be appropriate to deny leave to amend where the proposed amendment merely restates the same facts using different language).

For that reason, the motion to dismiss is **GRANTED WITH PREJUDICE**.

### B.     RISK FACTORS

The Court incorporates its legal analysis about the adequacy of risk factors from its Previous Order. (Previous Order 21–22.) Plaintiff challenges three risk factors, Statement Nos. 4–6. Again, plaintiff's challenge to each of these risk factors is that ON24 knew it faced material customer churn and did not disclose that information to potential investors. Because the plaintiff has not put forth sufficient facts to make that theory plausible, its claims against these risk factors once again fail. For the reasons stated above, further amendment would be futile.

For that reason, the motion to dismiss on this ground is **GRANTED WITH PREJUDICE.**

### C. ITEMS 303 AND 105

The Court set out the standard Items 303 and 105 of SEC Regulations S-K in its Previous Order. (Previous Order at 24.) Once again, because plaintiff has not provided sufficient factual support for its claim that ON24 was experiencing significant customer churn or risk of churn, it has not met its burden of demonstrating that ON24 violated its duty to disclose under either Item. This is, again for the reasons stated above, not a defect that can be solved by amendment.

For that reason, the Court **GRANTS** the motion to dismiss as to these Items **WITH PREJUDICE.**

### D. SECTION 15

Because plaintiff has not stated a primary claim under Section 11, its Section 15 claim also fails. *In re Wells Fargo Mortgage-Backed Certificates Litig.*, 712 F.Supp.2d 958, 969 (N.D. Cal. 2010) (internal citation omitted). The Court therefore **GRANTS** the motion to dismiss **WITH PREJUDICE** on this claim.

## IV. CONCLUSION

For the reasons stated above, Underwriter Defendants' motion for joinder is **GRANTED.** Defendants' motion to dismiss is **GRANTED WITH PREJUDICE.** Plaintiff has once again failed to put forth a sufficient factual foundation for its central theory of omission—that ON24 knew it faced material customer churn at the time of its IPO and omitted to tell its potential investors. Because plaintiff was previously given leave to amend and has failed to add anything other than internally inconsistent and conclusory facts in support, further amendment would be futile.

This terminates Dkt. Nos. 105 and 106.

The clerk of the court shall close the action.

**IT IS SO ORDERED**.

Date: **March 5, 2024**

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**